Cynthia Liao (CA Bar No. 301818)*
Johanna N. Hickman (D.C. Bar No. 981770)*
Jennie L. Kneedler (D.C. Bar No. 500261)*
Steven Y. Bressler (D.C. Bar No. 482492)**
Elena Goldstein (D.C. Bar No. 90034087)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982 (Liao)
cliao@democracyforward.org
hhickman@democracyforward.org
jkneedler@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

*Admitted *pro hac vice*
** Motion to appear *pro hac vice* pending

[Additional co-counsel on signature page]

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

GLOBAL NURSE FORCE; INTERNATIONAL
UNION, UNITED AUTOMOBILE, AEROSPACE
AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA LOCAL 4811;
INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA; SERVICE EMPLOYEES
INTERNATIONAL UNION, AFL-CIO
COMMITTEE ON INTERNS AND RESIDENTS;
AMERICAN ASSOCIATION OF UNIVERSITY
PROFESSORS; GLOBAL VILLAGE ACADEMY
COLLABORATIVE; SOCIETY OF THE DIVINE
WORD; FATHERS OF ST. CHARLES; CHURCH
ON THE HILL; JOHN SMITH; PHOENIX DOE;
and

NEPHROLOGY ASSOCIATES OF THE
CAROLINAS, PA, individually and on behalf of all
others similarly situated; and

BAE INDUSTRIES, individually and on behalf of
all others similarly situated; and

**Case No. 4:25-cv-08454-HSG**

**FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

**Administrative Procedure Act Case**

**Class Action**

LOWER BRULE DAY SCHOOL, individually and on behalf of all others similarly situated,

      *Plaintiffs*,

         v.

DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; JOSEPH B. EDLOW, in his official capacity as Director, U.S. Citizenship and Immigration Services; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State,

      *Defendants*.

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................1

II.   JURISDICTION AND VENUE ....................................................................5

III.  DIVISIONAL ASSIGNMENT ......................................................................6

IV.   PARTIES .........................................................................................................6

    A.    Employer Class Representatives ..........................................................6

    B.    Other Employer Plaintiffs ...................................................................7

    C.    Employee and Union Plaintiffs ...........................................................8

    D.    Other Plaintiffs ..................................................................................10

    E.    Defendants .........................................................................................11

V.    LEGAL BACKGROUND ............................................................................12

    F.    Congress Created the H-1B Visa to Ensure the U.S. Could Attract
        Necessary Workers in Specialty Occupations.....................................13

    G.    In Designing the H-1B Program, Congress Included Protections for
        U.S. Workers .....................................................................................14

    H.    Congress Created a Detailed Statutory Scheme to Govern the H-1B
        Process That Balances Private and Public Sector Needs ......................16

        1.    H-1B Registration and Lottery for Cap-Subject H-1B Visas...................16

        2.    Cap-Exempt H-1B Visas ...................................................................16

        3.    H-1B Petition Process .......................................................................17

        4.    Visa Issuance and Entry ...................................................................17

    I.    Congress Established a Detailed Fee System for H-1Bs That Sets
        Parameters on Fees and Dictates Their Use........................................18

    J.    The President's Ability to Restrict Entry Under the INA Does Not
        Authorize Him to Override Congress's Comprehensive H-1B Statute ................20

VI.   FACTUAL ALLEGATIONS .........................................................................21

    A.    The President's Proclamation ............................................................21

1.      The Proclamation is Based on Multiple Errors of Fact and
        Ignores the Benefits of the H-1B Program to the American
        Economy .......................................................................... 23

2.      The Proclamation's Exorbitant $100,000 Fee Is Unprecedented
        and Unjustified, and the Exception Process is Ripe for Abuse ................ 24

3.      After the Ill-Planned Proclamation Caused Immediate Harm,
        the Government Began to Backtrack ........................................ 25

B.      The Agency Defendants Imposed a $100,000 Requirement for "Any"
        New H-1B Petitions. ...................................................................26

C.      The Proclamation and Agency Policies Will Harm Plaintiffs and the
        Public Interest ...........................................................................29

        1.      Health care ........................................................... 29

        2.      K-12 school systems ................................................ 36

        3.      Manufacturing ....................................................... 41

        4.      Religious organizations............................................. 43

        5.      Research and academic institutions ........................... 52

VII.    CLASS ALLEGATIONS ........................................................54

VIII.   CAUSES OF ACTION ...........................................................57

IX.     PRAYER FOR RELIEF ..........................................................64

## I.    INTRODUCTION

1.      The H-1B visa program was established by Congress to provide a pathway for American employers to hire skilled non-U.S. workers in specialty occupations. There are around half a million H-1B workers in the United States[1] across a range of specialty fields, including researchers and workers in the science, technology, engineering, and mathematics (STEM) fields; doctors, other healthcare providers, and medical researchers; university professors and K-12 educators; and religious leaders. The standards for granting an H-1B petition focus on the worker's specialized knowledge and academic credentials. While many H-1B workers are employed in the computer technology industry, more than a third of all H-1B workers are in other fields.[2]

2.      The H-1B visa program is a critical pathway to hiring educators and healthcare workers—two categories in high demand in the U.S.—who comprise 10% of all H-1B workers.[3] The United States faces a projected shortfall of nearly 86,000 physicians in the next decade, particularly in medically underserved areas of the United States and places with health professional shortages, where nearly two-thirds of all foreign-trained physicians in the United States—including almost 23,000 H-1B workers, between 2001 and 2024—practice.[4] Nurses, too, are in short supply, particularly after the COVID-19 pandemic drove many nurses out of the profession, and insufficient staffing raises nurses' stress levels. K-12 school districts also rely on the H-1B visa program to fill critical vacancies, especially in rural areas facing acute staffing shortages,[5] and the H-1B visa program allows colleges and universities to hire talented scholars

---

[1] Maham Javaid & Adrián Blanco Ramos, *Where H-1B visa holders are from, who hires them and what they earn*, Wash. Post (Sept. 24, 2025), https://perma.cc/4YEH-DGLY.
[2] *Id.*
[3] *Id.*
[4] *AMA urges DHS to exempt physicians from new $100,000 H-1B visa fee*, Am. Med. Ass'n (Sept. 25, 2025), https://perma.cc/T69U-67BY.
[5] *Administration Announces Changes to H-1B Visa Program*, The School Superintendents Association (Sept. 24, 2025), https://perma.cc/ZT2K-BB2T.

and researchers from around the world, enabling American students to learn from and research under the supervision of these experts in specialized fields.[6]

3.    The H-1B program also allows religious organizations to retain priests and pastors who have the language skills, cultural competency, and religious training needed to minister to underserved populations, including poor refugee and migrant communities and economically distressed Appalachian communities.

4.    The H-1B program drives innovation and economic growth in the United States. It allows employers to fill labor shortages in specialized fields and fuels workers to invest additional dollars in the U.S. economy. It supports immigrants in creating new businesses that expand the U.S. labor market.

5.    H-1B visas are issued for an initial three-year term, and workers who hold these visas can have either immigrant or nonimmigrant intent—meaning Congress intended there to be a path to permanent residency for some H-1B workers, who may ultimately become lawful permanent residents (i.e. "green card" holders)—and may freely travel in and out of the United States.

6.    The Immigration and Nationality Act ("INA") sets forth a comprehensive and detailed scheme for the H-1B program and process, specifying qualitative and numeric limits on the number of H-1B visas to be granted, the standards for approving an H-1B petition from an employer, the standards for detecting and addressing unlawful use of the program by employers, and the fees to be charged and allocation and use of those funds by the government.

7.    Without warning on Friday, September 19, 2025, President Trump issued a Proclamation titled "Restriction on Entry of Certain Nonimmigrant Workers"[7] (the "September 19 Proclamation"). The Proclamation "restricted" entry into the United States of workers on H-1B visas, conditioning it on their employers making a $100,000 "payment" to the federal

---

[6] Ellie Davis, *What Trump's $100,000 Fee for Skilled-Worker Visas Could Mean for Higher Ed*, Chron. Higher Educ. (Sept. 22, 2025), https://perma.cc/J6J5-UDAM.
[7] Proclamation No. 10,973, 90 Fed. Reg. 46,027 (Sept. 19, 2025).

First Amended Complaint                    2                    Case No. 4:25-cv-08454-HSG

government, starting less than 36 hours after issuance, at 12:01 am ET on Sunday, September 21, 2025.

8.      At the Oval Office ceremony unveiling the Proclamation, Commerce Secretary Howard Lutnick stated that it would be "a hundred-thousand dollars a year for H-1B visas" and that "[e]ither the person is very valuable to the company and America, or they are going to depart, and the company is going to hire an American."[8]

9.      The broad language of the Proclamation and the unprecedented changes to this long-standing program caused a widespread panic, with employers instructing employees to return to the United States before 12:01 am ET on Sunday, September 21, and/or not to leave the country at all. Workers rushed back to the United States, abandoning family events and vacations, while others frantically requested to de-plane flights they had already boarded before they left the United States.

10.     Government agencies scrambled to respond to the chaos. Three agencies issued public statements over the weekend, in the days and hours after the Proclamation: the United States Citizenship and Immigration Services ("USCIS") which adjudicates the employer petitions; the United States Department of State ("State" or "State Department") which adjudicates visa applications submitted by H-1B nonimmigrant workers; and United States Customs and Border Protection ("CBP") which inspects and admits foreign nationals seeking to enter the United States.

11.     Collectively, the agencies' statements reflected the new policies the agencies quickly adopted to implement the Proclamation: A one-time payment of $100,000 is required "on submission" of "any" new H-1B petition filed after 12:01 am ET on September 21, 2025 ("$100,000 Requirement"). Payment is a condition for adjudication of any such H-1B petition, consular processing for H-1B visas, and entry into the United States for H-1B workers.

---

[8] Johana Bhuiyan, *Trump signs proclamation imposing annual $100,000 fee on H-1B visas*, The Guardian (Sept. 19, 2025), https://perma.cc/GQ23-AX3U.

12.     While the agencies' policies limit the $100,000 Requirement to new petitions and carve out renewals, the new policies did not differentiate between petitions for workers who are outside of the United States and those for workers who are already inside the United States, seemingly expanding the Proclamation's "entry" ban to include individuals who have already entered the country, not just those "currently outside the United States" as stated in the Proclamation.

13.     Shortly after Plaintiffs' filing of this lawsuit, USCIS issued new guidance on October 20, 2025. Under the new guidance, the $100,000 Requirement applies to any new H-1B petition filed after the effective date on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa at the time of filing. The guidance also provides that, in some cases, the $100,000 Requirement will apply even if the prospective worker is physically present in the United States at the time of filing. Individual exceptions to the $100,000 Requirement will be granted only in "extraordinarily rare circumstance[s]."

14.     Defendants' abrupt imposition of the $100,000 Requirement is unlawful. The President has no authority to unilaterally alter the comprehensive statutory scheme created by Congress. Most fundamentally, the President has no authority to unilaterally impose fees, taxes, or other mechanisms to generate revenue for the United States, nor to dictate how those funds are spent. The Constitution assigns the "power of the purse" to Congress, as one of its most fundamental premises. Here, the President disregarded those limitations, asserted power he does not have, and displaced a complex, congressionally specified system for evaluating petitions and granting H-1B visas. The Proclamation transforms the H-1B program into one where employers must either "pay to play" or seek a "national interest" exemption, which will be doled out at the discretion of the Secretary of Homeland Security, a system that opens the door to selective enforcement and corruption.

15.     Executive Branch agencies similarly cannot act contrary to or beyond the authority conferred by statute, nor can they act beyond or contrary to their own regulations. In immediately adopting the $100,000 Requirement without notice and comment, the agencies

failed to go through required regulatory processes. The $100,000 Requirement is also arbitrary and capricious. The government failed to consider how extorting exorbitant fees will stifle innovation. The government failed to consider harms to hospitals, churches, schools, and universities, and small businesses and non-profits, or how the fee will harm communities across the nation. Indeed, economic data and studies confirm that the new $100,000 Requirement will harm, not help, the U.S. economy and workers and their families in the United States.

16.    Plaintiffs are a health care business that helps hospitals across the country fill critical vacancies with qualified nurses from abroad, schools, religious organizations, labor unions, and workers, who are all facing the sudden $100,000 Requirement. Plaintiffs bring this action against President Donald J. Trump, the U.S. Department of Homeland Security ("DHS"), its subagencies USCIS and CBP, the State Department, and the heads of these agencies (collectively, "Defendants"), to challenge the legality and implementation of the Proclamation. Plaintiffs seek declaratory relief and injunctive relief because the Proclamation and the agencies' subsequent actions exceed the President's Constitutional authority and contravene the statutory H-1B process and program.

## II.    JURISDICTION AND VENUE

17.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

18.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(C). Plaintiff Local 4811 of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW Local 4811"), maintains its principal place of business in Berkeley, California. Plaintiff Phoenix Doe also resides in the Northern District of California. There is no real property at issue in this case.

19.    Joinder is proper in this action as the questions of law are identical to all Plaintiffs in this action.

### III.    DIVISIONAL ASSIGNMENT

20.    Per N.D. Cal. Civ. L.R. 3-2(c), this action shall be assigned to the San Francisco/Oakland Division, because Plaintiff UAW Local 4811 is headquartered in Alameda County and has affected members at the University of California at San Francisco.

### IV.    PARTIES

**A.  Employer Class Representatives**

21.    **Plaintiff Nephrology Associates of the Carolinas, PA** ("Nephrology Associates") seeks to represent a class of similarly situated individuals under Rule 23. Nephrology Associates is a medical practice focused on serving patients with kidney issues. It is incorporated in the state of North Carolina, with a principal place of business in Shelby, North Carolina and an additional office in Rutherfordton, North Carolina. Nephrology Associates has approximately 19 employees, including three physicians, three nurse practitioners, and other medical, administrative, and support staff. Nephrology Associates' practitioners provide care at its two office locations, at five dialysis clinics, and at Cleveland County's only hospital, Atrium Health Cleveland, which is part of the Advocate Atrium Health System, the third-largest nonprofit hospital system in the nation. Nephrology Associates' practitioners are the only nephrologists who have privileges to provide kidney care at Atrium Health Cleveland.

22.    **Plaintiff BAE Industries ("BAE")** seeks to represent a class of similarly situated individuals under Rule 23. BAE is a privately held automotive parts manufacturing company headquartered in Auburn Hills, Michigan, with approximately 250 employees. Founded in 1970, BAE specializes in precision metal stamping, assembly, and integrated component manufacturing. BAE provides support across the entire manufactured parts production cycle, from initial concept and prototyping through full-scale production and launch. BAE operates multiple production facilities across Auburn Hills, Warren, and Fraser in the Metro Detroit region. It plays an important role in the automotive supply chain and related manufacturing sectors, supplying components that must meet stringent quality, performance, and regulatory standards.

23.    **Plaintiff Lower Brule Day School** seeks to represent a class of similarly situated individuals under Rule 23. Lower Brule Day School is a K-12 school serving the Lower Brule Sioux Tribe with a principal place of business on the Lower Brule Reservation in Lower Brule, South Dakota. Lower Brule is located in the rural central part of the state. The Lower Brule Sioux Tribe is part of the Great Sioux Nation, a historic alliance of the Lakota, Nakota, and Dakota people of the Northern Plains. There are approximately 3,400 enrolled members of the Lower Brule Sioux Tribe, of whom approximately half live on the Reservation. Lower Brule Day School serves approximately 350 K-12 children, of whom 99% are American Indian and 100% qualify for free or reduced-price lunch.

**B.  Other Employer Plaintiffs**

24.    **Plaintiff Society of the Divine Word—Chicago Province** (also known as "Societas Verbi Divina," "SVD," and the "Divine Word Missionaries") is a religious missionary order of Roman Catholic priests and brothers presently serving in almost eighty countries around the world. The Chicago Province—headed by Father Adam Oleszczuk, the Provincial Superior of the province—is a non-profit, tax-exempt organization employing several hundred employees. Because of the diverse communities, cultures, and nationalities that Society of the Divine Word serves, it depends on the availability of H-1B visas for foreign religious workers with specialized skillsets, including Polish, Spanish, and Vietnamese language abilities.

25.    **Plaintiff Fathers of St. Charles** is a non-profit, tax-exempt religious organization and part of the Congregation of the Missionaries of St. Charles – Scalabrinians, a Roman Catholic international religious community dedicated to serving migrants and refugees of different cultures, religions and ethnicities in thirty-five countries on five continents. The Congregation was founded on November 28, 1887, by Saint John Baptist Scalabrini (1839-1905), the bishop of Piacenza, Italy, who at that time recognized the far-reaching social and religious implications of the massive emigration from Europe toward the Americas occurring at that time. Fathers of St. Charles, whose province (the St. John the Baptist Province) covers the United States, Canada, Mexico, Guatemala, and El Salvador, keeps its provincial office in Oak

Park, Illinois, and has been serving migrants for well over a century. It is a non-profit, tax-exempt religious organization that employs approximately thirty-five people in the United States. Fathers of St. Charles' missionary focus for the last twenty-five years has been to be in mission with migrants, with a focus on the very poorest migrants. This mission compels Fathers of St. Charles to provide all pastoral activities, including sacramental and liturgical activities, Bible study, and formation, in the native languages of the people they serve.

26.    **Plaintiff Church on the Hill d/b/a Algood First Baptist ("Church on the Hill")** is a non-profit 501(c)(3)-approved religious organization. The church was formed seventy years ago but officially incorporated in its current structure in 2003. It has approximately five employees located in the Appalachia region. In 2021, the church branched out and established a new church congregation, which began with twenty members and has since grown to over 200 members. The new church is in a different location and serves an underserved, economically disadvantaged region in Appalachia. Both Church on the Hill and the new church have established ministries for children, youth, families and students, as well as community outreach that meets both practical and spiritual needs.

**C. Employee and Union Plaintiffs**

27.    **Plaintiff John Smith** is a citizen of the United Kingdom who currently lives in the Appalachia region of the United States with his wife and four children. Pastor Smith arrived in the United States in 2021 on an R-1 nonimmigrant visa for foreign nationals in religious vocations and is currently working full-time at a church as a pastor in the Appalachia region. His R-1 nonimmigrant visa will expire next year.  He has been instrumental in overseeing the expansion of the church's congregation to a second location, and provides essential pastoral and spiritual services and guidance to the congregation's members and the local community.

28.    **Plaintiff Phoenix Doe** is a citizen of India residing in the Northern District of California. She is a postdoctoral researcher at a U.S. university whose cap-exempt H-1B change-of-status petition has been halted due to the $100,000 Requirement, putting at risk her work on detecting and treating blinding conditions and disrupting the laboratory that relies on her.

29. **Plaintiff UAW Local 4811** is a labor union headquartered in Berkeley, California that, jointly with the UAW International, is the exclusive collective bargaining representative for 48,000 workers at the University of California ("UC") across three distinct bargaining units and has a membership comprised of graduate student employees and non-student academic employees at UC. The Academic Student Employees unit, represented by UAW International and Local 4811, consists of over 36,000 UC employees working in positions such as graduate student researcher, teaching assistant, reader, and tutor. The Postdoctoral Scholars unit represented by UAW International and UAW Local 4811 consists of over 7,000 UC non-student employees working as postdoctoral scholars, who are early career scientists with doctorate degrees that perform research. The Academic Researchers unit represented by UAW International and UAW Local 4811 consists of over 5,000 UC non-student employees working in positions such as researcher, project scientist, specialist, and coordinator of public programs.

30. **Plaintiff the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW International")** is one of the largest and most diverse unions in North America. Headquartered in Detroit, Michigan, the UAW International has members in the United States, Canada, and Puerto Rico, and in virtually every sector of the economy. From its earliest days, the UAW International has been a leader in the struggle to secure economic and social justice for all people. The UAW International has nearly 1,000,000 active and retired members and represents approximately 120,000 workers in higher education—graduate students, postdoctoral scientists, researchers, university staff, and faculty— at institutions across the country including the University of California, California State University, University of Southern California, California Institute of Technology, UC Law San Francisco, California Institute of the Arts, University of Oregon, University of Washington, Washington State University, Columbia University, New York University, Harvard University, University of Pennsylvania, Princeton University, and Johns Hopkins University, among many others.

31.     **Plaintiff Committee of Interns and Residents, SEIU ("CIR")** is a local union of the Service Employees International Union, AFL-CIO ("SEIU"). CIR is headquartered in Long Island City, New York, and represents more than 40,000 interns, residents, and fellows in hospitals throughout the United States including California, Delaware, Florida, Idaho, Illinois, Massachusetts, Minnesota, New Jersey, New Mexico, New York, Pennsylvania, Rhode Island, Vermont, Washington, and Washington, D.C. CIR and CIR members are dedicated to improving residency training and education, advancing patient care, and expanding access to healthcare.

32.     **Plaintiff American Association of University Professors ("AAUP")** is a non-profit membership association and labor union of faculty and academic professionals throughout the country. AAUP is headquartered in Washington, D.C. Founded in 1915, the AAUP remains the nation's leading organization primarily dedicated to protecting academic freedom and shared governance in higher education. The AAUP has approximately 50,000 members on college and university campuses across the country. AAUP's mission is to advance academic freedom and shared governance of higher education institutions; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, postdoctoral fellows, and all those engaged in teaching and research in higher education; to help the higher education community organize to make its goals a reality; and to ensure higher education's contribution to the common good. The AAUP has helped to shape American higher education by developing the standards and procedures that maintain quality in education and academic freedom in this country's colleges and universities.

**D.  Other Plaintiffs**

33.     **Plaintiff Global Nurse Force** is a limited liability company with its principal place of business in Laguna Beach, California. For the past decade, Global Nurse Force has been connecting talented international nurses with healthcare facilities around the world. Global Nurse Force has placed over 10,000 nurses at more than 175 hospitals throughout the UK, Ireland, Canada, Australia and the Middle East. In the United States, where there has been a growing nursing shortage, Global Nurse Force has assisted U.S. health systems to recruit highly skilled

and experienced international nurses on H-1B specialty worker visas. Global Nurse Force operates a direct-hire model where the nurses come in as permanent employees of the hospital and receive the same pay and benefits as the hospital's regular staff. Global Nurse Force takes care of the logistics, including recruitment, credentials verification, licensing, immigration, and relocation. Although Global Nurse Force operates in various countries, its business model for its U.S. operations relies on the H-1B system and the ability of U.S. healthcare facilities to sponsor nurses for H-1B visas.

34.    **Plaintiff Global Village Academy Collaborative ("GVAC")** is a public, non-profit organization established in 2013, authorized under Colorado statute, and headquartered in Thornton, Colorado. For over a decade, GVAC has operated similar to a school district, providing centralized operational and educational support services to its member schools (the Global Village Academies, or "GVA") and its staff across Colorado. Global Village Academies are tuition-free, public charter schools providing English and second language immersion instruction (K-8) in Spanish, Mandarin Chinese, Russian, or French to its students. There are currently 3 Global Village Academy schools across the cities of Aurora, Thornton, and Parker, Colorado, which currently serve around 2,200 students collectively.

**E.  Defendants**

35.    **Defendant Donald J. Trump** is the President of the United States and is sued in his official capacity.

36.    **Defendant U.S. Department of Homeland Security ("DHS")** is a federal Department headquartered in Washington, D.C. It is responsible for administering immigration law, including H-1B adjudications through USCIS.

37.    **Defendant Kristi Noem** is the Secretary of Homeland Security and is sued in her official capacity.

38.    **Defendant U.S. Citizenship and Immigration Services ("USCIS")** is a component agency of DHS, headquartered in Camp Springs, MD. It is responsible for adjudicating H-1B petitions and other immigration petitions.

39.     **Defendant Joseph B. Edlow** is the Director of USCIS and is sued in his official capacity.

40.     **Defendant U.S. Customs and Border Protection ("CBP")** is a component agency of DHS, headquartered in Washington, D.C. It is responsible for inspecting and admitting foreign nationals into the United States.

41.     **Defendant Rodney Scott** is the Commissioner of CBP and is sued in his official capacity.

42.     **Defendant U.S. Department of State ("State" or "State Department")** is a federal Department headquartered in Washington, DC. It is responsible for administering U.S. visa programs, including consular processing for H-1B visas.

43.     **Defendant Marco Rubio** is the Secretary of State and is sued in his official capacity.

## V.    LEGAL BACKGROUND

44.     The purpose of the H-1B provisions is to "help employers who cannot otherwise obtain needed business skills and abilities from the U.S. workforce by authorizing the temporary employment of qualified individuals who are not otherwise authorized to work in the United States." *MadKudu Inc. v. USCIS*, No. 20-CV-02653-SVK, 2020 WL 7389419, at *1 (N.D. Cal. Nov. 17, 2020); 8 U.S.C. § 1101(a)(15)(H)(i)(b); 8 C.F.R. § 214.2(h)(1)(i).

45.     The H-1B visa has been the subject of more legislation than any other visa category and has been repeatedly modified and changed over the last 35 years. Congress has created a complex, but consistent, visa category to give U.S. employers access to the talent they need from every part of the world for jobs in any field that require at least a bachelor's degree as an entrance requirement.

46.     While many H-1B employers and workers are in the information technology ("IT") industry, H-1B workers are a diverse group, and do not solely reside in Silicon Valley. There are H-1B employers and workers living across the United States, including Texas, New

York, California, Colorado, and Illinois.[9] They work in religious organizations like churches, rural medical clinics, and local high schools. Some are entrepreneurs while others serve the public or work in non-profits. All pay taxes and bring value to their communities.

47.      As set forth in more detail below, Congress carefully designed the H-1B program to attract highly skilled workers to the United States while also protecting workers already in the United States. For example, Congress set annual limits on the number of H-1B workers and requires that employers pay a mandated prevailing wage and abide by other worker-protection rules. Congress also established detailed filing fee provisions. Congress crafted this framework to balance the interests of workers inside the United States and employers needing to fill vital roles, support innovation, and provide services in communities that would not be possible without H-1B workers.

## F.  Congress Created the H-1B Visa to Ensure the U.S. Could Attract Necessary Workers in Specialty Occupations

48.      The United States offers a range of visa categories that Congress created and spelled out in the INA. H-1B visas are awarded to individuals who are sponsored by employers to work temporarily in qualified specialty occupations. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b). Typically, they are initially granted for three years and can be extended to six years. 8 U.S.C. § 1184(g)(4), 8 C.F.R. § 214.2(h)(13)(iii)(A).

49.      A "specialty occupation" is an occupation that "requires theoretical and practical application of a body of highly specialized knowledge in fields of human endeavor." 8 C.F.R. § 214.2(h)(4)(ii). These fields include, but are not limited to, "architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts." *Id.*; *see also* 8 U.S.C. § 1184(i)(1). To qualify as a "specialty occupation," the occupation must require a bachelor's or higher degree in a directly related specific specialty, as a minimum for entry. 8 U.S.C. § 1184(i)(1); 8 C.F.R.

---

[9] *See, e.g.*, Carolyne Im, et al., *What we know about the U.S. H-1B visa program*, Pew Research Center (Mar. 4, 2025), https://perma.cc/GCE3-3AG7.

§ 214.2(h)(4)(ii). A medical doctor, for example, is a specialty occupation because generally one must obtain a medical degree to work as a doctor.

**G.  In Designing the H-1B Program, Congress Included Protections for U.S. Workers**

50.    Congress has highly regulated the H-1B visa category, particularly since 2000, to ensure that the United States enjoys the benefits of bringing in highly-skilled workers from abroad while ensuring that all workers—both workers coming to the U.S. and workers already in the U.S.—are protected from depressed wages and exploitation.

51.    For example, Congress sets numerical limits on the annual number of H-1B workers, except for those employed by higher education or research institutions, who are exempt from the statutory "cap" on the number of visas available per fiscal year. 8 U.S.C. § 1184(g)(1)(A), (5). The statutory cap is 65,000, plus an additional 20,000 available only for individuals who have earned a master's or higher degree from a United States institution of higher learning. *Id.* § 1184(g)(1)(A)(vii), (5)(C).

52.    Congress also requires that the employer pay the H-1B worker the higher of: (1) the actual wage the employer already pays to similar workers in that occupation; or (2) the prevailing wage for the occupation in the geographic area of intended employment. 8 U.S.C. § 1182(t)(1)(A)(i); 20 C.F.R. § 655.731(a). This prevailing wage requirement is designed to ensure that employers cannot undercut the U.S. labor market by hiring H-1B workers and paying them lower wages than those typical for their job in the U.S. labor market.

53.    The employment of the H-1B worker also cannot adversely affect the working conditions of similarly employed workers, and the Department of Labor ("DOL") must certify that there is no such adverse impact. 8 U.S.C. § 1101(a)(15)(H)(i)(b), 1182(t)(1)(A)(ii). Likewise, an employer may not bring in H-1B workers to work during a strike or lockout. 8 U.S.C. § 1182(t)(1)(C); 20 C.F.R. § 655.733.

54.    Employers may not discriminate against U.S. citizens based on citizenship status. *See* 8 U.S.C. § 1324b(a)(1).

55.    Another safeguard is the anti-displacement provision that applies to employers considered "H-1B dependent"[10] and those considered "willful violators" of employment protections.[11] Such employers must attest that the employment of a U.S. worker will not result in the displacement of a U.S. worker either 90 days before, or 90 days after, the filing of such a petition. An employer placing an H-1B worker at a third-party worksite must attest that it has made a good faith effort to determine that the employee's placement will not displace a U.S. worker. 8 U.S.C. § 1182(n)(1)(E)-(F); 20 C.F.R. § 655.738(c)-(d).

56.    When an employer misuses the H-1B program, it can face orders to pay back wages, civil monetary fines, and debarment, among other penalties. 8 U.S.C. § 1182(n)(2); 20 C.F.R. § 655.810. A debarred employer is prohibited from receiving approval for future H-1B petitions and other employment-based visa petitions. 8 U.S.C. § 1182(n)(2)(C); 20 C.F.R. § 655.810(d). This penalty is intended to protect both American and foreign workers from exploitation and unlawful practices.

---

[10] The statute and corresponding regulations include a very specific definition of H-1B dependence: an employer that has 25 or fewer full-time equivalent employees and employs more than 7 H-1B workers; or an employer that has 26 to 50 full-time equivalent employees and employs more than 12 H-1B workers; or 51 or more full-time equivalent employees and at least 15 percent of its workforce are H-1B workers. *See* 8 U.S.C. § 1182(n)(3)(A); 20 C.F.R. § 655.736(a).

[11] An employer is classified as a willful violator if, during the preceding five years, the Secretary of Labor has found, after notice and opportunity for a hearing, that the employer has committed either: willful failure to meet the conditions of the Labor Condition Application; or a willful misrepresentation of a material fact in the LCA. 8 U.S.C. § 1182(n)(1)(E)(ii); 20 C.F.R. § 655.736(f).

**H. Congress Created a Detailed Statutory Scheme to Govern the H-1B Process That Balances Private and Public Sector Needs**

### 1. H-1B Registration and Lottery for Cap-Subject H-1B Visas

57.    As discussed above, the INA sets a statutory "cap" on the number of new H-1B petitions each fiscal year. "Cap-subject" employers generally are for-profit companies in the private sector.

58.    To petition for H-1B status for a worker, cap-subject employers must first register the prospective employees in an annual lottery that is generally held in March of each year for employment starting at the beginning of the federal fiscal year in October. 8 C.F.R. § 214.2(h)(8)(iii).

59.    After the close of the registration period, USCIS performs a computer-generated lottery selection. *Id.* § 214.2(h)(8)(iii)(A)(5)(ii), (6)(ii).

60.    USCIS then notifies those petitioners whose registrations were selected that they are eligible to file a H-1B cap-subject petition and sends them filing instructions. *Id.* § 214.2(h)(8)(iii)(C). The selected petitioners may then file a petition. *Id.* § 214.2(h)(8)(iii)(D).

### 2. Cap-Exempt H-1B Visas

61.    Certain types of employers are "cap-exempt," meaning they are not subject to the numeric cap specified in the statute. Institutions of higher education, non-profit organizations (*e.g.*, certain hospitals, K-12 schools) affiliated with institutions of higher education, non-profit research organizations, and government research organizations are not subject to the annual numerical limitations. 8 U.S.C. § 1184(g)(5)(A)-(B); 8 C.F.R. § 214.2(h)(8)(iii)(F)(1), (2) and (3).

62.    Cap-exempt employers do not need to register or to participate in the annual lottery, but they do need to establish, to the satisfaction of USCIS, their cap-exempt status. They can file petitions directly and are not limited to filing on a particular cycle.

### 3. H-1B Petition Process

63.     Whether "cap-subject" or "cap exempt," an employer must petition for an H-1B employee by first submitting a Labor Condition Application ("LCA") to DOL. *See* 8 U.S.C. § 1182(n)(1); 20 C.F.R. § 655.730.

64.     In the LCA, the employer attests that it will follow the wage and working condition requirements. *See* 20 C.F.R. § 655.730(d). DOL then reviews these forms and must certify them. DOL typically does so in seven working days. 20 C.F.R. § 655.730(b).

65.     Once DOL certifies the LCA, the employer files a Form I-129 petition with USCIS to classify the foreign worker as an H-1B nonimmigrant. *See* 6 U.S.C. § 271(b)(5); 8 U.S.C. § 1184(c)(1); 8 C.F.R. §§ 103.2(a)(1), 214.2(h)(1)(i), (2)(i)(A).

66.     An employer can petition on behalf of workers who are physically located inside or outside of the United States. *See ITServe All., Inc. v. United States*, 122 F.4th 1364, 1366 (Fed. Cir. 2024); *see also* 8 U.S.C. § 1258(a); 8 C.F.R. § 248.1(a), (c). The individual may already be in the United States if, for example, their employer is petitioning to change their status from another immigration status to H-1B visa status. For example, many of the Plaintiff Unions' members are currently in the United States in lawful student or exchange status, including on F-1 visas, F-1 OPT, STEM OPT, or J-1 programs, and—until the Proclamation—expected that a current or prospective employer would be able to file H-1B petitions on their behalf, either to change their status within the United States or through consular processing abroad.

### 4. Visa Issuance and Entry

67.     Once USCIS approves an H-1B petition, if the worker is outside the United States, the worker generally must then obtain an H-1B visa from a United States consulate abroad before traveling to the United States. *ITServe*, 122 F.4th at 1367. Even some workers who are inside the United States when their H-1B petition is approved, depending on the specific case circumstances, may have to go abroad to receive consular processing in order to effectuate their H-1B status. The individual may then travel to a port of entry for inspection by CBP and, if

1  authorized, be admitted in H-1B nonimmigrant status and enter the United States. *See* 8 U.S.C.

2  §§ 1101(a)(13)(A), 1184(a)(1), 1225(a)(1); 8 C.F.R. § 212.1(a)(1).

3       68.    Workers who are able to change to H-1B status from within the United States may

4  still need to travel abroad for work, for family emergencies, or to renew a passport. These

5  workers typically must obtain an H-1B visa stamp at a U.S. consulate abroad before reentering. 8

6  U.S.C. § 1184(a).

7       69.    Once an H-1B worker is in the United States, employers may need to file

8  additional petitions with USCIS if there is a material change in the worker's employment

9  conditions, such as a change in worksite, or if the worker changes employers. 8 C.F.R.

10  § 214.2(h)(2)(i)(D)-(E), 8 C.F.R. § 274a.12(b)(9). As the initial three-year work authorization

11  period expires, employers can petition for an extension of another three years, and additional

12  extensions are possible, beyond the 6 years, under limited circumstances. 8 CFR

13  § 214.2(h)(13)(iii)(D).

14      **I.**   **Congress Established a Detailed Fee System for H-1Bs That Sets Parameters on**

15          **Fees and Dictates Their Use**

16       70.    Congress has established a clear framework for fees charged to H-1B petitioning

17  employers. These include the adjudication fees that USCIS sets by regulation, as authorized by 8

18  U.S.C. § 1356(m), and certain statutory fees charged to certain H-1B employers, authorized in 8

19  U.S.C. § 1184(c)(9)-(14). Required fees must be paid by H-1B employers, not by the H-1B

20  workers or their families. *See* 20 C.F.R. § 655.731(c)(9)(iii)(C)(10).

21       71.    DHS may charge fees for adjudication of petitions under 8 U.S.C. § 1356(m), but

22  Congress limited those fees. The statute provides that "fees for providing adjudication and

23  naturalization services may be set at a level that will ensure recovery of the full costs of

24  providing all such services, including the costs of similar services provided without charge to

25  asylum applicants or other immigrants. Such fees may also be set at a level that will recover any

26  additional costs associated with the administration of the fees collected." *Id.*

27

28     First Amended Complaint           18           Case No. 4:25-cv-08454-HSG

72.    DHS sets the amounts of adjudication fees through notice-and-comment rulemaking. *See, e.g.*, *USCIS Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6,194 (Jan. 31, 2024). Under the latest 2024 rule, for instance, H-1B employers must pay a fee to register for the lottery, a fee to file Form I-129, and an "asylum program fee," meant to subsidize USCIS's costs for processing asylum applications. 8 C.F.R. § 106.2(a)(3), (c)(11), (c)(13). At full price, these fees for adjudication total $1,595. *Id.*

73.    Because DHS has historically factored in an employer's ability to pay, the adjudication fees are discounted for small employers (25 or fewer full-time employees) and non-profits. *See id.* § 106.2(a)(3), (c)(13).

74.    Congress, through the INA, set additional mandatory statutory fees to be paid by employers.

75.    First, Congress set an American Competitiveness and Workforce Improvement Act of 1998 ("ACWIA") fee of $1,500. The statute effectively requires consideration of ability to pay; there is a discount for employers with 25 or fewer employees, who pay $750, and cap-exempt employers are exempt. The ACWIA fee is required only for the first two petitions filed on behalf of each individual. *See* 8 U.S.C. § 1184(c)(9)-(14).

76.    Second, Congress set a fraud prevention and detection fee of $500. The fraud fee is required with initial petitions and petitions to change employers. *Id.*; *see* 8 U.S.C. § 1184(c)(12)(A)(i)-(ii).

77.    Congress spoke clearly as to where these fees should go and for what purpose. For example, in establishing the ACWIA fee, Congress intended to support the American labor market by upskilling its workforce to "address a growing shortage of skilled worked for certain high technology positions important to American business." 144 Cong. Rec. S10877 (daily ed. Sept. 24, 1998). The INA directs that ACWIA fees be segregated into a special account and used for specified purposes. *See* 8 U.S.C. § 1356(s). The revenue is primarily split among: (1) DOL workforce training programs (50%), (2) National Science Foundation low-income STEM

scholarships (30%), and (3) National Science Foundation K-12 stem initiatives (10%). 8 U.S.C. § 1356(s)(2)-(4).

78.     The fraud prevention and detection fee's name indicates its purpose. The revenue is split equally among the three agencies responsible for administering the H-1B program: DOL (who oversees the Labor Condition Application and wage payment to the H-1B worker), DHS (who adjudicates requests for H-1B status), and the State Department (who decides whether to issue visas). 8 U.S.C. § 1356(v)(2)(A)-(C).

79.     Additionally, certain employers pay enhanced fees. For example, currently, a "50/50 employer" must pay an additional "Public Law 114-113 Fee" of $4,000. 8 C.F.R. § 106.2(c)(8); USCIS, H and L Filing Fees for Form I-129.[12] A "50/50 employer" is an entity that employs over 50 employees, with over half comprising nonimmigrant workers in H-1B or L-1 status.[13] *ITServe*, 122 F.4th at 1367 n.2; 8 C.F.R. § 106.2(c)(8).

80.     An employer that pays the full amount of these regulatory and statutory fees would pay a total of $7,595, nowhere near the $100,000 Defendants now demand.

81.     The $100,000 Requirement does not account for ability to pay, unlike many of the regulatory and statutory fees, which are discounted for small employers and non-profits.

**J.  The President's Ability to Restrict Entry Under the INA Does Not Authorize Him to Override Congress's Comprehensive H-1B Statute**

82.     The Proclamation invokes two provisions of the INA: sections 212(f) and 215(a), 8 U.S.C. §§ 1182(f) and 1185.

83.     Section 212(f) of the INA, 8 U.S.C. § 1182(f), provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he

---

[12] *See* USCIS, *H and L Filing Fees for Form I-129, Petition for a Nonimmigrant Worker*, https://perma.cc/5RRV-26DG.

[13] The L-1 visa "allows multinational corporations to sponsor visas for temporary intra-company transfers to the United States" for individuals working in a managerial, executive, or specialized knowledge capacity. *Nat'l Ass'n of Manufacturers v. DHS*, 491 F. Supp. 3d 549, 556 (N.D. Cal. 2020); 8 U.S.C. § 1101(a)(15)(L).

may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

84.    This statutory provision is designed to "regulate and influence conduct abroad, rather than at home," and does not authorize the President to effectuate "domestic policy as opposed to foreign policy or national security." *President & Fellows of Harvard Coll. v. DHS*, No. 25-cv-11472, --- F. Supp. 3d. ----, 2025 WL 1737493, at *10 (D. Mass. June 23, 2025). The Proclamation makes clear that it is concerned with domestic policy—charging domestic employers unprecedented fees, changing the conduct of employers and workers inside the United States, and raising revenue for domestic purposes. But 8 U.S.C. § 1182(f) does not permit the President to restrict entry for these purposes.

85.    In addition, section 215(a), 8 U.S.C. § 1185(a)(1), allows the President to "prescribe" "reasonable rules, regulations, and orders" governing who may "enter . . . the United States." *Id.* (emphasis added).

86.    Nothing in either statute authorizes the President to rewrite Congress's comprehensive H-1B statute by denying entry to all H-1B workers unless an employer pays $100,000 or is granted an exemption at the discretion of the Secretary of DHS.

## VI.    FACTUAL ALLEGATIONS

### A.  The President's Proclamation

87.    Late in the day on Friday, September 19, 2025, the White House issued a Presidential Proclamation pursuant to 8 U.S.C. § 1182(f) and § 1185(a) conditioning the adjudication of H-1B petitions and entry of H-1B beneficiaries into the United States on a $100,000 payment.

88.    Among other things, the Proclamation requires a $100,000 payment in connection with any H-1B petition for workers currently outside the U.S. seeking entry under the H-1B program, stating: "[e]ntry into the United States of [H-1B workers] is restricted, except for those

aliens whose petitions are accompanied or supplemented by a payment of $100,000." Proclamation § 1(a). The Proclamation directs DHS to "restrict decisions on petitions not accompanied by a $100,000 payment," *id.* § 1(b), and directs State to "approve only those visa petitions for which the filing employer has made the [$100,000] payment," *id.* § 2(b). DHS and State must "deny entry to the United States to any H-1B nonimmigrant" whose employer has not made the $100,000 payment. *Id.* § 2(c).

89.    The Proclamation made these new requirements effective as of 12:01 am ET Sunday, September 21, 2025. But the Proclamation does not specify to which agency the $100,000 "payment" should be made, how it should be paid, where it will be deposited, or how it will be used.

90.    The President's key advisor on this Proclamation appears to be Howard Lutnick, who outlined the scope and rationale of the Proclamation when it was issued. Speaking alongside the President at an Oval Office ceremony unveiling the Proclamation on September 19, Lutnick said: "a hundred-thousand dollars a year for H-1B visas, and all of the big companies are on board. We've spoken to them."[14]

91.    Lutnick also stated that current visa-holders would be subject to the fee and would have to leave the country if it was not paid: "Either the person is very valuable to the company and America, or they are going to depart and the company is going to hire an American," Lutnick said at the briefing. "And that's the point of immigration. Hire Americans and make sure the people coming in are the top, top people. Stop the nonsense."[15]

92.    Lutnick also made clear that the fee would be charged annually: "The company needs to decide . . . is the person valuable enough to have a $100,000-a-year payment to the government, or they should head home, and they should go hire an American."[16]

---

[14] *Trump unveils $100K yearly fee on H-1B visas in clampdown on legal immigration*, Wash. Post (Sept. 19, 2025), https://perma.cc/N7PP-Y53G.
[15] *Id.*
[16] *Id.*

**1.  The Proclamation is Based on Multiple Errors of Fact and Ignores the Benefits of the H-1B Program to the American Economy**

93.     The Proclamation's preamble solely identifies concerns with the program's use in the information technology fields, but employers seek and obtain H-1B visas for workers in a wide range of specialty occupations, including healthcare workers, researchers, clergy, university professors, K-12 teachers, and more. The Proclamation does not identify widespread fraud and misuse of the program in those fields nor otherwise justify why a market-wide penalty is an appropriate remedy.

94.     Even as to the IT industry, the Proclamation ignores pertinent facts reflecting that the H-1B program supports economic growth. Indeed, from 1990 to 2010, H-1B holders caused 30-50 percent of all productivity growth in the U.S. economy.[17] As one economist explained, "[W]orkers on H-1B visas cause dynamism and opportunity for natives. They cause more patenting of new inventions, ideas that create new products and even new industries. They cause entrepreneurs to found more (and more successful) high-growth startup firms. The resulting productivity growth causes more higher-paying jobs for native workers, both with and without a college education, across all sectors. American firms able to hire more H-1B workers grow more, generating far more jobs inside and outside the firm than the foreign workers take."[18]

95.     The Proclamation also ignores other benefits of bringing H-1B workers to the United States, where they consume goods and services and pay taxes in the United States. Cutting off employers' ability to employ H-1B workers will likely push some employers to outsource their work to other countries.

96.     The Proclamation claims, without evidence or explication, that abuses of the H-1B program are so serious as to be a threat to national security. But the government's own enforcement reflects otherwise: DOL is charged with investigating fraud and abuse of the Labor

---

[17] Giovanni Peri, Kevin Shih & Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in US Cities*, 33 J. Lab. Econ. S1(2) S225, S250-52 (2015), https://perma.cc/PK6F-KN6K.
[18] Michael A. Clemens, *New US curb on high-skill immigrant workers ignores evidence of its likely harms*, Peterson Inst. Int'l Econ. (Sept. 22, 2025), https://perma.cc/Y4DL-VSRQ.

Condition Application portion of the H-1B program and maintains a database of companies that abused the H-1B program and were banned from it. *See* 8 U.S.C. § 1182(n)(2), 20 C.F.R. 655.800 *et seq.*; *H-1B Willful Violator List of Employers*, U.S. Dep't Lab., https://perma.cc/4RPD-X7JT (effective as of Sept. 1, 2025). There are just eight companies on this list and only two were added in 2025, while tens of thousands of employers have used this program in recent years.

### 2. The Proclamation's Exorbitant $100,000 Fee Is Unprecedented and Unjustified, and the Exception Process is Ripe for Abuse

97.     The Proclamation's imposition of a draconian fee is unprecedented. No President has, without Congressional authorization and by fiat, imposed a market-wide penalty for purported misuse of a program—disregarding and overriding an existing, complex statutory scheme—on employers seeking to hire workers under a visa program Congress created specifically for that purpose. Nor may Presidents impose a tax or other general revenue-generating requirement without Congressional authorization.

98.     Here, the President appears determined to raise general revenue using the $100,000 Requirement, suggesting that this is a tax, not a fee for use of the program. While announcing the Proclamation, the President alluded to the ultimate use of the revenue generated from these $100,000 payments: "The main thing is we're going to have great people coming in and they're going to be paying. We're going to take that money and we're going to be reducing taxes and we're going to be reducing debt."[19]

99.     The Proclamation also provides an exception to the payment requirement in section (c), which states that "[t]he restriction imposed pursuant to subsections (a) and (b) of this section shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, in the Secretary's

---

[19] *Trump unveils $100K yearly fee on H-1B visas in clampdown on legal immigration*, *supra* n.14.

1  discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is

2  in the national interest and does not pose a threat to the security or welfare of the United States."

3      100.    The Proclamation includes no guidance, direction, or parameters for this

4  purported national interest exception, which was created from whole cloth. As drafted, the

5  standardless exception process is an open invitation for selective and arbitrary treatment. It

6  invites lobbying; it permits favoritism, ideologically based bias, and corruption.

7          **3.    After the Ill-Planned Proclamation Caused Immediate Harm, the**

8              **Government Began to Backtrack**

9      101.    Shortly after this announcement, current H-1B workers that were outside the

10  country started receiving urgent messages from their employers to return to the United States

11  before the Proclamation became effective at 12:01 am ET on Sunday, September 21. Many were

12  advised to remain in the United States until further notice.[20] Some workers spent thousands of

13  dollars on return travel to the United States.[21] Others cancelled planned trips, and some workers

14  who had already boarded flights made panicked requests to deplane after receiving news of the

15  Proclamation.[22]

16      102.    As this chaos unfolded on Saturday, September 20, the Administration began to

17  backtrack. An unnamed White House source, speaking on condition of anonymity to the press,

18  contradicted Lutnick's statements from the Oval Office and stated that the new requirement was

19  a "one-time fee" and "currently does not apply to renewals but that policy is under discussion."[23]

20  The source did not say whether existing visa-holders would be prevented from returning to the

21

22

---

23  [20] Madeleine Ngo, Lauren Hirsch & Pranav Baskar, *Trump's $100,000 Visa Fee Spurs Confusion and Chaos*, N.Y. Times (Sept. 22, 2025), https://perma.cc/EJ5T-RK6F.

24  [21] Emma Rossiter & Ishadrita Lahiri, *I spent $8,000 to get back to US after fears over Trump visa deadline*, BBC (Sept. 20, 2025), https://perma.cc/3NHM-JD39.

25  [22] Aditya Soni & Echo Wang, *'Fast and furious': H-1B workers abroad race to US as Trump order sparks dismay, confusion*, Reuters (Sept. 21, 2025), https://perma.cc/J82X-GHGH.

26  [23] *White House clarifies $100K H-1B visa fee won't apply to existing holders as Trump stirs anxiety*, PBS News (Sept. 21, 2025), https://perma.cc/SN9S-435A.

27

28

country, under the Proclamation's language broadly barring entry of individuals for whom the fee had not been paid.

103.    At 4:16 pm ET on Saturday, September 20, White House Press Secretary Karoline Leavitt posted another attempt at re-writing the Proclamation on the social media platform X:[24]



**B. The Agency Defendants Imposed a $100,000 Requirement for "Any" New H-1B Petitions.**

104.    The Proclamation tasked DHS, including its component agencies USCIS and CBP, and the State Department (collectively with the heads of those agencies and components, the "Agency Defendants") with the implementation of its requirements.

105.    The Agency Defendants issued a series of public statements in the hours and days following the Proclamation's late Friday, September 19, 2025, issuance.[25] After this lawsuit was filed, USCIS issued additional FAQs.

[24] Karoline Leavitt (@PressSec), X (Sept. 20, 2025, 4:16 PM), https://perma.cc/Y7WY-NHN9?type=image.

[25] Joseph B. Edlow, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B*, USCIS (Sept. 20, 2025), https://perma.cc/U54U-4UWD; Matthew S. Davies, *Proclamation,*

106.    Collectively, these documents reflect the new policies the Agency Defendants have adopted to implement the Proclamation.

107.    Starting in September, the Agency Defendants required a one-time payment of $100,000 "on submission" of "any" new H-1B petition filed after 12:01 am ET on September 21, 2025. Payment is a condition for adjudication of "any" new H-1B petition, as well as for consular processing and entry into the United States of any beneficiary of a new petition (the "Agency Policies").

108.    The Agency Policies were in some ways narrower than the Proclamation. They specify, for example, that the $100,000 Requirement only applies to new petitions and not to "renewals"[26]—a term that is not used in the existing statutory and regulatory scheme. The Agencies also chose not to condition entry into the United States on receipt of the $100,000 payment for existing H-1B visa holders or beneficiaries of petitions submitted before the effective date.[27]

109.    However, the new Agency Policies swept more broadly than the Proclamation in that they appeared to apply to *any* new H-1B petition submitted on or after September 21, 2025. They did not clearly differentiate between petitions for workers who are "currently outside the United States" and those for workers who are already inside the United States. Accordingly, the $100,000 Requirement applied even where workers were already lawfully present in the United States under, for example, a student visa or another immigration status, and were seeking to change to H-1B status.

110.    On October 20, 2025, two weeks after Plaintiffs filed this lawsuit, USCIS issued FAQs modifying the Agency Policies.

*Restriction on Entry of Certain Nonimmigrant Workers [H-1B]*, USCBP (Sept. 20, 2025), https://perma.cc/K9VG-QCYS; *H-1B FAQ*, U.S. Dep't State (Sept. 21, 2025), https://perma.cc/6DYF-9SCE; *H-1B FAQ*, White House (Sept. 21, 2025), https://perma.cc/G37A-W3AK; *H-1B FAQ*, USCIS (Sept. 21, 2025), https://perma.cc/R8CD-CK2A.

[26] *H-1B FAQ*, USCIS (Sept. 21, 2025), https://perma.cc/R8CD-CK2A.

[27] *Id.*

111.    Under the new FAQs, the $100,000 Requirement does not apply to change of status, amendment, or extension petitions for individuals inside the United States *if* USCIS exercises its discretion and approves the change of status, amendment, or extension. *See* 8 U.S.C. § 1258(a) ("The Secretary of Homeland Security *may*, under such conditions as he may prescribe, authorize a change from any nonimmigrant classification to any other nonimmigrant classification . . . .") (emphasis added); 8 C.F.R. § 214.1(c)(7) ("Where an applicant or petitioner demonstrates eligibility for a requested extension or amendment of stay, USCIS may grant the extension or amendment in its discretion."); USCIS Policy Manual Vol. 2, Part A, Ch. 4.A ("The decision to grant or deny an extension of stay or change of status request involves an exercise of discretion by USCIS.").

112.    The $100,000 Requirement remains in place, however, for workers outside of the United States seeking entry on an H-1B visa. It also continues to apply to those already in the United States who categorically cannot change their status to H-1B from within the United States,[28] as well as those who, in USCIS's discretion, are not granted a change of status, amendment, or extension.

113.    USCIS's FAQs also provide that exceptions to the $100,000 Requirement will be granted only "in the extraordinarily rare circumstance where the Secretary has determined that a particular alien worker's presence in the United States as an H-1B worker is in the national interest, that no American worker is available to fill the role, that the alien worker does not pose a threat to the security or welfare of the United States, and that requiring the petitioning employer to make the payment on the alien's behalf would significantly undermine the interests of the United States." Under this regime, to petition for an H-1B worker without paying the extra-statutory $100,000 fee, an employer must satisfy a "high threshold" by meeting criteria that

---

[28] Individuals with certain immigration statuses or individuals who lack lawful status, such as Deferred Action for Childhood Arrivals (DACA) recipients, are categorically ineligible to change status to H-1B from within the United States and thus must leave and come back to obtain H-1B status, which under USCIS's current guidance triggers the $100,000 fee. *See, e.g.*, 8 U.S.C. § 1258(a); 8 C.F.R. § 248.1(a)-(b); *id.* § 248.2(a).

is also nowhere in the INA.  To date, Plaintiffs are not aware of any exemptions that have been granted.

**C.  The Proclamation and Agency Policies Will Harm Plaintiffs and the Public Interest**

114.    The Proclamation and new Agency Policies harm both Plaintiffs and the broader public.

### 1.  Health care

115.    **Nephrology Associates** is headquartered in Shelby, which is in Cleveland County, North Carolina. Cleveland County is a rural community of approximately 100,000 people located in the south-central part of the state. Nephrology Associates' second office is in Rutherfordton, in neighboring Rutherford County. Rutherford County's population is also rural, with a population of approximately 64,000 people. Both Cleveland and Rutherford Counties are designated as Medically Underserved Areas and Health Professional Shortage Areas as defined by the Bureau of Health Workforce ("BHW") within the Health Services and Resource Administration ("HSRA"), an agency of the U.S. Department of Health and Human Services ("HHS"). This designation reflects a federal determination of inefficient access to care in an area with documented provider deficits and elevated health risks.[29] Approximately 75% of Nephrology Associates' patients are on Medicare and another 15-20% are uninsured.

116.    The Cleveland County and Rutherford County communities are home to a large population of patients with a high incidence of problems related to the kidneys, high blood pressure, or certain metabolic disorders. These conditions, while prevalent, are often underdiagnosed or inadequately managed due to limited access to nephrologists.

117.    Most patients are not diagnosed with kidney disease until later in life because the likelihood increases significantly with age. The vast majority of Nephrology Associates patients are over 65, which is the most common age group diagnosed with chronic kidney disease.

---

[29] *See* Health Resources and Services Administration, "What Is Shortage Designation," https://bhw.hrsa.gov/workforce-shortage-areas/shortage-designation.

Conditions like diabetes, hypertension, and heart disease affect the kidneys but can take years to cause damage that would require a nephrology appointment. Kidney function also starts to naturally decline after the age of fifty. Kidney disease is classified into five stages based on the level of kidney function, with Stage Five being failure or near-failure of the kidneys. Nephrology Associates' practitioners see patients at all stages of kidney disease. Nephrology Associates' practitioners serve as the medical directors at five kidney dialysis centers in the area.

118. Recruiting physicians with the right specialized knowledge and willingness to work in Nephrology Associates' geographic location has been challenging for many reasons, including that the community is rural. Nephrology Associates has only been able to meet its physician staffing needs through the H-1B program. Its physician staff includes two individuals currently on H-1B visas (a Pakistani national and an Ecuadorian national). Nephrology Associates' owner is originally from Bangladesh and required visa sponsorship as well. Today he is a U.S. citizen. Nearly all of Nephrology Associates' physicians have been or are currently on an H-1B visa.

119. In August 2024, Nephrology Associates lost an H-1B sponsored physician who relocated across the country. To replace this physician, Nephrology Associates retained a recruiting company. Over the course of nine months of active recruiting, Nephrology Associates received ten applications; eight of those applicants were foreign nationals requiring visa sponsorship. Only one applicant, an Indian physician completing her fellowship in the U.S. on a J-1 visa, was qualified for the position and willing to accept its terms. Nephrology Associates offered this prospective employee the position.

120. It is common for foreign national medical graduates on J-1 status to continue practicing in the United States if an employer, such as Nephrology Associates, is willing to sponsor them for an H-1B visa. This process involves obtaining a waiver of the general requirement to return to their country for two years by agreeing to work in an underserved area like the areas served by Nephrology Associates for at least three years. Following completion of

her J-1 program in June 2025, the prospective employee returned to India to see her family and wait for the J-1 waiver and H-1B visa petition to be approved.

121.    Nephrology Associates filed the H-1B petition for the prospective employee, which was receipted by USCIS on September 24, 2025, and simultaneously requested that USCIS approve the J-1 waiver, the last step necessary for the H-1B petition to be approved. Nephrology Associates paid an additional $2,805 to request premium processing of the petition, which typically means that decisions are to be made within 15 business days.

122.    While the J-1 waiver was approved, the H-1B petition remains pending. After USCIS published additional guidance regarding the fee on October 20, Nephrology Associates submitted a request for a "national interest" exception ("NIE") for the prospective employee. Then, in early November, Nephrology Associates received a request for evidence ("RFE") from USCIS stating that because the prospective employee was outside of the United States at the time the H-1B petition was filed, Nephrology Associates is required to demonstrate that it has either paid the $100,000 fee or received a NIE, before USCIS will resume processing of the case. Nephrology Associates, as a small practice in a rural community serving a low-income population, cannot afford to pay the $100,000 fee for the prospective employee. However, Nephrology Associates to date has also not received a decision on the NIE request, thereby impeding its ability to respond to the RFE, which has a response deadline of January 29, 2026.

123.    Because of the unanticipated delay in bringing the prospective employee on board, Nephrology Associates has had to move patient appointments, delaying critical care for members of the community whose needs will otherwise be unmet. Nephrology Associates currently has approximately100 people on its waiting list. Without relief from this Court, Nephrology Associates will not be able to bring the prospective employee aboard, will face months or years of additional recruiting, and may never be able to find a qualified and willing physician to replace the physician it lost. Meanwhile, hundreds of people with kidney disease will experience delays in essential care. The hurdles Nephrology Associates faces in filling this open position are also negatively impacting their revenue.

124.    For over a decade, Plaintiff **Global Nurse Force**, a California limited liability company, has connected healthcare systems across the globe with highly skilled and experienced nurses to ensure their staffing needs are met. Global Nurse Force has placed over 10,000 nurses at leading hospitals around the world.  In the United States, Global Nurse Force's clients include healthcare systems in Washington, Ohio, Louisiana, California and the District of Columbia who have used Global Nurse Force's "direct hire" model to hire hundreds of nurses on H-1B visas to fill critical staffing shortages.

125.    The United States has been suffering from a nursing shortage for decades, and this shortage will only intensify as the Baby Boomer generation ages and their need for health care grows. The COVID-19 pandemic drove many nurses out of the profession; nursing schools suffer from a faculty shortage as well as depressed enrollment; and insufficient staffing itself raises the stress level of nurses, has a negative impact on their job satisfaction, and motivates many nurses to retire or otherwise leave the profession. Inadequate levels of nurse staffing lead to errors and increased mortality rates, a decrease in the quality of patient care, and unit or full hospital closures, especially in rural areas.

126.    Global Nurse Force offers a direct hire model to U.S.-based healthcare systems that allows these healthcare systems to hire the experienced and specialized nurses they need by sponsoring them for H-1B specialty worker visas. Global Nurse Force provides "end to end" services that include facilitating the employer's interview and selection process, which usually involves preliminary online interviews followed by international travel that allows the employer to meet, interview, and select in person the nurses needed; providing support for the H-1B application process; and providing logistical travel support for the hired nurses, including arranging travel, airport pickup, and temporary housing for nurses and their families arriving in the United States. Directly hiring skilled nurses on H-1B visas allows healthcare systems to meet their staffing needs without relying on short-term hiring of so-called "travel nurses," which is a far more expensive staffing solution that, in a year, can cost healthcare systems millions of dollars more in fees paid to staffing providers.

127.    Global Nurse Force's business model for its U.S. clients is entirely based on the H-1B visa system and the ability of healthcare facilities to sponsor for H-1B visas the specialized nurses they need. As a result, the harmful impact of the Proclamation and the $100,000 Requirement on Global Nurse Force and its healthcare system clientele has been immediate. A health system in Louisiana, for example, recently went through the interview and selection process with Global Nurse Force and selected over two hundred nurses. When the Proclamation was issued, Global Nurse Force was in the process of assisting the hospital with preparing the H-1B applications for these nurses to be filed over the next two quarters. But that healthcare system, like most of Global Nurse Force's clients, cannot afford to pay an additional $100,000 fee for each nurse, and the healthcare system is now at a loss for how to fill the staffing shortages that are affecting its patients now. Indeed, many of Global Nurse Force's clients hire over a hundred nurses through each interview and selection cycle, which would translate into tens of millions of dollars in extra fees required by the Proclamation. Many of Global Nurse Force's clients are non-profit hospitals operating on thin margins and cannot absorb the $100,000 fee per nurse. If required to pay this fee, they will be forced to cancel international recruitment, leaving their positions unfilled.

128.    If the $100,000 Requirement remains in effect, it would force Global Nurse Force to close its U.S.-based operations, which would translate into a loss of millions of dollars in revenue. Without access to international nurses, their clients will be forced to reduce capacity in ICUs, emergency rooms and surgical units. Wait times will increase and patient outcomes will worsen. This proclamation directly threatens Global Nurse Force's operations and forces hospitals towards staffing models that are significantly more expensive—raising healthcare costs rather than reducing them, so that the ultimate victims are patients, especially in rural and inner-city communities.

129.    **Plaintiff CIR**, whose membership consists of medical interns, residents, and fellows, has numerous members who plan to seek H-1B visas and who have applications for H-

1B visas pending with their employers and may lose their ability to live and work in the United
States as a result of the Proclamation.

130.    For example, a Pakistani physician and member of CIR is currently completing a
fellowship in palliative care at a hospital that is part of an academic health care system on the
East Coast. The physician is married and has a two-year-old son who is a U.S. citizen. As our
population ages, the United States is facing an acute shortage of palliative care doctors who
provide end of life care; his expertise is therefore particularly valuable.

131.    This CIR member holds a J1 visa. Foreign physicians come to the United States
on J1 visas to complete their medical training. Generally, J1 visa holders must return to their
country for two years at the end of their training, unless they obtain a waiver of this requirement.
Foreign physicians generally apply for a waiver program, which allows them to change their
immigration status from a J1visa to an H-IB visa while remaining in the United States, if they
commit to practicing in communities with the greatest need. The United States provides these
waiver programs as a way to help address severe physician shortages in underserved areas.

132.    This CIR member is currently applying and interviewing with facilities located in
federally-designated Health Professional Shortage Areas and Medically Underserved Areas, the
first step toward securing the employment offer needed to apply for a waiver. Because of the new
$100,000 Requirement, however, employers who would normally petition for an H-1B visa on
his behalf are unable to do so. If the physician is unable to secure a position with H-1B visa (as is
likely), his years of training and his specialization will be for naught, and the United States will
lose a physician trained in a critical field who is ready to serve in precisely the communities that
most need him. He will be forced to return to Pakistan, where he is unlikely to find employment
adequate to support himself and his family.

133.    A Canadian CIR member is in his third year of a residency program in internal
medicine in a city on the East Coast. Like many foreign physicians, he is training in the United
States on a J1 visa, which requires him to pursue a waiver in order to remain and serve after
completing his residency.

134.     This member will complete his residency next year, apply for positions in underserved areas and apply for a waiver. Like many current and former CIR members before him, his prospective employer would then file an H-1B petition on his behalf. The new $100,000 Requirement, however, places sponsorship entirely out of reach for the very medical facilities Congress intended to benefit from these programs. If such facilities had the resources to pay this fee, they would not be struggling to recruit physicians through waiver programs in the first place.

135.     The Proclamation will harm the career prospects and lives of this CIR member and others similarly situated. Since sponsoring organizations are unlikely to be able to afford to pay $100,000, this member will likely face a two-year separation from his U.S. citizen fiancée and would need to incur costs to get recredentialed as a physician in his home country of Canada. This would set him back 1-2 years professionally.

136.     The loss of these medical workers will harm communities around the United States. The American Medical Association ("AMA") has expressed grave concerns about the impact of the $100,000 Requirement on the availability and quality of medical care in the United States. In a September 25, 2025, letter to DHS Secretary Kristi Noem urging DHS to exempt foreign-trained physicians from the fee, the AMA, along with more than 50 national specialty societies and state medical associations, noted that the United States is projecting a shortfall of 86,000 physicians by 2036.[30] This is especially concerning because America's population is aging, and there will not be enough doctors to care for older adults, many of whom suffer increased rates of chronic disease and have other complex medical needs.[31] Noting that of the 23% of physicians in the United States who are foreign trained, 65% practice in Medically Underserved Areas or Health Professional Shortage Areas and of those, 46% practice in rural areas, the letter explains that the fee endangers access to quality care for some of the Americans who most need it.[32]

---

[30] *Letter to Kristi Noem from National Medical Societies and State Medical Associations* (Sept. 25, 2025), https://perma.cc/2VP2-B6Q5.
[31] *Id.*
[32] *Id.*

137.     Many of the hospitals that hire foreign trained physicians are non-profits and will not be able to afford this fee. As the President of the AMA explained, "[i]f a hospital needs 50 foreign residents, and it's $100,000 each for each one, that's $5 million, and that's not going to happen . . . . There will be shortages." The consequences, he explained, are that "spots at hospitals will not be filled. Wait times will go up, and people will wait even longer at emergency departments." The fee, coupled with cuts in health insurance subsidies and reduced Medicaid payments, will exacerbate the financial stress many hospitals are already experiencing.[33]

138.     A 2023 study by the National Bureau of Economic Research found that foreign-born doctors help serve rural and low-income communities without reducing the employment of U.S.-trained physicians.[34] The study notes that while about 20% of the U.S. population lives in rural areas, only about 11% of physicians practice in these locations; and disparities in access to physicians contribute to disparities in population health.[35] After examining the data, the study concluded that foreign-born doctors were not "crowding out" U.S. born physicians, but rather that foreign-born physicians were filling essential gaps in coverage, particularly in rural areas.[36]

### 2.  K-12 school systems

139.     At a time when communities around the country are facing acute teacher shortages, the $100,000 Requirement means that school districts risk losing valuable teachers in both urban areas suffering from staffing shortages and in rural districts where teachers are difficult to recruit. For example, Texas public schools, which have historically employed more H-1B visa holding teachers than any other state education system, currently employ about 500 teachers on H-1B visas.[37] The $100,000 Requirement is approximately double the average

---

[33] Roni Caryn Rabin, *Medical Groups Warn Against Visa Fees for Foreign Doctors*, N.Y. Times (Sept. 26, 2025), https://perma.cc/Q243-3LTU.

[34] Breno Braga, Gaurav Khanna & Sarah Turner, *Migration Policy and the Supply of Foreign Physicians: Evidence from the Conrad 30 Waiver Program*, Nat'l Bureau of Econ. Research Working Paper No. 32005 (Dec. 2023), https://perma.cc/V8HK-LANH.

[35] *Id.*

[36] *Id.* at 3.

[37] Isaac Yu & Nusaiba Mizan, *Hundreds of Texas teachers are on H-1B visas. Could that change after Trump's new $100k fee?*, Hous. Chron. (Sept. 25, 2025), https://perma.cc/ED5L-9U28.

teacher salary in Texas.[38] A spokesperson for the Alief Independent School District ("ISD"),
outside Houston, said the $100,000 Requirement "would be a significant financial barrier for
public school districts and an unsustainable cost for Alief ISD."[39] Similarly, school officials in
North Carolina expressed concern about how the new fee would impact their ability to hire
teachers in a state that started the new school year with 2,155 teaching vacancies.[40] A
spokesperson for a charter school system that operates schools across North Carolina said the
$100,000 Requirement "would create a significant barrier for non-profit, tax-exempt, and public
institutions such as ours. Simply put, most schools could not sustain such costs."[41] She
concluded that "without an exemption, the results could be a severe shortage of qualified
teachers at a time when schools nationwide already face staffing challenges."[42] The
Superintendent of the Kodiak Island Borough School District in Alaska, which relies on H-1B
workers to fill staffing gaps, was more direct, saying "[w]ith a pen stroke, we have possibly
ruined the future of education for Alaska students."[43]

140.    **Plaintiff Lower Brule Day School** is a K-12 school located on the Lower Brule
Sioux Reservation, which covers approximately 400 square miles in rural central South Dakota
along the Missouri River. Lower Brule Day School was originally known as the Lower Brule
Boarding and Day School and was founded in 1895 as part of the federal government's forced
assimilation of American Indian children. The Lower Brule Sioux Tribe manages the school
pursuant to a grant with the Bureau of Indian Education, an agency within the U.S. Department
of the Interior.

---

[38] *Id.*
[39] *Id.*
[40] T. Keung Hui & Brian Gordon, *New $100,000 fee for H-1B Visas Could Hurt Teacher
Recruitment for NC Schools*, Herald Sun (Sept. 23, 2025), https://perma.cc/T3MQ-LYY7.
[41] *Id.*
[42] *Id.*
[43] Brian Venua, *The White House Upped the Cost of H-1B Visas. Alaska Schools Could Face
Major Consequences*, KXMT (Sept. 24, 2025), https://perma.cc/6LDV-SHD2.

141.    Lower Brule Day School serves approximately 350 children. The student population is 99% American Indian and 100% of the students qualify for free or reduced-price meals. Lower Brule Day School is guided by the twelve Wolakota ("Lakota Way") values of the Kul Wicasa Oyate: humility, perseverance, respect, honor, love, sacrifice, truth, compassion, bravery, fortitude, generosity, and wisdom. Lower Brule Day School prioritizes integrating native language and culture into daily school life.

142.    Lower Brule Day School has had trouble recruiting teachers due to the nationwide shortage of teachers and its rural location. The shortage of teachers is particularly acute in special education. There are 45 teachers at Lower Brule Day School, ten of whom are on H-1B visas. Four of the ten teachers on H-1B visas teach in special education, and they are the only teachers currently teaching in special education at the school. Without the H-1B visa program, Lower Brule Day School would not have an adequate number of certified teachers to teach its students. Teachers on H-1B visas provide continuity to Lower Brule Day School's students and to the community. Teacher turnover has a very negative impact on Lower Brule Day School's students, many of whom are already dealing with instability at home.

143.    Lower Brule Day School will be recruiting at least one new teacher for the 2026-2027 school year when its recruiting season starts in February 2026. While Lower Brule Day School will hire any qualified candidate, based on the school's experience it is highly likely that the most qualified and available candidates will come from outside of the United States and will require H-1B visas.

144.    Lower Brule Day School cannot afford to pay the $100,000 fee for an H-1B petition because it is approximately twice a teacher's starting salary. Within days of the Proclamation, the Lower Brule Sioux Tribal Council passed Resolution No. 2-26-006, "Resolution to Request Waiver from the Presidential Proclamation Restriction On Entry of Certain Non-immigrant Workers.'" Noting that the Lower Brule Day School uses H-1B visas to hire for hard-to-fill professional positions and that the school does not have sufficient funding to pay the $100,000 fee for the teachers requiring H-1B sponsorship  who need a visa in the future,

the Resolution calls on the Director of the Bureau of Indian Education to advocate for the waiver of the fee for Lower Brule Day School.

145.    **Plaintiff Global Village Academy Collaborative ("GVAC")** is headquartered in Thornton, Colorado and operates similar to a school district and provides operational and educational services to its member schools (Global Village Academies, or "GVA"), including, but not limited to, staff recruitment, legal services, human resources, facilities and site support, curriculum and material development, and financial management.

146.    GVAC's mission is to provide these essential services to its Global Village Academies to cultivate academic excellence, high levels of linguistic proficiency, and cultural competences in all of its students, starting as early as kindergarten and through the eighth grade, so that these students may achieve a higher level entrance in their language of choice by high school and develop the global perspectives and 21st century skills necessary to live and work with others internationally.

147.    Each Global Village Academy is a member of GVAC. GVAC has a charter school collaborative contract with each of its schools under Colorado law. Apart from the services GVAC provides to all its member schools, GVAC also provides strategic planning and policy development for its schools and maintains regular communication with each school through monthly meetings with principals and other methods of communication. GVAC regularly speaks on behalf of all GVA schools publicly regarding any issues or incidents concerning the schools.

148.    The Global Village Academies are tuition-free, public charter schools (K-8) providing English and second language immersion instruction to about 2,200 students across its schools in Aurora, Thornton, and Parker, Colorado. The Global Village Academies are centered on providing second language instruction in Spanish, Mandarin Chinese, Russian, or French using an immersion model. Parents select the language, or "village," their child begins learning, and for at least half of their school day, students learn all their core subjects immersed in their chosen language or village and taught by GVA's world language teachers. For the other half of the day, students receive this instruction in English.

149.    Global Village Academies heavily rely on GVAC to recruit and retain native-speaking world language teachers from all over the globe to provide their students with second language instruction through an immersion model that is consistent with an internationally benchmarked curriculum. The immersion model depends on GVA world language teachers who are highly qualified, experienced teachers with native-language skills who also bring their unique cultural perspectives and competencies from their home countries into the classroom. For this reason, GVAC does not recruit world language teachers who learned the language as a second language. The special combination of native-language skills and cultural competencies that GVAC seeks is not easily found through recruiting only U.S. workers. It is necessary for GVAC to attract world language teachers from outside the United States.

150.    Since 2007, GVAC has regularly relied on and engaged in the H-1B visa process to recruit and retain native-speaking world language teachers from around the world for its three GVA schools. Each year, GVAC recruits roughly 2-5 new world language teachers, but sometimes more, across their GVA schools. As part of this process, GVAC consistently recruits teachers from abroad who come to the United States on a H-1B visa to work at a GVA school. For the current 2025-2026 academic year underway, GVA schools are employing ten world language teachers who required H-1B visa sponsorship, three of whom came to the United States from abroad. Without the H-1B visa system, GVAC would not be able to continue recruiting qualified world language teachers for GVA schools to hire to carry out their unique educational model and provide the level of instruction that they have in the past.

151.    The $100,000 Requirement would significantly hinder GVAC's and its member schools' ability to recruit and hire new and qualified teachers for the upcoming academic year, particularly given the challenging teacher recruitment market and the need for world language teachers with both native-language skills and cultural competencies to achieve their mission. Given that GVA schools do not charge tuition and have a limited budget that largely comes from the state of Colorado, paying $100,000 for each new H-1B petition that the schools anticipate filing for the 2026-2027 academic year would have a significant financial impact on GVAC and

its schools. GVA schools could not afford to make even one $100,000 payment to continue hiring qualified world language teachers through H-1B petitions in line with its mission and model. As a result, GVAC would have to take significant, drastic measures to offset such a cost, like cutting down on current staffing or placing a cap on enrollment, that would have a vast impact on the GVA schools' funding, which is allocated by the state per pupil enrolled. Most of GVAC's funding then comes directly as a percentage of the schools' budget, so lower enrollment would directly mean less funding both for the schools and GVAC.

152.    The $100,000 Requirement would also harm GVAC's and its member schools' programmatic work, and the thousands of students they serve. If GVA schools cannot afford to hire world language teachers through the H-IB visa process, GVAC would be forced to fundamentally change its unique educational model that sets its schools apart for parents and students, undermining GVA schools' ability to provide the quality language immersion instruction and cultural competencies they are known for.

### 3.    Manufacturing

153.    **Plaintiff BAE Industries** is a privately held automotive parts manufacturing company headquartered in Auburn Hills, Michigan. Founded in 1970, BAE Industries specializes in precision metal stamping, assembly, and integrated component manufacturing. BAE operates multiple production facilities across Auburn Hills, Warren, and Fraser in the Metro Detroit region. It plays an important role in the automotive supply chain and related manufacturing sectors, supplying components that must meet stringent quality, performance, and regulatory standards.

154.    Recruiting has been a challenge for BAE due to the highly competitive nature of the market in Detroit, often referred to as "Motor City" and recognized as the center of automobile manufacturing in the United States. As a small private company, BAE supplies products to larger companies that ultimately end up in vehicles produced by large-scale American automakers such as Ford and General Motors. Operating a smaller company in such a

1   competitive market makes it particularly difficult for BAE to hire and retain talent. To address

2   these challenges, BAE has hired several employees through the H-1B visa program.

3       155.    In July 2018, BAE hired an international student from India who was in the

4   United States and had completed his master's degree at Wayne State University. BAE filed an H-

5   1B petition on his behalf, which was approved, and he transitioned into H-1B status on October

6   1, 2019.

7       156.    This employee works in BAE's Quality Department as a Senior Quality Engineer.

8   The Quality Department is responsible for ensuring compliance with the strict performance and

9   safety requirements that apply to automotive and industrial component manufacturing. He works

10  in the BAE plant that is responsible for manufacturing stampings that are assembled into highly

11  engineered seat mechanisms, subject to Fair Motor Vehicle Safety Standards.

12      157.    As he had been a member of the team for several years and was a valued

13  contributor to the company's workforce, BAE began the process to sponsor him for employment-

14  based permanent residence (colloquially, a "green card") and USCIS approved the immigrant

15  visa petition (Form I-140) that BAE filed for the employee on September 24, 2025. The

16  employee is still waiting for an immigrant visa to become available, however, so that he can

17  apply for permanent resident status.

18      158.    Although the employee's H-1B status reached the statutory six-year maximum

19  period of stay on October 16, 2025, USCIS's approval of the Form I-140 allows BAE to seek an

20  extension of his H-1B status while he awaits an immigrant visa.

21      159.    BAE prepared to file an H-1B extension petition to continue the employee's H-1B

22  status while he awaited the availability of an immigrant visa. This process begins with filing a

23  Labor Condition Application (LCA) to the Department of Labor ("DOL"), which BAE filed on

24  September 25. Under normal circumstances, an LCA is certified within seven working days.

25  However, the government shut down on October 1. As a result, the DOL did not certify the LCA

26  until November 4, 2025. Because the LCA remained pending, BAE was unable to file the H-1B

27  extension petition before the employee's H-1B status expired on October 16, 2025. As a result,

28  First Amended Complaint                    42                    Case No. 4:25-cv-08454-HSG

1   the employee, who did not want to be out of status, took leave from BAE and reluctantly

2   departed the United States on October 15, 2025.

3       160.    Five days later, the government issued guidance stating that H-1B petitions filed

4   on or after September 21, 2025, for workers who are outside the United States and require a new

5   H-1B visa would be subject to the $100,000 fee. Because the employee is now outside the United

6   States and his previous H-1B visa had expired, any H-1B petition BAE would file for him

7   appears to be subject to the $100,000 fee under USCIS's October 20, 2025 guidance.

8       161.    BAE just lost a significant amount of its business and has had to undergo cost-

9   saving measures, so it cannot afford the $100,000 fee to file an H-1B petition for the employee.

10  After nearly six years with the company, this employee is a critical member of BAE's Quality

11  Department. Moreover, BAE had planned to promote this employee into a Quality Manager

12  position, which he would assume when the current Quality Manager retires after serving BAE

13  for over a decade. Without this employee, BAE is suffering immediate harm due to the

14  importance of his role, his tenure with the company, and the respect he has developed within the

15  company.

16          **4.  Religious organizations**

17      162.    **Plaintiff Society of the Divine Word** (also known as "Societas Verbi Divina,"

18  "SVD," and the "Divine Word Missionaries") is a religious missionary order of Roman Catholic

19  priests and brothers presently serving in almost eighty countries around the world. The Chicago

20  Province—headed by Father Adam Oleszczuk, the Provincial Superior of the Province—is a

21  non-profit, tax-exempt organization employing several hundred employees.

22      163.    There are approximately 195 Divine Word Missionaries in the Chicago Province.

23  The Divine Word Missionaries work in the states of Illinois, Iowa, Wisconsin, Ohio, Missouri,

24  Tennessee, New Jersey, and Washington D.C; in several island nations in the Caribbean

25  including Antigua, Jamaica, B.V.I., Montserrat, St. Kitts, and St. Maarten; as well as in various

26  provinces in Canada. Divine Word Missionaries are involved in a variety of ecclesiastical

27  duties—or ministries—including parish administration and communications, Catholic formation,

28  First Amended Complaint                    43                Case No. 4:25-cv-08454-HSG

Catholic Biblical Apostolate, spiritual direction, vocation recruitment, fundraising, and other specialized ministries.

164.    SVD has three formation centers which educate future SVD members in the pre-novitiate, novitiate, and post-novitiate formation programs: Divine Word College in Epworth, Iowa; Divine Word Theologate in Chicago, Illinois; and Catholic Theological Union in Chicago, Illinois. Divine Word Missionaries oversee and implement each of these programs.

165.    As an international religious missionary order, SVD's members can be assigned to other countries by the SVD Generalate in Rome. Each year, Rome assigns newly final professed members to various countries around the world where the Society works, including the United States. Additionally, the Chicago Province often invites foreign Divine Word Missionaries to come to the United States to maintain its missionary outreach. Many of the members who are assigned to the United States will remain in this country for years, including members who eventually become U.S. citizens or lawful permanent residents.

166.    Because of the diverse communities, cultures, and nationalities that Society of the Divine Word serves, it is critical that Divine Word Missionaries have the cultural and language skills to properly perform their duties. In the Chicago Province alone, Society of the Divine Word has particularly large Spanish-, Polish-, and Vietnamese-speaking populations that require Divine Word Missionaries with those language skills to receive spiritual guidance and instruction, ministry, and sacraments. Individuals with the proper skillset and experience for these roles are hard to find and hard to replace. Additionally, given the ongoing changing realities in the American Catholic Church, such as an aging native-born clergy and religious community, and fewer American (born and naturalized) candidates becoming priests, many dioceses and religious orders, including SVD, are becoming increasingly dependent on foreign born priests. This trend is expected to worsen in the near future.

167.    Three SVD Divine Word Missionaries currently hold an H-1B visa. Each of these Divine Word Missionaries were carefully selected for their unique skills, spoken languages, and expertise, and they are critical for their respective ministries. This includes pastoring parishes,

1  performing administrative work, mentoring newly professed members working in the parish,

2  providing spiritual counsel and guidance in a variety of languages, and serving as church canon

3  law consultants (which requires further specialized training). These individuals' skills are

4  necessary to serve their ethnically diverse parishes.

5      168.    Although the Chicago Province of SVD has at least eight priests working in

6  nonimmigrant status with an R-1 visa—an immigration status which allows a nonimmigrant

7  worker in a religious occupation to temporarily live and work in the United States, under certain

8  conditions—there are key limitations on this status that prevent it from being a long-term

9  solution for SVD's ministerial needs. For example, an individual in R-1 status can only maintain

10 that status for up to five years. Although there is a path to a green card from R-1 status, it is a

11 long, involved process and currently has a lengthy backlog for an immigrant visa to become

12 available. Given this backlog, the ability to change nonimmigrant status to H-1B status is the

13 only lawful alternative available to SVD to maintain its priests' legal status in the United States.

14 SVD planned to petition for H-1B status for each of these individuals prior to the expiration of

15 their R-1 status, to ensure they could continue their work uninterrupted. If this is not possible

16 because of the prohibitive fee under the Proclamation, a Divine Word Missionary would need to

17 leave the U.S. and wait abroad for at least one year before he could receive another R-1 visa.

18 This would cause significant disruption and severely impact the parishes where these priests

19 perform vital services.

20     169.    The H-1B visa is the lawful pathway SVD must use to continue its critical

21 religious services ministry in the United States. As a non-profit, paying the $100,000 fee per

22 employee would create a crippling burden on the Chicago Province, and would pose serious

23 barriers to the continuity of its ministry in key areas. If SVD is unable to apply for H-1B visas

24 for its staff, it will be unable to continue providing critical language- and culturally-accessible

25 religious services to its congregants, impacting its congregants' spiritual needs and interfering

26 with SVD's religious exercise. In other words, SVD's inability to employ these professionals will

27 harm not only the organization, but also the communities it serves, especially those which

28

require the unique skillset of the individuals who would otherwise apply for H-1B visas. Furthermore, SVD had already begun plans and reserved the fees already required to apply for H-1B visas for its necessary religious workers, to fill roles for which U.S. citizens are simply not available. These plans must now be placed on hold since SVD cannot afford to pay the extravagant $100,000 fee for each necessary individual.

170.    **Plaintiff Fathers of St. Charles** is a part of the Congregation of the Missionaries of St. Charles – Scalabrinians, an international community of brothers who have felt the call to consecrate themselves to a missionary life in service of migrants. The Congregation serves migrants and refugees all over the world and is divided into several provinces or regions, each responsible for serving certain countries. The province of Fathers of St. Charles is the St. John the Baptist Province, whose jurisdiction covers the United States, Canada, Mexico, Guatemala, and El Salvador. The provincial office is located in Oak Park, Illinois and supports a membership of brothers hailing from thirteen different countries who minister in locations all over the province.

171.    Because Fathers of St. Charles are called by their faith to be in mission with migrants and refugees, with a special priority for the poorest migrants, it is critical for the members of Fathers of St. Charles to be able to perform all sacramental and liturgical activities in a linguistically and culturally appropriate manner for the communities they serve. For the St. John the Baptist Province, this requires the language and cultural competency to be able to minister to Latin American, Vietnamese, and Brazilian communities throughout the province's jurisdiction. Most members of Fathers of St. Charles speak at least two to three different languages and rotate to different locations both within the province as well as to other Scalabrinian provinces and regions outside the province as part of their calling and mission to be in community with migrants and refugees.

172.    The unique mission of the Congregation of the Missionaries of St. Charles and the Fathers of St. Charles requires the St. John the Baptist Province be able to bring members of the Congregation into the United States on visas so that they can work with and serve the ethnic

communities in the parishes entrusted to Fathers of St. Charles by the bishops. In the past, Fathers of St. Charles has used (and continues to use) R-1 religious worker visas to enable its members to live and work in the United States, and it has also subsequently sponsored its members for permanent residency so that they may remain with the province on a long-term basis. But because R-1 visas are valid only for five-year periods before the recipient must leave the United States for at least a year, and due to processing backlogs that have made it nearly impossible for R-1 visa holders to adjust status to lawful permanent residency before the five-year term of their visa expires, it has recently become necessary for Fathers of St. Charles to sponsor its members already in the United States on R-1 visas for H-1B visas so that they may maintain legal status and continue their work here.

173.    Fathers of St. Charles currently has three members here on R-1 visas that will expire imminently, and for whom Fathers of St. Charles had planned to petition for H-1B visas in the next few months. The mission and religious calling of Fathers of St. Charles depends heavily on the H-1B visa system and the ability of Fathers of St. Charles to be able to bring members of the Congregation from abroad to work in the United States on H-1B visas on a regular basis.

174.    The Proclamation and the $100,000 Requirement is therefore devastating to Fathers of St. Charles and their religious calling. Fathers of St. Charles cannot afford to pay $100,000 for each new H-1B visa application. The province's many humanitarian duties would be severely impacted if the province had to find hundreds of thousands of dollars within its budget to cover new H-1B visa applications on an ongoing basis in future years. If the Proclamation remains in effect, Fathers of St. Charles will not be able to maintain the legal status of the three members currently here on R-1 visas and would be forced to send them abroad, with no ability to fill the positions those members would leave vacant. In turn, the communities in those parishes would not be able to convene and worship in their own language and would be deprived of spiritual guidance and service, in contravention of the mission and spiritual calling of Fathers of St. Charles. The $100,000 Requirement substantially burdens Fathers of St. Charles's mission and ability to serve the poorest of migrants, and it currently unclear how Fathers of St.

1   Charles will be able to continue their spiritual work if they cannot access the H-1B visa system

2   going forward.

3       175.    **Plaintiff Church on the Hill** is a religious institution located in the Appalachia

4   region of the United States. The church congregation was formed seventy years ago but was

5   officially incorporated in its current structure in 2003.

6       176.    In 2021, Church on the Hill decided to branch out and establish a new church,

7   also known as a "church plant." The church plant, which began with twenty members from

8   Church on the Hill, formed a new congregation in a nearby city. The new church serves an

9   underserved, economically disadvantaged region in Appalachia and now has approximately 200

10  members in its congregation.

11      177.    Both Church on the Hill and the church plant have established ministries for

12  children, youth, families, and students, as well as community outreach that meets both practical

13  and spiritual needs. Some of the ministries in the church plant work with local schools to support

14  parents who are financially struggling and teachers who work with these low-income families.

15  Church members regularly visit sick and elderly community members in the hospital and in their

16  homes. Through these efforts, the church has become a trusted presence in the community,

17  standing alongside families in hardship and serving as a stabilizing and hope-filled influence in a

18  region marked by economic challenge.

19      178.    The church would not be what it is today if it had not hired foreign talent through

20  the visa system to assist with establishing this second church. Several years ago, Church on the

21  Hill hired a pastor from the United Kingdom on an R-1 visa, a temporary non-immigrant visa

22  available for religious workers. Prior to working for Church on the Hill, this pastor shared with

23  the Church Board his vision and calling to start a new church. The Board found this vision so

24  compelling that they offered a job to the pastor and then became the sponsor for his new petition

25  for nonimmigrant worker status and green card petition, which allowed him to adjust to legal

26  permanent residency from his R-1 visa. This pastor was and is integral to the church's mission

27  and work.

28

179.    To help make this vision of a second church a reality, Church on the Hill sponsored for an R-1 visa a second pastor from the United Kingdom, Plaintiff John Smith, who was a colleague of the first pastor the church had sponsored for an R-1 visa. The two pastors' work has allowed Church on the Hill to expand to its second location. John Smith's relationship to the first pastor, their long history, their common vision, their complementary qualifications, skills, and giftings create a unique synergy so that together they can co-pastor the church plant and its local community.

180.    Pastor John Smith is a native of England and is currently present in the U.S. on an R-1 visa. It was important to hire Pastor John Smith with an R-1 visa because of his unique qualifications and partnership with the first pastor. In addition, he brings extensive experience and training in cross-cultural mission work, having served and trained in diverse contexts overseas. This background has shaped his ability to minister effectively across generational, cultural, and socioeconomic boundaries within the Appalachian Highlands. Combined with his theological preparation, pastoral leadership, and long history of shared vision with the first pastor, his contribution could not be replicated by hiring unrelated local talent. Pastor Smith's leadership is critical for the growth and development of the church plant.

181.    Pastor John Smith's R-1 visa is set to expire on November 1, 2026, at which time he will have reached the maximum five-year stay on his R-1 visa in the United States. The church has sponsored Pastor John Smith for a green card, and that application has been approved, but there is a long processing backlog that is delaying his ability to adjust status to lawful permanent residency. Prior to the Proclamation, Church on the Hill planned to apply for an H-1B visa for Pastor John Smith so that he could remain in the U.S. and continue his ministry with the church while he waits to be able to adjust status. The church had retained immigration counsel to apply for an H-1B visa for him just prior to the Presidential Proclamation at issue.

182.    After the $100,000 Requirement was instituted, the church was forced to notify Pastor Smith that it cannot afford to pay this fee. Without an H-1B visa, John Smith will be unable to continue working for Church on the Hill after November 2026.

183.    The required fee directly harm Church on the Hill, their mission, and their members. The church is worried that the fee will prevent them from retaining the pastoral leadership that is central to their mission and the stability of their congregation. The fee has created real concern about the future of the church and the community that depends on it.

184.    If the H-1B fee continues in force, the church and its members will face a staffing shortage. Pastor John Smith has played a pivotal role growing the church, including shepherding the church plant in a nearby city. Pastor Smith leads many of the church's ministries and participates in preaching, teaching and mentoring new leaders. He also plays a key role in developing religious education programs for the church, leading worship and performing outreach to underserved families in the community. As part of Pastor John Smith's ministry, he has developed important and meaningful relationships with members of Church on the Hill's congregation and community that would be immediately weakened, if not severed completely, if he and his family no longer had legal status in the United States and were forced to leave the country. Many of the church's ministries and programs will be paused or cut back if Church on the Hill is unable to change Pastor John Smith's status to H-1B. Church on the Hill's existing church staff would not be able to fill the hole in our workforce that Pastor John Smith would leave if it cannot convert his status to continue his employment.

185.    If Pastor John Smith is unable to lawfully remain and work in the United States, the essential services he provides to the congregations and the community will be critically impacted, leaving a vulnerable population and community without the support it needs. Because the other pastor who co-leads the church is dealing with significant health issues, Pastor John Smith's absence would place considerable strain on him and on the church as a whole. Instead of continuing to expand and develop new ministries and outreach, the church would be forced into a position of simply trying to maintain what already exists. This would prevent further growth, limit innovation, and hinder the broader impact the church has been having.

186.    **Plaintiff John Smith** is a citizen of the United Kingdom who currently lives in the Appalachia region of the United States with his wife and four children. John Smith came to

the United States in 2021 on an R-1 nonimmigrant visa for foreign nationals in religious vocations, and is currently working as a full-time pastor at a church in his area. In addition to his rewarding and important work with the church, Pastor Smith's family have also established deep roots in their local community, where his children attend school, and have developed meaningful connections with their church and broader community. Pastor Smith's elderly mother and step-father also live close by, which allows Pastor Smith and his family to be close to them and continue these familial relationships. Pastor Smith and his wife are in the process of purchasing a home for their family.

187.    Pastor Smith's R-1 visa allows him to reside in the United States for up to five years until November 1, 2026, but his church offered him a permanent position if he could continue maintaining legal immigrant status in the country, and sponsored him for a green card with an I-360 petition. This I-360 petition was approved last year; however, due to an extreme backlog in visa processing, Pastor Smith cannot file to adjust his status to lawful permanent residency before his R-1 visa will expire. Thus, Pastor Smith's church retained immigration counsel to file an H-1B petition on Pastor Smith's behalf so he can continue working at the congregation while he waits for the opportunity to adjust his status.

188.    Before the church could file Pastor Smith's H-1B petition, however, the Proclamation went into effect. It is not possible for the church to pay such a high fee. The news has left Pastor Smith heartbroken and filled with uncertainty. He too cannot afford to pay this fee, and without the H-1B visa process, he will lose his job at the church and will not be able to remain in the United States beyond his five-year maximum stay on his R-1 visa. This would undermine his ability to continue providing the essential pastoral and community to his church. The new $100,000 fee would not only upend Pastor Smith's plans to remain in the United States and much of the spiritual work he has devoted himself to for the past several years, but also his family's lives and the relationships and plans they had for their future.

1

### 5. Research and academic institutions

2      189.    **Plaintiff UAW International** represents 120,000 members in higher education,

3  and **Plaintiff UAW Local 4811** represents nearly 50,000 members employed at the University of

4  California. These members include post-doctoral researchers, graduate students, and teaching

5  assistants who drive innovation and advances in multiple fields. Plaintiffs UAW International

6  and Local 4811 have numerous members whose employers had planned to file H-1B petitions

7  with USCIS on their behalf. These members may lose their ability to live and work in the United

8  States as a result of the Proclamation.

9      190.    For example, one UAW International and Local 4811 member is a 31-year-old

10  Indian post-doctoral researcher at a major U.S. research institution whose work focuses on

11  biomedical modeling and developing tools to simplify and accelerate drug discovery. His current

12  projects support advances in treatment for tuberculosis and breast cancer and he is the only

13  person in his lab working on these projects. He is presently employed on a STEM OPT

14  extension, but his projects will not be completed by the time it expires, and his laboratory

15  recommended that the research institute file an H-1B petition on his behalf. The imposition of a

16  $100,000 fee imposed by the Proclamation would be extremely burdensome on the research

17  institution and thus jeopardize both his research and the institution's investment. Since he found

18  out about the Proclamation, he has felt depressed and hopeless about his own future and the

19  future of his work and is finding it difficult to concentrate on his research.

20      191.    A European UAW International member is currently in a postdoctoral position at

21  a major research institution on the East Coast. He is a neuropharmacologist who studies the

22  impacts of opioids generally and fentanyl specifically on pain management, in an effort to

23  identify ways to reduce the risk of addiction. He chose to do his postdoctoral work in the United

24  States specifically because he is aware of the acuity of the opioid epidemic here and hopes to

25  find ways to reduce it. He is currently in the U.S. through a J-1 visa and his current institution

26  planned to sponsor him for an H-1B visa so he could continue this critical work. He is also

27  preparing to submit a major grant application for funding to continue and expand his work at that

28

institution, on which he would be the primary investigator. If he is unable to obtain an H-1B visa, his institution will lose access to any potential grant funding, and he will not be able to continue this critical research. When he became aware of the Proclamation, he was also personally devastated and has suffered from anxiety and insomnia because his entire career and the future of his research are now up in the air.

192.    **Plaintiff AAUP** has 50,000 members who are faculty and other academic professionals. Plaintiff AAUP has numerous members whose employers had planned to file H-1B petitions with USCIS on their behalf. These members may lose their ability to live and work in the United States as a result of the Proclamation.

193.    For example, one AAUP member had an offer from the major research university where that member is currently completing a postdoc. The university intended to seek an H-1B visa for this member, and they expected the H-1B process to be completed this fall. However, the university has placed the processing of this member's H-1B visa on hold indefinitely due to the $100,000 fee.

194.    The potential loss of these postdoctoral researchers, scientists, and academics will not just harm the individuals and the institutions that employ them. It will result in significant and potentially catastrophic setbacks to research that benefits the American public and ensures the United States remains a leading source of innovation and expertise. For example, the fee will likely result in sharp cutbacks in the employment of highly talented foreign workers and severe setbacks for university research, graduate programs, and clinical care, compounding an anticipated shortfall of 5.3 million skilled workers over the next decade.[44] Faculty search committees are already being told they have to exclude top candidates if those candidates would need H-1B visas. Andrea Liu, a physicist at the University of Pennsylvania, said the fee would

---

[44] Michael T. Nietzel, *Universities May Face Huge Costs From Trump's $100,000 H-1B Visa Fee*, Forbes (Sept. 26, 2025), https://perma.cc/FB3Y-LNJ4.

1   damage the future of her research group and described the impact as "an utter disaster—yet

2   another body blow to science."[45]

3          195.    **Plaintiff Phoenix Doe** is a citizen of India residing in the Northern District of

4   California. She is a postdoctoral researcher at a U.S. university whose cap-exempt H-1B petition

5   has been halted due to the $100,000 fee imposed by the Proclamation. Her research focuses on

6   identifying the genetic and epigenetic causes of vision loss due to aging, diseases such as

7   diabetes, and rare inherited genetic abnormalities of unknown etiology, with the goal of finding

8   new ways to diagnose and treat blinding conditions. Her laboratory relies on her as its first

9   postdoctoral scholar to build and advance its research program, and her ongoing work requires a

10  minimum of two more years. Due to the value of her skills and research expertise in both

11  computational biology as well as wet-lab bench research, her university employer approved her

12  for H-1B sponsorship, and she expected the process to be completed by this December, allowing

13  her to visit her home country for the first time in six years. Instead, as a result of the

14  Proclamation, her university has indefinitely paused moving forward with the processing of her

15  application. She is suffering debilitating stress and anxiety due to the uncertainty of her position,

16  which exacerbates the PTSD from which she suffers. Without relief, Plaintiff Phoenix will be

17  forced to leave her postdoctoral position the United States within four months, causing serious

18  professional and personal harm. Her departure will set back the crucial research she is

19  conducting, disrupting the lab's ongoing work and ability to secure future research funding,

20  preventing her department from getting any future funding through her, and potentially delaying

21  the availability of treatment for the conditions that are the focus of her research.

## VII.   CLASS ALLEGATIONS

23          196.    Plaintiffs Nephrology Associates, BAE Industries, and Lower Brule Day School

24  ("Class Plaintiffs") seek prospective injunctive and declaratory relief on behalf of a class of

---

[45] Natasha Gilbert, *Trump's $100K Visa Fee for Foreign Talent: How Will It Affect Researchers?*,
Nature (Sept. 24, 2025), https://perma.cc/2BUK-T49N.

similarly situated individuals under Rule 23(b)(2) of the Federal Rules of Civil Procedure ("Employer Class").

197.    The Employer Class comprises all U.S. employers who have filed or will file an H-1B petition that is subject to the $100,000 fee under the September 19, 2025 Proclamation, "Restriction on Entry of Certain Nonimmigrant Workers," or the Proclamation's implementing guidance, or would file such a petition but for the fee, with the United States Citizenship and Immigration Services received on or between September 21, 2025 and September 21, 2026, to employ a qualified temporary nonimmigrant worker in a specialty occupation in the United States under 8 U.S.C. § 1101(a)(15)(H)(i)(b) and 8 C.F.R. § 214.2(h)(1)(i).

198.    The $100,000 Requirement imposes the burden on H-1B employers to either pay an onerous fee to meet the labor needs of their business or to forgo or delay hiring altogether. In this way, Defendants force Class Members to make the painful choice between incurring expense or forgoing hiring, often into professions, areas, and industries suffering critical shortfalls—thus imposing an ongoing threat to the Employer Class's ability to petition for H-1B visas.

199.    Numerosity: The Class is so numerous that joinder of all individual members would be impracticable. Upon information and belief, in addition to Class Plaintiffs, the proposed class includes thousands of employers who have filed or will file an H-1B petition that is subject to the Proclamation or the Proclamation's implementing guidance, or would file an H-1B petition but for the $100,00 Requirement.

200.    According to data maintained by USCIS, on average, between FY 2022 and FY 2024, approximately 14,000 employers filed petitions that, if filed today, would or could be subject to the $100,000 Requirement under the Proclamation, as implemented.

201.    Commonality: Class Plaintiffs and all members of the proposed class have been harmed by Defendants' abrupt imposition of the $100,000 Requirement. This action requires a determination of whether the imposition of the $100,000 Requirement exceeds the President's authority and otherwise violates the Administrative Procedure Act. The questions of fact and law arising from the adjudication of this issue are common to all members of the Class, including:

202.    Whether the President exceeded his authority by unilaterally changing a statutory scheme created by Congress;

203.    Whether the President exceeded his authority by unilaterally imposing a fee, tax, or other mechanism to generate revenue for the United States;

204.    Whether the $100,000 Requirement violates the APA because it is not in accordance with the law and in excess of statutory authority;

205.    Whether the $100,000 Requirement violates the APA because it is arbitrary and capricious; and

206.    Whether the $100,000 Requirement violates the APA due to Defendants' failure to observe the procedures required by law, including notice and comment rulemaking, before imposition of the $100,000 Requirement;

207.    Typicality: Class Plaintiffs' claims for relief are typical of the claims of the Class. Class Plaintiffs are employers that have filed or will file an H-1B petition subject to the $100,000 fee under the Proclamation or the implementing guidance, or would file such a petition but for the fee, so that they can employ a qualified temporary nonimmigrant worker in a specialty occupation in the United States. Class Members are similarly all employers that, since September 21, 2025 have or will file an H-1B petition that is subject to the $100,000 fee under the Proclamation or the Proclamation's implementing guidance, or would file such a petition but for Defendants' imposition of the $100,000 Requirement.

208.    Adequacy of Representation: Class Plaintiffs can protect the interests of all members of the class fairly and adequately, as they have no conflicts of interest with any members of the Employer Class. Class Plaintiffs have retained counsel who are experienced in litigating both the substantive areas of law and complex class action cases.

209.    Injunctive and Declaratory Relief for the Class: Defendants created and implemented the $100,000 Requirement such that it applies to all members of the putative class. Class Plaintiffs and the putative class seek to establish that the $100,000 Requirement is unlawful. They also seek injunctive relief to remove the $100,000 Requirement and declaratory

relief to declare it unlawful and set it aside to permit them to move forward with current or future H-1B petitions without incurring this fee. Class Plaintiffs and the putative class are and will continue to be subject to the unlawfully implemented fee by Defendants' continued maintenance and enforcement of the $100,000 Requirement, and they are or will continue to be injured as a result.

210.     Pursuit of this action collectively will provide the most efficient mechanism for adjudicating the claims of Class Plaintiffs and members of the proposed class.

## VIII.   CAUSES OF ACTION

### COUNT 1

**Against Defendant Trump**

**On behalf of all Plaintiffs and the Employer Class**

**Actions *ultra vires*, in excess of statutory authority**

211.     Plaintiffs incorporate the factual allegations above as if set forth herein.

212.     The Proclamation cites Sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1182(f) and 1185(a), as providing statutory authority for imposing a requirement that employers submitting a petition for an H-1B visa make a "payment" of $100,000 to the United States.

213.     Neither INA § 212(f) nor § 215(a) authorizes the President to impose the $100,000 Requirement.

214.     Nor has Congress or the Constitution otherwise authorized the President to impose this fee, tax, or other revenue-generating requirement on H-1B petitioners. To the contrary, under the Constitution, the power of taxation belongs to Congress. U.S. Const. art. I, § 8, cl. 1.

215.     The cited statutes, INA §§ 212(f) and 215(a), cannot be reasonably interpreted to be a delegation of Congress's tax power.

216.    If these provisions were interpreted to provide this authority, they would violate the nondelegation doctrine because they contain no intelligible principles to guide decision-making on the amount of money that can be raised or the use of the money collected.

217.    That interpretation would also violate the major questions doctrine because these provisions contain no clear Congressional authorization for this action of great political and economic significance. And, there is no basis for delegated authority for the President to raise and spend money as he sees fit.

218.    INA § 212(f) and § 215(a) also do not authorize the President to override other provisions of the INA. *Trump v. Hawaii*, 585 U.S. 667, 689 (2018).

219.    In separate provisions, the INA sets standards for and limits on the entry into the United States of H-1B visa recipients and authorizes DHS—not the President—to impose limited fees in connection with H-1B visa petitions:

220.    The INA sets specific requirements for approval under the H-1B visa program. See 8 U.S.C. § 1101(a)(15)(H)(i)(b). It also sets specific caps on the number of people who may be admitted under this program, see 8 U.S.C. § 1184(g), reflecting a careful balancing of policy interests between employers' need to hire foreign workers for certain kinds of roles and the interests of American workers in the labor market.

221.    The INA also limits the fees that DHS may impose under 8 U.S.C. § 1356(m) for adjudication and naturalization services. Such fees "may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m). In accordance with the APA, DHS sets the amounts of these fees through notice-and-comment rulemaking. *See*, *e.g.*, 89 Fed. Reg. 6194.

222.    Beginning with the passage of the American Competitiveness and Workforce Improvement Act of 1998, Congress (via the INA) imposed additional fees on employers specifically in connection with H-1B visa petitions. *See* 8 U.S.C. § 1184(c)(9)-(14). The INA

also directs that these fees be segregated into a special account and used for specified purposes. 8 U.S.C. § 1356(s). Congress set these limits for the purpose of balancing impacts to the labor market for American workers while permitting foreign workers in this category to be hired for certain kinds of roles.

223.     The INA also includes detailed provisions to address misuse of the H-1B visa program. *See* 8 U.S.C. § 1182(n)(2); 20 C.F.R. § 655.800 *et seq*.

224.     In directing DHS to require a $100,000 "payment" to an unspecified account and for unspecified uses, in connection with H-1B visa petitions, the Proclamation conflicts with and supplants the structure Congress has established for approval and entry into the United States of H-1B visa recipients, including the fee structure for adjudication services in general and for the H-1B visa program in particular.

225.     Nor does the President have authority under 8 U.S.C. § 1182(f) to restrict workers from entering the United States because their employers failed to make this payment.

226.     The Proclamation's requirement to pay $100,000 as a condition of entry or re-entry to the United States, combined with the expansive and effectively standardless discretion of the Secretary of Homeland Security to disregard the Proclamation's dictates and Congressional intent, adds novel eligibility requirements, conflicts with, and supplants the structure Congress has established for the adjudication of H-1B petitions, issuance of H-1B visas, and entry into the United States for those with H-1B visas.

## COUNT 2

### Against Agency Defendants

### On behalf of all Plaintiffs and the Employer Class

### Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(A), (C)

### *Not in Accordance with Law, In Excess of Statutory Authority*

227.     Plaintiffs incorporate the factual allegations above as if set forth herein.

228.     Agency Defendants require a $100,000 fee as a mandatory requirement upon submission of any new H-1B petition received after 12:01 a.m., September 21, 2025.

229.    The new $100,000 Requirement, an extortionate fee, constitutes final agency action under 5 U.S.C. § 704.

230.    Agency Defendants each lack statutory authority to impose the $100,000 Requirement.

231.    The $100,000 Requirement is contrary to and/or in excess of the authority provided in provisions of the INA, including (1) the standards for approval and entry into the United States of H-1B visa applicants, as set forth in 8 U.S.C. § 1101(a)(15)(H)(i)(b) and 8 U.S.C. § 1184(g); (2) the fees to be charged to employers submitting petitions for H-1B visa applicants, including the amount of those fees and the purposes for which they may be used, as set forth in 8 U.S.C. § 1184(c)(9)-(14) and 8 U.S.C. § 1356(s); and (3) the fees to be charged generally for adjudication and naturalization services, as set forth in 8 U.S.C. § 1356(m).

232.    Nor do the Agency Defendants have the statutory authority to stop adjudicating petitions and visas or to bar individuals from entering the country unless their employers have paid $100,000.

233.    The $100,000 Requirement is contrary to law and in excess of statutory authority and must be set aside under 5 U.S.C. § 706(2).

234.    In the alternative to the APA, Plaintiffs bring this claim pursuant to the Court's inherent equitable authority to declare unlawful and enjoin unlawful agency action.

**COUNT 3**

**Against Agency Defendants**

**On behalf of all Plaintiffs and the Employer Class**

**Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(A)**

***Arbitrary and Capricious***

235.    Plaintiffs incorporate the factual allegations above as if set forth herein.

236.    Under the APA, a court shall set aside an action if it is arbitrary and capricious. 5 U.S.C. § 706(2)(A). An action is arbitrary and capricious if the agency "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the

1  problem, offered an explanation for its decision that runs counter to the evidence before the

2  agency, or is so implausible that it could not be ascribed to a difference in view or the product of

3  agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463

4  U.S. 29, 43 (1983). "When an agency changes course . . . , it must be cognizant that longstanding

5  policies may have engendered serious reliance interests that must be taken into account." *Dep't*

6  *of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

7      237.    Agency Defendants failed to consider the carefully crafted fees and factors

8  Congress intended for DHS to consider when adjusting fees for adjudication of H-1B petitions. 8

9  U.S.C. § 1356(m), for example, calls for DHS to consider the costs of providing adjudication and

10  naturalization services. But the $100,000 payment is untethered from the cost of adjudicating H-

11  1B petitions or any other petitions.

12      238.    Agency Defendants failed to consider the adverse impacts of the $100,000

13  requirement on small businesses, non-profits, and governmental jurisdictions, as required by the

14  Regulatory Flexibility Act. 5 U.S.C. §§ 603-604. Agencies are required to consider small entities'

15  ability to pay and to consider creating exemptions, discounts, or other alternatives for small

16  entities, and DHS typically has required small and non-profit employers to pay less in fees. But

17  here, the Agency Defendants did not consider ability to pay the $100,000 Requirement or explain

18  its unreasoned departure from that framework.

19      239.    Agency Defendants failed to consider the substantial burden that the $100,000

20  Requirement places on religious organizations who cannot afford to pay that exorbitant amount

21  and, as a result, will lose their pastors and priests.

22      240.    Agency Defendants failed to consider the negative impacts of the $100,000

23  Requirement on schools, hospitals, and communities, especially in underserved areas where

24  school districts and hospitals struggle to hire teachers and doctors and rely on the H-1B program

25  to ensure effective health care and educational services for their communities.

26      241.    Agency Defendants failed to consider the reliance interests of regulated parties

27  like Plaintiffs and their members. The agencies have never increased H-1B fees by six figures in

28

1  one go and have never done it without warning. Agency Defendants should have considered the

2  chaos that this enormous and sudden fee would predictably create for regulated parties, who

3  were caught by surprise and had no opportunity to prepare for it.

4      242.   Agency Defendants failed to consider alternative ways to address the purported

5  problems with the H-1B program, such as more closely scrutinizing any employers who may be

6  abusing the program, under the existing statutory enforcement mechanisms, rather than imposing

7  a blanket $100,000 fee on all employers.

8      243.   Agency Defendants did not consider how the $100,000 Requirement could

9  encourage employers to improperly lower wages for their workers—U.S. workers or H-1B

10  workers—in order to maintain needed staff but recoup additional costs paid to the government.

11      244.   While employers must provide a $100,000 payment "to accompany any new H-

12  1B visa petitions submitted after 12:01 a.m. . . . on September 21, 2025," *H-1B FAQ*, USCIS

13  (Sept. 21, 2025), https://perma.cc/9UKN-ZYDG, Agency Defendants have failed to consider

14  that, as of September 21, 2025, there was no mechanism by which petitioners could submit such

15  a fee.

16      245.   Agency Defendants have also failed to coherently explain other key information.

17  For instance, the agencies have not explained what will happen to employers who file petitions

18  before a payment system is set up, where the money will go, or how the money will be used.

19      246.   DHS has also failed to explain what criteria or factors it will consider in

20  determining whether an individual, an employer, or an industry will be exempt from the

21  $100,000 requirement. This failure invites arbitrary, selective enforcement of the new

22  requirement.

23

24

25

26

27

28

# COUNT 4

## Against Agency Defendants

## On behalf of all Plaintiffs and the Employer Class

## Violations of the Administrative Procedure Act,

## Regulatory Flexibility Act – 5 U.S.C. §§ 603-604, 706(2)(D)

### *Failure to Conduct Notice and Comment Rulemaking;*

### *Rulemaking Without Observance of Procedure Required by Law*

247. Plaintiffs incorporate the factual allegations above as if set forth herein.

248. *Notice and comment.* The APA requires that agencies provide public notice of, and opportunity to comment on, legislative rules before their promulgation. See 5 U.S.C. §§ 553(b)-(c). The agency must "consider and respond to significant comments received." *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). When the final rule is promulgated, the agency must provide "a concise general statement of [its] basis and purpose." 5 U.S.C. § 553(c).

249. The new requirement of a $100,000 payment is a legislative rule within the meaning of the APA. It "imposes new obligations" on H-1B petitioners, as the $100,000 payment must "accompany" their petition and the petitions will not be adjudicated and their workers will not be granted visas or be allowed to enter the United States without it. *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003). Legislative rules like the new $100,000 payment requirement must go through notice and comment rulemaking. See 5 U.S.C. § 553(b)-(c). USCIS has always provided notice and comment when adjusting fees for H-1B petitions except where Congress provided for the fees by statute. *See, e.g.*, *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6194 (Jan. 31, 2024), *as corrected,* 89 Fed. Reg. 20101 (Mar. 21, 2024).

250. Agency Defendants failed to provide notice and an opportunity for comment as required by the APA and have thus violated 5 U.S.C. §§ 553(b), (c) and 706(2)(D).

251.    *Effective date.* Agency Defendants also violated the APA by making the new $100,000 Requirement effective immediately without good cause. The APA requires that a substantive rule be published "not less than 30 days before its effective date." 5 U.S.C. § 553(d). If an agency claims good cause for making the rule effective in less than 30 days, it must publish its good cause explanation with the rule. *Id.* § 553(d)(3). Here, however, the new requirement became effective immediately. Agency Defendants failed to publish any good cause finding.

252.    *Regulatory Flexibility Act.* Agency Defendants have violated the Regulatory Flexibility Act (RFA), 5 U.S.C. § 601 *et seq.* Whenever an agency is required to conduct notice and comment rulemaking, an agency must "prepare and make available for public comment an initial regulatory flexibility analysis" that "describe[s] the impact of the proposed rule on small entities." 5 U.S.C. § 603(a). The initial analysis must discuss significant alternatives such as establishing different compliance requirements or timetables "that take into account the resources available to small entities" or "exemption from coverage of the rule, or any part thereof, for such small entities." *Id.* § 603(c). A final rule must include a final regulatory flexibility analysis that discusses, among other things, significant issues raised by the public or the Chief Counsel for Advocacy of the Small Business Administration and the steps the agency has taken to "minimize the significant economic impact on small entities." *Id.* § 604(a). Agency Defendants never published an initial analysis for public comment and did not publish a final analysis either, even though the $100,000 requirement will have an enormous impact on small entities.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Declare unlawful and set aside sections 1, 2, and 3(a) of the Proclamation;

2.    Declare unlawful and set aside enforcement and implementation of sections 1, 2, and 3(a) of the Proclamation, including the requirement to make a $100,000 payment as a prerequisite to adjudicate an H-1B petition or as a condition for visa issuance or entry into the United States for H-1B beneficiaries;

3.      Declare unlawful and set aside any agency guidance, procedures, or
        determinations made pursuant to, or in implementation of, sections 1, 2, and 3(a)
        of the Proclamation, including the Agency Policies;

4.      Enjoin Defendants from requiring the $100,000 payment and from conditioning
        H-1B petition adjudications, visa issuance, or entry on such payment;

5.      Order Defendants to process H-1B petitions under existing law, without the
        $100,000 payment condition;

6.      Grant such other and further relief as the Court deems just and proper.

Date: December 18, 2025                          Respectfully submitted,

/s/ Karen C. Tumlin
Karen C. Tumlin (CA Bar No. 234691)
Esther H. Sung (CA Bar No. 255962)
Laura Flores-Perilla (CA Bar No. 355645)
Hillary Li (GA Bar No. 898375)*
Brandon Galli-Graves (TX Bar No.
24132050)*
Emily Satifka (NJ Bar No. 330452020)*
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
hillary.li@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org
emily.satifka@justiceactioncenter.org


/s/ Charles H. Kuck*
GA Bar No. 429940
**KUCK BAXTER LLC**
365 Northridge Rd., Suite 300
Atlanta, GA 30350
404-949-8154
Ckuck@immigration.net


/s/ Zachary R. New
Zachary R. New***

/s/ Cynthia Liao
 Cynthia Liao (CA Bar No. 301818)*
Johanna N. Hickman (D.C. Bar No. 981770)*
Jennie L. Kneedler (D.C. Bar No. 500261)*
Steven Y. Bressler (D.C. Bar No. 482492)**
Elena Goldstein (D.C. Bar No. 90034087)*
**DEMOCRACY FORWARD
FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982 (Liao)
cliao@democracyforward.org
hhickman@democracyforward.org
jkneedler@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org



/s/ Kalpana Peddibhotla
Kalpana Peddibhotla (CA Bar No. 200330)
**SOUTH ASIAN AMERICAN JUSTICE
COLLABORATIVE (SAAJCO)**
333 W. San Carlos Street, Suite 600
San Jose, CA 95110
(408) 550-9240
kalpana@saajco.org


/s/ Jesse M. Bless
JESSE M. BLESS*

Atty. Reg. No. (Colorado): 53992
**JOSEPH & HALL, P.C.**
12203 East Second Ave.
Aurora, CO 80011
(303) 297-9171
zachary@immigrationissues.com

MA Bar # 660713
**BLESS LITIGATION LLC**
6 Vineyard Lane
Georgetown MA 01833
781-704-3897
jesse@blesslitigation.com

/s/ *Harini Srinivasan*
Harini Srinivasan (D.C. Bar No. 1032002)*
Aniko Schwarcz (D.C. Bar No. 980631)*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Suite 800
Washington, D.C. 20005
(202) 408-4600
hsrinivsan@cohenmilstein.com
aschwarcz@cohenmilstein.com

/s/ *Greg Siskind*
Greg Siskind***
TN Bar No. 14487
**SISKIND SUSSER**
1028 Oakhaven Road
Memphis, TN 38119
(901) 682-6455
gsiskind@visalaw.com

Alexandra Gray (NY Bar No. 6019590)*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine St., 14th Floor
New York, New York 10005
(212) 838-7797
agray@cohenmilstein.com

*Counsel for Plaintiffs*

* Admitted *pro hac vice*
** Motion to appear *pro hac vice* pending
*** Motion to appear *pro hac vice* forthcoming