Cynthia Liao (CA Bar No. 301818)*
Johanna M. Hickman (D.C. Bar No. 981770)*
Jennie L. Kneedler (D.C. Bar No. 500261)*
Steven Y. Bressler (D.C. Bar No. 482492)**
Elena Goldstein (D.C. Bar No. 90034087)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982 (Liao)
cliao@democracyforward.org
hhickman@democracyforward.org
jkneedler@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

*Admitted *pro hac vice*
** Motion to appear *pro hac vice* pending

[Additional co-counsel on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

GLOBAL NURSE FORCE, *et al.*,

      Plaintiffs,

      v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

      Defendants.

Case No. 4:25-cv-08454-HSG

**PLAINTIFFS BAE INDUSTRIES, NEPHROLOGY ASSOCIATES OF THE CAROLINAS, PA, LOWER BRULE DAY SCHOOL, GLOBAL VILLAGE ACADEMY COLLABORATIVE, GLOBAL NURSE FORCE, AND PHOENIX DOE'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND 5 U.S.C. § 705 STAY AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Judge:   Hon. Haywood S. Gilliam, Jr.
Ctrm:   2, 4th Floor
Date:   Thursday, February 12, 2026
Time:   2:00 p.m.

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION .................................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED .................................................................... 1

INTRODUCTION ...................................................................................................................... 2

LEGAL BACKGROUND ......................................................................................................... 4

    I.    Congress created a comprehensive regulatory framework governing the H-1B visa process. ................................................................................................................... 4

    II.   Congress established a detailed fee system for the H-1B program that limits fees and their use. .................................................................................................................. 6

    III.   Congress established a comprehensive system to prevent abuse and fraud. .................. 7

FACTUAL BACKGROUND ..................................................................................................... 8

    I.    The challenged Proclamation and its implementation upend the existing statutory and regulatory structure. ....................................................................................... 8

    II.   The $100,000 Requirement harms Plaintiffs. ........................................................... 11

LEGAL STANDARD ............................................................................................................... 14

ARGUMENT .............................................................................................................................. 15

    I.    Plaintiffs are likely to succeed on the merits of their claim that the Proclamation is ultra vires and conflicts with the INA. ..................................................................... 15

        A.   The $100,000 fee exceeds § 1182(f)'s text, which authorizes only the suspension of entry or imposition of entry restrictions. ..................................... 15

        B.   The Proclamation directly overrides the statutory scheme Congress established for the H-1B program and the fees charged to U.S. employers. ............ 17

        C.   The Proclamation's $100,000 fee is a statutorily unauthorized general revenue-generating tax that violates the separation of powers and Congress's Taxing Power. .............................................................................................. 21

    II.   Plaintiffs are likely to succeed on their claims that the $100,000 Requirement violates the Administrative Procedure Act. .................................................................. 23

        A.   Agency Defendants' imposition of the $100,000 Requirement is final agency action reviewable under the APA. ........................................................ 23

        B.   The $100,000 Requirement is contrary to law. ....................................... 25

        C.   Agency Defendants failed to observe procedures required by law. ............... 26

        D.   The $100,000 Requirement is arbitrary and capricious. ........................... 29

    III.   Plaintiffs have standing. ......................................................................................... 33

        A.   Employer Plaintiffs ................................................................................ 33

        B.   Global Village Academy Collaborative ....................................................... 35

        C.   Global Nurse Force ................................................................................ 36

        D.   Phoenix Doe ......................................................................................... 37

IV.    Plaintiffs are and will be irreparably harmed absent relief while litigation is pending.........38

    A.    Employer Plaintiffs and the Putative Class ................................................38

    B.    Global Village Academy Collaborative.......................................................39

    C.    Global Nurse Force.....................................................................................40

    D.    Phoenix Doe................................................................................................40

V.    The balance of the equities and public interest favor preliminary relief. ................41

VI.    The scope of requested relief is appropriate. ...........................................................43

VII.    No bond is required. .................................................................................................45

CONCLUSION...................................................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*A.O. v. Cuccinelli,*
    457 F. Supp. 3d 777 (N.D. Cal. 2020)................................................................41

*Abboud v. INS,*
    140 F.3d 843 (9th Cir. 1998)........................................................................37

*AFGE v. Trump,*
    139 F.4th 1020 (9th Cir. 2025)........................................................................41

*AFGE v. U.S. Office of Personnel Mgmt.,*
    781 F. Supp. 3d 920 (N.D. Cal. 2025)................................................................35

*AFL-CIO v. Block,*
    655 F.2d 1153 (D.C. Cir. 1981)........................................................................26

*AFL-CIO v. Trump,*
    318 F. Supp. 3d 370 (D.D.C. 2018) ................................................................20

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State,*
    766 F. Supp. 3d 74 (D.D.C. 2025) ................................................................23

*Air Line Pilots Ass'n, Int'l v. Alaska Airlines, Inc.,*
    898 F.2d 1393 (9th Cir. 1990)........................................................................15

*Alcaraz v. Block,*
    746 F.2d 593 (9th Cir. 1984)........................................................................26

*All. for the Wild Rockies v. Pena,*
    865 F.3d 1211(9th Cir. 2017)........................................................................14

*Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue,*
    926 F.3d 1061 (9th Cir. 2019)........................................................................29

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.,*
    750 F.2d 1470 (9th Cir. 1985)........................................................................40

*Ariz. Dream Act Coal. v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014)........................................................................41

*Ass'n of Am. Univs. v. Dep't of Def.,*
    No. CV 25-11740-BEM, 2025 WL 2899765 (D. Mass. Oct. 10, 2025).....................45

*Assoc. Fisheries of Me., Inc. v. Daley,*
    127 F.3d 104 (1st Cir. 1997)........................................................................28

*Bates v. United Parcel Service, Inc.,*
    511 F.3d 974 (9th Cir. 2007)........................................................................33

*Behring Reg'l Ctr. LLC v. Wolf,*
    No. 20-CV-09263-JSC, 2021 WL 1164839 (N.D. Cal. Mar. 26, 2021) ..................15

*Bennett v. Spear*,
   520 U.S. 154 (1997) ............................................................................................24

*Buschmann v. Schweiker*,
   676 F.2d 352 (9th Cir. 1982) ...........................................................................27

*C.G.B. v. Wolf*,
   464 F. Supp. 3d 174 (D.D.C. 2020) .................................................................41

*California v. Noem*,
   1:25-cv-13829 (D. Mass.) (filed Dec. 12, 2025) ..............................................11

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*,
   766 F.2d 1319 (9th Cir. 1985) .........................................................................45

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ...........................................................................27

*California v. Texas*,
   593 U.S. 659 (2021) .........................................................................................36

*CASA, Inc. v. Trump*,
   793 F. Supp. 3d 687 (D. Md. 2025) .................................................................44

*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*,
   513 F. Supp. 3d 154 (D.D.C. 2021) .................................................................31

*Chalk v. U.S. Dist. Court Cent. Dist. of California*,
   840 F.2d 701 (9th Cir. 1988) ...........................................................................41

*Chamber of Commerce v. DHS*,
   1:25-cv-03675-BAH (D.D.C.) (filed Oct. 16, 2025) ......................................11

*Chamber of Com. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ........................................................................20

*Citizens Bank of Md. v. Strumpf*,
   516 U.S. 16 (1995) ...........................................................................................22

*City of Brookings Mun. Tel. Co. v. FCC*,
   822 F.2d 1153 (D.C. Cir. 1987) ......................................................................29

*Cmty. Legal Servs. in E. Palo Alto v. HHS*,
   780 F. Supp. 3d 897 (N.D. Cal. 2025) ...................................................... 42, 45

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
   603 U.S. 799 (2024) .........................................................................................45

*DHS v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) .............................................................................................29

*Diamond Alternative Energy, LLC v. EPA*,
   606 U.S. 100 (2025) .........................................................................................36

*Doe #1 v. Trump*,
   957 F.3d 1050 (9th Cir. 2020) ................................................................... 17, 18

*Doe v. Noem*,
   778 F. Supp. 3d 1151 (W.D. Wash. 2025) ...................................................41

*Doe v. Trump*,
   784 F. Supp. 3d 1297 (N.D. Cal. 2025) ......................................................45

*Doran v. Salem Inn, Inc.*,
   422 U.S. 922 (1975) ....................................................................................40

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021)........................................................... 14, 35, 36

*E. Bay Sanctuary Covenant v. Trump*,
   932 F.3d 742 (9th Cir. 2018).......................................................... 15, 23, 26

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ....................................................................................30

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) .......................................................................37

*FBI v. Fikre*,
   601 U.S. 234 (2024).....................................................................................38

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009).....................................................................................29

*Fed. Trade Comm'n v. Bunte Bros., Inc.*,
   312 U.S. 349 (1941) ....................................................................................20

*Filazapovich v. Dep't of State*,
   560 F. Supp. 3d 203 (D.D.C. 2021) ............................................................16

*Food & Drug Admin. v. Alliance for Hippocratic Med.*,
   602 U.S. 367 (2025) .............................................................................. 35, 36

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ....................................................................................23

*Gomez v. Trump*,
   485 F. Supp. 3d 145 (D.D.C. 2020) ............................................................16

*Hawaii v. Trump*,
   585 U.S. 667 (2018) ....................................................................................25

*Hawaii v. Trump*,
   859 F.3d 741 (9th Cir. 2017) .......................................................................15

*Hawaii v. Trump*,
   878 F.3d 662 (9th Cir. 2017) .......................................................................25

*Hemp Indus. Ass'n v. Drug Enf't Admin.*,
    333 F.3d 1082 (9th Cir. 2003) .........................................................26

*Hernandez Roman v. Wolf*,
    829 F. App'x 165 (9th Cir. 2020) .....................................................44

*HiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022).............................................................40

*Hsiao v. Stewart*,
    527 F. Supp. 3d 1237 (D. Haw. 2021) ...............................................41

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ...........................................................................35

*Immigrant Defs. L. Ctr. v. Noem*,
    145 F.4th 972 (9th Cir. 2025)............................................................44

*Immigrant Legal Res. Ctr. v. Wolf*,
    491 F. Supp. 3d 520 (N.D. Cal. 2020) ...............................................31

*ITServe All., Inc. v. United States*,
    122 F.4th 1364 (Fed. Cir. 2024) .......................................................... 5

*Kelly v. U.S. Dep't of the Interior*,
    339 F. Supp. 1095 (E.D. Cal. 1972) ..................................................27

*Kingdom v. Trump*,
    No. 25-cv-691, 2025 WL 1568238 (D.D.C. June 3, 2025)...................14

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ...........................................................................25

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)...............................................................42

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...........................................................................33

*Milligan v. Pompeo*,
    502 F. Supp. 3d 302, 314-16 (D.D.C. 2020)......................................16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .............................................................................29

*N. Rockies Reg'l Ctr., LLC v. Jaddou*,
    743 F. Supp. 3d 1195 (D. Mont. 2024) ..............................................40

*Nat'l Ass'n of Mfrs. v. DHS*,
    491 F. Supp. 3d 549 (N.D. Cal. 2020) ...................... 17, 18, 25, 37, 38

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*,
    567 F.3d 521 (9th Cir. 2009) .............................................................33

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)...........................................................................21

*Nat'l Tel. Co-op. Ass'n v. FCC*,
   563 F.3d 536 (D.C. Cir. 2009) ................................................................28

*Nat'l TPS All. v. Noem*,
   150 F.4th 1000 (9th Cir. 2025) ............................................................14

*Nat'l TPS All. v. Noem*,
   773 F. Supp. 3d 807 (N.D. Cal. 2025) ..............................................14

*Nebraska v. Su*,
   121 F.4th 1 (9th Cir. 2024) ...................................................23, 29, 31

*New York v. U.S. Dep't of Energy*,
   No. 6:25-CV-01458-MTK, 2025 WL 3140578 (D. Or. Nov. 10, 2025) ..............45

*Nken v. Holder*,
   556 U.S. 418 (2009) ..............................................................................41

*Ohio v. EPA*,
   603 U.S. 279 (2024) ..............................................................................29

*Oregon Nat'l Desert Ass'n v. U.S. Forest Serv.*,
   465 F.3d 977 (9th Cir. 2006) ...............................................................25

*Pacito v. Trump*,
   768 F. Supp. 3d 1199 (W.D. Wash. 2025) .....................................23, 31

*Rai v. Biden*,
   567 F. Supp. 3d 180 (D.D.C. 2021) ....................................................16

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*,
   415 F.3d 1078  (9th Cir. 2005) ...........................................................28

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991) ..............................................................38

*Rotkiske v. Klemm*,
   589 U.S. 8 (2019) .................................................................................21

*S.F. Herring Ass'n v. Dep't of Interior*,
   946 F.3d 564 (9th Cir. 2019) .........................................................24, 25

*San Luis Obispo Mothers for Peace v. U.S. Nuclear Reg. Comm'n*,
   100 F.4th 1039 (9th Cir. 2024) ...........................................................33

*Savage Servs. Corp. v. United States*,
   25 F.4th 925 (11th Cir. 2022) .............................................................18

*RAICES v. Noem*,
   793 F. Supp. 3d 19 (D.D.C. 2025) .........................................16, 17, 18, 20

*Sequoia Orange Co. v. Yeutter*,
   973 F.2d 752 (9th Cir. 1992) ...............................................................27

*Skaff v. Meridien N. Am. Beverly Hills, LLC*,
   506 F.3d 832 (9th Cir. 2007) ...............................................................37

*Skinner v. Mid-Am. Pipeline Co.*,
  490 U.S. 212 (1989) ..............................................................................21

*Smiley v. Citibank (S. Dakota), N.A.*,
  517 U.S. 735 (1996)...............................................................................30

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004) ..............................................................................21

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001)..................................................................38

*Tenrec, Inc. v. USCIS*,
  No. 3:16-CV-995-SI, 2016 WL 5346095 (D. Or. Sept. 22, 2016)..................37

*Texas v. Biden*,
  646 F. Supp. 3d 753 (N.D. Tex. 2022) ....................................................14

*Thakur v. Trump*,
  148 F.4th 1096 (9th Cir. 2025) ...............................................................33

*Thakur v. Trump*,
  787 F. Supp. 3d 955 (N.D. Cal. 2025) ...............................................41, 42

*Thein v. Trump*,
  2025 WL 2418402 (D.D.C. Aug. 21, 2025) ..............................................16

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ..............................................................................44

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ...............................................................15, 16, 17, 20

*Trump v. Orr*,
  No. 25A319, 2025 WL 3097824 (U.S. Nov. 6, 2025) .................................29

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
  517 U.S. 544 (1996) ..............................................................................35

*United States v. Mead Corp.*,
  533 U.S. 218 (2001) ..............................................................................26

*Washington v. U.S. Dep't of Transp.*,
  792 F. Supp. 3d 1147 (W.D. Wash. 2025) ...............................................45

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ..............................................................................22

*WildEarth Guardians v. USDA*,
  135 F.4th 717 (9th Cir. 2025)..................................................................45

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................14, 38

*Xinyi Jiang v. USCIS*, No. C20-1693 TSZ,
   2021 WL 764264 (W.D. Wash. Feb. 26, 2021) ............................................... 37

**Statutes**

5 U.S.C. § 553 ............................................................................................... 26, 27

5 U.S.C. § 603 ............................................................................................... 26, 28

5 U.S.C. § 604 ........................................................................................... 26, 28, 32

5 U.S.C. § 611 .................................................................................................... 28

5 U.S.C. § 705 ................................................................................................... 1, 14

5 U.S.C. § 706 ............................................................................................... 27, 44

5 U.S.C. § 706(2) ................................................................................................ 45

5 U.S.C. § 706(2)(A) .......................................................................................... 23

8 U.S.C. §§ 1101(a)(13)(A) .................................................................................. 5

8 U.S.C. § 1101(a)(15) ..................................................................................... 4, 44

8 U.S.C. § 1182(a) .......................................................................................... 16, 17

8 U.S.C. § 1182(f) ................................... 8, 9, 15, 16, 17, 18, 20, 21, 22, 25

8 U.S.C. § 1182(n)(1) ....................................................................................... 5, 7

8 U.S.C. § 1182(n)(1)(A)(ii) ................................................................................. 8

8 U.S.C. § 1182(n)(1)(E) ...................................................................................... 8

8 U.S.C. § 1182(n)(1)(F) ...................................................................................... 8

8 U.S.C. § 1182(n)(2) ........................................................................................... 8

8 U.S.C. § 1182(t)(1)(B) ....................................................................................... 8

8 U.S.C. § 1184 .................................................................................................... 34

8 U.S.C. 1184(a)(1) ......................................................................................... 5, 21

8 U.S.C. § 1184(c)(1) ....................................................................................... 4, 16

8 U.S.C. § 1184(c)(9) ............................................................................................ 7

8 U.S.C. § 1184(c)(9)(A) ..................................................................................... 21

8 U.S.C. §1184(c)(9)-(12) ................................................................................... 21

8 U.S.C. § 1184(c)(9)-(14) .................................................................................... 7

8 U.S.C. § 1184(c)(12) .......................................................................................... 7

8 U.S.C. § 1184(g)(1)(A) ...................................................................................... 4

8 U.S.C. § 1184(g)(1)(A)(vii) ............................................................................... 4

8 U.S.C. § 1184(g)(4) ........................................................................................... 5

8 U.S.C. § § 1184(g)(5)(A) ................................................................................... 5

8 U.S.C. § 1184(i)(1) ............................................................................................ 4

8 U.S.C. § 1185(a) ............................................................................................ 9, 15

8 U.S.C. § 1258(a) ..................................................................................... 5, 10, 11

8 U.S.C. § 1356(m) ..................................................................6, 19, 20, 21

8 U.S.C. § 1356(s)(2)-(4) .......................................................................7

8 U.S.C. § 1356(u)(3) .............................................................................7

8 U.S.C. § 1184 ....................................................................................34

8 U.S.C. § 1356(v)(2)(A)-(C) ................................................................7

8 U.S.C. § 1356(v)(2)(A)-(C) ................................................................7

8 U.S.C. § 1184(g)(4) .............................................................................5

8 U.S.C. § 1185(a) ............................................................................9, 15

8 U.S.C. § 1356(v)(2)(A)-(C) ................................................................7

**Regulations**

20 C.F.R. § 655.730(d) ...........................................................................5

20 C.F.R. § 655.731(c)(9)(iii)(C) ..........................................................6

20 C.F.R. § 655.738(d) ...........................................................................8

20 C.F.R. § 655.810 ...............................................................................8

8 C.F.R. § 106.1(f) .................................................................................6

8 C.F.R. § 106.2(a)(3) ............................................................................6

8 C.F.R. § 106.4(a), (c)(2), (e)(2) ........................................................10

8 C.F.R. § 106.4(f)(1) ..........................................................................10

8 C.F.R. § 212.1(a)(1) ............................................................................5

8 C.F.R. § 214.1(c)(7) ..........................................................................10

8 C.F.R. § 214.2(h)(1)(i) ......................................................................44

8 C.F.R. § 214.2(h)(4)(ii) .......................................................................4

8 C.F.R. § 214.2(h)(8)(iii)(A) .................................................................5

8 C.F.R. § 214.2(h)(4)(iii)(B)(1) ............................................................5

8 C.F.R. § 214.2(h)(13)(iii)(D) ..............................................................5

8 C.F.R. § 248.1(a)-(b) .....................................................................5, 11

8 C.F.R. § 248.2(a) ...........................................................................5, 11

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 65 ...................................................................................1

Fed. R. Civ. P. 65(a)(2) ...................................................................15, 44

Fed. R. Civ. P. 65(b)(1) ........................................................................14

**Rules**

Improving the H-1B Registration Selection Process and Program Integrity,
    89 Fed. Reg. 7,456 (Feb. 2, 2024) .................................................27

Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program, and
  Program Improvements Affecting Other Nonimmigrant Workers,
    89 Fed. Reg. 103,054 (Dec. 18, 2024) ...................................................................31

Registration Fee Requirement for Petitioners Seeking To File H-1B Petitions on Behalf
  of Cap Subject Aliens,
    84 Fed. Reg. 60,307 (Nov. 8, 2019) ......................................................................30

Schedule of Fees for Consular Services—Nonimmigrant and Special Visa Fees,
    88 Fed. Reg. 18,243 (Mar. 28, 2023) ...............................................................31, 32

U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other
  Immigration Benefit Request Requirements,
    88 Fed. Reg. 402, 501 (Jan. 4, 2023) ...................................................................20

U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other
  Immigration Benefit Request Requirements,
    89 Fed. Reg. 6,194, 6,195 (Jan. 31, 2024) ............................................................ 6

U.S. Citizenship and Immigration Services Fee Schedule,
    75 Fed. Reg. 58,962, 58,962 (Sept. 24, 2010) .....................................................20

U.S. Citizenship and Immigration Services Fee Schedule,
    81 Fed. Reg. 73,292, 73,292 (Oct. 24, 2016) .......................................................20

U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other
  Immigration Benefit Request Requirements,
    85 Fed. Reg. 46,788 (Aug. 3, 2020) .....................................................................27

Weighted Selection Process for Registrants and Petitioners Seeking To File Cap-Subject
  H-1B Petitions,
    90 Fed. Reg. 45,986 (Sept. 24, 2025) ..................................................................32

**Constitution**

Const. art. I § 8, cl. 1 .........................................................................................................21


**Other Authorities**

American Competitiveness in the Twenty-first Century Act of 2000,
  Pub. L. No. 106-313, § 104(c) .............................................................................34

Consolidated Appropriations Act, 2016,
  Pub. L. No. 114-113 ...............................................................................................7

H.R. Rep. No. 100-979 (1988) .........................................................................................20

Proclamation No. 10,973,
  90 Fed. Reg. 46,027 (Sept. 19, 2025) ...............................3, 8, 9, 16, 17, 19, 20, 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on February 12, 2026 at 2:00 pm, or as soon as this matter may be heard[1] before The Honorable Haywood S. Gilliam, Jr., United States District Court for the Northern District of California, Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, California, Plaintiffs BAE Industries, Nephrology Associates of the Carolinas PA, Lower Brule Day School, Global Village Academy Collaborative, Global Nurse Force, and Phoenix Doe ("Movant Plaintiffs"), will and hereby do move the Court pursuant to Federal Rule of Civil Procedure 65 and 5 U.S.C. § 705, for an order preliminarily enjoining and staying Defendants from enforcing or implementing sections 1, 2, and 3(a) of the September 19, 2025 H-1B Proclamation and any agency rules, guidance, or procedures made pursuant to, or in implementation thereof. In the alternative, Plaintiffs move for summary judgment pursuant to Rule 65(a)(2).

This Motion is based upon this Notice of Motion and Memorandum of Points and Authorities, the declarations of the Movant Plaintiffs, Sarah K. Peterson, and Cynthia Liao in support thereof and exhibits attached thereto, the pleadings and records on file in this action, and such further arguments and matters as the Court may consider.

## STATEMENT OF ISSUES TO BE DECIDED

The issues to be decided in this Motion are:

1. Whether Movant Plaintiffs are likely to succeed on their claims that:

   a. The President's September 19, 2025 Proclamation, which imposes a $100,000 fee on each petition filed by an employer for an H-1B worker conflicts with the H-1B program and fee statutes created by Congress and is ultra vires;

   b. The implementation of the Proclamation by Agency Defendants United States Citizenship and Immigration Services, U.S. Customs and Border Protection; their parent agency Department of Homeland Security; the Department of State; and the heads of those agencies violates the Administrative Procedure Act ("APA") because it is not in accordance with the law and in excess of statutory authority;

   c. The $100,000 Requirement is arbitrary and capricious under the APA because the Agency

---

[1] Plaintiffs intend to file an administrative motion to expedite the hearing date to January 22 or 29, 2026 or any date between those two dates, at the Court's convenience.

Defendants failed to consider the obvious adverse impacts a draconian $100,000 fee would have on employers, especially small businesses and non-profits, as well as the downstream effects on communities that struggle to hire doctors, nurses, teachers, or other specialized workers without the H-1B program.

    d.   Agency Defendants failed to observe the procedures required by law, including notice and comment rulemaking and publishing analyses of the impacts on small businesses, before imposing the $100,000 Requirement.

2.  Whether Movant Plaintiffs have standing

3.  Whether Movant Plaintiffs will experience irreparable harm absent an injunction during the pendency of this litigation.

4.  Whether the balance of the equities and public interest support a preliminary injunction.

5.  Whether broad relief is appropriate.

## INTRODUCTION

Congress established the H-1B visa program to provide a pathway for American employers to hire skilled non-U.S.-workers in specialty occupations. H-1B visa holders work in a range of fields, including researchers and workers in the science, technology, engineering, and mathematics (STEM) fields; doctors, other healthcare providers, and medical researchers; university professors and K-12 educators; and religious leaders. They include workers in high-demand occupations facing staffing shortages, like healthcare and education—two fields that employ 10% of all H-1B workers.[2] The program helps American employers drive innovation, fill staffing gaps, and meet important needs in communities around the United States.

The Immigration and Nationality Act ("INA") sets forth a comprehensive and detailed scheme for the H-1B program and process. It specifies qualitative and numeric limits on the number of H-1B visas to be granted, the standards for approving an H-1B petition from an employer, the standards for detecting and addressing unlawful use of the program by employers, the fees to be charged to process and monitor the program, and the allocation and use of fees beyond the adjudication of petitions by the

---

[2] Maham Javaid & Adrián Blanco Ramos, *Where H-1B visa holders are from, who hires them and what they earn*, Wash. Post (Sept. 24, 2025) (ECF 46-2 at 7); Declaration of Sarah K. Peterson ("Peterson Decl.") ¶¶ 5-7 (discussing the physician shortage in the United States and the important role that international medical graduates on H-1B visas play in addressing that shortage).

government. But—notwithstanding these clear congressional directives and carefully calibrated regulatory structure—the President issued a Proclamation on September 19, 2025 that re-writes the rules of the program and converts it into a pay-to-play scheme, charging an unprecedented $100,000 fee for the entry of any new H-1B employee. Proclamation No. 10,973, 90 Fed. Reg. 46,027 (Sept. 19, 2025). The broad language of the Proclamation, the unprecedented changes to this long-standing program, and near-immediate effective date of 12:01 am ET on Sunday, September 21, caused widespread panic, both for employers with current employees on H-1B visas who were outside of the country for travel and for those employers intending to file petitions for H-1B employees to meet near-term hiring needs.

Since then, the government has moved to implement the Proclamation with actions by Defendants United States Citizenship and Immigration Services ("USCIS"), which adjudicates the employer petitions; the United States Department of State ("State" or "State Department"), which adjudicates visa applications submitted by H-1B nonimmigrant workers; and United States Customs and Border Protection ("CBP"), which inspects and admits foreign nationals seeking to enter the United States. Not only does the Proclamation itself exceed the President's authority, but the agencies' actions in implementing the Proclamation also exceed their statutory authority. The agencies' actions are also arbitrary and capricious and were done without following procedures required by law, such as providing notice and allowing public comment and analyzing the impact of the extortionate fee on small businesses before its imposition.

The Movant Plaintiffs are entities that use H-1B workers to fill critical staffing needs and serve their communities, including a small medical practice providing kidney care in rural North Carolina, a small automotive parts manufacturing company in Michigan, schools in Colorado and in rural South Dakota, a healthcare business that helps hospitals across the country fill critical vacancies with qualified nurses from abroad, as well as a post-doctoral researcher whose career trajectory has been disrupted. Plaintiffs brought this challenge to the legality of the Proclamation and the agency actions taken to implement it. The $100,000 requirement makes it extraordinarily expensive to hire H-1B workers, hurting small businesses and causing short-staffing in schools and rural hospitals that already face shortages of teachers, doctors, and nurses. A subset of those Plaintiffs facing the most imminent harms from the Proclamation—including a putative class of employer plaintiffs—now seeks an order from this

1   Court temporarily staying or enjoining implementation pending resolution of this matter, to protect them

2   from imminent and irreparable harm.

3                                    **LEGAL BACKGROUND**

4          Congress created a comprehensive statutory structure for the H-1B program that reflects its

5   careful balancing of the interests of employers, U.S. workers, and the needs of the American economy.

6   The INA governs the admission of noncitizens into the United States and provides for, among other

7   things, various categories of nonimmigrant visas. Nonimmigrant visas are available for noncitizens who

8   seek to enter the United States temporarily for a specific purpose. *See generally* 8 U.S.C. § 1101(a)(15).

9   One such nonimmigrant category is an H-1B nonimmigrant visa for an individual who enters the United

10  States to work temporarily in a qualified specialty occupation, *see* 8 U.S.C. § 1101(a)(15)(H)(i)(B), with

11  "specialty occupation" defined by statute and regulation.[3] To ensure the United States enjoys the benefits

12  of bringing skilled workers from abroad while protecting the interests of U.S. workers, Congress has

13  continuously amended the INA to refine the H-1B program. Indeed, since its creation in 1990, Congress

14  has amended the statutory scheme for the H-1B program repeatedly in response to the evolving needs of

15  the American economy and workforce, creating a comprehensive structure for the submission and

16  adjudication of H-1B petitions and visas, the attending fees, and safeguards to prevent misuse and fraud.

17  **I.     Congress created a comprehensive regulatory framework governing the H-1B visa process.**

18         The process to become a H-1B worker starts with a U.S.-based employer's submission of a

19  petition on behalf of the employee—who can be physically located inside or outside of the United

20  States—to USCIS. 8 U.S.C. § 1184(c)(1).

21         For "cap-subject" employers, Congress has set numerical limits on the annual number of H-1B

22  visas available each fiscal year. *See id.* § 1184(g)(1)(A). Currently, the annual statutory cap is 65,000,

23  plus an additional 20,000 available only for holders of an advanced degree from a U.S. university. *Id.*

24  § 1184(g)(1)(A)(vii), (5)(C). Because demand for H-1B visas significantly outstrips availability, USCIS

25  implemented a lottery to randomly select among the cap-subject registrations.[4] Cap-subject employers

26

27  _____
    [3] 8 U.S.C. § 1184(i)(1); 8 C.F.R. § 214.2(h)(4)(ii). These fields include, but are not limited to,
    "architecture, engineering, mathematics, physical sciences, social sciences, medicine and health,
28  education, business specialties, accounting, law, theology, and the arts." 8 C.F.R. § 214.2(h)(4)(ii).
    [4] For example, for FY 2026, USCIS received 358,737 lottery registrations. USCIS, *H-1B Electronic
    Registration Process* (Liao Decl. Ex. 1).

register for the lottery, and, if selected, have 90 days to submit their petitions. 8 C.F.R. § 214.2(h)(8)(iii)(A). The annual lottery is generally held in March of the year for employment starting at the beginning of the federal fiscal year in October.[5]

Congress has exempted certain employers from the numerical limits: universities and their affiliated nonprofit entities (e.g., their health systems) and nonprofit and government research organizations are "cap-exempt." 8 U.S.C. § § 1184(g)(5)(A), (B). These employers do not need to participate in the lottery in order to file a petition for an employee and can file at any time of the year. *See* 8 C.F.R. § 214.2(h)(8)(iii)(A)(1) (specifying which types of petitioners are required to register and participate in the lottery as a precondition of filing a petition).

Prior to submitting a petition, both cap-subject and cap-exempt employers must first file an application with the Department of Labor ("DOL") attesting that they will follow wage and working condition requirements. *See* 8 U.S.C. § 1182(n)(1); 20 C.F.R. § 655.730(d). After DOL certifies the application, the employer may file an H-1B petition (Form I-129) with USCIS. *See* 8 C.F.R. § 214.2(h)(4)(iii)(B)(1). Once approved by USCIS, H-1B petitions are generally valid for an initial three-year period of employment. They can be renewed once, for another three years of employment, and in some circumstances can be renewed for additional periods of time. *See* 8 U.S.C. § 1184(g)(4); 8 C.F.R. § 214.2(h)(13)(iii)(D), (E).

After USCIS grants the petition, if the employee is outside the United States, the employee must apply for an H-1B visa at a U.S. embassy or consulate abroad before entering the United States. *See ITServe All., Inc. v. United States*, 122 F.4th 1364, 1367 (Fed. Cir. 2024); 8 U.S.C. §§ 1101(a)(13)(A), 1184(a)(1), 1225(a)(1); 8 C.F.R. § 212.1(a)(1). If the employee is already in the United States, the employer may request permission from USCIS for that employee to change to H-1B status without having to leave the country. *ITServe*, 122 F.4th at 1367; 8 U.S.C. § 1258(a); 8 C.F.R. § 248.1(a)-(b). Some individuals already in the United States cannot change status, however, either because they are categorically ineligible to do so under Department of Homeland Security ("DHS") regulations or because USCIS has not approved their request. 8 C.F.R. § 248.2(a); USCIS Policy Manual Vol. 2, Part A, Ch.

---

[5] *See, e.g.*, USCIS, Alert, *FY 2026 H-1B Cap Initial Registration Period Opens on March 7* (Feb. 5, 2025) (Liao Decl. Ex. 19); USCIS, Alert, *FY 2025 H-1B Registration Period and myUSCIS Organizational Account Reminders* (Feb. 28, 2024) (Liao Decl. Ex. 20); USCIS, Alert, *FY 2024 H-1B Cap Initial Registration Period Opens on March 1* (Jan. 27, 2023) (Liao Decl. Ex. 21).

4.A (ECF 46-10 at 1) ("The decision to grant or deny an extension of stay or change of status request involves an exercise of discretion by USCIS."). Those who cannot change status must leave the United States, apply for an H-1B visa, and re-enter with that visa before being permitted to work in H-1B status. Declaration of Sarah K. Peterson ("Peterson Decl.") ¶¶ 16-17 (describing types of international medical graduates who cannot change status without traveling outside the United States).

## II.    Congress established a detailed fee system for the H-1B program that limits fees and their use.

Congress established a specific fee structure that ensures program sustainability, protection against abuse, and access to highly skilled, specialized workers for all manner of American enterprises— from small, family-owned businesses to publicly traded corporations. These include specific fees that DHS sets by regulation through notice-and-comment rulemaking as well as statutory fees specifically set by Congress for H-1B employers. Required fees must be paid by H-1B employers and not by H-1B employees. *See* 20 C.F.R. § 655.731(c)(9)(iii)(C), (10)(ii).

Congress authorized DHS to charge fees for adjudication of immigration benefits, including H-1B petitions, provided that such fees are tied to "the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." 8 U.S.C. § 1356(m).[6] Existing regulations require H-1B employers to pay fees to register for the lottery and to file the petition, plus a fee to subsidize asylum application processing. 8 C.F.R. § 106.2(a)(3), (c)(11), (c)(13); USCIS Form G-1055, Fee Schedule (ECF 46-3 at 3; ECF 46-4 at 3-5) (listing H-1B fees). These regulatory fees add up to $1,595 per petition at most. There are discounts for small employers (those with 25 employees or less) and non-profits. *See id.*; *see also* 8 C.F.R. § 106.1(f) (defining small employer and non-profit).

On top of the regulatory fees, H-1B employers also pay several statutory fees that Congress enumerated in the INA, which Congress has recalibrated over time in response to the evolving needs of the U.S. labor market and to deter fraud and abuse. For example, in the American Competitiveness and

---

[6] Congress intended that USCIS be a fee-funded agency. Almost all of USCIS's budget (96%) comes from fees charged to applicants seeking immigration benefits with fees collected segregated into a separate account to fund USCIS's adjudication and naturalization services. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 89 Fed. Reg. 6,194, 6,195 (Jan. 31, 2024) ("USCIS 2024 Fee Rule").

Workforce Improvement Act of 1998 ("ACWIA"), Congress imposed a $1,500 fee on employers for the first two petitions. 8 U.S.C. § 1184(c)(9)-(14). The statute halves the fee for employers with 25 or fewer full-time employees and does not apply at all to cap-exempt employers. *See id.* § 1184(c)(9). Congress also required all H-1B petitioning employers to pay a $500 fraud prevention and detection fee, *Id.* § 1184(c)(12), and imposed an additional fee for certain high-volume H-1B employers (currently $4,000), *see* USCIS Form G-1055, Fee Schedule (ECF 46-4 at 4) (citing Consolidated Appropriations Act, 2016, Pub. L. No. 114-113). Currently, the regulatory and statutory fees together total as much as $7,595.[7]

In addition to specifying the fees that can be charged, Congress also directed where the collected fees should be deposited and the permissible use of such fees. For example, Congress required certain H-1B fees to be segregated from other fees and government revenues and primarily used to support the American labor market by upskilling its workforce in the field of technology.[8] Similarly, Congress required that the fraud prevention and detection fee be split equally among the three agencies responsible for administering the H-1B program: DOL (who oversees the labor certification and wage payments to H-1B workers), DHS (who adjudicates H-1B petitions), and the State Department (who decides whether to issue visas). 8 U.S.C. § 1356(v)(2)(A)-(C).

## III. Congress established a comprehensive system to prevent abuse and fraud.

In designing the H-1B program, Congress built in protections to ensure that the program aligns with the needs of the domestic economy and does not incentivize or permit abuse or fraud. For example, in requiring employers seeking to hire H-1B workers to file a labor condition application with DOL, the statute requires the employer to commit to (among other things) offering the H-1B worker either the wage it pays its other, similarly situated employees or the "prevailing wage level for the occupational classification in the area of employment"—whichever is higher. 8 U.S.C. § 1182(n)(1)(A)(i). Employers must certify that the employment of H-1B workers will not adversely affect the working conditions of

---

[7] Some employers choose to pay an additional, optional "premium processing" fee to obtain a speedier decision on their petitions. 8 U.S.C. § 1356(u)(3).

[8] *See* 8 U.S.C. § 1356(s)(2)-(4) (requiring the revenue be split among: DOL workforce training programs (50%), National Science Foundation low-income STEM scholarships (30%), and National Science Foundation K-12 stem initiatives (10%)).

similarly employed workers. *See id.* § 1182(n)(1)(A)(ii). Employers are prohibited from bringing in H-1B workers during a strike or lockout. *Id.* § 1182(t)(1)(B).

Congress also established additional requirements for certain employers with a large percentage of existing workers on H-1B visas and employers with a history of violating program requirements. Such employers must certify that they have tried and failed to fill the position(s) with domestic workers and that filling the position(s) with an H-1B worker has not and will not displace a U.S. worker within the 180-day period surrounding the date of the application. *Id.* §§ 1182(n)(1)(E), (n)(1)(G), (n)(3)(A)(iii). Additional protections apply when an employer hires an H-1B employee to perform duties at the worksite of a different employer. *Id*. § 1182(n)(1)(F); 20 C.F.R. § 655.738(d). Misuse of the H-1B program can result in the employer being ordered to pay back wages and/or monetary fines, among other possible penalties, including debarment from participation in any employment-based visa program. *See* 8 U.S.C. § 1182(n)(2); 20 C.F.R. § 655.810.

## FACTUAL BACKGROUND

## I.    The challenged Proclamation and its implementation upend the existing statutory and regulatory structure.

Notwithstanding Congress's detailed and finely articulated statutory scheme, late on Friday, September 19, 2025, the President issued a Proclamation that unilaterally imposes a massive, extra-statutory fee on employers seeking H-1B workers. The Proclamation alleges "large-scale replacement of American workers through systemic abuse of the [H-1B] program" purportedly allowing employers "to artificially suppress wages resulting in a disadvantageous labor market for American citizens, while at the same time making it more difficult to attract and retain the highest skilled subset of temporary workers." *Id.* at 46,027. In announcing the Proclamation, the President said that the purpose of the new fee is to generate general revenue, rather than a fee to improve or otherwise fund the H-1B program. *See* Cat Zakrzewski, et al., *Trump unveils $100K yearly fee on H-1B visas in clampdown on legal immigration*, Wash. Post (Sept. 19, 2025) (ECF 46-12 at 1) ("We're going to take that money and we're going to be reducing taxes and we're going to be reducing debt.").

The Proclamation premises the new fee on the President's statutory authority under § 212(f) of the INA, 8 U.S.C. § 1182(f), to "suspend the entry" of noncitizens in certain circumstances, by

conditioning the entry of H-1B workers on a payment of $100,000.[9] *Id.* §§ 1(a), 2(c); 8 U.S.C. § 1182(f). In addition, and on the same purported statutory basis, the Proclamation prohibits DHS from adjudicating any H-1B petitions and the State Department from approving any H-1B visas absent evidence of the $100,000 payment. *See* Proclamation §§ 1(b), 2(b). The Proclamation made the $100,000 fee effective "12:01 a.m. eastern daylight time on September 21, 2025"—less than 48 hours after it was issued—and it applies by its terms to any potential H-1B employee physically outside of the United States as of that date (even those with a visa in hand). The Proclamation's restrictions are to remain in effect for one year, i.e., until September 2026, although the Proclamation calls for agencies to recommend whether to extend it. *Id.* §§ 1(a), 3(b). There are no discounts or exemptions from the $100,000 fee for small employers or nonprofits, in contrast to the statutory and regulatory discounts for such employers. *See supra* Legal Background § II. Per the Proclamation, the only way for an employer to avoid the $100,000 fee is by obtaining a "national interest" exception granted by the Secretary of Homeland Security in her discretion. Proclamation § 1(c) (granting the Secretary discretion to determine that the hiring of "any individual [H-1B worker], all [H-1B workers] for a company, or all [H-1B workers] working in an industry" is in the national interest). The Proclamation does not provide any guidance or further details about how to seek or obtain such an exception.

After the President's Friday afternoon announcement on September 19, current H-1B workers who were outside the United States began receiving urgent messages from their employers to return before the Proclamation became effective after midnight on Sunday. The result was mass chaos, with some workers spending thousands of dollars on return travel to the United States.[10] Others cancelled planned trips, and some workers who had already boarded flights made panicked requests to deplane.[11]

In response, DHS, including its component agencies USCIS and CBP, and the State Department (together, "Agency Defendants") rushed to issue a series of public statements on September 20 and 21.[12]

---

[9] The Proclamation also cites 8 U.S.C. § 1185(a), but it does not confer additional authority as explained *infra* n. 18.
[10] Madeleine Ngo, Lauren Hirsch & Pranav Baskar, *Trump's $100,000 Visa Fee Spurs Confusion and Chaos*, N.Y. Times (Sept. 22, 2025) (Liao Decl. Ex. 2); Emma Rossiter & Ishadrita Lahiri, *I spent $8,000 to get back to US after fears over Trump visa deadline*, BBC (Sept. 21, 2025) (Liao Decl. Ex. 3).
[11] Aditya Soni & Echo Wang, *'Fast and furious': H-1B workers abroad race to US as Trump order sparks dismay, confusion*, Reuters (Sept. 21, 2025) (Liao Decl. Ex. 4).
[12] Joseph B. Edlow, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B*, USCIS (Sept. 20, 2025) (ECF 46-5); Matthew S. Davies, *Proclamation, Restriction on Entry of Certain*

The announced policies indicated that the Agency Defendants would require a one-time payment of $100,000 "on submission" of "any" new H-1B petition filed after the Proclamation's effective date, sweeping even more broadly than the Proclamation to include workers physically present in the United States as well. ECF 46-7, 46-8. The agency policies also said, on the other hand, that the $100,000 Requirement would only apply to "new" petitions and not to "renewals"—a term not used in the statutory or regulatory scheme—and that it would *not* apply to existing H-1B visa holders or beneficiaries of petitions submitted before the effective date, which is narrower than the Proclamation itself. ECF 46-5, 46-6, 46-7, 46-8. The agency guidance provided no information about how to actually pay the fee. *See id.* Nor did it include any instructions regarding how to seek a national interest exception.

A month later, on October 20, USCIS issued updated guidance, which deviated from both the Proclamation and the prior agency guidance. *H-1B Specialty Occupations*, USCIS (Oct. 20, 2025) ("Oct. Guidance") (ECF 46-9). According to this guidance, the $100,000 Requirement applies to any new H-1B petition filed on or after September 21, 2025, on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa. *Id.* at 2. For beneficiaries inside the United States, under the guidance, the $100,000 fee will not apply to employers of individuals in the U.S. who are changing status from certain valid nonimmigrant visas to H-1B or who are requesting an amendment or extension, but *only if* USCIS grants the change of status, amendment, or extension. *Id.* Such approvals are discretionary decisions by USCIS, however,[13] and petitioners cannot control how long USCIS takes to approve such requests.[14] Those whose requests are not approved must leave and re-enter the United States to obtain

---

*Nonimmigrant Workers [H-1B]*, CBP (Sept. 20, 2025) (ECF 46-6); *H-1B FAQ*, USCIS (Sept. 21, 2025) (ECF 46-7); *H-1B FAQ*, State Dept. (Sept. 21, 2025) (ECF 46-8).

[13] *See* 8 U.S.C. § 1258(a) ("The Secretary of Homeland Security *may*, under such conditions as he may prescribe, authorize a change from any nonimmigrant classification to any other nonimmigrant classification . . . .") (emphasis added); 8 C.F.R. § 214.1(c)(7) ("Where an applicant or petitioner demonstrates eligibility for a requested extension or amendment of stay, USCIS may grant the extension or amendment in its discretion. The denial of an extension or amendment of stay request may not be appealed."); USCIS Policy Manual Vol. 2, Part A, Ch. 4.A (ECF 46-10 at 1) ("The decision to grant or deny an extension of stay or change of status request involves an exercise of discretion by USCIS."); USCIS Policy Manual Vol. 1, Part E, Ch. 8.C.2 (ECF 46-11 at 7-8) ("non-exhaustive" list of numerous discretionary factors to consider).

[14] While an employer can pay an extra fee of $2,805 for premium processing within 15 business days, premium processing does not guarantee that USCIS will approve a petition within that time. 8 C.F.R. § 106.4(a), (c)(2), (e)(2). The premium processing regulation only requires USCIS to "issue an approval notice, denial notice, a notice of intent to deny, *or a request for evidence* within the premium processing timeframe." *Id.* § 106.4(f)(1).

H-1B status which, under the guidance, triggers the $100,000 fee. *See* Oct. Guidance, ECF 46-9 at 2; *see also* Peterson Decl. ¶ 16. Similarly, individuals with certain immigration statuses or individuals who lack lawful status, such as Deferred Action for Childhood Arrivals ("DACA") recipients, are categorically ineligible to change status to H-1B status from within the United States. *See id.*; 8 U.S.C. § 1258(a); 8 C.F.R. § 248.1(a)-(b); *id.* § 248.2(a). They, too, must leave and re-enter to obtain H-1B status, which triggers the fee. Peterson Decl. ¶ 17.

The updated guidance also directs petitioners to pay the $100,000 fee through Pay.gov. Oct. Guidance, ECF 46-9 at 2. It directs that petitions subject to the fee that are submitted without proof of the $100,000 payment or an exception from the Secretary of DHS will be "denied." *Id.*

The guidance provides that exceptions to the $100,000 payment will be granted by the Secretary of DHS only "in the extraordinarily rare circumstance where the Secretary has determined that a particular alien worker's presence in the United States as an H-1B worker is in the national interest, that no American worker is available to fill the role, that the alien worker does not pose a threat to the security or welfare of the United States, and that requiring the petitioning employer to make the payment on the alien's behalf would significantly undermine the interests of the United States." *Id.* at 3.

## II.    The $100,000 Requirement harms Plaintiffs.

Plaintiffs are individuals, employers, and entities from healthcare, education (K-12 and higher education), manufacturing, and STEM fields, as well as religious organizations. Plaintiffs play important roles in the American economy and in providing crucial services to American communities, but their ability to do so is in jeopardy due to the $100,000 fee. Plaintiffs filed this lawsuit on October 3, 2025 against Defendants President Trump, DHS, and its subagencies USCIS and Customs and Border Patrol, the State Department, and the heads of those agencies and subagencies. Compl. (ECF 1).[15] Plaintiffs subsequently filed a First Amended Complaint, adding as additional Plaintiffs BAE Industries, Nephrology Associates, and Lower Brule Day School. First Amended Compl. ("FAC") ¶¶ 21-23 (ECF 74). Plaintiffs allege that President Trump exceeded his statutory authority under the INA and that the agencies' implementation of the Proclamation was contrary to law, arbitrary and capricious, and failed

---

[15] After Plaintiffs filed this lawsuit, two other lawsuits challenging the Proclamation and $100,000 fee were filed in other districts: *Chamber of Commerce v. DHS*, 1:25-cv-03675-BAH (D.D.C.) (filed Oct. 16, 2025), and *California v. Noem*, 1:25-cv-13829 (D. Mass.) (filed Dec. 12, 2025).

to follow required procedures such as notice and comment. *Id.* ¶¶ 211-252. Plaintiffs seek declaratory and injunctive relief. *Id.* Prayer for Relief.

Today, six Plaintiffs, BAE Industries, Nephrology Associates, Lower Brule Day School, Global Village Academy Collaborative, Global Nurse Force, and Phoenix Doe, move for preliminary relief from the $100,000 Requirement during the pendency of this litigation, or in the alternative for summary judgment. In addition, as explained in the motion for class certification being filed concurrently, Plaintiffs BAE Industries, Nephrology Associates, and Lower Brule Day School seek to represent a class of employers who have filed or will file H-1B petitions subject to the $100,000 Requirement, or would file such a petition but for the fee, received on or between September 21, 2025 and September 21, 2026, so that the Court may grant classwide relief.

Nephrology Associates is a small medical practice in rural North Carolina that provides important kidney care in Medically Underserved Areas.[16] Declaration of Dattie Michaelle Waters ("Waters Decl.") ¶¶ 5-6. It has only been able to meet its physician staffing needs through the H-1B program. *Id.* ¶ 11. Nephrology Associates recently offered a position to an Indian national who completed a nephrology fellowship in the United States on a J-1 visa. *Id.* ¶ 12. This physician has obtained a waiver of the general requirement that J-1 visa holders return to their home country for two years because the physician's position at Nephrology Associates would provide care in a Medically Underserved Area. *Id.* ¶¶ 13-14, 16-17; *see also* Peterson Decl. ¶ 7 (describing J-1 waiver process). But because the physician left the United States when her J-1 visa expired in June, the H-1B petition filed for her by Nephrology Associates on September 24, 2025 is subject to the $100,000 fee. Waters Decl. ¶¶ 14, 16-19.

BAE Industries is a small automotive parts manufacturing company in Michigan that has difficulty recruiting and retaining staff due to the highly competitive nature of the Detroit automotive labor market. Declaration of Melynn Zylka ("Zylka Decl.") ¶¶ 1, 5. To address these challenges, it has hired several H-1B employees. *Id.* ¶ 5. One of these employees has been with the company for several years on an H-1B visa. *Id.* ¶¶ 6-7. However, his visa expired during the recent 43-day government shutdown, during which BAE was unable to file for an extension of his H-1B status, and he was forced

---

[16] The U.S. Department of Health and Human Services (HHS) recognizes geographic areas where there is a shortage of primary care health services as Medically Underserved Areas. Health Resources and Services Administration, *What Is Shortage Designation?* (Liao Decl. Ex. 5).

to leave the United States to avoid being unlawfully present. *Id*. ¶¶ 8-11. Now, to petition for him again, BAE must pay a fee it cannot afford or lose an employee with years of experience. *Id*. ¶¶ 12-15.

Lower Brule Day School is a K-12 school located on the Lower Brule Sioux Reservation in rural central South Dakota. Declaration of Lance Witte ("Witte Decl.") ¶ 5. Lower Brule Day School serves approximately 350 students, 99% of whom are American Indian and 100% of whom qualify for free or reduced-price meals. *Id*. ¶¶ 9. Lower Brule Day School has had trouble recruiting teachers, due to the nationwide teacher shortage and its rural location. *Id*. ¶ 10. Of the school's 45 teachers, 10 are on H-1B visas, and without the H-1B program the school would not have an adequate number of teachers to teach their students. *Id*. ¶ 11. Starting in February, the school will be recruiting at least one new teacher for the 2026-2027 academic year. Based on the school's experience, it is highly likely that the most qualified and available candidates will come from outside of the United States and require H-1B sponsorship. *Id*. ¶ 12. But Lower Brule Day School cannot afford to pay the $100,000 fee, which is approximately twice a starting teacher's salary. *Id*. ¶ 13.

GVAC's three public charter schools provide immersive second language instruction that is consistent with an internationally benchmarked curriculum. Declaration of Michael Henderson ("Henderson Decl.") ¶¶ 2-3, 9. GVAC relies on the H-1B visa program to recruit and retain world language teachers from around the world for its three schools. *Id*. ¶ 9. Its member schools currently employ 10 teachers on H-1B visas and have sponsored 17 teachers for H-1B visas in the last six years. *Id*. ¶¶ 9-10. GVAC plans to begin recruitment for new teachers for the 2026-2027 academic year in February 2026, but their schools cannot afford to pay $100,000 to sponsor even one teacher from abroad, which threatens their recruitment cycle and their entire educational model. *Id*. ¶¶ 15-18.

Global Nurse Force ("GNF") plays a critical role in addressing the nursing shortage in the United States by placing nurses from abroad in U.S. healthcare facilities using the H-1B program. Declaration of Lalit Pattanaik ("Pattanaik Decl.") ¶ 4. Its U.S. business model is threatened because the healthcare facilities it works with cannot afford to pay $100,000 to sponsor each nurse from abroad. GNF already has lost millions of dollars in revenue because of the fee. *Id*. ¶¶ 14-15.

Phoenix Doe is a postdoctoral scholar in the Department of Ophthalmology at a U.S. university whose research has contributed to important advancements in the diagnosis of an autoimmune eye disease. Declaration of Phoenix Doe ("Doe Decl.") ¶¶ 2-5. The $100,000 fee threatens Doe's ability to

continue her research and remain in the U.S. lawfully because her university will not continue with her H-1B petition if it is subject to a $100,000 fee. *Id.* ¶ 11. Two weeks after this lawsuit was filed, USCIS issued its October Guidance providing that change of status petitions for individuals in the United States would not be subject to the fee, but only if USCIS approved the change of status. *See* Oct. Guidance, ECF 46-9 at 2. However, unless USCIS exercises its discretion and approves her change of status, Doe's work and ability to remain in the United States remain at risk.

These Plaintiffs are just some of the thousands of employers, organizations, and individuals across the United States harmed due to the Proclamation.

## LEGAL STANDARD

A preliminary injunction is appropriate when the moving party (1) is likely to succeed on the merits; (2) irreparable harm is likely without preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. Fed. R. Civ. P. 65 (b)(1), (c); *Winter* v. *Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). When the government is a party, "the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021). Alternatively, if there are "serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiffs favor, and the other two *Winter* factors are satisfied." *All. for the Wild Rockies* v. *Pena,* 865 F.3d 1211, 1217 (9th Cir. 2017) (cleaned up). A stay of an agency action under 5 U.S.C. § 705 of the APA "is governed by the [same] preliminary injunction factors." *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1015 (9th Cir. 2025); *see* 5 U.S.C. § 705 (allowing courts to "postpone the effective date of an agency action or . . . preserve status or rights pending conclusion of the review proceedings").[17]

Courts have discretion, with notice to the parties, to convert a motion for preliminary injunction into a motion for summary judgment. *See Air Line Pilots Ass'n, Int'l v. Alaska Airlines, Inc.,* 898 F.2d

---

[17] Although the $100,000 fee is already in effect, "[c]ourts—including the Supreme Court—routinely stay *already-effective* agency action." *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 834 (N.D. Cal. 2025) (quoting *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022)); *accord Kingdom v. Trump*, No. 25-cv-691, 2025 WL 1568238, at *5 (D.D.C. June 3, 2025) (observing that "various courts have interpreted § 705 to permit a 'stay'— which may be more aptly described as a temporary rollback—even of already-consummated agency action").

1393, 1397 n.4 (9th Cir. 1990); Fed. R. Civ. P. 65(a)(2); *see also Behring Reg'l Ctr. LLC v. Wolf*, No. 20-CV-09263-JSC, 2021 WL 1164839, at *3 (N.D. Cal. Mar. 26, 2021).

### ARGUMENT

The Court should grant a preliminary injunction because the Movant Plaintiffs are likely to succeed on the merits of their claims that the $100,000 Requirement was imposed unlawfully, and because not only Plaintiffs but the broader public are also harmed by the $100,000 Requirement. The government suffers no harm from being prevented from violating the law. In the alternative, the Court should grant summary judgment for Plaintiffs and vacate the $100,000 Requirement.

## I. Plaintiffs are likely to succeed on the merits of their claim that the Proclamation is ultra vires and conflicts with the INA.

The Proclamation is an unlawful attempt to rewrite key provisions of the INA. Although § 1182(f) gives the President some authority to suspend entry of noncitizens in certain circumstances, that authority is not unbounded. *See generally Trump v. Hawaii*, 585 U.S. 667, 688-89 (2018); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 760 (9th Cir. 2018). Most relevant here, § 1182(f) authorizes the President to suspend or restrict the entry of an individual or class of individuals, and nothing more; and the President cannot use § 1182(f) either to override provisions of the INA, pass new laws, or to impose fees or taxes to raise revenue (a power that belongs exclusively to Congress). The President's mandate that American employers pay an extra-statutory $100,000 fee to employ new H-1B employees entering the United States conflicts with the H-1B statutory regime and exceeds the limited authority on which it is premised.[18]

### A. The $100,000 fee exceeds § 1182(f)'s text, which authorizes only the suspension of entry or imposition of entry restrictions.

The Proclamation's $100,000 fee requirement goes far beyond either the suspension or restriction of entry of an individual or class of individuals authorized by § 1182(f). By its express terms, § 1182(f) authorizes the president to "suspend the entry" of or "impose … restrictions" on noncitizens whose entry he finds "detrimental to the interests of the United States." 8 U.S.C. § 1182(f). Yet the

---

[18] The Proclamation also cites § 1185(a), but that statute provides no additional authority. *Trump v. Hawaii*, 585 U.S. at 683 n.1; *Hawaii v. Trump*, 859 F.3d 741, 770 n.10 (9th Cir. 2017), *vacated and remanded on other grounds,* 583 U.S. 941.

Proclamation unlawfully reaches beyond the entry of noncitizens and purports to regulate USCIS's adjudication of H-1B petitions submitted by U.S. employers and the Department of State's approval of H-1B visa applications submitted by noncitizens seeking a visa to enter the United States.

Section 1(b) of the Proclamation, for example, requires the Secretary of Homeland Security to "restrict decisions on [H-1B] petitions not accompanied by $100,000 payment" for individuals "currently outside the United States." *Id.* § 1(b). But having the authority to "impose on the *entry* of [noncitizens] any restrictions he may deem to be appropriate," 8 U.S.C. § 1182(f) (emphasis added), does not mean that the President has the authority to alter the rules governing domestic conduct, including the adjudication of H-1B petitions duly filed by U.S. employers.[19] *See RAICES v. Noem*, 793 F. Supp. 3d 19, 81 (D.D.C. 2025) (§ 1182(f) does not authorize President to alter removal procedures for non-citizens present in the U.S.).

Section 2(b) of the Proclamation similarly instructs the Secretary of State to "verify receipt" of the $100,000 fee and requires the Secretary to "approve only those visa petitions for which the filing employer has made the payment." Proclamation § 2(b). But § 1182(f) does not confer upon the President the authority to prevent the issuance of a visa or otherwise render an H-1B visa applicant ineligible to receive a visa. As numerous other courts have held in the wake of the Supreme Court's *Hawaii* decision, Section 1182(f) must be read in tandem with Section 1182(a), which enumerates specific grounds of inadmissibility that render an individual both "inadmissible" *and* "ineligible to receive visas and ineligible to be admitted to the United States." 8 U.S.C. § 1182(a) (emphasis added).[20] The Proclamation

---

[19] The restriction on adjudications of H-1B petitions also contradicts 8 U.S.C. § 1184(c)(1), which imposes a nondiscretionary duty on DHS to adjudicate H-1B petitions, mandating that the agency "shall determine" the "question of importing any [noncitizen]" on an H-1B visa "upon petition of the importing employer." 8 U.S.C. § 1184(c)(1). This mandatory command does not allow the President to impose novel preconditions on the adjudication of petitions.

[20] Indeed, in *Hawaii*, the Supreme Court recognized a "basic distinction" between *admissibility* (i.e., the ability to "gain[] entry (or admission) to the United States") and "*visa issuance*," and found that these two concepts "operate in different spheres." *Hawaii*, 585 U.S. at 694-95, n.3. District courts have relied on this distinction to hold that while a § 1182(f) entry restriction may render a noncitizen inadmissible, it does not render the noncitizen ineligible to receive a visa, and does not permit the Department of State to refuse to adjudicate or issue visas. *See Thein v. Trump*, 2025 WL 2418402, at *15 (D.D.C. Aug. 21, 2025) ("Several other courts in this District have held that the Department of State cannot rely on proclamations issued pursuant to 8 U.S.C. § 1182(f) to deny visa applications. Today, this Court joins that chorus." (citing *Rai v. Biden*, 567 F. Supp. 3d 180, 194 (D.D.C. 2021); *Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203, 233-35 (D.D.C. 2021); *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 314-16 (D.D.C. 2020); *Gomez v. Trump*, 485 F. Supp. 3d 145, 191-94 (D.D.C. 2020)).)

essentially—and erroneously—attempts to utilize § 1182(f) to restrict visa issuance in a way that Congress has only authorized in § 1182(a).

The Proclamation's regulation of the *adjudication* of petitions filed by employers in the U.S. and the *approval* of visa applications by prospective employees prior to entry exceeds the grant of authority in § 1182(f)'s text to temporarily suspend or restrict *entry*. The Proclamation is thus ultra vires.

## B. The Proclamation directly overrides the statutory scheme Congress established for the H-1B program and the fees charged to U.S. employers.

The Proclamation also impermissibly conflicts with and overrides Congress's comprehensive statutory scheme governing the H-1B visa program. *See Hawaii*, 585 U.S. at 689 ("§ 1182(f) does not allow the President to expressly override particular provisions of the INA"). Through numerous provisions in the INA, refined over time through subsequent amendments, Congress has carefully calibrated the H-1B statutory scheme to balance the competing hiring demands of American employers, who seek access to a limited talent pool of noncitizen specialty workers, with the interests of American workers, the evolving needs of the U.S. labor market, and concerns about fraud and exploitative use of the H-1B visa by employers. The INA likewise reflects Congress's considered judgment that the fees for visa processing must be tied to actual processing costs. The Proclamation's $100,000 fee effectively overrides Congress's judgment, replacing the detailed H-1B visa program with a pay-to-play system that requires payment far beyond the Defendant Agencies' operational costs.

The President may not invoke Section 1182(f) to "eviscerate[]" an entire "statutory scheme," *See Doe #1 v. Trump*, 957 F.3d 1050, 1064 (9th Cir. 2020). Nor may he use that limited authority to "revers[e] course on legislatively enacted policy in its entirety." *See Nat'l Ass'n of Mfrs. v. DHS*, 491 F. Supp. 3d 549, 566 (N.D. Cal. 2020); s*ee also RAICES*, 793 F. Supp. 3d at 80 (Section 1182(f) authority "cannot plausibly be read to authorize the President" to issue a Proclamation that effectively re-writes the statutory scheme).

### 1. The Proclamation overrides Congress's carefully designed safeguards to combat fraud in the H-1B program and replaces them with a fee untethered to fraud prevention.

Although the Proclamation identifies "abuse" as the key justification for imposing "higher costs on companies seeking to use the H-1B program," Proclamation Preamble, Congress has already

incorporated numerous mechanisms into the H-1B program to combat fraud and abuse by employers. The Proclamation supersedes all these provisions with a $100,000 fee whose revenue the President has made clear will be used *not* to prevent fraud in the H-1B program, but for other purposes, *see* ECF 46-12. Section 1182(f) does not allow the President to "supplant" Congress's fraud-prevention efforts "with a new, non-statutory" mechanism, *see RAICES*, 793 F. Supp. 3d at 80, nor does it allow the President to treat mere use of a visa program as "abuse" as the Proclamation's imposition of a $100,000 fee that prices out all but the wealthiest employers seems to suggest.

Congress built multiple safeguards into the H-1B visa system to prevent abuse and fraud. These include, among others, a mandatory additional $500 fee levied on employers filing petitions for new employees, specifically for the detection and prevention of fraud; an additional $4,000 fee levied on employers with over 50 employees where over half are either H-1B or L-1 workers; the required labor certification employers must file attesting to the intended employee's wages and working conditions; and penalties to be imposed on employers who are found to have engaged in fraud or abuse. *See supra* Legal Background § III. The Proclamation smashes this finely tuned system with a sledgehammer of a fee meant to exclude all but the wealthiest employers. *Nat'l Ass'n of Mfrs.*, 491 F. Supp. 3d at 568-69 (where findings "completely disregard[] . . . the preexisting statutory framework," they are insufficient to justify invocation of section 212(f) powers). And all without identifying a single deficiency in the statutory means of preventing abuse and fraud.

The Proclamation also introduces a new source of abuse and fraud into the system by creating a "national interest" exception, which the Secretary of Homeland Security may grant in her sole and unreviewable discretion, with no stated criteria or considerations, and with no guardrails to prevent lobbying by employers or corruption in the decision-making process. "[W]hen the legislature has attacked a specific problem—and crafted a detailed and precise remedy to address that problem—we should generally assume that the law represents Congress's considered and exclusive judgment on that issue." *Savage Servs. Corp. v. United States*, 25 F.4th 925, 939 (11th Cir. 2022). Section 1182(f) does not permit the President to sweep that judgment aside in favor of his own. *See Doe #1*, 957 F.3d at 1064, 1067 (a § 212(f) proclamation cannot "effectively rewrit[e] provisions of the INA" or "eviscerate[] the statutory scheme").

**2. The Proclamation's $100,000 fee contravenes the carefully considered fee system that Congress established to recover the costs of providing adjudication and naturalization services.**

The Proclamation fundamentally alters the H-1B program and is irreconcilably at odds with the INA. By limiting participation in the H-1B visa system to only those employers willing and able to pay $100,000 per worker, the Proclamation upends the fine-tuned balance Congress set to accommodate the numerous interests at stake in the hiring of noncitizen specialty workers. The Proclamation's $100,000 fee dwarfs the maximum amount—$7,595—that an employer could be required to pay for an H-1B petition under existing statutes and regulations. Given that the median compensation for H-1B workers in medicine and health occupations is $100,000, and for those in education occupations only $72,000, the Proclamation is as much or more than a year's worth of salary costs for those workers.[21] By charging such a fee, the Proclamation effectively eliminates the availability of H-1B workers for a wide swath of employers, including smaller and non-profit employers whose hiring and innovation needs Congress expressly accommodated. *See supra* Legal Background § II.

The Proclamation's failure to articulate any connection between the $100,000 fee and the costs USCIS incurs in processing H-1B petitions is particularly problematic. Indeed, the Proclamation admits the lack of a connection, explaining that the fee is intended "to impose higher costs" on H-1B employers "to address the abuse of [the H-1B] program." Proclamation, Preamble. Congress already set fees to account for USCIS's processing costs, and deterrence of petitions through higher fees was not a factor that Congress chose to use when setting fees for the H-1B program. The Proclamation's $100,000 fee directly contradicts Congress's judgment, as well as the agency's own historical understanding, that fees set by the Executive Branch for adjudication services should enable the agency to recover the costs of providing those services, and nothing more.

While Congress set certain specific fees to be charged in connection with the administration of the H-1B visa program, *see supra* Legal Background § II, it also specified in 8 U.S.C. § 1356(m) that fees "may be set at a level" to recoup DHS's costs of providing adjudication and naturalization services. "[A]ll adjudication fees" would be designated by the agency "in regulations." Agency rulemaking on

---

[21] *See* USCIS, Characteristics of H-1B Specialty Occupation Workers, FY 2024, at 47 (Table 9a) (Apr. 29, 2025) (Liao Decl. Ex. 12).

fees has consistently reaffirmed the understanding that § 1356(m) "requires USCIS fees to be based on total costs for USCIS to carry out adjudication and naturalization services."[22] This historical practice comports with § 1356(m)'s text as well as its legislative history, which includes a conference report confirming that "[t]he conferees expect[ed] that funds generated by this Account shall not be used for any purpose other than enhancing naturalization and adjudication programs." H.R. Rep. No. 100-979, at 38 (1988). When § 1356(m) specifies that adjudication fees be set at a level to recoup costs, Congress was setting a ceiling for such fees, and not a floor, as the legislative history and the agency's longstanding rules make clear. *See Fed. Trade Comm'n v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941) (giving significant weight when interpreting a statute to the "practical construction of the Act by those entrusted with its administration").

The Proclamation, however, rips off that ceiling to impose a fee more than 10 times greater than already established H-1B fees, with no relationship between the cost of adjudication and the fee imposed. As justification for the new $100,000 fee, the Proclamation claims only that due to "abuse of the H-1B program," it is "necessary to impose higher costs on companies seeking to use the H-1B program." President Trump subsequently declared that, "We're going to take that money and we're going to be reducing taxes and we're going to be reducing debt." ECF 46-12 at 1.

The Proclamation directly conflicts with multiple INA provisions that Congress enacted as part of a carefully considered visa system that enables U.S. employers to bring in foreign specialty workers on H-1B visas while balancing labor market and fraud concerns. While deferential to the President, *see Hawaii*, 585 U.S. at 684, the plain text of § 1182(f) does not and cannot support executive action that so thoroughly contravenes Congressional intent. *See RAICES*, 793 F. Supp. 3d at 87-88; *AFL-CIO v. Trump*, 318 F. Supp. 3d 370, 417 (D.D.C. 2018) ("[E]xecutive orders that conflict with the purposes of a federal statute are ultra vires.") (citing *Chamber of Com. v. Reich*, 74 F.3d 1322, 1339 (D.C. Cir. 1996), *rev'd and vacated on other grounds*, 929 F.3d 748 (D.C. Cir. 2019)).

---

[22] USCIS 2024 Fee Rule, 89 Fed. Reg. at 6,288; *see also* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 88 Fed. Reg. 402, 501 (Jan. 4, 2023) (justifying an increase in H-1B fees as necessary to "cover the expenses of the H-1B registration program"); U.S. Citizenship and Immigration Services Fee Schedule, 81 Fed. Reg. 73,292, 73,292 (Oct. 24, 2016) ("USCIS 2016 Fee Rule") ("DHS has determined that adjusting the fee schedule is necessary to fully recover costs and maintain adequate service."); U.S. Citizenship and Immigration Services Fee Schedule, 75 Fed. Reg. 58,962, 58,962 (Sept. 24, 2010) ("USCIS 2010 Fee Rule") (same).

**C.     The Proclamation's $100,000 fee is a statutorily unauthorized general revenue-generating tax that violates the separation of powers and Congress's Taxing Power.**

Finally, the Proclamation is also ultra vires because it creates a payment requirement—one that the President has said would generate money "to be reducing taxes" and "reducing debt," ECF 46-12 at 1—in the absence of any language in § 1182(f) that could conceivably authorize the President to impose new fees or taxes, or to otherwise use it to raise revenue. The levy of a fee upon domestic public and private sector employers to generate general revenue is a tax in everything but name. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564 (2012) (how the government labels an exaction does not control whether it is a tax for constitutional purposes). Because the Constitution reserves to Congress the taxing power, *see* Const. art. I § 8, cl. 1, "Congress must indicate clearly its intention to delegate to the Executive the discretionary authority" to impose payment requirements on regulated parties, "whether characterized as 'fees' or 'taxes.'" *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989). But no such delegation exists in § 1182(f).

Section 1182(f) is devoid of language concerning fees, taxes, or any other kind of monetary payment. But other INA provisions do expressly command or otherwise delegate to the executive the power to impose fees, including the fee provisions concerning the H-1B visa itself. *See* 8 U.S.C. § 1184(c)(9)(A) ("The Attorney General *shall impose a fee* on an [H-1B-petitioning] employer . . .") (emphasis added); *see also* 8 U.S.C. §§ 1356(m), 1184(a)(1), 1184(c)(9)-(12). These provisions demonstrate that Congress knows how to adopt language authorizing the Executive Branch to impose certain fees or otherwise require monetary payments from regulated parties—and specifically did so in certain sections of the INA—but chose *not* to do so when enacting § 1182(f). *See Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) ("Atextual judicial supplementation [of a statute] is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision."); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.") The Proclamation cannot impute a taxing authority to the President that Congress has not delegated in § 1182(f).

Moreover, in conditioning the entry of H-1B workers—as well as the adjudication and approval of H-1B petitions—on the payment of money by American employers, the Proclamation is an extreme

outlier among all other § 1182(f) proclamations and orders. There is no precedent for a president using § 1182(f) to require any kind of monetary payment to the federal government. There is certainly no history of a president using § 1182(f) to impose a fee that is orders of magnitude greater than any pre-existing fees prescribed by Congress, tied not only to the entry of a noncitizen but also the adjudication of petitions and the approval and issuance of visas, intended to generate general revenue to go into the United States' coffers, and untethered to the actual costs of administering the visa program. "[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *West Virginia v. EPA*, 597 U.S. 697, 725 (2022) (citation omitted).

The Proclamation's attempt to regulate noncitizens' "entry" to the United States by imposing a fee requirement on American employer petitioners thus strains the text of § 1182(f) beyond its breaking point. It opens the door to mischief in at least two ways: permitting any President to effectively shut down Congressionally authorized immigration pathways by imposing prohibitively high fees as a condition of entry, and allowing the President to regulate the conduct of not only foreign nationals but also U.S. persons and entities by extracting from them any fee of the President's choosing, as a condition for entry of a foreign national to the United States. Here, the President is doing both. The stated purpose of the Proclamation's fee is to drive down or eliminate usage of this Congressionally authorized program, and the justification for it is to address the purported conduct of domestic employers (not individuals outside the country) by making them pay an enormous fee. Such an interpretation of § 1182(f) upends the separation of powers and runs afoul of the major questions doctrine. *See West Virginia*, 597 U.S. at 723 (Congress does not "typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme") (citation omitted); *see also Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 20 (1995) ("It is an elementary rule of construction that the act cannot be held to destroy itself.") (quotation marks omitted).

\*\*\*

The Proclamation, as well as any implementation of it, exceeds the authority granted by § 1182(f) and is ultra vires.

II.     **Plaintiffs are likely to succeed on their claims that the $100,000 Requirement violates the Administrative Procedure Act.**

Not only is the President's Proclamation unlawful, the Agency Defendants' implementation of it is independently unlawful. "The APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). Section 706(2) of the APA requires reviewing courts to "hold unlawful and set aside agency action" they find to be "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (B), (C). Courts similarly "shall" set aside agency actions that are "arbitrary, capricious, [or] an abuse of discretion," or that are found to be "without observance of procedure required by law." *Id.* § 706(2)(A), (D).

A.     **Agency Defendants' imposition of the $100,000 Requirement is final agency action reviewable under the APA.**

As a threshold matter, the Agency Defendants' imposition of the $100,000 Requirement constitutes a final agency action subject to review under the Administrative Procedure Act.

The Agency Defendants' imposition of the $100,000 Requirement on H-1B-petitioning employers is an "agency" action that cannot be shielded from judicial review by simply pointing to the Proclamation. *See Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) (observing that "[n]o language in the APA prevents or excepts review of an agency action that implements a presidential action" and holding that a Department of Labor rule implementing an executive order was subject to APA review); *E. Bay Sanctuary Covenant*, 932 F.3d at 770 ("review[ing] the substantive validity of the Rule together with the Proclamation"); *see also AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 766 F. Supp. 3d 74, 83 (D.D.C. 2025) (observing that to hold otherwise "would allow the President and agencies to simply reframe agency action as orders or directives originating from the President to avoid APA review."). This is particularly so where, as here, Defendants' actions are not "ministerial implementations, sans discretion, of Presidential authority." *Pacito v. Trump*, 768 F. Supp. 3d 1199, 1227 (W.D. Wash. 2025). The Proclamation leaves many implementation questions unanswered, and the agencies have exercised considerable discretion in filling the gap. *See id.* (reviewing agency actions implementing executive

orders where the agency actions did "not merely color within the lines"). Thus, they are "agency" actions reviewable under the APA.

For example, Proclamation's § 1(c) allows the Secretary of Homeland Security, "in the Secretary's discretion," to grant exceptions to the $100,000 requirement if the hiring of particular H-1B workers "is in the national interest and does not pose a threat to the security or welfare of the United States." The Proclamation indicated that exceptions could be made for individuals, all individuals working for a company, or all individuals working in a particular industry. Proclamation § 1(c). In USCIS's October 20, 2025 guidance, however, the agency chose to make the exception very narrow and added conditions that did not appear in the Proclamation: exceptions will be granted only in "extraordinarily rare circumstance[s]" and require a determination that "no American worker is available to fill the role" and that requiring the $100,000 payment "would significantly undermine the interests of the United States." Oct. Guidance, ECF 46-9 at 3. The guidance also appears to contemplate—but does not justify or explain— that exceptions will be made only on an individual basis, rather than permitting a company- or industry-wide exception. *See id.* (requiring determination that "*a particular alien worker's* presence in the United States as an H-1B worker is in the national interest") (emphasis added). By narrowing the exception, DHS has expanded the $100,000 Requirement beyond even what the Proclamation contemplated, demonstrating that the implementation of the Proclamation is an "agency" action.

The $100,000 Requirement is also a "final" agency action. Agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) determines "rights or obligations" or if "legal consequences will flow" from it. *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotations omitted). The $100,000 Requirement meets the first *Bennett* prong because it is a "definitive position" and not "merely tentative." *S.F. Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 578 (9th Cir. 2019). Agency Defendants have not, for example, merely issued a proposed regulation that might require employers to pay $100,000 in the future, if the agencies later finalize the rule. Rather, they have already made the $100,000 Requirement effective, using mandatory language ("Payment must be made…") with an effective date ("petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025"), and directing petitioning employers to pay through Pay.gov. Oct. Guidance, ECF 46-9 at 2. According to the government, a Treasury account has already been established to collect the

money. Liao Decl. Ex. 6 ¶ 7. The $100,000 Requirement meets the second *Bennett* prong because it has a "direct and immediate effect on the day-to-day operations of the subject party." *Oregon Nat'l Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (cleaned up). "[T]he [action] has the status of law or comparable legal force, and . . . immediate compliance with its terms is expected." *Id.* at 987. "[T]here is no suggestion that compliance" with the $100,000 Requirement is "somehow optional." *S.F. Herring Ass'n*, 946 F.3d at 580. USCIS has clearly stated that "[p]etitions subject to the $100,000 payment that are filed without a copy of the proof of the payment from pay.gov or evidence of an exception from the Secretary of Homeland Security will be denied." Oct. Guidance, ECF 46-9 at 2; *see also* Waters Decl. ¶ 19.

### B.     The $100,000 Requirement is contrary to law.

The Agency Defendants' guidance is not in accordance with law and exceeds statutory authority. Administrative agencies "literally ha[ve] no power to act . . . unless and until Congress confers power[s]" to do so, and Congress has not conferred such power here. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The Proclamation appears to be the only source of authority Agency Defendants have claimed. But, as discussed *supra* Argument § I, § 1182(f) does not authorize either the President or executive agencies to go beyond an entry suspension to predetermine the outcomes of USCIS or State adjudications of H-1B petitions and visa applications. The Proclamation and the implementing agency guidance also contravene multiple INA provisions and reduce the finely tuned H-1B visa system to an extortionate pay-to-play scheme while imposing an impermissible tax on U.S. employers, in violation of the separation of powers and Congress's taxing power. Because it is unlawful for the President to condition the adjudication of H-1B petitions and the approval of H-1B visa applications on the petitioning employer's payment of a $100,000 fee, so is it likewise unlawful for USCIS or State to refuse to adjudicate H-1B such petitions and applications without such payment and for CBP to refuse entry to an H-1B employee based on failure to pay the fee. Defendants "lack lawful authority to implement the Proclamation's provisions" if the Proclamation itself is unlawful. *Nat'l Ass'n of Mfrs*, 491 F. Supp. 3d at 569; *see also Hawaii v. Trump*, 878 F.3d 662, 680 (9th Cir. 2017) (observing that courts may enjoin "officers who attempt to enforce the President's directive" if the directive is unlawful), *rev'd and remanded on other grounds,* 585 U.S. 667 (2018). Because Agency Defendants' actions conflict with statute and exceed their statutory authority, the Court should set them aside.

C.      **Agency Defendants failed to observe procedures required by law.**

The $100,000 Requirement also violates the APA because the Agency Defendants did not follow procedures required by law, specifically notice-and-comment rulemaking procedures required by the APA, 5 U.S.C. § 553, and the Regulatory Flexibility Act's requirement of certain impact analyses, *id.* §§ 603-604.

1.      **Agency Defendants failed to provide notice and an opportunity for public comment.**

The $100,000 Requirement must be set aside because the Agency Defendants did not follow notice and comment rulemaking procedures required under 5 U.S.C. § 553. Under the APA, when promulgating a legislative rule, an agency must publish a proposed rule and give the public "an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)-(c); *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003) (differentiating between legislative rules and interpretative rules). Only after considering the public's comments can the agency finalize the rule. *Id.* § 553(c). The APA also requires that a rule be published not less than thirty days before its effective date. *Id.* § 553(d). These requirements are "'designed to assure due deliberation' of agency regulations and 'foster the fairness and deliberation that should underlie a pronouncement of such force.'" *E. Bay Sanctuary Covenant*, 932 F.3d at 775 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001)).

Agency Defendants' imposition of a $100,000 requirement is a legislative rule because it "imposes new obligations" on H-1B petitioners, as petitions will not be adjudicated and their workers will not be granted visas or be allowed to enter the United States without the $100,000 payment. *Hemp*, 333 F.3d at 1088. It is also "inconsistent with a prior rule having the force of law," namely the previous, much lower fees (which went through notice-and-comment rulemaking). *Id.* Thus, Agency Defendants were required to go through notice and comment and publish a final rule at least 30 days before it became effective, yet utterly failed to do so. Nor have Agency Defendants claimed that any of the APA's "'narrowly construed and only reluctantly countenanced'" exceptions to notice and comment justify their abandonment of that requirement. *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984) (quoting *AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981)).

Agency Defendants' procedural failures prejudiced Plaintiffs and the public. Agency Defendants' haste contrasts sharply with USCIS's historical practice of providing notice and soliciting comment when adjusting fees or making other changes to the H-1B program. Public participation in those rulemakings was robust,[23] and it would have been robust as to the $100,000 Requirement as well. Had there been a notice and comment period, the public could have provided "data, views, or arguments," 5 U.S.C. § 553(c), on the adverse impacts the sudden and extremely high fee increase would have on employers, including small businesses like Plaintiffs BAE Industries and Nephrology Associates. The public could have commented on the impacts of the $100,000 Requirement on communities that struggle to recruit enough doctors, nurses, or teachers in rural areas. In the past, USCIS has considered public comments and, in response, provided fee discounts to small employers and nonprofits.[24] This time, though, Agency Defendants did not even give the public a chance to be heard.

"The interchange of ideas between the government and its citizenry provides a broader base for intelligent decision-making and promotes greater responsiveness to the needs of the people." *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982) (quoting *Kelly v. U.S. Dep't of the Interior*, 339 F. Supp. 1095, 1102 (E.D. Cal. 1972)). Moreover, "[c]omplying with the notice and comment provisions of the APA is not a matter of agency choice." *Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 757 n.4 (9th Cir. 1992). Because Defendant Agencies here have promulgated a legislative rule "without observance of procedure required by law," including the APA's notice-and-comment and effective-date requirements, it must be held "unlawful and set aside." 5 U.S.C. § 706(2); *see also California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018).

**2. Agency Defendants failed to analyze and seek public comment on small business impacts, contrary to the requirements of the Regulatory**

---

[23] *See, e.g.*, USCIS 2024 Fee Rule, 89 Fed. Reg. at 6,240 (7,973 comments "from individuals, schools or universities, advocacy groups, lawyers or law firms, legal assistance providers, community or social organizations, businesses, State and Federal elected officials, research organizations, religious organizations, local governments or tribes, unions, and business or trade associations"); U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 85 Fed. Reg. 46,788 (Aug. 3, 2020) ("USCIS 2020 Fee Rule") (43,108 comments from similar groups); Improving the H-1B Registration Selection Process and Program Integrity, 89 Fed. Reg. 7,456, 7,459 (Feb. 2, 2024) (510 comments from similar groups).

[24] *See, e.g.*, USCIS 2024 Fee Rule, 89 Fed. Reg. at 6198, 6209, 6244 (providing discounts to nonprofits and small employers petitioning for H-1B and other nonimmigrant workers in response to comments that fees in the $530 to $1,5385 range would be disproportionately burdensome).

**Flexibility Act.**

The Agency Defendants also failed to follow the Regulatory Flexibility Act. "The RFA was passed in 1980 to "'encourage administrative agencies to consider the potential impact of nascent federal regulations on small businesses.'" *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1100 (9th Cir. 2005) (quoting *Assoc. Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 111 (1st Cir. 1997). As then-Judge Kavanaugh has explained, the RFA imposes procedural requirements on agencies "to state, summarize, and describe" the impacts of a rule on small businesses and the steps the agency has considered and taken to minimize those impacts. *Nat'l Tel. Co-op. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) (Kavanaugh, J.). Specifically, whenever an agency is required to conduct notice and comment rulemaking (as Agency Defendants were here), an agency must "prepare and make available for public comment an initial regulatory flexibility analysis" that "describe[s] the impact of the proposed rule on small entities." 5 U.S.C. § 603(a). The initial analysis must discuss significant alternatives such as establishing different compliance requirements or timetables "that take into account the resources available to small entities" or "exemption from coverage of the rule, or any part thereof, for such small entities." *Id.* § 603(c). A final rule must include a final regulatory flexibility analysis that discusses, among other things, significant issues raised by the public or the Chief Counsel for Advocacy of the Small Business Administration and the steps the agency has taken to "minimize the significant economic impact on small entities." *Id.* § 604(a).

Here, Agency Defendants never published an initial analysis for public comment and did not publish a final analysis either, even though the $100,000 requirement will have an enormous impact on small entities. Because Agency Defendants have not complied with the Regulatory Flexibility Act and continued enforcement of the $100,000 Requirement is not "in the public interest," this Court should, at a minimum, "defer[]the enforcement of the rule against small entities." *Id.* § 611(a)(4)(B); *see infra* Argument § V (describing adverse impacts on the public).[25]

---

[25] The RFA also supports Plaintiffs' "related but distinct claim that the [Agency Defendants'] action is arbitrary and capricious under the APA because the agency did not reasonably address the [$100,000 Requirement's] impact on small businesses." *Nat'l Tel. Co-op. Ass'n*, 563 F.3d at 540. This argument is discussed *infra* Argument § II.D.2.

1    **D.    The $100,000 Requirement is arbitrary and capricious.**

2    Agency Defendants' implementation of the $100,000 Requirement is also arbitrary and

3    capricious. "[T]he touchstone of 'arbitrary and capricious' review . . . is 'reasoned decisionmaking.'"

4    *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019)

5    (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52

6    (1983)). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably

7    explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592

8    U.S. 414, 423 (2021)). In reviewing the action, the court "must ensure, among other things, that the

9    agency has offered 'a satisfactory explanation for its action[,] including a rational connection between

10   the facts found and the choice made.'" *Id.* (quoting *State Farm*, 463 U.S. at 43). An agency is obliged

11   "to consider alternatives" and has "a duty . . . to give a reasoned explanation for its rejection of such

12   alternatives." *Nebraska*, 121 F.4th at 17 (quoting *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d

13   1153, 1169 (D.C. Cir. 1987)). "[A]n agency cannot simply ignore 'an important aspect of the problem.'"

14   *Ohio*, 603 U.S. at 293 (quoting *State Farm*, 463 U.S. at 43). When an agency changes course, it "must

15   show that there are good reasons for the new policy," *FCC v. Fox Television Stations, Inc.*, 556 U.S.

16   502, 515 (2009), and "it must be cognizant that longstanding policies may have engendered serious

17   reliance interests that must be taken into account," *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30

18   (2020) (cleaned up).

19   That an agency is implementing a presidential directive does not exempt an agency "from basic

20   APA requirements of reasoned decisionmaking." *Nebraska*, 121 F.4th at 17. In *Nebraska*, for instance,

21   the Department of Labor issued a regulation that implemented a new executive order that "required

22   federal contractors to pay employees a $15 minimum wage," but the court noted that the executive order

23   gave "DOL considerable discretion," and held that DOL acted arbitrarily and capriciously because it

24   failed to consider "modify[ing] the amount of the . . . minimum wage rate, chang[ing] the effective date

25   of the wage rate, or phas[ing] in the wage rate over a number of years." *Id.* at 5, 17.[26]

26

27

28   [26] *Trump v. Orr* is not to the contrary. No. 25A319, 2025 WL 3097824, at *1 (U.S. Nov. 6, 2025) (finding plaintiffs unlikely "to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow"). The executive order at issue in that case did not give the agency discretion in implementation.

Agency Defendants' implementation of the $100,000 Requirement was arbitrary and capricious under these established standards. The agencies' imposition of an enormous, immediate, and blanket fee of $100,000 was not reasonable or reasonably explained. Despite the discretion given in the Proclamation, the agencies failed to consider obvious aspects of the problem, such as the serious disruption of reliance interests and the pricing out of small businesses and nonprofits, and they failed to consider alternative approaches that could have mitigated harms. Indeed, the extremely thin administrative records from State, CBP, and USCIS—13, 11, and 22 pages, respectively (including cover pages)—show that the agencies failed to consider much of anything at all. Liao Decl. Exs. 7, 8, 9.[27]

### 1. Agency Defendants failed to consider its past practice of incremental fee increases and reliance interests.

Agency Defendants' implementation of the $100,000 Requirement was arbitrary and capricious in numerous ways. First, in imposing a huge, overnight $100,000 fee, Agency Defendants failed to acknowledge and explain its departure from its own past practice regarding fees. An agency is free to change course, but it "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016); *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) ("[s]udden and unexplained change" may be arbitrary, capricious, or an abuse of discretion). In explaining its changed position, an agency must take into account reliance interests on the agency's previous policies. *Encino Motorcars*, 579 U.S. at 222.

Agency Defendants have never increased H-1B fees by six figures in one go nor increased them without advance warning. Previous fee adjustments were done through notice and comment rulemaking and affected parties knew in advance about the fee increase before the new fees became effective. The past fee increases were also much smaller. For example, USCIS increased fees for H-1B filers by $1,125 in 2024, by $10 in 2019, by $135 in 2016, and $5 in 2010.[28] State increased fees for H-1B visa applicants

---

[27] The government filed the administrative records in *Chamber of Commerce*, 1:25-cv-03675-BAH (D.D.C.). *See* Liao Decl. ¶¶ 7-9.

[28] USCIS 2024 Fee Rule, 89 Fed. Reg. at 6,363; Registration Fee Requirement for Petitioners Seeking To File H-1B Petitions on Behalf of Cap Subject Aliens, 84 Fed. Reg. 60,307, 60,307 (Nov. 8, 2019); USCIS 2016 Fee Rule, 81 Fed. Reg. at 73,320 ($135 fee increase for Form I-129, the form used for H-

by $15 in 2023.[29] The enormous and sudden $100,000 fee was a radical departure from the Agency Defendants' past approach. Yet, nowhere in the various memoranda and FAQs or in the administrative record have the agencies displayed any awareness of the change. *See Pacito*, 768 F. Supp. 3d at 1234 (finding agency implementation of executive order arbitrary and capricious where agency deviated from regulations).

Agency Defendants also failed to consider the burden that the $100,000 fee would predictably create for employers and workers. Nor did the agencies consider alternatives that could have mitigated harms such as "more accommodating" timelines to allow employers and workers "to reorder their affairs, *Regents*, 591 U.S. at 32, modifying the amount of the fee, changing the effective date, or phasing in the fee, *Nebraska*, 121 F.4th at 17. This failure makes the virtually exceptionless $100,000 fee arbitrary and capricious.

## 2. Agency Defendants failed to consider adverse impacts on small businesses and nonprofits.

Second, in imposing an across-the-board $100,000 fee, Agency Defendants failed to consider an important aspect of the problem—the adverse impacts of the $100,000 requirement on small businesses and non-profits that are less able to pay—and to consider alternatives that could have lessened those impacts, such as discounts or later effective dates, despite having considered and offered alternatives in the past. *See Nebraska*, 121 F.4th at 17 (agency "acted arbitrarily and capriciously when it overlooked alternatives"); *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 173 (D.D.C. 2021) (agency acted arbitrarily and capriciously by failing to consider impact of immigration-related fee increase on legal service providers, where INA provisions showed Congress's concern about immigrants' access to counsel).

According to DHS's own estimates, 84.8% of H-1B-petitioning employers are small entities.[30] Congress has repeatedly recognized that small entities have fewer resources and specifically sought to

---

1B petitions); USCIS 2010 Fee Rule, 75 Fed. Reg. at 58,962, 58,964. In 2020, USCIS raised fees for H-1B filers by $95, but that rule was stayed and never went into effect. USCIS 2020 Fee Rule, 85 Fed. Reg. at 46,901; *see, e.g.*, *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 548 (N.D. Cal. 2020).
[29] Schedule of Fees for Consular Services—Nonimmigrant and Special Visa Fees, 88 Fed. Reg. 18,243, 18,245 (Mar. 28, 2023) ("State 2023 Fee Rule").
[30] Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program, and Program Improvements Affecting Other Nonimmigrant Workers, 89 Fed. Reg. 103,054, 103,192 (Dec. 18, 2024) (estimate based on FY 2022 data).

accommodate them. For example, the $1,500 statutory ACWIA fee that H-1B employers pay is cut in half for employers with 25 or fewer full-time employees, and does not apply to cap-exempt employers (who tend to be non-profits). *See supra* Legal Background § II. More generally, for rules subject to notice-and-comment rulemaking (as the $100,000 Requirement is, *see supra* Argument § II.C), Congress requires agencies to "take into account the resources available to small entities" and to consider adopting alternatives that "minimize the significant economic impact on small entities." 5 U.S.C. § 604. The agencies' past practice of considering the economic impact of H-1B fees and other rules on small entities makes clear that both DHS and State are well aware that such employers entities tend to have more limited resources.[31] The agencies' failure to show any consideration or make accommodation for the particular needs of such employers is striking given this prior practice.[32]

But here, even though $100,000 is much more onerous than previous fee increases ($1,125 in 2024, $15 in 2023, $95 in 2020), the Agency Defendants conspicuously failed to consider the $100,000 Requirement's impact on the nearly 85% of H-1B employers who are small entities. They also failed to consider alternative policies for those less able to pay. Imposing a blanket $100,000 fee without considering an important, known aspect of the problem and alternatives was arbitrary and capricious.

### 3. Agency Defendants failed to consider impacts on schools, hospitals, and communities.

Third, Agency Defendants failed to consider the negative impacts of the $100,000 requirement on schools, hospitals, and communities, especially in underserved areas where school districts and hospitals struggle to hire teachers, doctors, and nurses and rely on the H-1B program to ensure effective health care and educational and other services for their communities. Waters Decl. ¶¶ 11, 19-20; Witte Decl. ¶¶ 9-11; Pattanaik Decl. ¶¶ 3, 9-13; Henderson Decl. ¶¶ 9-12, 15-18; Peterson Decl. ¶¶ 5-7, 14-17, 20. As a result, the agencies failed to consider more tailored approaches for underserved areas.

---

[31] *See, e.g.*, 88 Fed. Reg. at 453 ("DHS appreciates that nonprofit or small entities may not have the same level of financial resources as many large, for-profit corporations that also submit petitions for foreign workers."); USCIS 2024 Fee Rule, 89 Fed. Reg. at 6,354, 6,356-57, 6,362-69; State 2023 Fee Rule, 88 Fed. Reg. at 18,246; USCIS 2020 Fee Rule, 85 Fed. Reg. at 46,900-01; *see also* Weighted Selection Process for Registrants and Petitioners Seeking To File Cap-Subject H-1B Petitions, 90 Fed. Reg. 45,986, 46,014-16 (Sept. 24, 2025) (analyzing impact of H-1B lottery changes on small entities).
[32] *E.g.*, USCIS 2024 Fee Rule, 89 Fed. Reg. at 6,256; State 2023 Fee Rule, 88 Fed. Reg. at 1,824 (proposing $120 fee increase but finalizing only a $15 increase in response to comments).

Because Agency Defendants failed to consider the obvious adverse impacts of making the $100,000 fee apply immediately and across the board without considering alternatives such as postponed or phased-in effective dates or discounts, the Court should enjoin their arbitrary and capricious implementation of the $100,000 Requirement.

## III.    Plaintiffs have standing.

Plaintiffs have standing to bring their claims. "To establish standing, the plaintiff . . . must show that an injury-in-fact was caused by the challenged conduct and can be redressed by a favorable judicial decision." *San Luis Obispo Mothers for Peace v. U.S. Nuclear Reg. Comm'n*, 100 F.4th 1039, 1054 (9th Cir. 2024). "As a general rule, in an injunctive case this Court need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) (proceeding to the merits where one of the two plaintiffs "unquestionably" had standing and defendant challenged standing only as to the other plaintiff). Nevertheless, each Plaintiff moving for preliminary relief has established standing.

### A.    Employer Plaintiffs

Employer Plaintiffs BAE Industries, Nephrology Associates, and Lower Brule Day School each have filed or will file an H-1B petition that is subject to the $100,000 fee, or would file such a petition but for the fee. In other words, they all suffer the same or similar injury of being subject to the unlawful fee. When "the plaintiff is himself an object of the action . . . at issue, . . . there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992). And there is no question here that these Plaintiffs have standing, both in their individual capacity and as representatives of the putative class. *See Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc) ("In a class action, standing is satisfied if at least one named plaintiff meets the requirements." (citation omitted)); *Thakur v. Trump*, 148 F.4th 1096, 1104-05 (9th Cir. 2025) ("Where the class seeks injunctive relief, the court 'consider[s] only whether at least one named plaintiff satisfies the standing requirements for injunctive relief.'") (quoting *Bates*).

Plaintiff Nephrology Associates' three physicians, all of whom have been beneficiaries of H-1B petitions, practice in a medically underserved, rural community in North Carolina. Waters Decl. ¶ 6, 11. Nephrology Associates hired a fourth nephrologist who is currently stuck abroad because USCIS has

told Nephrology Associates that to approve its H-1B petition for this physician, Nephrology Associates must pay the $100,000 fee or obtain a national interest exception ("NIE"). *Id.* ¶¶ 12-19. As a small medical practice, Nephrology Associates cannot afford to pay the $100,000 fee. *Id.* ¶ 19. Without relief from this Court, Nephrology Associates will not be able to bring the physician aboard, will face months or years of additional recruiting, and may never be able to find a qualified and willing physician to replace the physician it lost. Meanwhile, hundreds of people with kidney disease in the community are experiencing delays in essential care. *Id.* ¶ 20.

Because of the $100,000 Requirement, BAE Industries is struggling to retain an important employee, a Senior Quality Engineer, who they sponsored for an H-1B visa in 2019. Zylka Decl. ¶¶ 6-7, 12. Due to the government shutdown, the employee's H-1B extension petition could not be filed before his H-1B status in the United States expired. *Id.* ¶¶ 9-11.[33] To avoid being unlawfully present, the employee left the United States in mid-October. *Id.* ¶ 11. To bring him back, BAE would have to pay a $100,000 fee, which BAE cannot do, given that it recently lost a longstanding contract representing 20% of its sales. *Id.* ¶ 12. The employee's absence is harming BAE's operations because of the importance of his role, the knowledge the employee has developed of BAE and the industry, and the trust he has built with BAE employees. *Id.* ¶¶ 13-15.

Lower Brule Day School depends on the H-1B program to hire an adequate number of teachers to serve its 350 students. Witte Decl. ¶ 11. In February 2026, the school plans to start recruiting at least one new teacher for the 2026-2027 academic year. *Id.* ¶ 12. While the school will hire any qualified candidate, based on its experience, it is highly likely that the most qualified and available candidates will come from outside the United States and will require H-1B visas. *Id.* But the school does not have sufficient funding to pay the $100,000 fee for the teachers requiring H-1B sponsorship who it expects to need to hire. *Id.* ¶¶ 13-14.

BAE, Nephrology Associates, and Lower Brule Day School's experiences evidence the integral role the H-1B program plays in ensuring Americans' access to medical services and safe transportation, among many other things.

---

[33] H-1B status may be extended beyond the six-year limit for a noncitizen, like BAE's employee, who is the beneficiary of an approved immigrant visa petition and for whom an immigrant visa number is not yet available. American Competitiveness in the Twenty-first Century Act of 2000, Pub. L. No. 106-313, § 104(c) (8 U.S.C. § 1184 note); 8 C.F.R. § 214.2(h)(13)(iii)(E).

### B.    Global Village Academy Collaborative

GVAC has standing to challenge the application of the $100,000 fee to its member schools, which harms GVAC as an organization and the schools themselves. *See E. Bay Sanctuary Covenant*, 993 F.3d at 662 (organizations can assert standing on behalf of their members and in their own right). GVAC operates like a school district: it provides centralized operational and educational support services, including teacher recruiting and placement, to its three member schools and its staff. Henderson Decl. ¶ 3.

For almost twenty years, GVAC and its schools have relied on the availability of H-1B petitions to recruit, hire, and retain world language teachers. *Id*. ¶ 9. Recruiting teachers who require H-1B sponsorship is critical for Global Village Academy ("GVA") schools' operations and mission because their entire educational model depends on hiring teachers who are native speakers. *Id*. ¶ 11. Based on their prior recruitment efforts, the combination of native-language skills and cultural competencies that GVAC schools look for is not easily found hiring only within the United States. *Id*. ¶ 12. However, because GVAC's schools are tuition-free, and both GVAC and the schools have limited budgets, GVA schools cannot afford to pay $100,000 for each teacher they hire from abroad. *Id*. ¶¶ 15-16. Therefore, GVA schools are injured by the fee, and this litigation is germane to GVAC's purpose, which is to ensure that GVA school students are receiving impactful instruction in a second world language. *Id*. ¶ 2; *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (setting forth requirements for associational standing); *AFGE v. U.S. Office of Personnel Mgmt.*, 781 F. Supp. 3d 920, 937-38 (N.D. Cal. 2025) ("An organization establishes representational standing where it shows that some subset of its members have been, or imminently stand to be, injured."). Finally, the participation of the member schools themselves is unnecessary because this case seeks declaratory, injunctive, and vacatur relief. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996).

The fee also harms GVAC as an organization because it jeopardizes its finances, directly affects and interferes with GVAC's core business activities, frustrates its mission, and impairs its ability to perform the services it provides for its member schools. *See Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395 (2025). GVAC assisted its schools in recruiting the ten world language teachers currently employed with the schools through the H-1B program, three of whom were sponsored from abroad. Henderson Decl. ¶ 9. If GVA schools are not able to hire employees requiring

H-1B sponsorship, including specifically from countries outside the United States, GVAC would have to fundamentally change its unique educational model that sets its schools apart for parents and students attracted to the benefits of dual language immersion. *Id.* ¶ 17. And if the fee were to be enforced against a GVA school for even one teacher, it would dramatically impact GVAC's ability to recruit enough teachers who are native-language speakers. *Id.* ¶¶ 15-16. The schools would likely need to place a cap on enrollment as a result, which would mean less funding for the schools, given that most of their funding comes from the State of Colorado and is based on the number of pupils enrolled at the schools, and GVAC itself, given that most of its budget comes directly from its schools. *Id.* ¶ 16. *E. Bay Sanctuary Covenant*, 993 F.3d at 663-64 (organizations had direct standing to sue where when they established that the defendant's actions had frustrated their missions, impaired their ability to perform the services they were formed to provide, and jeopardized their funding).

### C.     Global Nurse Force

Global Nurse Force ("GNF") has facilitated the placement and hiring of hundreds of nurses in U.S. healthcare facilities in recent years. Pattanaik Decl. ¶ 4. Even if the government is not directly regulating a plaintiff (or its members), but rather a third party, the plaintiff can establish standing by showing that "third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383 (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)) (cleaned up). The Supreme Court "has identified a variety of familiar circumstances where government regulation of a third-party individual or business may be likely to cause injury in fact to an unregulated plaintiff. For example, when the government regulates (or under-regulates) a business, the regulation (or lack thereof) may cause downstream or upstream economic injuries to others in the chain, such as certain manufacturers, retailers, suppliers, competitors, or customers." *Id.* at 384; *see also Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025) (fuel producers have standing to challenge EPA action that required automakers to make more electric vehicles and fewer gasoline-powered vehicles, leading to fuel producers making less money).

GNF's work involves recruiting and screening nurses outside of the United States, facilitating the interviewing process with healthcare facilities, managing all immigration paperwork, and matching qualified nurses with facilities requiring their specific expertise. Pattanaik Decl. ¶ 4. The fee eliminates GNF's ability to operate its H-1B placement business in the United States because its clients—who

employ the nurses—cannot afford to pay $100,000 to hire a nurse from abroad. This directly harms GNF because it will lose business opportunities with healthcare facilities. *Id*. ¶¶ 14-15. In fact, GNF already has lost millions of dollars in revenue due to the $100,000 fee. *Id*. ¶ 14. *See Nat'l Ass'n of Mfrs.*, 491 F. Supp. 3d at 569-70 (operator of cultural exchange programs had standing to challenge Presidential Proclamation suspending entry of foreign nationals seeking admission on nonimmigrant visas, including H-1B visas, where operator filed declarations outlining the specific harms it had incurred as a result of the Proclamation); *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) (supplier of firing-range facilities was harmed by Chicago's ban on firing ranges).

### D. Phoenix Doe

In January 2025, Phoenix Doe began a postdoctoral research position in a newly established lab funded for three years. Doe Decl. ¶ 2. Her research focuses on why people lose their vision from inherited eye diseases and with aging. *Id*. ¶ 3. She is currently in the United States in valid status, but that status will expire on January 31, 2026. *Id*. ¶ 6. Prior to the Proclamation, her university had approved moving forward with an H-1B petition so that she could continue her vital research. *Id*. ¶ 7. But the petition process was paused because of the $100,000 fee imposed by the Proclamation. *Id*. ¶¶ 7-8. Because Phoenix Doe faced losing "the significant opportunity to obtain authorization to live and work in the United States," she had standing to file suit on October 3, 2025. *See* Compl.; *Tenrec, Inc. v. USCIS*, No. 3:16-CV-995-SI, 2016 WL 5346095, at *6 (D. Or. Sept. 22, 2016) (cleaned up); *see also id.* at *4-9 (H-1B beneficiaries have standing to challenge the administration of the H-1B program); *Abboud v. INS*, 140 F.3d 843, 847 (9th Cir. 1998) ("[t]he immigrant beneficiary is more than just a mere onlooker; it is her own status that is at stake when the agency takes action on a preference classification petition") (citation omitted); *see also Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) ("The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint.").

On October 20, USCIS announced new guidance that change of status H-1B petitions for individuals in the United States would not be subject to the $100,000 fee *if* USCIS approves the change of status, a discretionary decision that at least one court in this circuit has held is unreviewable. *See* Oct. Guidance, ECF 46-9 at 2; *Xinyi Jiang v. USCIS*, No. C20-1693 TSZ, 2021 WL 764264, at *2 (W.D. Wash. Feb. 26, 2021). But under the voluntary cessation doctrine, "a defendant must prove that no

reasonable expectation remains that it will return to its old ways," *FBI v. Fikre*, 601 U.S. 234, 241 (2024), and the government has not done so here where it reserves the right to deny change of status and again subject Doe's H-1B petition to the fee, *see id.* at 242 (finding case not moot where there was a "lack of assurance" that the government would not resume its allegedly unlawful conduct). Moreover, Doe's ultra vires challenge to the Proclamation is unaffected by USCIS's discretionary implementation.

**IV.     Plaintiffs are and will be irreparably harmed absent relief while litigation is pending.**

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Here, each of the five Movant Plaintiffs has demonstrated that they are suffering, or imminently will suffer, irreparable harm as a result of the Proclamation and the fee.

**A.     Employer Plaintiffs and the Putative Class**

Nephrology Associates, BAE Industries, Lower Brule Day School, and the employers they seek to represent as a class are likely to suffer irreparable harm in the absence of an injunction. For businesses that use the H-1B program, this sudden and exorbitant fee has disrupted staffing decisions, delayed onboarding of vital personnel, and forced employers to weigh untenable options: absorb a six-figure cost per hire, or forgo the worker altogether. The consequences have been immediate and compounding—vacant essential positions, overburdened existing staff, disrupted operations, and unmet customer demand. These injuries that the employer plaintiffs are experiencing have been recognized as irreparable by the Ninth Circuit. *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm"); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (evidence of threatened loss of prospective customers or goodwill supports irreparable harm finding); *Nat'l Ass'n of Mfrs.*, 491 F. Supp. 3d at 569-70 (disruption of business operations, interference with existing employees, the threatened loss of prospective customers, shutting down of entire programs, and the likelihood that some cultural programs will have to cease operations altogether are irreparable injuries).

The harms to employers subject to the $100,000 Requirement cannot be understated. For example, Nephrology Associates' inability to fill a crucial nephrologist position due to the fee is resulting in reduced ability to provide medical services to the local population, lost revenue, disruption

of business operations, and increased workload for existing physicians. Waters Decl. ¶¶ 6-11, 20. BAE is suffering harm due to the absence of its Senior Quality Engineer, who is a valued employee and a critical part of BAE's operations because he helps to ensure that manufactured parts meet strict safety standards and buyer specifications, in addition to managing third-party auditing and recertification processes. Zylka Decl. ¶¶ 7, 14-15. BAE had planned to promote this employee on January 5, 2026, when the current Quality Manager for the plant where he works had planned to retire, but the employee is currently stuck abroad due to the imposition of the fee. *Id*. ¶¶ 11, 13. Now, BAE must either pay a fee it cannot afford or lose the years of knowledge, experience, and trust that this employee has developed. *Id*. ¶¶ 12, 14-15. Starting in February 2026, Lower Brule Day School will be recruiting for the 2026-2027 academic year. Witte Decl. ¶ 12. Based on the school's experience, it is highly likely that the most qualified and available candidates for the teacher position will come from outside of the United States and require H-1B sponsorship. *Id*. ¶ 12. But the school cannot afford to pay the $100,000 fee. *Id*. ¶ 13.

### B.    Global Village Academy Collaborative

GVAC's educational model depends on the H-1B visa process to recruit world language teachers to teach at its three schools. Henderson Decl. ¶¶ 7-9. In February, GVAC plans to begin recruitment for new teachers for the 2026-2027 academic year, based on the needs of its individual schools. *Id.* ¶ 18. GVAC advertises broadly and considers applications from teachers all around the world, and they consistently recruit teachers from abroad. *Id.* ¶ 10. The process for submitting H-1B petitions for teachers starts as early as March. *Id.* ¶ 18. The existence of the fee imperils GVAC's ability to recruit qualified teachers from outside the United States for the upcoming academic year or for the schools to sponsor teachers in the United States who cannot change their status to an H-1B visa for some reason. *Id.* ¶¶ 15-17. If forced to pay the fee, GVAC and their member schools would have to take drastic measures to offset the costs, such as decreasing staffing for other positions. *Id.* ¶ 16. And if GVAC cannot recruit enough teachers who are native-language speakers, it would likely need to place a cap on enrollment for its schools, which would negatively impact the funding for both GVAC and the member schools, the reputation GVAC and the member schools have built in their communities, and the ability of GVAC and their member schools to sustain their unique educational model. *Id.* ¶¶ 16-17. These injuries are irreparable. *See supra* Argument § IV.A.

### C. Global Nurse Force

Plaintiff Global Nurse Force's business model for its U.S.-based clients depends on the H-1B program and is therefore threatened by the fee, because its clients cannot afford to pay $100,000 for each nurse they hire. Pattanaik Decl. ¶¶ 4-6, 11-15. GNF is currently facing lost business opportunities, severed client relationships with healthcare facilities, damaged relationships with international nurses, and millions of dollars in lost revenue because of the imposition of the $100,000 fee. *Id.* ¶¶ 14-15. This harm is irreparable. *HiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) ("[T]he threat of being driven out of business is sufficient to establish irreparable harm." (quoting *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985)); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) ("a substantial loss of business" can constitute irreparable harm); *N. Rockies Reg'l Ctr., LLC v. Jaddou*, 743 F. Supp. 3d 1195, 1208-09 (D. Mont. 2024) (intermediary's inability to participate in EB-5 investor visa program was irreparable harm because it put at risk the processing of visa applications for existing investor clients, prevented intermediary from seeking new clients, and threatened existing and future investments, impacting jobs in the local economy).

### D. Phoenix Doe

Unless and until USCIS makes the discretionary decision to approve Phoenix Doe's change of status to H-1B and thus to remove the threat of the $100,000 fee, Doe faces the threat of losing her position at her university and suffering serious career setbacks. Doe Decl. ¶¶ 10-15. Her research projects would be cut off midstream, and years of specialized training would be wasted. *Id.* ¶¶ 12-15. Phoenix Doe also would lose her income and health insurance. *Id.* ¶ 16. Without health insurance, she will lose access to her psychologist and psychiatrist, who she relies on to manage her post-traumatic stress disorder. *Id.* Phoenix Doe's psychiatrists prescribed an emotional support animal for her five years ago, and the animal has become essential for her wellbeing. *Id.* But Phoenix Doe would have to leave the animal behind if she returns to India. *Id.* She also would incur unrecoverable costs, including breaking her lease and relocating internationally on short notice. *Id.* Moreover, Phoenix Doe's departure would disrupt a new laboratory that relies on her and jeopardize the continuation of her research, which has already led to medical breakthroughs that benefit the American public. *Id.* ¶¶ 12-15.

Courts have recognized that the "loss of opportunity to pursue [Plaintiffs'] chosen profession[s] constitutes irreparable harm," and is particularly heightened where "[s]etbacks early in their careers are

likely to haunt Plaintiffs for the rest of their lives." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citing *Chalk v. U.S. Dist. Court Cent. Dist. of California*, 840 F.2d 701, 710 (9th Cir. 1988)); *see also Doe v. Noem*, 778 F. Supp. 3d 1151, 1164 (W.D. Wash. 2025) (loss of or delay in obtaining employment authorization is an irreparable harm); *Hsiao v. Stewart*, 527 F. Supp. 3d 1237, 1253 (D. Haw. 2021) (inability to renew H-1B visa was irreparable harm because plaintiff could not legally work and would become an undocumented immigrant subject to deportation). "[A] delay, even if only a few months, pending trial represents . . . productive time irretrievably lost" to an early-career plaintiff like Phoenix Doe. "Plaintiffs' entire careers may be constrained by professional opportunities they are denied today." *Ariz. Dream Act Coal.*, 757 F.3d at 1068.

Phoenix Doe remains very concerned about her future in the United States, and it is extremely upsetting to her to think about having to leave. Doe Decl. ¶¶ 9, 16. The fear and psychological harm she is experiencing is understandable and irreparable. *A.O. v. Cuccinelli*, 457 F. Supp. 3d 777, 794-95 (N.D. Cal. 2020) (petitioners for Special Immigrant Juvenile Status "articulated ample reasons why they will suffer irreparable harm absent a preliminary injunction" where a USCIS policy would make them ineligible for SIJ benefits and subject to removal from the United States and plaintiffs suffered emotional and psychological harms from the potential that their petitions would be denied). Harms resulting from loss of income or gaps in health care that accompany job loss also are irreparable. *AFGE v. Trump*, 139 F.4th 1020, 1040 (9th Cir. 2025), *stay granted pending appeal on other grounds, Trump v. AFGE*, No. 24A1174 (U.S. July 8, 2025).

## V.    The balance of the equities and public interest favor preliminary relief.

The two final factors in the analysis—the balance of the equities among the parties and the public interest—merge where, as here, the government is the party opposing preliminary relief. *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors strongly favor Plaintiffs.

First, this Motion seeks only to stay or enjoin implementation of an unlawful fee, and "[i]t is well established that the Government cannot suffer harm from [relief] that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (cleaned up). Moreover, "'[t]here is generally no public interest in the perpetuation of unlawful agency action.'" *Thakur v. Trump*, 787 F. Supp. 3d 955, 996 (N.D. Cal. 2025) (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12

(D.C. Cir. 2016)). Therefore, for the same reasons that Plaintiffs are likely to succeed on the merits of their claims challenging this agency action as unlawful, the balance of the equities also favors relief.

Second, Defendants' unlawful actions not only threaten irreparable harm to Plaintiffs, as described above, but also harm the broader communities they serve. Employers like Nephrology Associates depend upon the H-1B program to hire enough staff to serve their constituencies. Nephrology Associates serves its 3,000 patients each year by recruiting physicians through the H-1B program, in a rural and medically underserved area of North Carolina, where its doctors are the only nephrologists with privileges at the only hospital in Cleveland County. *See* Waters Decl. ¶¶ 5-6, 9-11. This practice currently has a waiting list of patients waiting for care, yet it cannot move forward with onboarding a physician it was already in the process of hiring when the Proclamation was issued, unless preliminary relief is granted. *Id.* ¶¶ 10, 20. The 2,200 Colorado children educated by Global Village Academies schools, for example, will lose the opportunity to learn both language skills and cultural competencies from native-speaking world language teachers that cannot be hired, absent relief from the $100,000 fee. *See* Henderson Decl. ¶¶ 3, 8-12, 15-16. The nurses placed by Global Nurse Force are likewise important to addressing nursing shortages, especially in medically underserved areas where such shortages are particularly acute. *See* Pattanaik Decl. ¶¶ 3-4. And scientific and medical research—like that being carried out by Phoenix Doe—is of vital importance to the public, yet is put directly at risk by the Proclamation and the challenged agency actions. Phoenix Doe is in the middle of a multi-year research grant, studying the causes of vision loss, but her work cannot continue—and the grant funding already spent will be wasted—if she is unable to remain in the country on H-1B status, as she and her university had planned. *See* Doe Decl. ¶ 2-3, 12-15. On analogous facts, other courts in this District have considered impacts to the populations served by a party seeking preliminary relief, when evaluating the balance of the equities. *See, e.g., Cmty. Legal Servs. in E. Palo Alto v. HHS*, 780 F. Supp. 3d 897, 925 (N.D. Cal. 2025) (considering harmful impacts on immigrant children, if legal services organization not provided preliminary relief); *Thakur*, 787 F. Supp. 3d at 975 (considering loss of partially completed scientific research, if grant funding not restored).

The harm caused by the $100,000 fee radiates far beyond Plaintiffs and their specific communities. Millions of Americans depend on the H-1B program to address critical workforce shortages. In healthcare, for example, 75 million Americans (22% of the U.S. population) live in areas

where there is a shortage of providers and the shortage will continue to grow in the coming years (up to a projected shortage of 187,130 physicians by 2037).[34] The shortage cannot be addressed without foreign-trained physicians. Nearly 1 in 4 physicians in the United States are international medical graduates, and 64% of them practice in underserved communities. *See generally* Peterson Decl.[35] Beyond healthcare, critical shortages exist across other essential sectors such as education, research, and religious services. School districts cannot fill thousands of teaching positions, leaving students (especially those in rural and other underserved areas) without access to instructors in subjects where domestic candidates are scarce, like specialized educators in STEM fields. States like Texas, which employs approximately 500 H-1B teachers, and North Carolina, which began the school year with 2,155 teaching vacancies, illustrate the nationwide scope of this crisis.[36] *See also* Witte Decl. ¶¶ 10-11. Research institutions cannot retain scientists conducting critical health research, jeopardizing work on medical breakthroughs that could save lives. *See* Doe Decl. ¶¶ 2-3, 12-15. Imposing the $100,000 fee upon nonprofits, small businesses, and public institutions will force Americans to endure reduced access to medical care, diminished educational opportunities, and delays in scientific research that could improve public health. The cumulative effect is to deprive Americans of essential services while eliminating the substantial economic contributions H-1B workers provide to communities nationwide.

## VI.     The scope of requested relief is appropriate.

The scope of relief Plaintiffs seek in this Motion—an order staying or enjoining Defendants from enforcing or implementing sections 1, 2, and 3(a) of the September 19, 2025 Proclamation, or any agency rules, guidance, or procedures made pursuant to, or in implementation of, those sections of the Proclamation—is appropriate and necessary.

Plaintiffs BAE, Nephrology Associates, and Lower Brule Day School are concurrently seeking to represent a class of U.S. employers who have filed, will file, or but for the $100,000 payment

---

[34] Bureau of Health Workforce, Health Resources & Servs. Admin., HHS, Physician Workforce: Projections, 2022-2037, at 1 (2024) (Liao Decl. Ex. 14).

[35] Liz Mineo, *How Immigrant Doctors Fill Critical Gap in U.S. Healthcare System*, Harvard Gazette (Nov. 20, 2025) (Liao Decl. Ex. 15); Srikrishna Malayala, et al., *Medically Underserved Areas and International Medical Graduates (IMGs) in the United States: Challenges During the Covid-19 Era*, 11 J. Cmty. Hosp. Intern. Med. Perspectives 457, 458 (2021) (Liao Decl. Ex. 16).

[36] Isaac Yu & Nusaiba Mizan, *Hundreds of Texas teachers are on H-1B visas. Could that change after Trump's new $100k fee?*, Hous. Chron. (Sept. 25, 2025) (Liao Decl. Ex. 17 at 3); T. Keung Hui & Brian Gordon, *New $100,000 fee for H-1B Visas Could Hurt Teacher Recruitment for NC Schools*, Raleigh News & Observer (Sept. 23, 2025) (Liao Decl. Ex. 18 at 5).

requirement imposed by the Proclamation issued on September 19, 2025, would file an H-1B petition that is subject to the Proclamation with the United States Citizenship and Immigration Services received on or between September 21, 2025 and September 21, 2026, to employ a qualified temporary nonimmigrant worker in a specialty occupation in the United States under 8 U.S.C. § 1101(a)(15)(H)(i)(b) and 8 C.F.R. § 214.2(h)(1)(i). Courts may provisionally certify classes at the preliminary injunction stage. Plaintiffs' Motion for Class Certification ("Pls. Class Cert. Mot.") Section IV.A. If the Court grants Plaintiffs' motion for class certification, a class-wide preliminary injunction and § 705 stay is appropriate, as all members of the class are being required to pay an unlawful $100,000 fee.[37] *See, e.g.*, *Hernandez Roman v. Wolf*, 829 F. App'x 165, 173 (9th Cir. 2020); Pls. Class Cert Mot. Section IV.C.[38]

Although Plaintiffs GVAC, Global Nurse Force, and Phoenix Doe are not class members, their harms would also be redressed by class-wide relief for employers, since it would cover any petitions that are subject to the $100,000 fee, including any such petitions that would be filed by GVAC's member schools, Global Nurse Force's hospital clients, and Phoenix Doe's employer. *See CASA, Inc. v. Trump*, 793 F. Supp. 3d 687, 701 (D. Md. 2025) (in challenge to Trump's birthright citizenship executive order, "classwide preliminary injunction also provides complete relief to the individual and organizational plaintiffs . . . because the certified class includes the children of the individual plaintiffs and the children of the members of CASA and ASAP").

Alternatively, the Court can and should, with notice to the parties, convert Plaintiffs' motion for preliminary relief into a summary judgment motion and "set aside" the $100,000 fee in a final judgment pursuant to 5 U.S.C. § 706. *See* Fed. R. Civ. P. 65(a)(2) (allowing courts to combine preliminary injunction hearing with trial on the merits); *see also Chamber of Commerce*, 1:25-cv-03675-BAH, Minute Order (Oct. 29, 2025) (Liao Decl. Ex. 10 at 7-9) (in parallel case challenging the $100,000 fee,

---

[37] As of this filing, no court has granted any relief from the $100,000 fee. A summary judgment motion hearing is scheduled for December 19, 2025, in *Chamber of Commerce*, 1:25-cv-03675-BAH (D.D.C.). But even if those plaintiffs are successful, depending on the scope of relief ordered by the court, relief might not extend to Plaintiffs here who are not members of the plaintiff associations in that case.

[38] In *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995 (9th Cir. 2025) ("*ImmDef*"), the Ninth Circuit narrowed the scope of a nationwide § 705 stay to the plaintiff, a legal services provider, and its clients, during the pendency of the government's appeal of the stay, citing *Trump v. CASA, Inc.*, 606 U.S. 831, 852-53 (2025). However, *ImmDef* was not a class action. *See id.* at 849-50 (contrasting class actions with "universal injunctions").

converting motion for preliminary injunction into an expedited motion for summary judgment). Under 5 U.S.C. § 706(2), courts "shall" set aside agency actions that violate the APA, and it is well established that "when a federal court sets aside an agency action, the federal court vacates that [action]—in much the same way that an appellate court vacates the judgment of a trial court." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 830 (2024) (Kavanaugh, J., concurring); *WildEarth Guardians v. USDA*, 135 F.4th 717, 739 (9th Cir. 2025) ("Vacatur of the agency action 'is the presumptive remedy under the APA.'"). "Vacatur acts directly on the 'agency action,'" and is not party-specific in scope. *New York v. U.S. Dep't of Energy*, No. 6:25-CV-01458-MTK, 2025 WL 3140578, at *16 (D. Or. Nov. 10, 2025) (rejecting government's argument to limit vacatur remedy to specific parties); *see also Ass'n of Am. Univs. v. Dep't of Def.*, No. CV 25-11740-BEM, 2025 WL 2899765, at *28 (D. Mass. Oct. 10, 2025) (same).[39]

## VII.    No bond is required.

This injunction is sought "to protect the public interest and ensure compliance with federal law." *Cmty. Legal Servs. in E. Palo Alto*, 780 F. Supp. 3d at 926 (declining to impose a bond). Accordingly, the Court should not require any bond. *See Cal. ex rel. Van De Kamp* v. *Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985) (courts may waive or require nominal bond); *Washington v. U.S. Dep't of Transp.*, 792 F. Supp. 3d 1147, 1193 (W.D. Wash. 2025) (waiving bond "[i]n public-interest litigation where the court enjoins unlawful agency action"); *Doe v. Trump*, 784 F. Supp. 3d 1297, 1315 (N.D. Cal. 2025) (exercising discretion to waive a bond in cases that "raise issues of public interest and the balance of equities weighs heavily in Plaintiffs' favor").

## CONCLUSION

For the reasons discussed, Plaintiffs' motion should be granted.

Date: December 18, 2025                          Respectfully submitted,

/s/ Karen C. Tumlin                              /s/ Cynthia Liao
Karen C. Tumlin (CA Bar No. 234691)              Cynthia Liao (CA Bar No. 301818)*
Esther H. Sung (CA Bar No. 255962)               Johanna M. Hickman (D.C. Bar No. 981770)*
Laura Flores-Perilla (CA Bar No. 355645)         Elena Goldstein (D.C. Bar No. 90034087)*
Hillary Li (GA Bar No. 898375)*                  Steven Y. Bressler (D.C. Bar No. 482492)**
                                                 Jennie L. Kneedler (D.C. Bar No. 500261)*

---

[39] *CASA* is not to the contrary, as it expressly noted that its holding did not address courts' remedial authority under the APA. 606 U.S. at 847 n.10; *see also id.* at 869 (Kavanaugh, J., concurring).

Brandon Galli-Graves (TX Bar No. 24132050)*
Emily Satifka (NJ Bar No. 330452020)*
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
hillary.li@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org
Emily.satifka@justiceactioncenter.org

*/s/ Charles H. Kuck***
GA Bar No. 429940
**KUCK BAXTER LLC**
365 Northridge Rd., Suite 300
Atlanta, GA 30350
404-949-8154
Ckuck@immigration.net

/s/ *Zachary R. New***
Zachary R. New***
Atty. Reg. No. (Colorado): 53992
**JOSEPH & HALL, P.C.**
12203 East Second Ave.
Aurora, CO 80011
(303) 297-9171
zachary@immigrationissues.com

/s/ *Harini Srinivasan*
Harini Srinivasan (D.C. Bar No. 1032002)*
Aniko Schwarcz (D.C. Bar No. 980631)*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Suite 800
Washington, D.C. 20005
(202) 408-4600
hsrinivsan@cohenmilstein.com
aschwarcz@cohenmilstein.com

Alexandra Gray (NY Bar No. 6019590)*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine St., 14th Floor
New York, New York 10005
(212) 838-7797
agray@cohenmilstein.com

**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982 (Liao)
cliao@democracyforward.org
hhickman@democracyforward.org
egoldstein@democracyforward.org
jkneedler@democracyforward.org

*/s/ Kalpana Peddibhotla*
Kalpana Peddibhotla (CA Bar No. 200330)
**SOUTH ASIAN AMERICAN JUSTICE COLLABORATIVE (SAAJCO)**
333 W. San Carlos Street, Suite 600
San Jose, CA 95110
(408) 550-9240
kalpana@saajco.org

*/s/ Jesse M. Bless*
JESSE M. BLESS*
MA Bar # 660713
**BLESS LITIGATION LLC**
6 Vineyard Lane
Georgetown MA 01833
781-704-3897
jesse@blesslitigation.com

*/s/ Greg Siskind*
Greg Siskind***
TN Bar No. 14487
**SISKIND SUSSER**
1028 Oakhaven Road
Memphis, TN 38119
(901) 682-6455
gsiskind@visalaw.com

*Counsel for Plaintiffs*

\* Admitted *pro hac vice*
\*\* Motion to appear *pro hac vice* pending
\*\*\* Motion to appear *pro hac vice* forthcoming