1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| GLOBAL NURSE FORCE, *et al.*, | Case No. 4:25-cv-08454-HSG |
| Plaintiffs, | **DECLARATION OF SARAH K. PETERSON** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants. | |

**DECLARATION OF SARAH K. PETERSON**

I, Sarah K. Peterson, declare under penalty of perjury as follows:

1.       I serve as the Chair of the International Medical Graduate Taskforce ("IMGT") Government Liaison Committee. I have served in this position since July 2022.

2.       I am over the age of 18 and competent to testify and make this declaration on behalf of IMGT.

3.       I have been practicing employment-based immigration law for nearly two decades. I have served as an adjunct professor teaching advanced immigration law at the University of Minnesota Law School since 2018. I also served as an Elected Director of the Board of Governors of the American Immigration Lawyers Association ("AILA") from 2012 to 2022. I have personal knowledge of the facts set forth below, and if called as a witness, I could and would testify competently thereto.

4.       IMGT is a national nonprofit organization of approximately 200 legal professionals who are dedicated to helping Americans in rural and urban physician-shortage areas obtain the healthcare they need and deserve. Among other goals, we strive to educate the federal government, national and state policy makers, administrative officials, and the American public on the need for fair and reasonable laws permitting international physicians to begin or continue medical careers in the United States. We work on behalf of universities, medical centers, teaching hospitals, and clinics of all sizes, and on behalf of international medical graduates ("IMGs") seeking necessary authorizations to work in the United States, including, most typically, through the H-1B nonimmigrant process.

5.       The physician shortage in the United States is alarming and growing: the Health Resources and Services Administration ("HRSA") report from November 2024 reveals that 75 million people in the U.S. live in a Health Professional Shortage Area ("HPSA") or in a Medically Underserved Area ("MUA")[1] and the projected physician shortage of 124,180 physicians in 2027 will grow to a shortage of 187,130 full-time physicians in 2037.[2]

---

[1] Health Resources and Services Administration, *State of the Primary Care Workforce Report 2024* (Nov. 2024)*,* https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/state-of-the-primary-care-workforce-report-2024.pdf.
[2] Health Resources and Services Administration, *Physician Workforce: Projections, 2022-2037* (Nov. 2024), Physician Workforce: Projections, 2022-2037.

1

6.       IMGs fill a needed role in partially decreasing the physician shortage within the U.S. healthcare sector. The Association for Advancing Physician and Provider Recruitment ("AAPPR") reports that in 2021, 64% of foreign-trained physicians were practicing in a HPSA or MUA; that over the last 25 years, nearly 23,000 H-1B physicians worked in underserved communities; and that the average economic output generated by each physician nationwide is $3.2 million.[3]

7.       The H-1B visa is the primary, and sometimes the only, immigration option for an IMG to provide clinical care in the United States. For example, IMGs who complete graduate medical education in J-1 visa status are precluded from seeking H or L visa status, or Lawful Permanent Residence (a "green card"), in the United States after they finish training unless they first return to their home country for at least two years. 8 USC 1182(e). However, 8 U.S.C. 1184(l) provides that physicians who complete their U.S. residency or fellowship training in J-1 visa status may remain in the United States after they complete training and change status to H-1B as long as they agree to provide full-time clinical care to medically underserved Americans for at least three years. Such physicians must obtain a waiver of the two-year home residency requirement by filing through three different government agencies, including both the Department of State and U.S. Citizenship and Immigration Services ("USCIS"), and then complete their three-year J-1 waiver commitment in H-1B status in an underserved community.

8.       I am familiar with the Presidential Proclamation of September 19, 2025, *Restriction on Entry of Certain Nonimmigrant Workers*," (the "Proclamation"). The Proclamation applies to certain H-1B petitions filed on or after September 21, 2025, and imposes a payment of $100,000 on employers seeking to employ certain nonimmigrant workers as H-1B specialty occupation employees unless the petition qualifies for an exception.

9.       USCIS issued guidance on October 20, 2025, that provides that the $100,000 payment is required when: (a) an H-1B petition is filed for a beneficiary who is located outside of the United States who does not already have an H-1B visa; or, (b) an H-1B petition is filed for a beneficiary who is located inside the United States where the H-1B petition requests or requires consular, port of entry, or preflight inspection notification. In the latter case, the beneficiary will have to travel overseas before

---

[3] Eli Greenspan, *H-1B Process Update* (Oct. 28, 2025), Association for Advancing Physician and Provider Recruitment, https://aappr.org/2025/10/28/h-1b-process-update/.

DECL. OF SARAH K. PETERSON                            Case No. 4:25-cv-08454-HSG

1    the H-1B petition can be approved, rather than being able to extend or change status within the United

2    States. Thus, this Proclamation impacts both IMGs located outside and inside the United States.

3         10.    The October 20, 2025, USCIS guidance also states that, "Payment must be made prior

4    to filing a petition with USCIS, as petitioners must submit proof that the payment has been scheduled

5    from pay.gov or evidence of an exception from the $100,000 payment from the Secretary of Homeland

6    Security at the time of filing the H-1B petition. Petitions subject to the $100,000 payment that are filed

7    without a copy of the proof of the payment from pay.gov or evidence of an exception from the

8    Secretary of Homeland Security will be denied." ECF 46-9.

9         11.    USCIS also set forth a four-criteria standard for an "exception" from the $100,000

10    payment, known as the "national interest exception." USCIS has stated that it will grant such

11    exceptions only in "extraordinarily rare circumstances" and only when the request demonstrates that

12    (1) a particular alien worker's presence in the United States as an  H-1B worker is in the national

13    interest, (2) no American worker is available to fill the role, (3) the alien worker does not pose a threat

14    to the security or welfare of the United States, and (4) requiring the petitioning employer to make the

15    payment on the alien's behalf would significantly undermine the interests of the United States. ECF 46-

16    9.

17         12.    USCIS has given no guidance about how an employer, or an industry, is

18    to demonstrate such criteria, nor have they imposed a timeline within which USCIS must process a

19    national interest exception request. As a result, employers, employees, and practitioners are left in a

20    state of uncertainty, without a realistic understanding of how long such national interest exception

21    requests will take, ultimately leaving them unable to plan effectively. To our knowledge, USCIS also

22    has not issued any general exception for any employer or industry, despite language in the

23    Proclamation stating that such exceptions might be available

24         13.    As Chair of the IMGT Government Liaison Committee, I am aware of many members

25    who have submitted requests for exceptions since October 20, 2025, but am not aware of USCIS

26    making any decisions regarding national interest exception requests from payment.

27         14.    Members of IMGT represent healthcare providers/employers and international

28    physician candidates who have been detrimentally impacted by the Proclamation. Because some

employers, many of which are teaching hospitals and nonprofits, cannot bear the $100,000 payment

DECL. OF SARAH K. PETERSON                     Case No. 4:25-cv-08454-HSG

1  burden, and without clear guidance on employer and industry exceptions, some employers have

2  already had to make a variety of immediate and significant decisions that are negatively impacting the

3  ability to provide access to healthcare across the United States. These decisions include suspending the

4  allocation of medical slots to IMGs during the current and ongoing National Resident Matching

5  Program ("the Match") process, pausing new job offers for physician vacancies, and/or rescinding

6  previous job offers because of the Proclamation. Still others have had to condition offers of future

7  employment on a prospective grant of a national interest exception from the $100,000 payment,

8  creating uncertainty as to how and whether they will be able to meet future staffing needs.

9        15.     If this Proclamation remains in effect, it will continue to directly and significantly

10  reduce the number of physicians able to provide critically needed care in the United States. Thus, it

11  will further exacerbate shortages in the U.S. healthcare workforce and make it more difficult for

12  Americans to access medical care. In June 2025, the National Rural Health Association ("NRHA")

13  highlighted the physician shortage impact on rural areas referred to as "medical deserts."[4]

14        16.     With demand rising faster than physicians can be trained, the Proclamation will worsen

15  physician shortages and drive costs higher for everyone, especially for those employers who rely on

16  incentives within our immigration laws to attract IMGs to work in federally designated physician

17  shortage areas of the country. For example, the following groups of physicians will not be able to

18  fulfill their commitments to provide urgently needed full-time clinical care to Americans in shortage

19  areas unless or until their prospective employers pay the federal government $100,000 or the Secretary

20  of Homeland Security grants them an "extraordinarily rare" exception from the payment:

- All IMGs who were outside the United States on or after September 21, 2025, and who did not already have an H-1B visa or an H-1B petition pending. IMGT is aware of multiple physicians experiencing this situation.

- All IMGs who are currently in the U.S. in J-1 visa status and who are not eligible to change their status to H-1B without traveling outside the United States to apply for the H-1B visa at an American embassy abroad may be subject to this payment. This group includes those J-1 physicians who applied for clinical waivers pursuant to the J-1 waiver program under 8 U.S.C.

---

[4] Daniel Siegel, NRHA, *Rural physician burnout and staffing shortage impact in 2025* (June 9, 2025), https://www.ruralhealth.us/blogs/2025/06/rural-physician-burnout-and-staffing-shortage-impact-in-2025.

DECL. OF SARAH K. PETERSON                                          Case No. 4:25-cv-08454-HSG

1184(l) but whose waiver applications were not adjudicated before their existing J-1 status expired (a problem exacerbated by the government shutdown).

- IMGs who intend to seek a change of status from within the United States to H-1B before beginning their J-1 waiver commitments in physician shortage areas, but who must then depart the country while the H-1B petition is pending, or whose requests to change status are denied by USCIS for any other reason. The Proclamation subjects the employer to the $100,000 payment if a physician files to change status to H-1B and has to travel outside the United States for any reason – even for an emergency such as serious illness or death of a family member – before the H-1B is approved by USCIS. Such physicians would then need to obtain a visa abroad before they can return and begin work in the underserved area, thus triggering the application of the $100,000 payment.

17.     Other IMGs seeking to fill gaps in the U.S. healthcare system and their prospective U.S. employers will also be negatively impacted by the Proclamation. For example:

- Physicians who completed U.S. graduate medical education in J-1 status and received J-1 waivers based on hardship to a qualifying relative or based on the fear of persecution, rather than a waiver of the two-year home-residency requirement, are precluded under 8 U.S.C. § 1258 from changing status within the United States. As a result, they may therefore only obtain H-1B status by departing the United States and applying for an H-1B visa at a U.S. consular post abroad, thus triggering the Proclamation's $100,000 payment unless a national interest exception is granted.

- Under current DHS policy, IMGs who hold J-2 visa status (spouses of J-1 visa holders) who seek H-1B status cannot change status to H-1B from within the United States. Many of these physicians also seek to work in the same underserved areas where their J-1 waivered spouses are committed to providing care; however, without a $100,000 payment or a national interest exception, they will be unable to do so because of the Proclamation. Now these communities risk losing both doctors.

- The Proclamation is also certain to have a dramatic impact on Graduate Medical Education ("GME") programs that train our next generation of physicians and, by extension, the millions of Americans who receive medical care at U.S. teaching hospitals. GME programs fill

thousands of residency and fellowship positions each year to ensure that hospitals can deliver essential patient care and continue training the next generation of physicians. Because of how the U.S. GME system is structured, a significant portion of these positions are filled by IMGs who require and depend on visa sponsorship to train in the United States, including through the H-1B program. According to the Accreditation Council for Graduate Medical Education ("ACGME"), in the 2024-25 academic year, there were 167,083 active residents and fellows in ACGME-accredited programs. Of those, approximately 24.1% were IMGs – that means that almost a quarter of our nation's future physicians in training are IMGs.[5] The Proclamation, however, has deterred GME programs from offering residency and fellowship positions pursuant to the H-1B program in the upcoming academic year because the teaching hospitals and/or nonprofits that run GME programs cannot pay the $100,000 payment for each IMG. Consequently, GME programs will be unable to fill all their training slots – meaning even fewer physicians to provide care to patients in the years ahead, especially in rural and underserved areas that already face severe recruitment challenges. A reduction in residents and fellows will further strain faculty and existing residents and reduce patient access, which creates a trickle-down effect across the U.S. healthcare system. Requiring a national interest exception request for every single resident and fellow seeking H-1B status is also administratively burdensome and time-consuming, delays the overall process and start date for the physician, and adds to legal and administrative costs for the GME programs and hospitals – it is not sustainable.

18.    Without access to the H-1B program to sponsor physicians completing GME, more GME programs will need to shift to exclusive reliance on the J-1 visa to sponsor physicians completing GME at U.S. hospitals. While the J-1 visa may be an alternative for *some* GME programs, it carries a two-year home residency requirement for the IMG physician unless they secure a waiver of the requirement, most commonly by committing to serve in an underserved area for three (3) years pursuant to 8 U.S.C. 1184(l). These J-1 waivers, however, are limited and, as such, highly competitive. An increase in J-1 physicians will quickly outpace the availability of J-1 waiver positions, which may

---

[5] The Accreditation Council for Graduate Medical Education, *ACGME 2024-25 Graduate Medical Report* 9 (2025), https://www.acgme.org/globalassets/pdfs/2024-2025acgmeannualreportforweb.pdf.

DECL. OF SARAH K. PETERSON                                    Case No. 4:25-cv-08454-HSG

1  leave many qualified physicians unable to remain in the United States and practice, despite the nation's

2  critical need for their services, especially in rural underserved communities, and despite GME

3  Programs' investments in their U.S. training. Forcing all IMGs and GMEs to use the J-1 program

4  versus the H-1B program will create a bottleneck that reduces physician availability nationwide and

5  deepens existing healthcare disparities across the United States. While other J-1 waiver strategies may

6  be available to some physicians (i.e., hardship or persecution-based waivers), the physician will be

7  required to consular process abroad for their H-1B visa status, which will require the employer to pay

8  the $100,000 payment unless granted an exception.

9  　　　　19.　　　The $100,000 payment required under the Proclamation also threatens to obstruct many

10  IMGs' ability to meet the criteria of the Physician National Interest Waiver ("PNIW") program, which

11  was designed by Congress for the very purpose of attracting and retaining physicians in underserved

12  areas where U.S. physicians are not available or willing to serve. Under 8 USC 1153(b)(2)(B)(ii),

13  Congress authorized a green card pathway for physicians who agree to work as full-time clinical

14  physicians for a total of at least 5 years in a federally designated physician shortage area, deeming this

15  work to be worthy of a "national interest waiver" of the ordinarily required U.S. labor market test prior

16  to green card approval. Most IMGs seeking green cards through the PNIW route must complete the

17  five-year service in a HPSA or in a MUA while in H-1B status, often the only temporary work visa

18  available to IMGs. The $100,000 payment imposed by the Proclamation places formidable financial

19  and procedural hurdles on physicians who may be seeking to enter the United States from abroad in H-

20  1B status to complete a PNIW commitment, or who are denied a change of status from within the

21  United States to H-1B. Requiring the employers of such physicians to pay a $100,000 payment or to

22  seek a time-consuming national interest exception to participate in a program Congress has already

23  determined is in the national interest obstructs the legislative intent to attract and retain medical

24  professionals in underserved communities. Without H-1B approval, physicians are legally unable to

25  accumulate the necessary qualifying five years of service for the PNIW and adjust their status to

26  permanent residency. Such barriers effectively negate the public interest objectives of the PNIW and

27  undermine the federal government's initiatives to resolve physician shortages in rural and medically

28  underserved communities.

DECL. OF SARAH K. PETERSON                                                                    Case No. 4:25-cv-08454-HSG

1       20.    For all the above-stated reasons, the Proclamation's imposition of a $100,000 payment

2 on certain H-1B petitions in the absence of subjectively reviewed and "extraordinarily rare" case-by-

3 case exceptions threatens to significantly impede the delivery of healthcare to millions of Americans

4 who rely on the services of H-1B physicians working in parts of the United States where the federal

5 government has already determined there are not enough U.S. doctors and where Congress has

6 separately incentivized U.S.-trained IMGs to provide care. 8 U.S.C. §§ 1184(l), 1153(b)(2)(B)(ii). The

7 Proclamation undermines the purposes of those programs by imposing a financial obstacle on the

8 employers of these H-1B physicians that many will be unable to surmount.

9

10

11      I declare under penalty of perjury under the laws of the United States of America that the

12 foregoing is true and correct.

13

14                            Executed on December   18  , 2025 in Minneapolis, Minnesota.

15

16                            Sarah Peterson (Dec 18, 2025 13:41:31 EST)

17                            Sarah K. Peterson

18

19

20

21

22

23

24

25

26

27

28

DECL. OF SARAH K. PETERSON                                       Case No. 4:25-cv-08454-HSG