# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA<br><br>and<br><br>ASSOCIATION OF AMERICAN UNIVERSITIES,<br><br>                    Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>                    Defendants. | Case No. 1:25-cv-3675-BAH |

**DECLARATION OF PATRICK SHEN**

I, Patrick Shen, declare as follows:

1. I am Vice President for Immigration Policy at Plaintiff Chamber of Commerce of the United States of America (the U.S. Chamber). I make this declaration based on my own personal knowledge and business records reasonably available to me in my role as Vice President for Immigration Policy. If called to testify in this matter, I could and would competently testify to the matters set forth herein.

2. The U.S. Chamber is a 501(c)(6) nonprofit organization headquartered in Washington, DC. The U.S. Chamber is the world's largest business federation, representing approximately 300,000 direct members and indirectly representing the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country.

3.      For more than 100 years, the U.S. Chamber has advocated for pro-business policies that help businesses create jobs and grow our economy. The U.S. Chamber fulfills this purpose in part by leading pro-business initiatives on legislation and regulation. Ensuring that businesses have access to employees with the correct skills is fundamental to their success. Central to the U.S. Chamber's advocacy mission is addressing the "worker shortage crisis" by "helping employers across the country develop and discover talent." U.S. Chamber of Commerce, *Major Initiatives: America Works Initiative*, https://perma.cc/EG35-52F9. That includes within the "related topic[]" of immigration. *Id.*; *see also* U.S. Chamber of Commerce, *Topics: Immigration,* https://perma.cc/S4TA-3ZJD; U.S. Chamber of Commerce, *Major Initiatives: America Works Initiative* (describing the Chamber's major initiative to address the "worker shortage crisis" by "helping employers across the country develop and discover talent," including through the "related topic[]" of "immigration"), https://perma.cc/EG35-52F9.

4.      The U.S. Chamber regularly brings litigation against federal, state, and local governments to challenge governmental action that causes its members undue harms. This includes the U.S. Chamber's current challenge against the presidential proclamation of September 19, 2025, *Restriction on Entry of Certain Nonimmigrant Workers* (the Proclamation). In addition to this current challenge, the U.S. Chamber (along with other business associations) has brought on behalf of its members several successful lawsuits challenging executive action that threatened to undermine the H-1B program. *See generally Chamber of Com. of the U.S. v. U.S. Dep't of Homeland Sec.,* No. 4:20-cv-7331 (N.D. Cal. 2020); *Nat'l Assoc. of Mfrs. v. U.S. Dep't of Homeland Sec.,* No. 4:20-cv-4887 (N.D. Cal. 2020). And the U.S. Chamber regularly participates in the notice-and-comment process when DHS or other agencies conduct rulemaking relating to business-relevant immigration policies in general, and to the H-1B program in particular. *See, e.g.*, U.S. Chamber of Commerce, Comment on *Modernizing H-1B Requirements, Providing Flexibility in the F-1 Program, and Program Improvements Affecting other Nonimmigrant Workers* (Dec. 22, 2023),

2

https://perma.cc/FK9V-9RT2; U.S. Chamber of Commerce, Comment on *Establishing a Fixed Time Period of Admission and an Extension of Stay Procedure for Nonimmigrant Academic Students, Exchange Visitors, and Representatives of Foreign Media* (Sept. 26, 2025), https://perma.cc/B2RV-EUA2.

5.    Part of the U.S. Chamber's mission is advocating for its members' abilities to hire and retain the world's best and brightest to foster innovation and facilitate economic growth and job creation in the United States. Many members of the U.S. Chamber face acute skill shortages as to certain specialty occupation workers. This difficulty corresponds to a well-documented, nationwide labor shortage. These struggles are especially pronounced in the science, technology, engineering, and mathematics (STEM) industries, where the gap is as much about the lack of necessary skills as it is suitable workers.  That is because, in many STEM fields, jobs require acute specialization acquired through advanced education and training. Workers with these skills take significant time and investment to develop, meaning a lack of sufficient skill in the domestic labor pool is not something that can be remedied overnight without seeking to hire non-U.S.-based workers.

6.    When they cannot find a sufficient number of talented individuals for the positions they need to fill domestically, employers may need to use the H-1B visa program to recruit qualified candidates. That may mean recruiting foreign-born students studying at American universities who may remain in the United States and work with the benefit of H-1B status, or it may mean recruiting workers who currently live overseas but can come to the United States via an H-1B visa. H-1B workers are a key driver of innovation and productivity gains for many U.S. Chamber member companies.

7.    The U.S. Chamber has members who are subject to the annual "cap" on visas, and it also has members who are "cap-exempt."  Our member companies that are subject to the cap—and therefore must participate in the annual registration and lottery to secure H-1B visas—must

begin their workforce planning, preparation, and recruiting process in the preceding autumn in order to make sure they are ready for the annual March lottery.

8. The registration process is not as simple as a company "flipping a switch" and informing the government that it would like to petition for a particular number of H-1B visas in a given year, to be used at the company's discretion after they are granted.  Rather, a registration for the lottery requires a company to identify a specific individual whom it would like to sponsor for an H-1B visa.  That requirement, in turn, requires the company to recruit, screen, interview, and select a particular individual for the role the company is attempting to fill.  That process can—and regularly does—take months to complete.

9. The U.S. Chamber's cap-exempt members, which include universities, are not subject to the annual lottery, meaning they can petition for H-1B visas at any time during the year.

10. Oftentimes, H-1B workers contribute to the innovation and productivity of the U.S. Chamber's members by helping their research and development teams develop new patents. Such research efforts span across various industries, in businesses large and small, and they are critical to the strength of America's energy producers, pharmaceutical companies, cybersecurity firms, information technology companies, heavy equipment manufacturers, automobile companies, healthcare facilities, and many others.

11. For members of the U.S. Chamber that are unable to afford the $100,000 fee—or may need to reduce the number of H-1B workers they attempt to hire—the Proclamation and its implementation will hamper their efforts to engage in critical research initiatives. It also will threaten their ability to successfully recruit qualified candidates whom, but for the $100,00 fee, they otherwise would attempt to hire.  That is because the member company would be forced to tell the candidates—many of whom are in demand in the pool for highly skilled labor—that even if the company "wins" the lottery and has the right to petition for an H-1B visa, it will not be able to pay the fee necessary to actually secure the visa.

4

12.    Relatedly, the H-1B workers employed by our members help support the jobs of their companies' American workers; in many cases, the contributions of the H-1B workers help create new job opportunities for U.S. workers. H-1B workers have this effect because recruiting talent with the specialized skills necessary to support innovation is essential for enhancing a company's productivity, which enables the company to grow, expand its operations, and thereby create new jobs. Enjoining the Proclamation and its implementation will allow American companies to meet their critical need for specialized, highly skilled labor so they can continue to compete in the global marketplace and perform the critical research initiatives that will move our nation and our economy forward.

13.    As Vice President for Immigration Policy for the U.S. Chamber, I know the reactions to the Proclamation of many U.S. Chamber members, including the ways in which the Proclamation will result in irreparable changes to the American market for highly skilled labor and inflict substantial harm upon many of the U.S. Chamber's members of all sizes and across several economic sectors.

14.    Dozens of specific U.S. Chamber members who were planning to hire H-1B workers through the upcoming H-1B visa lottery now anticipate, after the announcement of the Proclamation, hiring fewer or no H-1B workers. Without the ability to hire H-1B workers, these members will be left with unanticipated vacancies in critical roles, many of which our members anticipate will go unfilled.

15.    Numerous members, faced with an inability to fill U.S.-based positions with H-1B workers due to the Proclamation, have determined that they will have to move certain projects or positions outside of the United States. Many others would have to leave positions unfilled, resulting in lower productivity and, in some cases, requiring planned projects to be cancelled or downsized. These consequences will mean delays in product development and innovation.

16.    These impacts are also immediate. In anticipation of the March 2026 H-1B lottery, dozens of U.S. Chamber members have already begun their recruitment and hiring process for H-1B workers or were planning to do so before the end of 2025 because—as noted above—that process often takes months to complete.

17.    Numerous member companies that routinely hire multiple H-1B workers every year, and had begun preparations to do so again this year, have determined they will be unable to seek *any* H-1B visas due to the $100,000 fee. One such company uses the H-1B program because it has not been able to find enough U.S.-based graduates of top universities with the skills the company needs. Without the ability to hire H-1B workers, the company believes that it will be unable to fill those roles with U.S.-based workers, and thus anticipates needing to offshore certain roles, leave positions unfilled, and even cancel or downsized planned projects, significantly slow-ing investments in building innovative new technologies. Another member believes that without H-1B employees, it will need to eliminate certain roles in-house and outsource those positions, causing increased expenses, along with substantial and irreparable disruption in management structure and workforce planning. For another member, the company will either need to move those positions overseas or leave many of them unfilled, resulting in reduced productivity.

18.    I have read the declaration submitted in this action by Condrad Daniels, President of HJI Supply Chain Solutions, whose experience provides an example of the harms suffered by Chamber members who will be unable to use the H-1B program as they otherwise would. *See generally* Daniels Decl. As that declaration illustrates, the $100,000 fee makes it cost-prohibitive for many businesses to hire an H-1B employee, which can force a business to leave a vacant posi-tion unfilled, or to fill it with a candidate who is not as qualified. *See id.* ¶¶ 6–13.

19.    Numerous members still plan to hire some H-1B employees but plan to reduce hir-ing or otherwise change their practices to accommodate the $100,000 fee. For example, one mem-ber that typically hires dozens of H-1B employees annually anticipates that it will hire fewer H-1B

employees than usual because of the fee and anticipates needing to relocate other positions overseas or settling for unfilled positions, which might require downscaling planned products. Another member that ordinarily hires scores of H-1B employees expects to hire only a handful because of the fee and anticipates needing to offshore certain roles or downscale planned activities because it cannot recruit talent globally. Another member does not anticipate reducing its use of the H-1B program but must compete with companies outside of the United States that will not have to pay an added premium to access candidates with certain qualifications in quantitative and technical capacities, which will give foreign companies a competitive edge in hiring; this member anticipates needing to increase hiring outside of the United States if the fee remains in effect, potentially building out operations overseas rather than domestically.

20. These members are already incurring costs from the new fee. One member that anticipates seeking far fewer H-1B visas than usual is reevaluating its entire staffing model by evaluating which key roles still require H-1B sponsorship, which will need to be staffed in other countries, and which will have to be eliminated. Another member that attempts to hire over 100 H-1B employees per year is already implementing—and will continue to implement—a substantial workforce planning response to the Proclamation. That workforce planning response includes eliminating plans to hire H-1B employees for all but very senior roles—depriving the member of specialized international talent even in important mid-level roles—and assessing which of its international offices can best absorb recruitment, employment, and project execution for roles that ordinarily would be located in the United States. As a result, it will lead to a decline in U.S.-based research and development and innovation activity. Another member had already begun the recruitment and hiring process for H-1B employees for the upcoming lottery cycle prior to the issuance of the Proclamation—the member ordinarily hires over a hundred in a given year—but has had to pause extending offers to foreign-national hires requiring an H-1B visa, putting this company at a competitive disadvantage in attempting to recruit global talent.

21. Another U.S. Chamber member—a public research university that is cap-exempt and therefore can petition for an H-1B visa at any time—similarly will be irreparably harmed by the Proclamation. I have read the declaration submitted in this action by Nancy A. Gonzales, Executive Vice President and University Provost at Arizona State University (ASU). *See generally* Gonzales Decl. As that declaration illustrates, prior to the Proclamation, ASU submitted H-1B visa petitions in order to fill critically important faculty positions and had planned to continue using the program at a similar rate. *Id.* ¶¶ 6–7. Indeed, but for the Proclamation (and its $100,000 fee), ASU intended to submit roughly a dozen new H-1B petitions over the next 12 months. *See id.* ¶¶ 7–8.

22. In addition, the harm caused by the Proclamation is not limited to U.S. Chamber members who hire H-1B workers as their own employees. I have read the declaration submitted in this action by Torie Poser, Owner of Poser Consulting, LLC (d/b/a GoRural), whose experience provides another example of the harms suffered by Chamber members as a result of the Proclamation's $100,000 fee on new H-1B petitions. *See generally* Poser Decl. As that declaration illustrates, some companies' revenue streams are dependent on the ability to recruit and place H-1B workers with other employers. *See id.* ¶ 9. Accordingly, those companies will lose money as long as the Proclamation is in effect. *Id.* ¶ 10. Not only that, but they potentially will have to cut jobs, not to mention the downstream consequences of their being unable to place H-1B workers with their clients. *See id.* ¶¶ 11–15.

23. These are just a few limited examples of harms experienced by hundreds of U.S. Chamber members. Members of the U.S. Chamber currently employ, in the aggregate, tens or hundreds of thousands of H-1B visa holders. And each year, hundreds of members of the U.S. Chamber recruit thousands of additional potential H-1B workers and register to file petitions on their behalf. Imposing a $100,000 fee for each new H-1B petition will drastically alter U.S. Chamber members' use of the H-1B program. Many members of the U.S. Chamber who wish to file

8

future H-1B petitions—particularly small businesses and startups whose relatively smaller operating budgets cannot absorb an unanticipated additional $100,000-per-worker recruitment expense—no longer will be able to afford to do so, and certainly not in the numbers that would be best for their business.

24. Because employers often seek to participate in the H-1B program when the anticipated role is one they cannot fill with a domestic worker, in most cases, if a business cannot hire an H-1B worker, that position will go unfilled. These unfilled positions will result in lower productivity, efficiency, and innovation at the companies, making it harder for them to compete in the global marketplace. Likewise, these unfilled positions will reduce the availability of direct services provided to Americans, perhaps most significantly healthcare services. Alternatively, members might see no alternative option other than to relocate the position outside the United States. Consequently, American jobs supported by these projects will disappear, due to the job-creating gains in innovation supported by H-1B workers, as will the downstream economic benefits of those jobs.

25. Even for member companies that can afford to pay the $100,000 fee and decide to do so, adding a $100,000 startup cost for hiring each H-1B employee will mean that member companies will need to either curtail their use of the H-1B program or cut spending elsewhere. The result will be either fewer temporary specialized workers than anticipated, or less budget to spend on research and development, program investment, or to create more American jobs. These companies, too, will experience reductions in productivity, efficiency, and innovation and likewise lose a competitive edge in the global marketplace.

26. In the aggregate, members of the U.S. Chamber employ millions of U.S. workers. Because the effect of the rule will be to make it much more expensive—if not outright impossible—to hire new H-1B workers, the Proclamation will have a direct and immediate impact on the many business members of the U.S. Chamber that routinely seek to employ talented individuals from around the world who enter the U.S. on H-1B visas.

27.    The harms to businesses from the Proclamation will be irreparable, in part because, by imposing a $100,000 fee on H-1B petitions, the Proclamation severs anticipated new H-1B employees from the company and will result in positions being left unfilled. Companies subject to the annual H-1B cap get one chance each year to hire H-1B employees through the registration and lottery process. At a minimum, the Proclamation will be in effect for the next H-1B lottery, in March of 2026, and it might remain in effect in future years. Employers will forever lose the value gained from hiring workers through the H-1B program in 2026 and beyond. H-1B workers make valuable contributions to employers that will go unrealized. The loss of this talent pool, particularly when companies had anticipated to benefit from it in the coming year and into the future, is likely to be very disruptive for many U.S. Chamber members.

28.    Enjoining implementation of the Proclamation would immediately remedy these future harms that, absent an injunction, the Proclamation inevitably would cause.

29.    For many of the same reasons, enjoining implementation of the Proclamation not only would remedy substantial harm to the members of the U.S. Chamber, but also would benefit the public as a whole. The Nation benefits from the H-1B program through the job growth and economic productivity that results when businesses are able to hire H-1B workers—a process which allows companies to meet acute labor needs and invest in innovation, while being able to locate their operations within the United States.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:      10/24/2025
                Washington, DC                              Patrick Shen