BRETT A. SHUMATE
*Assistant Attorney General*
Civil Division

DREW C. ENSIGN
*Deputy Assistant Attorney General*

TIBERIUS DAVIS
*Counsel to the Assistant Attorney General*

GLENN M. GIRDHARRY
*Acting Deputy Director*
Office of Immigration Litigation

JAIME SCOTT
*Trial Attorney*

DAVID J. BYERLEY
*Senior Litigation Counsel* (DC 1618599)
Office of Immigration Litigation
United States Department of Justice
P.O. Box 868 Ben Franklin Station
Washington, D.C.  20044
202-532-4523 | David.Byerley@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

GLOBAL NURSE FORCE, *et al.*,

      Plaintiffs,

      v.

DONALD J. TRUMP, *et al.*,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 4:25-cv-08454-HSG

**DEFENDANTS' OPPOSITION TO [75] MOTION FOR PRELIMINARY INJUNCTION.**

Judge: Hon. Haywood S. Gilliam, Jr.
Hearing: February 19, 2026, 2:00pm.

1

2

# TABLE OF CONTENTS

STATEMENT OF RELIEF ................................................................................................ 1

ISSUES PRESENTED FOR REVIEW ........................................................................... 1

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 3

    I.   The Executive's Broad Authority ......................................................................... 3

    II.  H-1B Nonimmigrant Classification ..................................................................... 3

    III. H-1B Abuses ......................................................................................................... 6

    IV. Presidential Proclamation 10973 ........................................................................ 8

    V.  Agency Guidance and Memoranda ...................................................................... 9

LEGAL STANDARD .................................................................................................... 11

ARGUMENT .................................................................................................................. 11

    I.   Several Plaintiffs Lack Standing. ....................................................................... 11

       A.  Phoenix Doe Fails to Show Standing, Much Less Irreparable Injury ............ 11

       B.  Standing for the Remaining Plaintiffs is Dubious, At Best. ......................... 13

    II.  Consular Non-Reviewability Precludes Review. ............................................... 15

    III. Plaintiffs' Lack a Cause of Action. .................................................................... 17

       A.  The *Ultra Vires* Claims Are Unlikely to Succeed. ..................................... 17

       B.  Plaintiffs Cannot Challenge Implementation of the Proclamation Under the APA. .... 20

    IV. The Proclamation Is Not Ultra Vires. ............................................................... 27

       A.  The Proclamation Satisfies the Prerequisites of §§ 1182(f) and 1185(a)(1). ............... 27

       B.  The Proclamation Does Not Conflict with the INA ..................................... 32

    V.  Plaintiffs' Procedural Arguments are Wrong. ................................................... 37

       A.  Plaintiffs' Notice-and-Comment Claims Fail. ............................................ 37

    VI. Arbitrary and Capricious Review Under the APA is Unavailable. .................... 39

    VII. Plaintiffs Are Not Entitled to a Preliminary Injunction or a § 705 Stay. .......... 41

       A.  Plaintiffs Lack an Irreparable Harm ........................................................... 41

       B.  Balance of the Equities. .............................................................................. 43

       C.  Scope of Relief. .......................................................................................... 44

       D.  The Court Should Require Bond .................................................................. 44

       E.  Stay Pending Appeal. .................................................................................. 45

CONCLUSION ............................................................................................................... 45

1

## TABLE OF AUTHORITIES

2

3    **Cases**

4    *Abourezk v. Reagan*,
        785 F.2d 1043 (D.C. Cir. 1986) ................................................................ 16
5
6    *Adams v. Vance*,
        570 F.2d 950 (D.C. Cir. 1978) ................................................................. 44
7
     *Alexander v. Sandoval*,
8        532 U.S. 275–89 (2001) ......................................................................... 19

9    *Allen v. Milas*,
        896 F.3d 1094 (9th Cir. 2018) .................................................................. 25
10
11   *Am. Foreign Serv. Ass'n v. Trump*,
        2025 LX 100042, at *6 (D.C. Cir. June 20, 2025) ........................... 17, 27
12
     *Amanullah v. Nelson*,
13       811 F.2d 1 (1st Cir. 1987) ...................................................................... 16

14   *Ancient Coin Collectors Guild v. CBP*,
        801 F. Supp. 2d 383 (D. Md. 2011) ......................................................... 21
15
16   *Bahiraei v. Blinken*,
        717 F. Supp. 3d 726 (N.D. Ill. 2024) ................................................... 31-32
17
     *Barahona v. Napolitano*,
18       2011 U.S. Dist. LEXIS 117536 at *6-9 (S.D.N.Y. Oct. 11, 2011) ............. 34
19
     *Bautista-Rosario v. Mnuchin*,
20       568 F. Supp. 3d 1 (D.D.C. 2021) ............................................................. 16

21   *Bennett v. Spear*,
        520 U.S. 154 (1997) .............................................................................. 22
22
23   *Biden v. Texas*,
        597 U.S. 785 (2022) .............................................................................. 33
24
     *Bolbol v. Rowell Ranch Rodeo, Inc.*,
        673 F. Supp. 3d 1099 (N.D. Cal. 2023) .................................................... 42
25
26   *Bradford v. U.S. Dep't of Labor*,
        101 F.4th 707 (10th Cir. 2024) .......................................................... 38, 40
27
     *Broadgate Inc. v. USCIS*,
28       730 F. Supp. 2d 240 (D.D.C. 2010) ......................................................... 39

*Bustamante v. Mukasey*,
    531 F.3d 1059 (9th Cir. 2008) ........................................................................ 16

*Caremax Inc. v. Holder*,
    40 F. Supp. 3d 1182 (N.D. Cal. 2014) ............................................................. 4

*\*Chamber of Commerce of U.S. v. U.S. DHS*,
    2025 LX 507601 (D.D.C. Dec. 23, 2025) ...... 13, 14, 17, 18, 22, 26, 28, 30, 31, 40, 42, 43, 44

*Cheever v. Huawei Device USA, Inc.*,
    2019 WL 8883942 (N.D. Cal. Dec. 4, 2019) ................................................... 30

*Dakota Central Telephone Co.*,
    250 U.S. ........................................................................................................... 19

*Dalton v. Specter*,
    511 U.S. 462 (1994) ........................................................................ 17, 18, 20, 27

*Del. Valley Reg'l Ctr., LLC v. U.S. DHS*,
    106 F.4th 1195 (D.C. Cir. 2024) ............................................................... 23, 25

*Dep't of State v. Muñoz*,
    602 U.S. 899 (2024) ................................................................................... 15, 16

*Detroit Int'l Bridge Co. v. Canada*,
    189 F. Supp. 3d 85 (D.D.C. 2016) ....................................................... 22, 26, 37, 39

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ...................................................................................... 40, 41

*Doan v. INS*,
    160 F.3d 508 (8th Cir. 1998) ........................................................................... 16

*Doe 1 v. Biden*,
    2 F.4th 1284 (9th Cir. 2021) ...................................................................... 30, 32

*Doe 1 v. Trump*,
    957 F.3d 1050 (9th Cir. 2020) ......................................................................... 32

*Doe 1 v. Trump*,
    984 F.3d 848 (9th Cir. 2020) ...................................................................... 29, 32

*E. Bay Sanctuary Covenant v. Garland*,
    994 F.3d 962 (9th Cir. 2021) ........................................................................... 41

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ........................................................................... 20

*EG Enters., Inc. v. Dep't of Homeland Sec.*,
    467 F. Supp. 2d 728 (E.D. Mich. 2006) ........................................................... 4

*Fiallo v. Bell*,
  430 U.S. 787 (1977) .................................................................................. 15, 18-19, 19

*Glob. Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025) ............................................................................. 17, 20

*Haig v. Agee*,
  453 U.S. 280 (1981) ................................................................................................ 19

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952) ................................................................................................ 19

*Hawaii v. Trump*,
  585 U.S. 667 (2018) ..................... 3, 15, 16, 17, 26, 27, 28, 29, 31, 32, 33, 34, 35, 37, 38, 39

*Hemp Indus. Ass'n v. Drug Enf't Admin.*,
  333 F.3d 1082 (9th Cir. 2003) ................................................................................ 38

*Hidden Empire Holdings, LLC v. Angelone*,
  2025 LX 406885, at *11 (C.D. Cal. Aug. 19, 2025) ........................................... 11, 12

*Immigrant Defs. L. Ctr. v. Noem*,
  145 F.4th 972 (9th Cir. 2025) ................................................................................. 41

*Kerry v. Din*,
  576 U.S. 86 (2015) .................................................................................................. 31

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) .......................................................................................... 16, 27

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ................................................................................................ 24

*Make The Rd. N.Y. v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) ......................................................... 22, 26, 37, 38

*Marshall Field & Co. v. Clark*,
  143 U.S. 649 (1892) ................................................................................................ 37

*Maryland v. King*,
  567 U.S. 1301 (2012) .............................................................................................. 44

*Matushkina v. Nielsen*,
  877 F.3d 289 (7th Cir. 2017) ................................................................................. 16

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ................................................................................................ 41

*Mow Sun Wong v. Campbell*,
  626 F.2d 739 (9th Cir. 1980) ........................................................................... 26, 29

*Munaf v. Geren*,
    553 U.S. 674 (2008) ................................................................................ 11

*Murphy Co. v. Biden*,
    65 F.4th 1122 (9th Cir. 2023) ................................................................ 20

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ............................................................... 13, 14, 15, 43

*N. Am. Butterfly Ass'n v. Wolf*,
    977 F.3d 1244 (D.C. Cir. 2020) ............................................................ 20

*Nebraska v. Su*,
    121 F.4th 1 (9th Cir. 2024)(a) ......................................................... 21, 40

*NFIB v. Sebelius*,
    567 U.S. 519–66 (2012) ......................................................................... 36

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................... 43, 44, 45

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................................... 24, 25

*NRC v. Texas*,
    605 U.S. 665 (2025) ......................................................................... 19, 20

*Ojmar US, LLC v. Sec. People, Inc.*,
    2017 WL 2903143 (N.D. Cal. July 7, 2017) ........................................ 42

*Pacito v. Trump*,
    152 F.4th 1082 (9th Cir. 2025) ................................................... 26, 31, 32

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015)(A) ........................................................................... 38

*President. Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ......................................................................... 17, 20

*RAICES v. Noem*,
    793 F. Supp. 3d 19 (D.D.C. 2025) ....................................................... 30

*Royal Siam Corp. v. Chertoff*,
    484 F.3d 139 (1st Cir. 2007) ................................................................ 3-4

*Saavedra Bruno v. Albright*,
    197 F.3d 1153 (D.C. Cir. 1999) ........................................................... 25

*Sale v. Haitian Centers Council, Inc.*,
    509 U.S. 155 (1993) ......................................................................... 30, 31

*Seila L. LLC v. CFPB,*
  591 U.S. 197 (2020) ................................................................. 21

*Sherley v. Sebelius,*
  689 F.3d 776 (D.C. Cir. 2012) ................................................ 40

*Sierra Club v. Env't Prot. Agency,*
  955 F.3d 56 (D.C. Cir. 2020) .................................................. 23

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) ................................................................. 44

*Trump v. Int'l Refugee Assistance Project,*
  582 U.S. 571 (2017) ................................................................. 11

*\*Trump v. Orr,*
  223 L.Ed.2d 180 (U.S. 2025) ............................... 22, 37, 40, 41

*Tulare Cnty v. Bush,*
  185 F. Supp. 2d 18 (D.D.C. 2001) ..................................... 21, 22

*United States ex rel. Knauff v. Shaughnessy,*
  338 U.S. 537 (1950) ................................................................. 15

*United States v. George S. Bush & Co., Inc.,*
  310 U.S. 371 (1940) ................................................................. 31

*United States v. Ju Toy,*
  198 U.S. 253 (1905) ................................................................. 16

*United States v. Texas,*
  599 U.S. 670–99 (2023) ........................................................... 44

*Webster v. Doe,*
  486 U.S. 592 (1988) ................................................................. 18

*Winter v. NRDC, Inc.,*
  555 U.S. 7 (2008) .............................................................. 11, 41

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ................................................................. 16

*Zemel v. Rusk,*
  381 U.S. 1 (1965) ..................................................................... 37

*Ziglar v. Abbasi,*
  582 U.S. 120 (2017) ................................................................. 19

**Statutes**

5 U.S.C. § 553 ................................................................................................ 39

5 U.S.C. § 701 ................................................................................................ 25

5 U.S.C. § 702 ................................................................................................ 25

5 U.S.C. § 704 ............................................................................................ 21, 22

5 U.S.C. § 705 ................................................................................................ 41

8 U.S.C. § 1101 ............................................................................................ 3, 5

*8 U.S.C. § 1182 ............................. 1, 2, 3, 9, 10, 16, 17, 18, 20, 22, 26, 27, 28, 29-35, 36, 37-41

8 U.S.C. § 1184 ...................................................................................... 4, 5, 31, 34

8 U.S.C. § 1185 .................................................................. 1, 3, 17, 18, 27, 28, 29, 38

8 U.S.C. § 1356 ........................................................................................ 33, 34

8 U.S.C. § 1361 ................................................................................................ 30

8 U.S.C. § 1356 .................................................................................... 33, 34, 39

**Executive Orders**

Proclamation No. 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, 90 Fed. Reg. 46,027 (Sept. 19, 2025)................................................................ *passim*

**Regulations**

8 C.F.R. § 214.2 ........................................................................................ 5, 31

8 C.F.R. § 248.3 ...................................................................................... 6, 8, 9

8 C.F.R. § 1361 ................................................................................................ 31

**Legislative Materials**

*Immigration Reforms Needed To Protect Skilled American Workers: Hearing Before the S. Judiciary Comm.*, 114th Cong. 114-831 (2015) (statement of President Richard L. Trumka, President, AFL-CIO)........................................................................ 7, 35, 45

*Restoring The Trust For Families And Working-Age Americans: Hearing Before the H. Comm. on the Budget*, 114th Cong. 114-22 at 99 (Sept. 21, 2016) (testimony of Dr. William Spriggs, Chief Economist, AFL-CIO) ................................................................ 7-8

**Other**

*AFL-CIO Center for Strategic Research, *Report: After Decimating U.S. Manufacturing, Wal-Mart Takes Aim at the Information Technology Sector*, AFL-CIO (April 1, 2015)............7, 12, 45

Bill Whitaker, *Are U.S. Jobs Vulnerable To Workers With H-1B Visas?*, CBS News (August 13, 2017) ...................................................................................................................6, 7

*Corporations Abuse H-1B Visa Program For Lay-Offs, Lower Wages*, Transportation Communications Union/IAM .......................................................................................7

*How H-1B Visas Have Been Abused Since the Beginning*, CBS NEWS (August 13, 2017) ............6

Julia Preston, *Breaking Silence To Defy Ex-Bosses; Laid-Off Americans, Required To Zip Lips On Way Out, Grow Bolder*, THE NEW YORK TIMES (June 13, 2016) .........................................6, 7

Julia Preston, *Pink Slips at Disney. But First, Training Foreign Replacements*, THE NEW YORK TIMES (June 4, 2015) ...............................................................................................6

Patrick Thibodeau, *Southern California Edison IT Workers 'Beyond Furious' Over H-1B Replacements*, COMPUTERWORLD (Feb. 4, 2015) ...................................................................6

Ron Hira and Daniel Costa, *New Evidence Of Widespread Wage Theft in the H-1B Visa Program*, Economic Policy Institute (Dec. 9, 2021) ...................................................................6

*USCIS Investigating Alarming Level of Potential H-1B Fraud*, Constangy Brooks Smith & Prophete LLP (May 3, 2023) .......................................................................................6

**STATEMENT OF RELIEF**

Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction. Because the preliminary injunction should be denied, Plaintiffs are also not entitled to summary judgment, so their alternate request for summary judgment should also be denied.

**ISSUES PRESENTED FOR REVIEW**

1. Whether Plaintiffs have adequately shown standing where their injuries depend on contingencies and speculation?

2. Whether Plaintiffs have an *ultra vires* cause of action where the statues provide sweeping discretion and no clear prohibitions?

3. Whether the Court can set aside a Presidential exercise of his own authority by enjoining agencies from complying with that order?

4. Whether Plaintiffs have shown that the H-1B Proclamation, which restricts the entry of H-1B non-citizens absent a condition of payment, is in excess of Executive authority to restrict the entry of non-citizens under § 1182(f) and set entry conditions under § 1185(a)?

5. Whether the Proclamation overrides the INA despite no clear conflict?

6. Whether notice and comment was required despite no APA cause of action and the agencies merely implementing a Proclamation dealing with foreign affairs?

7. Whether Plaintiffs have shown that they are entitled to a universal injunction when over half of the current Plaintiffs felt no need to seek such an injunction?

**INTRODUCTION**

For decades, aliens and companies have exploited the H-1B nonimmigrant worker visa program by importing lower-paid, lower-skilled workers—thereby artificially depressing wages and employment opportunities for skilled U.S. citizens. Responding to this pervasive abuse of the H-1B system, President Trump invoked his broad authority to temporarily restrict the entry of non-citizens under 8 U.S.C. § 1182(f) and § 1185(a) by issuing Proclamation 10973, Restriction on Entry of Certain Nonimmigrant Workers, 90 Fed. Reg. 46,027 (Sep. 24, 2025) (the "Proclamation"). In the Proclamation, the President determined that "[t]he large-scale

replacement of American workers through systemic abuse of the [H-1B] program has undermined both [the United States'] economic and national security." *Id.* As a result, the President found that "the unrestricted entry" into the country of certain H-1B temporary workers "would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages[.]" *Id.* The President thus temporarily suspended, restricted, or regulated the entry of aliens seeking a new H-1B visa unless their petitions "are accompanied or supplemented by a payment of $100,000. *Id.* at 46,028. The Proclamation is within the President's broad delegated authority.

On October 3, 2025, Plaintiffs—a collection of for-profit corporations, religious organizations, unions, and two anonymous individuals—filed suit against the Government. Some of the Plaintiffs—only six of the fourteen total—strategically waited until the week before Christmas to file their "emergency" motion for a preliminary injunction.   Plaintiffs' motion fails, and the Court should deny the motion.

First, Plaintiffs' injuries are far too speculative for standing. Second, proclamations restricting the entry of aliens are non-justiciable under consular non-reviewability. Third, Plaintiffs lack a cause of action, as *ultra vires* claims can only be brought when there is a clear statutory prohibition, especially when the statutes exude deference and discretion as here. The problems with Plaintiffs' APA cause of action are more varied. Plaintiffs cannot challenge agency guidance merely implementing a Presidential Proclamation, there is no final agency action, and any action would be committed to agency discretion. Fourth, on the merits the Proclamation suspends, restricts, or regulates the entry of aliens under §§ 1182(f) and 1185(a) and therefore, the impact on domestic entities is irrelevant. Fifth, the Proclamation does not override any part of the INA, it adds restrictions in addition to those already existing. Nor is the payment restriction a tax. Sixth, because the APA does not apply and the agencies are merely implementing a Proclamation in the realm of foreign affairs, there is no basis for requiring notice and comment or reviewing the Proclamation as arbitrary and capricious through the back door. Finally, Plaintiffs have not demonstrated that their alleged economic harms are irreparable, and the equites

decidedly favor the Government. This Court should deny Plaintiffs' motion for a preliminary injunction, as well as their alternative request for summary judgment.

## BACKGROUND

### I.    The Executive's Broad Authority

Under the INA, ch. 477, 66 Stat. 163 (8 U.S.C. § 1101 et seq.), admission to the United States normally requires a valid visa or other travel document. *See* 8 U.S.C. §§ 1181, 1182(a)(7)(A)(i) *and* (B)(i)(II), 1203. A visa is typically necessary, but not sufficient, for admission; the alien still must be found admissible upon inspection at a port of entry. *Id.* §§ 1201(h), 1185(d), 1225(a); *see id.* § 1101(a)(4).

The INA establishes myriad bases of inadmissibility and visa ineligibility. *See, e.g.*, 8 U.S.C. §§ 1182(a), 1201(g). Congress has also afforded the President broad discretionary authority to suspend or impose restrictions on the entry of aliens:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). "By its terms, § 1182(f) exudes deference to the President in every clause." *Trump v. Hawaii*, 585 U.S. 667, 684 (2018). The Supreme Court has thus "observed that § 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Id.* Section 1185(a)(1) further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe." 8 U.S.C. § 1185(a). Presidents have invoked that authority to advance national-security and foreign-policy objectives over 90 times.

### II.    H-1B Nonimmigrant Classification

The INA provides for the classification of qualified temporary foreign workers who are coming to the United States to perform services in a "specialty occupation" based "upon petition of the importing employer." *Id.* §§ 1101(a)(15)(H)(i)(b); 1184(c)(1) (the "H-1B program"); *see Royal Siam Corp. v. Chertoff*, 484 F.3d 139, 144 (1st Cir. 2007) (discussing eligibility

1   requirements). Admission of any alien as a nonimmigrant shall be for such time and under such

2   conditions as the Attorney General (and, post- Homeland Security Act of 2002, the DHS Secretary)

3   may by regulations prescribe, *see* §§ 1184(a)(1), 1103(a)(1). "The intent of the H-1B provisions is

4   to help employers who cannot otherwise obtain needed business skills and abilities from the U.S.

5   workforce by authorizing the temporary employment of qualified individuals who are not

6   otherwise authorized to work in the United States." www.dol.gov/agencies/whd/immigration/h1b;

7   *see also Caremax Inc. v. Holder*, 40 F. Supp. 3d 1182, 1187 (N.D. Cal. 2014) ("Fundamentally,

8   an H–1B visa allows an employer… to fill a temporary position because of a special need,

9   presumably one that cannot be easily fulfilled within the U.S.").

10   Consistent with that intent, with certain exceptions for models and Department of Defense,

11   most H-1B jobs and applicants must meet the "specialty occupation" requirement as a minimum

12   qualification for eligibility. A specialty occupation is defined as an occupation that requires

13   (A) "theoretical and practical application of a body of highly specialized knowledge" and (B) "the

14   attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a

15   minimum qualification for entry into the occupation in the United States." 8 U.S.C. § 1184(i)(1);

16   *see, e.g.*, *EG Enters., Inc. v. Dep't of Homeland Sec.*, 467 F. Supp. 2d 728, 735 (E.D. Mich. 2006)

17   (explaining that issue is not simply whether a particular beneficiary qualifies as a member of a

18   specialty occupation, but whether the proffered position constitutes a specialty occupation).

19   By statute, H-1B petitions fall into two broad categories: cap-subject petitions and cap-

20   exempt petitions. Cap-subject petitions are counted against the strict numerical limitations created

21   by Congress, which for any fiscal year after 2003 is 65,000 ("Regular Cap"), with an additional

22   20,000 for individuals who have earned a master's or higher degree from a United States institution

23   of higher education ("Master's Cap"), for a total annual allocation of 85,000 initial H-1B visas or

24   initial grants of H-1B status. *See* 8 U.S.C. § 1184(g)(1)(A) (Regular Cap); § 1184(g)(5)(C)

25   (Master's Cap). Once a beneficiary has been counted towards the numerical allocations, the

26   beneficiary may be cap-exempt for a 6-year period of H-1B admission, with the potential for a

27   longer period if certain steps have been taken to pursue lawful permanent resident status. *See* 8

28   U.S.C. § 1184(g)(7); 8 CFR § 214.2(h)(13)(iii)(D) and (E). Other H-1B petitions are cap-exempt

1   based on the nature of the petitioning employer or work location. *See* 8 U.S.C. § 1184(g)(5)(A),

2   (B). The demand for initial H-1B status invariably exceeds the Congressionally imposed numerical

3   limitations, and as such, DHS regulations provide rules for the administration of an H-1B cap

4   selection process, commonly referred to as a "lottery." *See* 8 C.F.R. § 214.2(h)(8)(iii).

5       Before a petitioning employer is eligible to submit a Form I-129, Petition for a

6   Nonimmigrant Worker, requesting H-1B classification on behalf of a beneficiary who is subject

7   to the H-1B cap ("an H-1B cap-subject petition"), the petitioner must submit a registration for that

8   beneficiary for the H-1B cap lottery through the USCIS website. *See id.* § 214.2(h)(8)(iii)(A)(1)

9   (discussing the registration requirement). Once the registration period closes, USCIS then

10  determines whether it has received registrations for a sufficient number of unique beneficiaries

11  projected as needed to meet the Regular and Master's caps. *See* 8 C.F.R. §§ 214.2(h)(8)(iii)(A)(5)-

12  (6). When USCIS determines that it has received sufficient registrations, it closes the registration

13  period and randomly selects, through a computer-generated program, the number of unique

14  beneficiaries deemed necessary to meet the cap among the registrations properly submitted. *See*

15  *id.* at §§ 214.2(h)(8)(iii)(A)(5)(ii); 214.2(h)(8)(iii)(A)(6)(ii). If a beneficiary is selected, USCIS

16  sends a notification to the online account of each prospective petitioner who submitted a

17  registration for the selected beneficiary along with petition filing instructions. 8 C.F.R §

18  214.2(h)(8)(iii)(C); *see also id.* § 214.2(h)(8)(iii)(D).

19      The employer must then file a Form I-129 to request the classification of the alien as an H-

20  1B nonimmigrant worker (known as an "H-1B petition"). *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b); 8

21  C.F.R. § 214.2(h)(4)(iii)(B)(1). Under the applicable regulations, USCIS shall notify the petitioner

22  of the approval, denial, intent to revoke, and revocation of any H-1B petitions. *Id.* § 214.2(h)(9)(i),

23  (h)(10)(ii), (h)(11). If the petition is approved and the alien beneficiary is outside the United States,

24  is inside the United States and requested consulate notification, or inside the United States and the

25  alien's associated status request was denied, the alien beneficiary of the approved H-1B petition,

26  unless visa exempt, must apply for a visa at a U.S. consulate abroad before applying for admission

27  as an H-1B nonimmigrant. *See* 8 U.S.C. § 1184(c)(1) (providing that an H-1B petition "shall be

28  made and approved before the visa is granted."). If the alien is in the United States, and for which

---

a requested change of status was granted, the change to H-1B status is generally effective upon the petition validity start date. 8 C.F.R. § 248.3(f).

### III.    H-1B Abuses

The H-1B visas program has long been subject to serious abuses.[1] Unfortunately, these abuses have only escalated over time.[2] This abuse has contributed to numerous companies laying off thousands of Americans and replacing them with foreign workers, oftentimes requiring American workers to train their foreign replacements[3] and conditioning severance on signing a Non-Disclosure Agreement. *Id.*[4] The President of the University of California—under former DHS Secretary Napolitano, no less—has admitted that UC "didn't use the H-1B process in the right way" in response to a controversy in which University of California San Francisco (UCSF) Medical Center fired Americans and replaced them with H-1B workers,[5] and forced the fired Americans to train their H-1B replacements on the way out of UCSF's doors.[6]  American workers, replaced from their jobs by H-1B non-citizens, have reported fearing retaliation from their former

---

[1]    *How H-1B Visas Have Been Abused Since the Beginning*, CBS NEWS (August 13, 2017) (https://www.cbsnews.com/news/how-h-1b-visas-have-been-abused-since-the-beginning/)

[2]    *See USCIS Investigating Alarming Level of Potential H-1B Fraud*, Constangy Brooks Smith & Prophete LLP (May 3, 2023), https://www.lexology.com/library/detail.aspx?g= 69ea81ea-29e3-48d3-afcc-c624f20e1c23;  Ron Hira and Daniel Costa, *New Evidence Of Widespread Wage Theft in the H-1B Visa Program*, Economic Policy Institute (Dec. 9, 2021), https://www.epi.org/publication/new-evidence-widespread-wage-theft-in-the-h-1b-program/.

[3]    Julia Preston, *Pink Slips at Disney. But First, Training Foreign Replacements*, THE NEW YORK TIMES (June 4, 2015); Patrick Thibodeau, *Southern California Edison IT Workers 'Beyond Furious' Over H-1B Replacements*, COMPUTERWORLD (Feb. 4, 2015).

[4]    Julia Preston, *Breaking Silence To Defy Ex-Bosses; Laid-Off Americans, Required To Zip Lips On Way Out, Grow Bolder*, THE NEW YORK TIMES (June 13, 2016).

[5]    Bill Whitaker, *Are U.S. Jobs Vulnerable To Workers With H-1B Visas?*, CBS News (August 13, 2017) (https://www.cbsnews.com/news/are-u-s-jobs-vulnerable-to-workers-with-h-1b-visas-2/) ("Former head of Homeland Security Janet Napolitano, now president of the University of California, faced a huge public outcry when she got rid of those 80 IT jobs at the Medical Center. She declined to give us an on camera interview, but stated publicly that the university, quote 'didn't use the H-1B process in the right way.'").

[6]    Whitaker, *supra* n.5. ("After our story, UCSF wrote us and said that it regrets the decision to ask some of its workers to train their replacements.  Quote 'it was a mistake, and… the university intends for this to never happen again.'").

---

employers for speaking out about the issue.[7]  This has drawn the attention of prominent politicians across the political spectrum, including Sens. Durbin (D-IL) and Blumenthal (D-CT).[8]

Labor unions[9]—including the AFL-CIO, to which Plaintiff CIR belongs—have investigated and documented employers' abuse of the H-1B system as well.  In 2015, the then-President of AFL-CIO and 2022 Presidential Medal of Freedom recipient, Richard L. Trumka, strongly condemned the H-1B program before Congress, submitting written testimony that "it is irresponsible to expand access to employment-based temporary work programs that will continue to hold down wages, increase worker vulnerability, and reduce social mobility for deserving workers[.]"[10]  He continued, "the H-1B visa program allows employers to stifle wages, create a captive workforce, and make previously full time jobs insecure and temporary" and "this program is being misused to replace stable, middle class jobs with a contingent, disposable workforce that employers can underpay and then replace at will."[11]  The AFL-CIO's Center for Strategic Research also issued a report concluding there was rampant abuse by Walmart of the H-1B system, opining Walmart was "driving down standards in the tech industry in the U.S. by using H-1B visas and contractors excessively, and violating the spirit, if not the letter of the visa program. This keeps costs low and allows for IT guest workers to be paid less" than American graduates.[12]  AFL-CIO's testimony and report are included herewith.

[7]    Preston, *supra* n.4.

[8]    Preston, *supra* n.4. ("'I have heard from workers who are fearful of retaliation,' said Senator Richard Blumenthal, Democrat of Connecticut. 'They are told they can say whatever they want, except they can't say anything negative about being fired.'").

[9]    "H-1B visas are killing American jobs." *Corporations Abuse H-1B Visa Program For Lay-Offs, Lower Wages*, Transportation Communications Union/IAM (last visited January 16, 2026), https://www.tcunion.org/legislative-outlook/corporations-abuse-h-1b-visa-program-for-lay-offs-lower-wages/

[10]    *Immigration Reforms Needed To Protect Skilled American Workers: Hearing Before the S. Judiciary Comm.*, 114th Cong. 114-831 (2015) (statement of President Richard L. Trumka, President, AFL-CIO).
https://www.judiciary.senate.gov/imo/media/doc/Trumka%20Testimony.pdf

[11]    *Supra* n.10.

[12]    AFL-CIO Center for Strategic Research, *After Decimating U.S. Manufacturing, Wal-Mart Takes Aim at the Information Technology Sector*, AFL-CIO (April 1, 2015) (https://aflcio.org/sites/default/files/2017-03/Walmart%2Band%2BTech%2BIndustry_4115Final.pdf) (emphasis removed).  AFL-CIO's

1

**IV.    Presidential Proclamation 10973**

2      Relying on substantial evidence of abuse and harms to the national interest, President

3 Donald J. Trump issued the Proclamation on September 19, 2025. The Proclamation explained

4 that abuse of the H-1B nonimmigrant worker program has led to "[t]he large-scale replacement of

5 American workers," "suppress[ed] wages," and "a disadvantageous labor market for American

6 citizens," which "has undermined both our economic and national security." *Id.* at 46,027. H-1B

7 workers account for an outsized share of the labor market in Science, Technology, Engineering,

8 and Mathematics (STEM) fields, and that the information technology (IT) sector, and particularly

9 outsourcing firms, have abused the H-1B system, providing H-1B workers for entry-level positions

10 at a 36% discount over American workers. *Id.*

11      As the number of H-1B workers in STEM fields has increased, the unemployment rate for

12 recent college graduates in those fields has also increased, and companies have at times laid off

13 thousands of American workers while simultaneously hiring thousands of H-1B workers. *Id.* at

14 46,027-28. In some cases, American workers were forced to train their H-1B replacements. *Id.* at

15 46,028. Employing H-1B workers in entry-level positions at discounted rates undercuts American

16 worker wages and opportunities, and it is antithetical to the purpose of the H-1B program, which

17 is "to fill jobs for which highly skilled and educated American workers are unavailable." *Id.*

18      Not only are H-1B program abuses detrimental to American workers, the Proclamation

19 also explains that such abuses are a national security threat because they reduce American wages

20 and "discourage[e] Americans from pursuing careers in science and technology, [thereby] risking

21 American leadership in these fields." *Id.* The President thus found that "[t]he severe harms that the

22 large-scale abuse of this program has inflicted on our economic and national security demands an

23 immediate response" and that "unrestricted entry into the United States of certain foreign workers

24 … would be detrimental to the interests of the United States because such entry would harm

25

then-Chief Economist also testified to Congress that "…we have H1B visa workers who will come

26 and undercut Americans who borrowed money to get degrees in STEM. So if Congress wants to

be on the side of American workers, let's be on the side of making investment and letting the price

27 of work go up." *Restoring The Trust For Families And Working-Age Americans: Hearing Before

the  H.  Comm.  on  the  Budget*, 114th Cong. 114-22 at 99 (Sept. 21, 2016)

28 (https://www.congress.gov/114/chrg/CHRG-114hhrg22467/CHRG-114hhrg22467.pdf).

American workers, including by undercutting their wages." *Id.* The President accordingly determined that it was "therefore necessary to impose higher costs on companies seeking to use the H–1B program in order to address the abuse of that program while still permitting companies to hire the best of the best temporary foreign workers." *Id.*

To that end, the Proclamation imposed entry restrictions on H-1B workers pursuant to the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a). In particular, it restricted entry to only petitions accompanied by or supplemented by a payment of $100,000. *Id.* It created an exception for individuals, companies, or industries that the Secretary of Homeland Security determines, in her discretion, are "in the national interest and do not pose a threat to the security or welfare of the United States." *Id.* at 46,029.

The Proclamation restricted the entry of aliens as H-1B nonimmigrants, instructed the Secretary of Homeland Security to restrict decisions on H-1B petitions not accompanied by the $100,000 payment, and instructed the Secretary of State to confirm payment of the $100,000 before addressing any visa application. *Id.* at 46,028-29. It also instructed the State Department and DHS to take all necessary steps to implement the Proclamation and deny entry to any H-1B nonimmigrant whose employer has not made the payment. *Id.* at 46,029. The Proclamation also instructed the Department of Labor and DHS to engage in rulemaking on issues relating to the prevailing wage and the H-1B lottery. *Id.* Such rulemaking is not challenged in this litigation.

The restrictions are set to expire after 12 months, absent an extension. *Id.* at 46,028.

## V.    Agency Guidance and Memoranda

The day after the Proclamation, USCIS issued a two-paragraph Memorandum explaining the contours of the Proclamation. *See* ECF 75-19 at 4.[13] USCIS explained that the Proclamation applied prospectively, to those petitions not yet filed and did not impact the ability of any current visa holder to travel to or from the United States. *Id.* USCIS also updated its website to explain that the Proclamation "applies to new H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, on behalf of beneficiaries who are outside the United States and do

---

[13] https://www.uscis.gov/sites/default/files/document/memos/H1B_Proc_Memo_FINAL.pdf

1  not have a valid H-1B visa." ECF 75-19 at 8.[14] It explained that the $100,000 payment can be

2  submitted through pay.gov, that "[p]ayment must be made prior to filing a petition with USCIS",

3  that "petitioners must submit proof that the payment has been scheduled" or evidence that they

4  received a waiver, and that [p]etitions subject to the $100,000 payment that are filed without a

5  copy of the proof of the payment from pay.gov or evidence of an exception from the Secretary of

6  Homeland Security will be denied." *Id.* It further provided information on where to submit a

7  request for an exception. *Id.*

8      U.S. Customs and Border Protection ("CBP") also issued brief guidance on September 20,

9  2025, stating that the Proclamation applies only to new H-1B petitions and does not impact aliens

10  who are the beneficiaries of approved petitions or who hold valid H-1B visas. *See* ECF 75-18 at

11  12.[15] It explained that "[t]he Proclamation does not impact the ability of any current visa holder to

12  travel to or from the United States" and that "CBP will continue to process current H-1B visa

13  holders in accordance with all existing policies and procedures." *Id.*

14      The State Department issued two paragraphs of guidance on its website explaining that the

15  Proclamation "restricts the entry of aliens into the United States as H-1B nonimmigrants if they

16  are seeking to perform services in a specialty occupation" and "restricts the issuance of H-1B visas,

17  except for those aliens whose petitions filed with U.S. Citizenship and Immigration Services

18  (USCIS) are accompanied or supplemented by a payment of $100,000." ECF 75-17 at 13.[16] The

19  State Department unequivocally stated that "No visas have been revoked pursuant to the

20  Proclamation." *Id.* In FAQs, the State Department referenced the USCIS and CBP guidance and

21  stated that it had "posted guidance to all consular offices, consistent with the guidance from

22  [USCIS] and [CBP] guidance." ECF 75-17 at 13-14.[17]

23

24

25  ---

[14] https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations

26  [15] www.cbp.gov/sites/default/files/2025-09/2025_09_20_-_memo_-

27  _h1b_restriction_on_entry_1_redacted.pdf

[16] travel.state.gov/content/travel/en/News/visas-news/restriction-on-entry-of-certain-

28  nonimmigrant-workers.html

[17] www.state.gov/h-1b-faq/

---

1

**LEGAL STANDARD**

2

A preliminary injunction is an "extraordinary" and "drastic" remedy that is never awarded

3

as a matter of right. *Munaf v. Geren*, 553 U.S. 674, 690 (2008). "A plaintiff seeking a preliminary

4

injunction must establish that he is likely to succeed on the merits, that he is likely to suffer

5

irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

6

and that an injunction is in the public interest." *Winter v. NRDC*, *Inc.*, 555 U.S. 7, 20 (2008).

7

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as

8

much on the equities of a given case as the substance of the legal issues it presents." *Trump v.*

9

*Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017).  When it comes to entry and

10

admission decisions, Governmental interests "are undoubtedly at their peak[.]" *Id*. at 581.

11

Tellingly, the motion is filed by only a handful of the named Plaintiffs—i.e., not the putative

12

class, but including those who are "not [putative] class members"—yet Plaintiffs still seek a

13

universal injunction anyway. *See* ECF 75 at 44.

14

Summary judgment requires a higher threshold than does a preliminary injunction. "[T]he

15

purpose of a summary judgment motion is to make a judgment on the merits for only those claims

16

where there can be no genuine dispute about the material facts." *Hidden Empire Holdings, LLC*

17

*v. Angelone*, 2025 LX 406885, at *11 (C.D. Cal. Aug. 19, 2025) "To be successful on summary

18

judgment, the movant must affirmatively demonstrate 'the absence of a genuine issue of fact *on*

19

*each issue material to its case*.'" *Id.* (quoting *C.A.R. Transp. Brokerage Co. v. Darden Rests.,*

20

*Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)). "This burden is even greater on a movant that bears the

21

burden of proof at trial, who must 'lay out the elements of its claim, citing the facts it believes

22

satisfies those elements, and demonstrat[e] why the record is so one-sided as to rule out the

23

prospect of the nonmovant prevailing.'" *Id.* (quoting Wright & Miller, *Grounds for Summary*

24

*Judgment—Burden on the Moving Party*, 10A Fed. Prac. & Proc. Civ. § 2727.1 (4th ed. 2025)).

25

**ARGUMENT**

26

**I.    Several Plaintiffs Lack Standing.**

27

**A. Phoenix Doe Fails to Show Standing, Much Less Irreparable Injury.**

28

1    Doe concedes there is nothing to suggest that the H-1B Proclamation applies to her and

2    admits her employer has already filed a petition without the $100,000 payment.  Doe Decl. (ECF

3    75-8) ¶¶ 7-10, Motion (ECF 75) at 37-38. She thus lacks an injury traceable to the Proclamation.

4    Indeed, Doe is "currently in the United States on valid F-1 STEM OPT status." Doe Decl. (ECF

5    75-8) ¶ 6. Her employer delayed filing a status change petition on her behalf until December 17,

6    2025, which she speculates was "because of the $100,000" payment or (more likely) because

7    "[her] employer could not file any new H-1B petitions due to the federal government shutdown."

8    *Id.* ¶¶ 7-9.  A month after the shutdown concluded, her employer then filed the petition without

9    the $100,000 payment, ostensibly because the H-1B Proclamation did not apply. *Id.* ¶ 7. Doe

10   states she is seeking only a change in status to H-1B from her current F-1 status. ECF 89 at 3, n.2.

11   As Doe admits, the H-1B Proclamation would *only* apply if USCIS determines she is ineligible

12   for a change in status or if she returns to India. Doe Decl. ¶ 10; *accord* H-1B Proclamation, §

13   1(a)-(b). Doe does not allege she is ineligible for a change in status, and she has no plans to return

14   to India. *See* Compl. (ECF 1), FAC (ECF 74), Motion (ECF 75) at 37-38.[18] Doe's injury is wholly

15   speculative.

16       She instead relies on the voluntary cessation doctrine, claiming USCIS could deny her

17   change in status and thus subject her to the Proclamation. Mot.37-38. But the H-1B Proclamation,

18   and the subsequent agency guidance do no currently apply to her, it applies only to those "who

19   are currently outside the United States," those petitions that request consular notification, port of

20   entry notification, or pre-flight inspection for an alien in the United States, or those with a status

21   request that is denied. H-1B Proclamation, § 1(a)-(b). These are not her circumstance, so as Doe

22   never had standing, she cannot claim this is a mootness issue now. Even so, voluntary cessation

23   turns on whether the defendant ceased the harmful activity itself, and Doe admits the decision to

24   change her status is a separate discretionary decision. Mot.37. A separate discretionary decision

25   that she speculates might go against her does not mean that the Government is voluntarily ceasing

26   to apply a Proclamation to her that did not apply to her in the first instance. "To obtain forward-

27

28   [18]    Doe laments that she does "not even have confirmation that USCIS has received it",
     notwithstanding Doe's declaration postdates the submission by a single day. Doe Decl. ¶ 10.

looking relief, the plaintiffs must establish a substantial risk of future injury that is traceable to the Government defendants and likely to be redressed by an injunction against them." *Murthy v. Missouri*, 603 U.S. 43, 69 (2024).  Enjoining the H-1B Proclamation—which might never apply to her—will not remedy her alleged injury,[19] which is speculative at best and non-existent in fact.

Even assuming the H-1B Proclamation did apply to her, Doe's continued refusal to identify herself means the Court cannot assess such claims as, e.g., her "university employer cannot pay this fee." *Id.* Assuming (hypothetically) that Doe works at Stanford University—one of the world's wealthiest universities, with assets in the tens of billions[20]—her claim that Stanford would be irreparably injured from making a $100,000 payment (or, alternatively, hiring a U.S. citizen, a lawful permanent resident, or another alien in lawful status already in the U.S. with authorization to work) is farcical.  The Court cannot evaluate Doe's claims concerning irreparable harm to her and/or her employer in the abstract.  Doe's preliminary injunction should be denied. And if she cannot show standing, she should be dismissed as a party.

### B.  Standing for the Remaining Plaintiffs is Dubious, At Best.

As noted, many of the Plaintiffs do not seek a preliminary injunction. For those that do, their injuries rest on a "speculative chain of possibilities" that are not clearly traceable to the Proclamation. *Murthy*, 603 U.S. at 70. Injuries for the six employer Plaintiffs seeking relief is not concrete, as none have alleged that they sought exceptions, it is speculative they will get employees through the lottery, and they can hire American workers instead. Indeed, a member employer in *Chambers* did exactly that, which is the effect the H-1B Proclamation intended. As the *Chamber* court noted, at least one employer involved in that case did ultimately hire a domestic employee in lieu a foreign worker. *Chamber of Commerce of U.S. v. U.S. DHS,* 2025 LX 507601, at *30, n1 (D.D.C. Dec. 23, 2025).  As they do not have standing, the class they seek to represent does not either.

---

[19]     Ironically, the H-1B Proclamation protects Doe from competing with potential H-1B beneficiaries outside of the United States who might have competed for her position.
[20]     Annual Financial Report (2025) at 10, 26, 71, *Stanford University* (December 9, 2025) (https://bondholder-information.stanford.edu/sites/g/files/sbiybj21416/files/media/file/fy25-annual-financial-report.pdf).

BAE alleges that *one* employee was affected, but does not allege to have sought an exception or attempted to fill the vacancy with a domestic worker. Zylka Decl. (ECF 75-3). Global Village Academy Collective (GVAC) alleges one employee departed midyear and that they are searching for a replacement, but GVAC does not allege that they have selected a particular candidate from abroad, and GVAC admits that they hire mostly from within the United States. Henderson Decl. (ECF 75-6) at ¶ 9.[21] The same goes for LBDS who is seeking to fill just *one* vacancy for the 2026-27 school year, has not begun recruiting efforts, and speculates that they will not be able to fill that vacancy with an employee already present in the United States. Witte Decl. ¶ 12. Neither LBDS nor GVAC explains any basis for their belief that they could not fill their limited vacancies by focusing their efforts to recruit domestically. Their conjectural claims that their efforts to recruit domestically are predestined to fail are speculative at best, and so is the presupposition that any request for an exception for a H-1B candidate will be denied. The conjectural future injury—that any untried domestic recruitment effort or unmade § 1(c) exception request is doomed—is far too speculative to support standing. *See Murthy*, 603 U.S. at 70; *see also Chamber*, 2025 LX 507601, at *30 n.1 (noting a cap-subject employer who was looking for an H-1B employee and who ultimately hired a domestic employee instead failed to demonstrate standing, and noting because they "ultimately hired a domestic, non-H1-B employee for the role, leading defendants, correctly, to credit the Proclamation as 'already working' as intended" (internal marks, citations omitted)).

Nephrology Associates, at the very least, is the only Plaintiff that has sought an exception under H-1B Proclamation § 1(c) for the one foreign employee it is interested in recruiting under the H-1B program. Waters Decl. ¶ 19. Nephrology claims that without a § 1(c) exception, it fears it "may never be able to find a qualified and willing physician to replace the [prospective employee] physician it lost[.]" Waters Decl. ¶ 20. Its standing depends on the contingency that the pending exception will be denied, and if it is, that the Court assume that its untried recruiting

---

[21] GVAC also does not explain why it believes there is a lack of native Spanish, French, or Mandarin speakers already present in the United States that could be suitable for the roles they wish to fill with foreign workers. Henderson Decl. ¶ 9.

1   efforts for a single replacement employee already present in the United States will fail. Moreover,
2   most of these Plaintiffs are subject to the H-1B cap lottery, so it is speculative the future
3   beneficiaries would be properly registered and selected in the lottery such that the prospective
4   employers will be eligible to file an H-1B cap petition. Adding all these contingencies together
5   creates a "speculative chain of possibilities" insufficient for standing. *Murthy*, 603 U.S. at 70.

6   **II.   Consular Non-Reviewability Precludes Review.**

7       The Proclamation is not reviewable under principles of consular nonreviewability. The
8   Supreme Court has long held that "[t]he admission and exclusion of foreign nationals is a
9   fundamental sovereign attribute" that is "largely immune from judicial control." *Dep't of State v.*
10  *Muñoz*, 602 U.S. 899, 907 (2024) (quotations omitted). In particular, the Supreme Court has held
11  that "[t]he conditions of entry for every alien, the particular classes of aliens that shall be denied
12  entry altogether, the basis for determining such classification, the right to terminate hospitality to
13  aliens, [and] the grounds on which such determination shall be based" are "wholly outside the
14  power of this Court to control." *Fiallo v. Bell*, 430 U.S. 787, 796 (1977) (citation omitted). Indeed,
15  the authority to regulate the entry of aliens is "inherent in the executive department of the
16  sovereign, Congress may in broad terms authorize the executive to exercise the power . . . for the
17  best interests of the country during a time of national emergency." *United States ex rel. Knauff v.*
18  *Shaughnessy*, 338 U.S. 537, 543 (1950); *see also Hawaii*, 585 U.S. at 702 (quoting *Fiallo*, 430
19  U.S. at 792 for same reasoning). Review of entry decisions is "not within the province of any court,
20  unless expressly authorized by Congress." *Id.* On the flip side, "Congress may delegate to
21  executive officials the discretionary authority to admit noncitizens immune from judicial inquiry
22  or interference" and "[w]hen it does so, the action of an executive officer to admit or to exclude
23  an alien is final and conclusive." *Muñoz*, 602 U.S. at 900 (quotations omitted).

24      Plaintiffs' claims challenging the President's Proclamation are non-justiciable on both
25  fronts. Congress has clearly not authorized judicial review of entry decisions. *Knauff*, 338 U.S. at
26  543. "The [INA] does not authorize judicial review of a consular officer's denial of a visa; thus,
27  as a rule, the federal courts cannot review those decisions" under the "doctrine of consular
28  nonreviewability." *Muñoz*, 602 U.S. at 908 (quotations omitted). Instead, Congress has delegated

to the Executive branch sweeping "discretionary authority" over whether to admit aliens. *Id.* Congress made a policy choice in §§ 1182(f) and 1185(a) by conferring a "sweeping proclamation power" to suspend entry of aliens and impose restrictions wholly in the President's discretion without creating a cause of action for review. *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (R.B. Ginsburg, J.). "By its terms, § 1182(f) exudes deference to the President in every clause," and "entrusts to the President the decisions whether and when to suspend entry," "whose entry to suspend," "for how long," "and on what conditions. *Hawaii*, 585 U.S. at 682, 684 (declining to resolve "difficult question" of reviewability). So, whereas here, "the President acts pursuant to an express or implied authorization of Congress"—e.g., 8 U.S.C. §§ 1182(f) and 1185(a)(1)—the President's "authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

Nor does it matter which agency is enforcing the President's Proclamation in the first instance. Over a century of caselaw shows that principles of nonreviewability apply regardless of who decides to deny entry to a foreign national. *See Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972)("The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come into this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications." (emphasis added) (quotations omitted)). Historically, the doctrine has been applied to executive officers like the President, *Hawaii*, 585 U.S. at 703–04, the Attorney General, *Mandel*, 408 U.S. at 766, the Secretary of the Treasury, *Bautista-Rosario v. Mnuchin*, 568 F. Supp. 3d 1, 6–7 (D.D.C. 2021), the "Secretary of Commerce and Labor," *United States v. Ju Toy*, 198 U.S. 253, 261 (1905) (decision is "conclusive"), DHS and its components, *Matushkina v. Nielsen*, 877 F.3d 289, 295-96 (7th Cir. 2017) (CBP), and legacy INS determinations, *Doan v. INS*, 160 F.3d 508, 509 (8th Cir. 1998), *Amanullah v. Nelson*, 811 F.2d 1, 9 (1st Cir. 1987). As the Ninth Circuit stated, there is "nothing to suggest that the reasoning or outcome would vary according to which executive officer is exercising the Congressionally-delegated power to exclude." *Bustamante v. Mukasey*, 531 F.3d 1059, 1062 n.1 (9th Cir. 2008).

1       Since Plaintiffs are challenging the Executive's admission decisions, such claims are

2   nonreviewable.  It does not matter whether Plaintiffs characterize their challenge as being to the

3   H-1B Proclamation directly or, *e.g.*, USCIS's adherence to the H-1B Proclamation.   Non-

4   reviewability doctrine precludes review of both characterizations.

5       **III.    Plaintiffs' Lack a Cause of Action.**

6       Plaintiffs raise their claims under the APA or as equitable *ultra vires* claims. Neither works.

7   Thus, Plaintiffs lack a cause of action and their preliminary injunction motion should be denied.

8       **A.  The *Ultra Vires* Claims Are Unlikely to Succeed.**

9       Plaintiffs seek to challenge the Proclamation and its implementation as ultra vires. It fails

10  for many reasons. And Plaintiffs make no defense of their reliance on this narrow cause of action.

11      **1.**    As a threshold matter, it is a dubious proposition that *ultra vires* claims are even

12  available as against the President, given that courts generally cannot restrain the President.

13  *Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (federal courts have "no jurisdiction of a

14  bill to enjoin the President in the performance of his official duties") (quoting *Mississippi v.*

15  *Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867)); *see also Am. Foreign Serv. Ass'n v. Trump*, 2025 LX

16  100042, at *2 (D.C. Cir. June 20, 2025) (per curiam). Even if *ultra vires* review can lie against a

17  presidential action, "such review is not available when the statute in question commits the decision

18  to the discretion of the President."  *Dalton v. Specter*, 511 U.S. 462, 474 (1994).  Here, § 1182(f)

19  clearly grants that discretion, so *ultra vires* review is not available. *Glob. Health Council v. Trump*,

20  153 F.4th 1, 16 (D.C. Cir. 2025).

21      Section 1182(f) is the quintessential statute that "commits the decision to the discretion of

22  the President" and thus precludes an ultra vires cause of action. *Dalton*, 511 U.S. at 474. Section

23  1182(f) provides a grant of broad, unreviewable discretion to the President to exercise powers to

24  suspend or restrict the entry into the United States of any aliens or class of aliens "[w]henever the

25  *President finds*" that entry of such aliens or class of aliens "would be *detrimental to the interests*

26  *of the United States*." 8 U.S.C. § 1182(f) (emphasis added). As the Supreme Court has held, "[b]y

27  its terms, § 1182(f) exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684;

28  *Chamber*, 2025 LX 507601, at *8. The discretion in § 1185(a)(1) is even clearer, as it allows the

---

1    President to set "reasonable rules, regulations, and orders, and subject to such limitations and

2    exceptions as *the President may* prescribe" without any precondition or finding. 8 U.S.C. §

3    1185(a)(1) (emphasis added); *Chamber*, 2025 LX 507601, at *37. The Supreme Court previously

4    addressed parallel language in § 102(c) of the Foreign Services Act which allowed termination of

5    a CIA employee whenever the Director "shall deem such termination necessary or advisable in the

6    interests of the United States" finding that language, too, "fairly exudes deference" to the

7    President. *Webster v. Doe*, 486 U.S. 592, 600 (1988) (emphasis added). As a result, the Court

8    found that the provision in Webster "appears … to foreclose the application of any meaningful

9    judicial standard of review." *Id.* It also foreclosed a discharged employee from "complain[ing] that

10   his termination was not 'necessary or advisable in the interests of the United States,' since that

11   assessment is the Director's alone." *Id*. at 603.

12         Both §§ 1182(f) and 1185(a)(1) likewise provide no meaningful standard of review and

13   foreclose any inquiry into the President's reasoning, because the provisions do not require

14   evidence that such entry is detrimental to the interests of the United States, only that the President

15   finds that it would be. *Id*. at 600; *Chamber*, 2025 LX 507601, at *42. "How the President chooses

16   to exercise the discretion Congress has granted him" in §§ 1182(f) and 1185(a)(1) of the INA is

17   thus "not a matter for [a court's] review." *Dalton*, 511 U.S. at 476. That prohibition on review

18   extends to any claim that "concerns not a want of [Presidential] power, but a mere excess or abuse

19   of discretion in exerting a power" because "the judicial may not invade the legislative or executive

20   departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion."

21   *Id*. at 474 (quoting *Dakota Central Telephone Co. v. S. Dakota ex rel. Payne*, 250 U.S. 163, 184

22   (1919)). Thus, the Proclamation, which was made pursuant to a broad grant of discretionary

23   authority in §§ 1182(f) and 1185(a)(1), is not subject to review via an *ultra vires* claim.

24         Judicial review of the President's discretionary determination in this area is particularly

25   inappropriate because that determination includes both immigration and national security issues.

26   The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental

27   sovereign attribute exercised by the Government's political departments largely immune from

28   judicial control." *Fiallo*, 430 U.S. at 792 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345

---

U.S. 206, 210 (1953)). It is "wholly outside the power of this Court to control" the power to expel or exclude aliens, including "[t]he conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based" are "wholly outside the power of this Court to control." *Id.* at 796 (citation omitted). Likewise, "[n]ational-security policy is the prerogative of the Congress and President," and "[j]udicial inquiry into the national-security realm raises 'concerns for the separation of powers.'" *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017); *see also Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *Dakota Central Telephone Co.*, 250 U.S. at 184 (refusing to consider claim that President abused discretion based upon statutory provision giving President power to control telephone lines if he "deem[ed] it necessary for the national security or defense"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."). Courts are therefore "'reluctant to intrude upon'" an exercise of that national security authority "unless 'Congress specifically has provided otherwise,'" *Ziglar*, 582 U.S. at 143, and an *ultra vires* claim like Plaintiffs assert here necessarily lacks congressional authorization.

**2.**    Even if such review is available generally, Congress knows how to create a cause of action to enforce a statute, but it clearly did not here. Implied causes of actions for statutes are highly disfavored. *See  Alexander v. Sandoval*, 532 U.S. 275, 288–89 (2001). "Before enactment of the APA, those challenging agency action often lacked a statutory cause of action." *NRC v. Texas*, 605 U.S. 665, 680 (2025). To prevent litigants from circumventing Congress's decision by using equity, the Supreme Court requires the challenged action to be "in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *Id.* at 681 (quotation omitted).

Plaintiffs make no attempt to meet this test. Nowhere do they identify a specific statutory prohibition (because there isn't one). Nowhere do they establish that the Proclamation "entirely

1  exceeds" the authority granted to the President by Congress. Rather, they have "dress[ed] up a

2  typical statutory-authority argument as an ultra vires claim." *Id.* at 682.

3       Even if *NRC* is limited to statutes that preclude judicial review (it is not), it applies to

4  statutes that implicitly preclude such review. S*ee also Glob. Health Council*, 153 F.4th at 20. Based

5  on the discretion afforded to the President explained above, *NRC* applies to §§ 1182(f) and 1185(a).

6  But even if *NRC's* test does not apply, that does not mean *ultra vires* claims can be brought for

7  any routine statutory violation. That would render Congress's choice not to create a cause of action

8  void. At most, even a broader view of *ultra vires* claims requires the statutory violation to be

9  "obviously beyond the terms of the statute" or "far outside the scope of the task that Congress gave

10  it." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (finding the statute did

11  not preclude review and thereafter denying *ultra vires* claim). Plaintiffs cannot meet this

12  demanding standard. The Proclamation was clearly lawful. But at most, given the broad delegation

13  and deference at issue, this is a close and contestable issue on the margins. Plaintiffs may disagree

14  with the policy or the findings, but such disagreement falls well short of what is required for an

15  *ultra vires* claim. *NRC*, 605 U.S. at 666 (explaining allegations that agencies reached "a conclusion

16  which does not comport with the law" is not enough for an *ultra vires* claim); *see also Murphy Co.*

17  *v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023) (*ultra vires* jurisdiction over a presidential

18  proclamation existed only because plaintiff plausibly alleged the presidential proclamation at issue

19  under the Antiquities Act violated the Oregon and California Railroad and Coos Bay Wagon Road

20  Grant Lands Act). That is insufficient for any statutory *ultra vires* claims.

21       **B.  Plaintiffs Cannot Challenge Implementation of the Proclamation Under the APA.**

22            **1.  Ministerially Implementing a Presidential Proclamation is Not**
23                 **Reviewable as a Final Agency Action.**

24       The APA does not provide a cause of action for judicial review of the President's

25  Proclamation. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Dalton v. Specter*, 511

26  U.S. 462, 470 (1994). As the Ninth Circuit has explained, "[t]he scope of our review [under the

27  APA] ... is limited to 'agency action,' and the President is not an 'agency.'" *E. Bay Sanctuary*

28  *Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018).

This rule extends to agencies that merely comply with a Proclamation made by the President in the exercise of power delegated directly to him by Congress. While, in some circumstances, an agency implementation via further final action (e.g., regulation) that adopts or implements a generalized policy choice by the Executive may be reviewable, simple *compliance* with explicit and non-negotiable terms of a Presidential Proclamation is not an independent "agency action" for which APA review is available. *Compare Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) (finding APA review available for DOL's implementation of rules under the President's directive that gave DOL "considerable discretion" in executing Presidential directive to "issue regulations… to implement the requirements of this order" (citing Executive Order 14026 (86 Fed. Reg. 22,836)) *with Bradford v. U.S. DOL*, 101 F.4th 707, 731 (10th Cir. 2024). Here, the President is exercising *Presidential* statutory authority under Sections 1182(f) and 1185(a), and the agencies have no discretion to either decrease (or increase) the *President's* entry restrictions.

Unlike *Su*, Plaintiffs have not identified any final agency action that is in any way distinct from the H-1B Proclamation. *See* 5 U.S.C. § 704. It is true that agencies must execute the Proclamation, but that is always true. *Cf. Seila L. LLC v. CFPB*, 591 U.S. 197, 204 (2020) ("[N]o single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance."). If the fact that an agency is simply complying the President's Proclamation allowed for an APA challenge, this would effectively nullify the President's exemption from the APA and allow agencies to easily torpedo Presidential exercises of Congressionally-delegated authority by holding their compliance for notice-and-comment.

Realizing this, courts have found no APA review where the agency's action (if any) is an "extension of the President's action" and "merely carrying out directives of the President." *Tulare Cnty v. Bush*, 185 F. Supp. 2d 18, 21 (D.D.C. 2001), *aff'd on other grounds*, 306 F.3d 1138, 1143 (D.C. Cir. 2002) ("Forest Service is merely carrying out directives of the President, and the APA does not apply to presidential action"); *see also Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 403 (D. Md. 2011) (no APA review was available where agency was "acting on behalf of the President."). Here, Plaintiffs only challenge short explanatory memoranda as the necessary final agency actions. Mot. 23-24. Any argument that the agency memoranda "is agency

1  action would suggest the absurd notion that all presidential actions must be carried out by the

2  President him or herself in order to receive the deference Congress has chosen to give to

3  presidential action." *Tulare County*, 185 F. Supp. 2d at 21. This is not to say any or all

4  implementations of a presidential directive is unreviewable; rather, there is no reviewable action

5  when the agency is merely complying with the *President's* exercise of *Presidential* authority (as

6  opposed to exercising *agency* authority to further a President's policy choice), and has no

7  independent statutory authority to increase or decrease the President's § 1182(f) restrictions. *Id.*;

8  *Chamber*, 2025 LX 507601, at *74-75. That is doubly true here given the broad discretionary

9  nature of the statute and the intersection of foreign affairs, national security, and immigration

10  issues. *See Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016).

### 2. Plaintiffs Identify No Final Agency Action.

12  For similar reasons, even if implementing a Presidential Proclamation did not preclude

13  APA review by itself, the agency memoranda cannot constitute "final agency action." Only "final

14  agency action" is reviewable under the APA. 5 U.S.C. § 704. To be final (1) "the action must mark

15  the 'consummation' of the agency's decisionmaking process," rather than being "of a merely

16  tentative or interlocutory nature," and (2) "the action must be one by which rights or obligations

17  have been determined," or from which "legal consequences will flow[.]" *Bennett v. Spear*, 520

18  U.S. 154, 177-78 (1997) (internal marks and citations omitted).

19  Plaintiffs' claims fail both prongs. As Plaintiffs' motion makes clear, Plaintiffs seek to

20  enjoin the H-1B Proclamation in its entirety, as no agency set the $100,000 restriction on its own

21  statutory authority.  None of the memoranda reflect any decision-making by the agencies, as they

22  were bound to abide the President's Proclamation. *See Trump v. Orr*, 223 L.Ed.2d 180, 181 (U.S.

23  2025); *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020); *Detroit Int'l Bridge Co.*,

24  189 F. Supp. 3d at 100. There was no decision for them to make, so the view that implementing

25  the $100,000 payment required by the Proclamation destroys the principle set by *Franklin*.

26  To circumvent *Franklin*, Plaintiffs mainly focus on a two-paragraph Memorandum issued

27  by USCIS that simply explains the Proclamation and clarifies that it only applies prospectively,

28  consistent with the H-1B Proclamation's text. Mot. 9-10, 24-25. USCIS's website was also updated

---

to, *inter alia*, explain how the $100,000 could be paid and that "petitioners must submit proof that the payment has been scheduled" or evidence that they received a waiver. ECF 75-19 at 7. Similarly, CBP issued a two-paragraph memorandum explaining the Proclamation, clarifying that it was prospective, and stating that "CBP will continue to process current H-1B visa holders in accordance with all existing policies and procedures." ECF 75-18. Finally, the State Department posted two paragraphs on its website explaining the Proclamation, that it is prospective, and that USCIS and CBP had issued similar guidance. ECF 75-17 at 10-14. But no decision apart from the President's Proclamation created the $100,000 entry payment restriction. Similarly, no rights or consequences flow from the memoranda themselves. *See Sierra Club v. Env't Prot. Agency*, 955 F.3d 56, 62-65 (D.C. Cir. 2020). Any impact on rights stems instead from the Proclamation itself, which restricts entry subject to a $100,000 payment. The memoranda are merely explanatory, and are therefore not actions. *See Del. Valley Reg'l Ctr., LLC v. U.S. DHS*, 106 F.4th 1195, 1206 (D.C. Cir. 2024) (an agency statements that "tread[s] no new ground" is not an "action"). At most, the memoranda merely direct the agency personnel to comply with the President's Proclamation, and thus do not constitute final agency action on their own. *See Detroit Int'l Bridge Co.*. 3d at 100.

Nor are Plaintiffs injured by these memoranda, as they only explain the existing Proclamation, which is what restricts entry subject to the $100,000 payment. Indeed, the Proclamation itself dictates how employers must comply. 90 Fed. Reg. 46029 § 2. Similarly, Plaintiffs imply that the agencies have otherwise modified the Proclamation by having not apply to status changes or existing visa holders abroad.  Mot. 9-10. That is inaccurate, that is how the Proclamation itself operates. H-1B Proclamation § 2(a) ("Employers shall, prior to filing an H-1B petition on behalf of an alien *outside the United States*, obtain and retain documentation showing that the payment described in section 1 of this proclamation has been made." (emphasis added)). In any event, Plaintiffs would have to challenge those separate discrete actions. But they do not clearly do so. Nor could they, as they are obviously not injured by a narrowing of the Proclamation.

---

1   Tellingly, Plaintiffs do not hide the ball that their challenge is to the H-1B Proclamation *itself*, as

2   opposed to any freestanding agency rule. Mot. 23-33.[22]

3          Despite the entirety of the Motion directed at the H-1B Proclamation itself, Plaintiffs make

4   only one argument claiming any incongruence between an agency's compliance with the H-1B

5   Proclamation and the H-1B Proclamation itself.  Namely, Plaintiffs argue that the publication of

6   information on USCIS.gov describing the types of individualized waivers currently granted by the

7   Secretary of Homeland Security somehow substantively expands the H-1B Proclamation, and

8   thereby constitutes a new "rule" that the Court can use as a springboard to enjoin the H-1B

9   Proclamation entirely.  Mot. at 24. For at least three reasons, this argument is wrong.

10         First, Plaintiffs' argument is an obvious non-sequitur: if USCIS.gov's information is the

11  challenged "action," then the remedy is to set aside USCIS's "action," not the President's H-1B

12  Proclamation and all implementation. Plaintiffs would have to challenge the separate decision not

13  to grant broader exceptions. Plaintiffs cannot use that separate decision to springboard into a

14  challenge of the entire Proclamation and its implementation. *See Lujan v. Nat'l Wildlife Fed'n*,

15  497 U.S. 871, 890 (1990).  Doing so would only prove that their claims are impermissible

16  programmatic challenges. *See Id.*; *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

17         Second, Plaintiffs grossly misrepresent both the content and import of the cited information

18  on USCIS.gov. On USCIS.gov, USCIS provided information about the types of exceptions the

19  Secretary is *currently* granting (individualized) and how interested employers could seek an

20  exception.  ECF 75-19.[23]  Plaintiffs interpret this information to mean company or industry-wide

21  exceptions will never be granted. Mot. at 24. But the cited content in no way restricts the Secretary

---

22  [22]     Absent the memoranda, Plaintiffs would face the same harms, but clearly have nothing to

23  challenge other than the Proclamation itself. At most, the memoranda clarify that the Proclamation
    is only prospective, which does not harm Plaintiffs.

24  [23]     "Exceptions to the $100,000 payment are granted by the Secretary of Homeland Security

25  in the extraordinarily rare circumstance where the Secretary has determined that a particular alien
    worker's presence in the United States as an H-1B worker is in the national interest, that no

26  American worker is available to fill the role, that the alien worker does not pose a threat to the
    security or welfare of the United States, and that requiring the petitioning employer to make the

27  payment on the alien's behalf would significantly undermine the interests of the United States.
    Petitioning employers who believe their alien worker satisfies this high threshold may seek an

28  exception by sending their request and all supporting evidence to H1BExceptions@hq.dhs.gov."

---

from making company-wide or industry-wide exceptions, nor does USCIS.gov anywhere say that no such exceptions will be considered. *Id.*[24] Rather, USCIS.gov simply provides information about how to seek a waiver for each beneficiary. Plaintiffs' theory is exactly the same as that rejected by the D.C. Circuit in *Del. Valley Reg'l Ctr., LLC v. U.S. Dep't of Homeland Sec.*, 106 F.4th 1195, 1203-06 (D.C. Cir. 2024), in which an EB-5 petitioner interpreted a Q&A on USCIS.gov to be an agency interpretation categorically rejecting certain applications, rather than the mere provision of information. Plaintiffs point to no language on USCIS.gov (or elsewhere) stating that industry- or company-wide exceptions will never be considered. Mot. 23-24. Plaintiffs cannot manufacture agency action through unsupported and unreasonable interpretations from what are clearly non-rule informational statements. *Del. Valley Reg'l Ctr., LLC*, 106 F.4th at 1206.

Third, nothing in the H-1B Proclamation actually requires the Secretary to grant any exceptions, it merely says § 1(a) and (b) will not apply "*if* the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States." H-1B Proclamation, § 1(c) (emphasis added). Merely stating that the Secretary is currently considering exceptions treads no new ground and takes no new action. *Del. Valley Reg'l Ctr., LLC*, 106 F.4th at 1206. Indeed, nothing in § 1(c) requires the Secretary to do anything at all.

### 3. Any Agency Action Would Be Committed To Agency Discretion.

Even if APA review were generally available for Presidential actions or agency implementations of Proclamations, it would still be unavailable here. The APA's cause of action expressly leaves intact "other limitations on judicial review," 5 U.S.C. § 702(1), which includes the longstanding limitation on review of Executive decisions to deny entry to aliens, *see supra* § III; *Allen v. Milas*, 896 F.3d 1094, 1107 (9th Cir. 2018); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1160 (D.C. Cir. 1999). The APA also does not permit review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Norton*, 542 U.S. at 64.

---

[24] It is also worth mentioning that USCIS is subordinate to the DHS Secretary, and therefore cannot bind the DHS Secretary's discretion.

1    There is no statute or other law to gauge the agency action against, only the President's
2  Proclamation under §§ 1182(f) and 1185(a)(1), which "exudes deference to the President in every
3  clause." *Hawaii*, 585 U.S. at 684; *Pacito v. Trump*, 152 F.4th 1082, 1086 (9th Cir. 2025); *Chamber*,
4  2025 LX 507601, at *47. Section 1182(f) allows the President to suspend entry of a class of aliens
5  "[w]henever the President finds that the entry… would be detrimental to the interests of the United
6  States." And in doing so the President can impose "any restrictions he may deem to be
7  appropriate." 8 U.S.C. § 1182(f). Section 1185(a)(1) authorizes the President to set "reasonable
8  rules, regulations, and orders" for entry or departure as "the President may prescribe." These
9  sections grant the President sweeping discretion to determine when to issue a Proclamation and
10  what restrictions to impose. *Mow Sun Wong v. Campbell*, 626 F.2d 739, 744 (9th Cir. 1980). The
11  Supreme Court has thus "observed that § 1182(f) vests the President with 'ample power' to impose
12  entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684.
13  Thus, the President's determination of whether and how to suspend or regulate entry is inherently
14  committed to his discretion and is therefore unreviewable under the APA. *See Make The Rd. N.Y.*,
15  962 F.3d 612, 633 (D.C. Cir. 2020) (similar discretion given to Secretary of DHS is unreviewable).
16  The Ninth Circuit has recently reaffirmed that when the President makes a finding under § 1182(f)
17  and imposed a restriction, courts "cannot engage in 'a searching inquiry into the persuasiveness of
18  the President's justifications'" for that restriction. *Pacito*, 152 F.4th at 1087 (quoting *Hawaii*, 585
19  U.S. at 683-84). By transitive property, that discretion is carried over to the agencies that comply
20  with the Proclamation. The agencies' implementation of the proclamation is thus also committed
21  to agency discretion as well. *See Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 105-06 (President
22  had discretion and his order delegated discretion to Secretary, so no APA review of Secretary's
23  decision since that was also committed to agency discretion).
24    Thus, the Proclamation is the relevant source of law for the agencies, foreclosing judicial
25  review. The same would be true even if Plaintiffs could separately challenge any decision not to
26  grant categorical exceptions by the Secretary. Sections 1182(f) and 1185(a) give the President
27  discretion on who to suspend, regulate, or restrict and thus who to except. The Proclamation then
28  gives the discretion over exceptions to the Secretary. The Secretary's exercise of that discretion is

1    thus likewise unreviewable. Proclamations under §§ 1182(f) and 1885(a)(1) are simply not
2    reviewable. Any contrary conclusion would eviscerate the "longstanding" rule that "[h]ow the
3    President chooses to exercise the discretion Congress has granted him"—here, in §§ 1182(f) and
4    1185(a)(1)—"is not a matter for [ judicial] review." *Dalton*, 511 U.S. 462, at 476

### IV.    The Proclamation Is Not Ultra Vires.
#### A.    The Proclamation Satisfies the Prerequisites of §§ 1182(f) and 1185(a)(1).

Even if Plaintiffs' claims are justiciable, this court's review of the Proclamation "must be
exceedingly deferential" because the delegation of Sections 1182(f) and 1185(a)(1) "invokes the
President's discretion in exercising core Article II responsibilities" addressing immigration,
foreign affairs, and national security. *Am. Foreign Serv. Ass'n v. Trump*, 2025 LX 100042, at *6
(D.C. Cir. June 20, 2025). "Because decisions in these matters may implicate relations with foreign
powers, or involve classifications defined in the light of changing political and economic
circumstances, such judgments are frequently of a character more appropriate to either the
Legislature or the Executive." *Hawaii*, 585 U.S. at 702 (quotations omitted). And when the
Executive Branch provides "a facially legitimate and bona fide reason" for denying a visa, "courts
will neither look behind the exercise of that discretion, nor test it by balancing its justification."
*Mandel*, 408 U.S. at 770. The Proclamation readily passes muster under the deferential review
afforded to the President or under any other standard.

Section 1182(f) provides that whenever the President finds that the entry of "any class of
aliens into the United States would be detrimental to the interests of the United States," he may
suspend their entry or impose on their entry "any restrictions he may deem to be appropriate."
Section 1185(a)(1) authorizes the President to establish "reasonable rules, regulations, and orders"
for entry and departure "as the President may prescribe." Sections 1182(f) and 1185(a)(1) "exude[]
deference to the President in every clause," as it "entrusts to the President the decisions whether
and when to suspend entry," "whose entry to suspend," "for how long," and "on what conditions."
*Hawaii*, 585 U.S. at 684. The "*sole prerequisite*" to the President's exercise of authority under this
"comprehensive delegation" is the determination that entry of the covered aliens into the United
States "would be detrimental to the interests of the United States." *Id*. at 685 (emphasis added);

---

1    *Chamber*, 2025 LX 507601, at *42.

2        Notably, § 1185(a)(1) requires no finding of detriment, does not have to apply to a class of

3    aliens, and can simply be a regulation on entry rather than a suspension. That authority alone

4    validates the Proclamation. Yet Plaintiffs do not address it other than to say the section "provides

5    no additional authority," Mot. 23 n.6, because the Supreme Court said §§ 1182(f) and 1185(a)(1)

6    "substantially overlap[]," *Hawaii*, 585 U.S. at 683 n.1. But the Court simply noted that given the

7    overlap "we need not resolve ... the precise relationship between the two statutes" based on the

8    Government's argument that any distinction was irrelevant for that proclamation. *Id*. Here, the

9    $100,000 payment can easily be supported as a reasonable regulation on entry under § 1185(a)(1)

10   alone. Regardless, the Proclamation also satisfies § 1182(f)'s prerequisites and can be upheld on

11   that basis as either a suspension or restriction.

12       **1.**     Notably, Plaintiffs do not dispute that the President more than satisfied this "sole

13   prerequisite" of § 1182(f) with a detailed Proclamation. The President expressly found "that the

14   unrestricted entry into the United States of certain foreign workers" described in the Proclamation

15   "would be detrimental to the interests of the United States[.]" 90 Fed. Reg. at 46,028. That alone

16   would suffice, as the Supreme Court has upheld a Proclamation saying only that. *See Hawaii*, 585

17   U.S. at 686 (upholding single sentence proclamation). Indeed, "[t]he evidentiary support and

18   justification offered in the Proclamation for the findings made and actions directed is more

19   extensive than that offered in other presidential proclamations." *Chamber*, 2025 LX 507601, at

20   *41. Nor do Plaintiffs contest that the Proclamation does not apply to "any alien" or a "class of

21   aliens." *Id.* at *14–15.

22       **2.**     Instead, Plaintiffs argue that the Proclamation is not actually a "suspension" or

23   "restriction" on entry because impermissibly regulates and targets domestic companies. Mot. 16,

24   22. Not so. First, under the Proclamation, aliens seeking to enter with new H-1B visas cannot enter

25   the country for that purpose unless evidence is provided showing that the additional $100,000

26   payment has been made, when applicable. 90 Fed. Reg. at 46,028. So the Proclamation literally

27   "suspend[s] ... entry" or imposes "restrictions… on the entry of aliens." 8 U.S.C. § 1182(f). This

28   is underscored by the fact that aliens already within the United States may be able to seek an H-

1B visa without the $100,000 payment. The restriction is solely upon *entrance—i.e.*, precisely what § 1182(f) permits. And, once again, this is obviously a "regulation" on entry under § 1185(a)(1). Plaintiffs' disagreement with the type or form of the restriction or regulation does not make it less of a restriction or regulation. The Supreme Court has held that § 1182(f)'s use of the language "any restrictions he may deem to be appropriate" "vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684. Thus § 1182(f) delegates authority to the President to "supplement the other grounds of inadmissibility in the INA." *Id.* That holding is consistent with the longstanding precedent that the "[§ 1182(f)] specifically grants the President, where it is in the national interest to do so, the extreme power to prevent the entry of any alien or groups of aliens into this country as well as the lesser power to grant entry to such person or persons with any restriction on their entry as he may deem to be appropriate." *Mow Sun Wong*, 626 F.2d at 744 n.9. The $100,000 payment is simply another restriction on entrance that the President deemed appropriate to address the serious national interest concerns.

Plaintiffs real gripe, then, is that they think the payment is regulating domestic employers. Mot. 16. The Proclamation bans the entry of aliens absent a payment, regardless of who pays. And for H-1B visas, where the employer is a necessary sponsor, regulation of the alien is inherently bound up in the employer. That is true of many visas (such as J, F, L, and K) and does not categorically exempt H-1B visas from the scope of § 1182(f)—nor does it transform the Proclamation into a purely domestic regulation. Moreover, it is inaccurate to claim that the purpose of the statute (and thus its scope) is limited to foreign concerns. The text has no such limit. Instead, it permits the President to determine when entry would be detrimental to the interests of the United States for any reason. Indeed, the proclamation upheld in *Hawaii* stemmed from concerns about unvetted migrants raising "national security" and "public-safety threats" within the United States. 585 U.S. at 677- 80. The Ninth Circuit made this clear, holding that "it makes no difference whether the additional entry restrictions are imposed under § 212(f) based on assertedly domestic policy concerns… [as] all such restrictions may be characterized as reflecting "domestic" policy concerns to a greater or lesser degree." *Doe 1 v. Trump*, 984 F.3d 848, 870 (9th Cir. 2020), *vacated*

1   *on denial of reh'g en banc sub nom. Doe 1 v. Biden*, 2 F.4th 1284 (9th Cir. 2021) (collecting

2   examples). Indeed, "the distinction between foreign and domestic policy finds no support in the

3   statutory text which simply speaks in terms of restricting entry of aliens 'detrimental to the United

4   States' and contains no limitation to any particular sphere, foreign or domestic." *Chamber*, 2025

5   LX 507601, at *52 (cleaned up). So the domestic impact or even intent of the Proclamation is

6   irrelevant.[25]

7           **3.**     Briefly in footnotes, Plaintiffs halfheartedly argue that the Proclamation improperly

8   restricts "visa issuance," not admissibility at the border.  Mot. at 16 n. 19-20. "Arguments raised

9   only in footnotes, or only on reply, are generally deemed waived" however. *Cheever v. Huawei*

10  *Device USA, Inc.*, 2019 WL 8883942, at *3 (N.D. Cal. Dec. 4, 2019) (quoting *Estate of Saunders*

11  *v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014)). The Court should thus decline to rule on this

12  issue. Regardless, if the Court reaches this issue, it should reject Plaintiffs' position. The authority

13  under Sections 1182(f) and 1185(a) are not limited to border inspections, as the President has used

14  this authority to erect naval blockades in international waters.  *See Sale v. Haitian Centers Council,*

15  *Inc.*, 509 U.S. 155, 187 (1993) (finding it "perfectly clear" that the President could "establish a

16  naval blockade" to prevent illegal migrants from entering the United States).

17          In any event, the entire purpose of a visa is to gain entry; the two are inherently

18  commingled. Indeed, the INA requires that "[w]henever any person makes application for a visa

19  *or any other document required for entry*, or makes application for admission*, or otherwise*

20  *attempts to enter the United States*, the burden of proof shall be upon such person to establish that

21  he is eligible to receive such visa *or such document*, or is not inadmissible under any provision of

22  this chapter, and, if an alien, *that he is entitled to* the nonimmigrant, immigrant, special immigrant,

23  immediate relative, or refugee *status claimed*, as the case may be." 8 U.S.C. § 1361 (emphasis

24  added). The H-1B petition is a statutorily required step in the process to enter the United States as

25  ---
    [25]     *RAICES v. Noem*, 793 F. Supp. 3d 19 (D.D.C. 2025) is clearly inapplicable, as that case
26  involved the alleged application of § 1182(f) to non-citizens already unlawfully present in the
    United States.  At most, *RAICES* indicated that § 1182(f) cannot be used as a vehicle to remove
27  aliens. *Id.* at 81 ("[T]he authority to 'impose on the *entry* of aliens any restrictions he may deem
    to be appropriate,' 8 U.S.C. § 1182(f) (emphasis added), does not mean that the President has the
28  authority to alter the rules that apply to those who have already entered.").

---

an H-1B non-immigrant: "Such petition [to import[] any alien as a nonimmigrant under subparagraph (H) shall be made and approved before the visa is granted." 8 U.S.C. § 1184(c)(1); *see also* 8 C.F.R. § 214.2(h)(2)(i)(A) (requiring a petition in the form required by USCIS); *id.* § 214.2(h)(4)(C)(iii) (beneficiary qualifications). Moreover, the INA contemplates that to receive such entry documents the alien must be both admissible and eligible for the status claimed. 8 U.S.C. § 1361. The alien cannot be inadmissible under "any provision of the INA." *Kerry v. Din*, 576 U.S. 86, 89 (2015) (citing *id.* § 1361). That includes § 1182(f), which "enabl[es] the President to supplement the other grounds of inadmissibility in the INA." *Hawaii*, 585 US. at 684. And, the petition must be submitted in the form required by USCIS, 8 C.F.R. § 214.2(h)(2)(i)(A), which here includes proof of payment. ECF 75-19 at 8. Thus, there can be no legitimate argument that the Proclamation payment is not a restriction on entry. *Chamber*, 2025 LX 507601, at *55-56 (rejecting a "myopic view of the process for legally entering the United States").

4.     At bottom, Plaintiffs' arguments are pure policy disagreements with the Proclamation. Section 1182(f) does not permit litigants to "challenge" a Presidential entry suspension order "based on their perception of its effectiveness and wisdom," however, because Congress did not permit courts to substitute their own assessments "for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy." *Hawaii*, 585 U.S. at 708 (citations and quotations omitted); *see also Pacito*, 152 F.4th at 1087. Whether the President's chosen method of addressing a perceived risk to the national interest "is justified from a policy perspective" is irrelevant, because he need not "conclusively link all of the pieces in the puzzle before courts grant weight to his empirical conclusions." *Id.* at 686-87 (citations omitted); *Chamber*, 2025 LX 507601, at *42. That is all Plaintiffs' argument amounts to; a challenge to the President's reasoning and chosen remedy. Such judicial second guessing "would amount to a clear invasion of the legislative and executive domains." *United States v. George S. Bush & Co., Inc.*, 310 U.S. 371, 380 (1940); *Sale*, 509 U.S. at 165 ("[t]he wisdom of the policy choices" reflected in Presidential Proclamations are not "matter[s] for our consideration"); *Bahiraei v. Blinken*, 717 F. Supp. 3d 726, 745 (N.D. Ill. 2024) ("[I]t [is] very difficult for anyone who served in the IRGC to obtain an immigrant visa to the United States.

1  Whether this [] policy should change is beyond the competency of courts to decide.").

2  **B. The Proclamation Does Not Conflict with the INA.**

3  Congress layered the President's Sections 1182(f) and 1185(a)(1) authority on top of his

4  authority under the INA to prescribe restrictions on alien admissions. Indeed, *Hawaii* explained

5  that "§ 1182(f) vests the President with 'ample power' to impose entry restrictions *in addition to*

6  those elsewhere enumerated in the INA." 585 U.S. at 684 (emphasis added). The Supreme Court

7  rejected a "cramped" reading of the President's authority, one that regarded the sections as

8  conferring on the President "only a residual authority to address emergency situations." *Id*. at 691

9  (emphasis added). A "cramped" reading is precisely what Plaintiffs offer with their argument that

10  the Proclamation unlawfully conflicts with the INA and H-1B program. Mot. 15-25. The

11  Proclamation does not conflict with any statutory provision; at most, consistent with § 1182(f), the

12  payment "impose[s] [an] entry restriction[] in addition to those elsewhere" in the H-1B program.

13  *Hawaii*, 585 U.S. at 684. In fact, the Ninth Circuit has repeatedly rejected similar arguments

14  challenging another Proclamation in a stay posture. *See Pacito*, 152 F.4th at 1086 ("§ 1182(f)

15  exudes deference to the President and vests him with ample power to impose entry restrictions in

16  addition to those elsewhere enumerated in the Immigration and Nationality Act." (cleaned up)).[26]

17  **1. The Payment does Not Override H-1B Fee Provisions.**

18  Nothing in § 1182(f) suggests that a restriction on entry cannot be monetary, nor do

19  Plaintiffs cite anything in support. Instead, Plaintiffs argue that the payment overrides Congress

20  reticulated scheme for H-1B fees. Mot. 17-20. That is wrong and is the exact "reticulated

21  regulatory scheme" argument that the Ninth Circuit adopted in *Hawaii* that the Supreme Court

22  rejected. 585 U.S. at 681. Plaintiffs' argument is that the existence of *some fees* for *some purposes*

23  implicitly excludes the possibility of any other payments. That would eviscerate Section 1182(f),

24  which often "impose[s] entry restrictions in addition" to even more comprehensive provisions on

25

26  [26] Plaintiffs rely on *Doe 1 v. Trump* to argue that the Proclamation cannot conflict with the INA.
Mot. 17 (citing 957 F.3d 1050 (9th Cir. 2020)). But that was a stay decision. And the merits panel
27  disagreed, holding that there was no conflict and the Proclamation satisfied section 1182(f) despite
domestic impacts. *Doe 1*, 984 F.3d at 868, 870. That opinion was vacated in the denial of en banc
28  because administrations changed, mooting the case. *Biden*, 2 F.4th 1284 (9th Cir. 2021).

admissibility in the INA. *Hawaii*, 585 U.S. at 684. The Supreme Court rejected an even stronger argument that the INA's default vetting and waiver scheme "implicitly bar[red]" the President from supplementing those restrictions under Sections 1182(f) and 1185(a). *Id*. at 689-91. Thus to "expressly override" part of the INA, the Proclamation must fully displace a provision or directly conflict with an express limit. *Id.* The Proclamation does neither. The existing provisions of the INA remain in effect, the statutory fees still apply, and the Proclamation does not run afoul of any express provision. Plaintiffs mischaracterize the payment required as an H-1B program "fee" to argue that fees are statutorily limited to USCIS's adjudication costs under 8 U.S.C. § 1356(m). But Plaintiffs do not show the payment restriction is a "fee" that would fall within the ambit of § 1356(m). It is not designated by the Attorney General in any regulation, nor is it paid into the specified Treasury account. *See* § 1356(m); *see also* Decl. of Jerome Jackson (ECF 75-16), ¶¶ 4-7. The payment is not to cover costs, it performs a completely different function that is not expressly prohibited or otherwise governed by the INA. Rather, the Proclamation payment was set by the President as a restriction on entry that he found "would be detrimental to the interests of the United States because such entry would harm American workers, including by undercutting their wages" and it is paid into a general account for miscellaneous payments. 90 Fed. Reg. at 46027; Jackson Decl. ¶¶ 4-7. Plaintiffs' unilateral decision to characterize the Proclamation payment as "adjudication fee" is simply not supported by § 1356(m).

But even if one could characterize it as a fee under that section, Plaintiffs' arguments still fail. Plaintiffs say the section only allows "the agency to recover the costs of providing those services, and nothing more." Mot. 19.  The statutory provision has no such limit. Instead, the statutory text empowers the Attorney General to set fees and is entirely permissive: "fees for providing adjudication and naturalization services *may be set* at a level that will ensure recovery of the full costs of providing all such services," and "*may also be set* at a level that will recover any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m)(emphasis added). The Supreme Court "repeatedly observed that the word 'may' clearly connotes discretion." *Biden v. Texas*, 597 U.S. 785, 802 (2022) (quotations omitted). Further, subsection (m) is a general provision, not a fee schedule specific to H-1B petitions. It would be a

1    significant limit to suggest this foreclosed any payment restriction under §§ 1182(f) or 1185(a)(1)

2    absent an express prohibition. Yet nothing in that section limits the possibility of any other

3    payment.

4        Indeed, Plaintiffs acknowledge that other fees can be charged for H-1B petitions for other

5    purposes and thus payments are not limited to section 1356(m) fees to cover costs. Mot. 6-7, 18-

6    19.  Plaintiffs also acknowledge that Congress does not take this view either, by directing large

7    chunks of certain H-1B fees to go towards "support[ing] the American labor market by upskilling

8    its workforce in the field of technology." Mot. at 7. As another example, § 1356(u) "authorize[s]"

9    the Secretary to "establish and collect a premium fee," including for H-1B petitions. That section

10   acknowledges payments "in addition to any other fees authorized by law." 8 U.S.C. § 1356(u)(1).

11   Another provision Plaintiffs point to, § 1184(c)(12), likewise says a fee "shall" be imposed for

12   fraud prevention, but acknowledges this is "[i]n addition to any other fees authorized by law." So

13   the fees that can be charged for H-1B are not limited to subsection (m). Sections 1182(f) and

14   1885(a)(1) allow for such payments "in addition to those elsewhere enumerated in the INA."

15   *Hawaii*, 585 U.S. at 684. There is no clear conflict other than those manufactured by Plaintiffs.

16       By contrast, Congress knows how to create a specific prohibition when it wants to. Section

17   1356(e)(3), for example, says that a specific fee "shall not apply" to certain immigrants arriving

18   by ferry. 8 U.S.C. § 1356(e)(3). When Congress intends a specific prohibition to apply to

19   immigration fees, it makes it express. There is no such prohibition in § 1356(m).

20       Plaintiffs cite legislative history to suggest fees under § 1356(m) are limited. Mot. 20-21.

21   Even if relevant, the 1990 amendment to that section expanded the scope of fees to say they may

22   be set to ensure the full cost of all such services are recovered. *See Barahona v. Napolitano*, 2011

23   U.S. Dist. LEXIS 117536 at *6-9 (S.D.N.Y. Oct. 11, 2011) (explaining legislative history and

24   amendment). While that may set a minimum for the fees, it does not set a maximum. In any event,

25   none of the legislative history suggests that this is the only payment that can be levied. There is

26   nothing in the history about the President's ability to set other payments under other authorities.

27       And Plaintiffs' argument that the payment exceeds all existing fees is thus also irrelevant,

28   that is not a conflict. Mot. 19-20. As a result, the Proclamation has not overridden anything, it has

---

merely supplemented existing H-1B requirements. That is precisely what Sections 1182(f) and 1185(a) are designed to do.

### 2. The Proclamation does Not Override Existing Fraud Protections.

Plaintiffs' related arguments is that "Congress built multiple safeguards into the H-1B visa system to prevent abuse and fraud" and so, in Plaintiffs view, the President cannot restrict H-1B entry based on fraud or abuse. Mot. 29-30. This is misguided. First, the fact that Congress incorporated anti-abuse and anti-fraud provisions, if anything, indicates that the Congressional intent was that the H-1B program not be abused – an abuse that Plaintiffs do not contend has been successfully countered by Congressional guardrails. Nor do Plaintiffs dispute H-1B abuse is widespread, even in this district.[27]  Mot. 17-18.

Second, not all of the "abuse" of the H-1B program cited by the H-1B Proclamation is *fraudulent* abuse, but rather lawfully using the H-1B program to such a degree that it has disadvantaged the domestic labor force.  In fact, only a fraction of the lengthy explanation for the H-1B Proclamation is about fraudulent abuse. 90 Fed. Reg. 46027, 46027-29.  The AFL-CIO has agreed that both fraudulent and non-fraudulent abuses are rampant, in any event.[28] Finally, this is almost a mirror image of the argument plaintiffs made in *Hawaii*, claiming Congress already set up a sufficient vetting system. 585 U.S. at 689. The Supreme Court rejected that argument, holding "plaintiffs have not identified any conflict between the statute and the Proclamation that would implicitly bar the President from addressing deficiencies in the Nation's vetting." system. *Id.* The same is true here. The various fees and labor certifications Plaintiffs point to are not superseded or overridden by the Proclamation. They still exist. The Proclamation is another way to address various abuses in the system beyond just fraud. Mot. 18. Plaintiffs only retort is to speculate (with

---

[27]    Bill Whitaker, *Are U.S. Jobs Vulnerable To Workers With H-1B Visas?*, CBS News (August 13, 2017) (https://www.cbsnews.com/news/are-u-s-jobs-vulnerable-to-workers-with-h-1b-visas-2/) ("Former head of Homeland Security Janet Napolitano, now president of the University of California, faced a huge public outcry when she got rid of those 80 IT jobs at the Medical Center. She declined to give us an on camera interview, but stated publicly that the university, quote 'didn't use the H-1B process in the right way.'").

[28]    AFL-CIO Center for Strategic Research, *supra* n.12; *Immigration Reforms Needed To Protect Skilled American Workers: Hearing Before the S. Judiciary Comm.*, 114th Cong. 114-831 (2015) (statement of President Richard L. Trumka, President, AFL-CIO).

1   zero evidence) that exceptions to the Proclamation could create fraud. Mot. 18. That simply

2   highlights the weakness of their position.

3   **3.   The Proclamation does Not Impose an Impermissible Tax.**

4        Plaintiffs' last gasp is to claim that the Proclamation usurps Congress' taxing power. Mot.

5   22-23. First, a regulatory payment is not the same as a tax. The Supreme Court continues to

6   recognize that not all payments are taxes, distinguishing them, in part, on how high the payment

7   is and who collects it. *NFIB v. Sebelius*, 567 U.S. 519, 565–66 (2012) (citing *Bailey v. Drexel*

8   *Furniture Co.,* 259 U.S. 20, 36–37 (1922)). Unlike *NFIB*, the fee here is collected by USCIS, not

9   the IRS. *Id.* And in *NFIB* the tax could never be more than insurance, but here Plaintiffs' core

10  argument is the payment is excessive in relation to H-1B application (purposefully so), and this

11  causes them irreparable harm because it is allegedly ruinous. *Id.* Plaintiffs cannot have it both

12  ways, if the payment is so large it can be "prohibitory," it is a penalty or fee rather than a tax. *Id.*

13  The payment is a suspension or restriction on entry, not a tax. The point of the payment is to

14  increase employment and wages of Americans, especially in national security related industries.

15  While it may raise revenue, that is not the purpose and the effect might not raise revenue. While

16  Plaintiffs cite an article quoting a video of the President saying the money will be used for

17  "reducing taxes" and "reducing debt," Mot. 21, the video itself makes clear the President is talking

18  about the Gold Card, not this Proclamation, which was announced on the same day.[29] No matter

19  how hard Plaintiffs' try, they cannot spin this into something it is not.

20       Second, Plaintiffs acknowledge that Defendants can adjust fees for visas, including for H-

21  1B. 8 U.S.C. §§ 1356(m), 1184(a)(1). If that is not an intrusion on Congress' taxing power, then

22  neither is imposing a limited payment as a restriction on aliens entering the country. Plaintiffs

23  argue (at 23) that the delegation in those provisions is express while here it is not. But to the extent

24  this is a delegation, it occurs at the intersection of foreign affairs and immigration where the

25  President wields significant "authority," so Congress "must of necessity paint with a brush broader

26

27  [29]    https://www.whitehouse.gov/presidential-actions/2025/09/the-gold-card/.    The    video    is

28  available here: https://www.youtube.com/watch?v=d9rENKjxMiw&t=269s. The context for the
    quote at issue begins around minute 4:26 and continues to 4:47.

1   than that it customarily wields in domestic areas." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965).

2   Accordingly, Congress may "invest the President with large discretion in matters arising out of the

3   execution of statutes relating to trade and commerce with other nations." *Marshall Field & Co. v.*

4   *Clark*, 143 U.S. 649, 691 (1892). The same is true here, where Congress delegated sweeping

5   discretion to impose "any restrictions he may deem to be appropriate" in the realm of

6   "immigration" and "foreign affairs." *Hawaii*, 585 U.S. at 684, 708 (quoting § 1182(f)) (emphasis

7   added). Given this foreign affairs and immigration context—and that Proclamations are limited in

8   time, to entry, and classes of aliens—this power does not raise a major question either. The fact

9   that this Proclamation does not perfectly mirror previous ones is of no moment; Presidents are not

10  bound by limited uses of their predecessors, only the text of the statute. Congress expressly

11  delegated "sweeping authority" in the text of the statutes here, and the Proclamation falls well

12  within that broad delegation. *Hawaii*, 585 U.S. at 639.

13  **V. Plaintiffs' Procedural Arguments are Wrong.**

14          **A.  Plaintiffs' Notice-and-Comment Claims Fail.**

15          Plaintiffs' claim that the agency memoranda—which reiterate the Proclamation—should

16  have gone through notice and comment rulemaking and comply with the Regulatory Flexibility

17  Act is unavailing. Mot. 26-28.  Again, as Plaintiffs themselves readily point out, "the President

18  issued a Proclamation that unilaterally imposes" the $100,000 payment restriction. Mot. 8. That

19  ends the analysis.

20          First, as explained, Sections 1182(f) and 1185(a)'s powers belong to the *President* alone,

21  and the agencies lack authority to either disobey or disregard that exercise pending a meaningless

22  notice-and-comment that does not excuse them from following the Proclamation. *See Orr*, 223

23  L.Ed.2d at 181; *Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 100. Indeed, the D.C. Circuit rejected

24  an almost identical argument that the Secretary of Homeland Security needed to go through notice

25  and comment rulemaking to expand expedited removal because the statute gave the  Secretary

26  "sole discretion" to change the rule "at any time," thus he "would be free to ignore the comments"

27  and "notice-and-comment procedure would be an empty, yet time-consuming, exercise." *Make*

28  *The Rd. N.Y.*, 962 F.3d at 635. The laws here "exude[] deference to the President in every clause."

---

*Hawaii*, 585 U.S. at 684. Indeed, Section 1182(f) gives the President the power to suspend or restrict entry "[w]henever the President finds" it would be detrimental and. Section 1185(a)(1) further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe." In both timing and discretion, those laws and more deferential than the law in *Make the Road*. So there is no basis to require the agencies to engage in notice and comment rulemaking to implement the Proclamation, as they must. They would have to ignore the comments and it would be a meaningless barrier. *See Make The Rd. N.Y.*, 962 F.3d at 635. Plaintiffs were not prejudiced by being unable to submit comments that the agencies could not have followed. *Id.*

Plaintiffs cite no support for the proposition that agencies can ignore a Presidential exercise of Presidential authority pending a purposeless notice-and-comment that would change none of the agencies obligations, nor empower the agency to disregard the Presidential exercise of statutory authority. *See Bradford*, 101 F.4th at 731. Plaintiff identifies no circumstance where any President has been required to seek public notice-and-comment (under either the RFA or APA) before Executive branch agencies will engage in simple obedience to an § 1182(f) Proclamation. Here, as Plaintiffs' motion makes clear, everything they challenge is directly from the H-1B Proclamation – they identify nothing that originates from a further implementation of the H-1B Proclamation as opposed to the H-1B Proclamation itself.

Second, notice and comment rulemaking applies only to legislative rules, which have the force of law and "create[] new rights and impose[] new obligations." *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1088 (9th Cir. 2003). But under Section 1182(f) and Section 1185(a), the Proclamation is what has the force of law, not agency implementation. The Proclamation is what creates new rights and obligations, the agency guidance merely interpret and implement those obligations. Thus they are not legislative rules and are more akin to interpretive or procedural rules, which do not have to go through notice and comment. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citing 5 U.S.C. § 553(b)(A)).

Third, several exceptions apply to notice and comment rulemaking in any event. The "good cause exception" applies because it would be "impracticable" to announce rulemaking for a

---

1    temporary one year Proclamation and allow potential petitioners to quickly apply and avoid the

2    Proclamation altogether.  5 U.S.C. § 553(b)(B). Requiring notice and comment rulemaking here

3    would severely undermine the Proclamation and its purpose. Applying notice and comment

4    rulemaking to §§ 1182(f) and 1185(a) generally makes little sense since they provide discretion to

5    the President issue a Proclamation "[w]henever the President finds" the national interest are being

6    harmed, requiring quick action. In addition, the "foreign affairs" exception applies, 5 U.S.C. §

7    553(a)(1), because "[t]he exclusion of aliens ... is inherent in the executive power to control the

8    foreign affairs of the nation." *Knauff*, 338 U.S. at 542. Sections 1182(f) and 1185(a) inherently

9    deal with foreign affairs functions, as explained earlier. *See Hawaii*, 585 U.S. at 708. That is

10   certainly true here, where foreign counties have long had concerns about their skilled workers

11   being sent to the United States and the United States has concerns about foreign workers here.

12          Fourth, Plaintiffs claim implementing the Proclamation departed from previous USCIS

13   practices for fees. Mot. 26-27. But as explained, the payment requirement here is not akin to the

14   fees USCIS typically charges. And, *e.g.*, § 1356(j) is permissive and is limited to "provisions of

15   this section," such as the subsection (m) fees for costs. Those rulemaking requirements have no

16   import for the Proclamation. USCIS is not departing from its norm of implementing proclamations

17   without notice and comment. Plaintiffs can point to no previous proclamation under §§ 1182(f) or

18   1185(a) where USCIS used notice and comment to avoid compliance.

19          Finally, Plaintiffs' Regulatory Flexibility Act argument adds no extra analysis because it

20   only applies if an agency "is required ... to publish a general notice of proposed rulemaking." 5

21   U.S.C. § 603(a); Mot. at 28. Since the agencies were not required to engage in notice and comment

22   rulemaking, the RFA does not apply. *See Broadgate Inc. v. USCIS*, 730 F. Supp. 2d 240, 243

23   (D.D.C. 2010) (no RFA requirement for H-1B regulations).

24   **VI.    Arbitrary and Capricious Review Under the APA is Unavailable.**

25          Arbitrary and capricious review cannot exist for the mere implementation of a

26   Proclamation. *See  Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 106 (rejecting arbitrary and

27   capricious challenge to agency action implementing executive order in President's discretion).

28   Indeed, it would arguably be arbitrary and capricious for the agencies to depart from the President's

Proclamation based on their own initiative or the concerns of others. *See Orr*, 223 L.Ed.2d at 181 ("[R]espondents [are not] likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow."); *Bradford*, 101 F.4th at 731.

Plaintiffs rely heavily on *Su*, 121 F.4th at 17. Mot. 29. But *Su* dealt with an executive order that gave "DOL considerable discretion." *Id.* at 5, 17. Of course a President cannot just issue an executive order to escape the ordinary strictures of the APA where they otherwise apply. But here Sections 1182(f) and 1185(a) give the authority to the President to issue a Proclamation in his discretion that itself has the force of law, not simply an executive order. And the agencies, unlike DOL, did not have any discretion to depart from the Proclamation. This is why the court in *Chamber* rules that "defendants plainly do not act 'arbitrarily and capriciously' or 'contrary to law' in implementing a legally permissible presidential directive. Indeed, defendants here had no other course of action: …an agency 'may not simply disregard' a binding presidential directive." *Chamber*, 2025 LX 507601, at *76 (quoting *Sherley v. Sebelius*, 689 F.3d 776, 784-85 (D.C. Cir. 2012)). "[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012). Plaintiffs' APA claim against the agencies—that they either should have defied the H-1B Proclamation or should have considered choices they lacked authority to adopt— is unlikely to succeed. *Chamber*, 2025 LX 507601, at *77; *Bradford*, 101 F.4th at 731 (holding that an agency action cannot "be[ ] an arbitrary and capricious exercise of agency discretion [where] the agency ha[s] *no discretion* to act otherwise" (emphasis original)).

Moreover, this analysis only matters if Plaintiffs have an APA cause of action. Plaintiffs point to no statutory factors that the agencies must consider in Sections 1182(f) and 1185(a) because there are none. Instead, Plaintiffs just list a series of things they wish the President and/or the agencies had considered. Mot. 29-33. But agencies "are not compelled to explore every alternative device and thought conceivable by the mind of man." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (internal marks omitted). For example, Plaintiffs think the agencies should have specifically considered the impact on schools and hospitals with no basis in the

relevant statutes. Mot. at 31-32. More generally, Plaintiffs take aim at the agency's purported "fail[ure] to consider", among other things, "modifying the amount…, changing the effective date, or phasing in" the $100,000 payment. *Id.* But Plaintiffs identify no statutory basis for USCIS (or any other agency) to "modify" "change" or "phas[e] in" the President's § 1182(f) determinations, especially after its effective date. *Id.* In essence, Plaintiffs argue that the agencies should have acted *ultra vires* to stymie, ignore, tie up, disobey, or water down the President's § 1182(f) determination, absent any authority in § 1182(f) to do any such thing. That claim is simply not likely to succeed. *Orr*, 223 L.Ed.2d at 181.

## VII.    Plaintiffs Are Not Entitled to a Preliminary Injunction or a § 705 Stay.

As noted *supra*, there are four primary consideration factors for a preliminary injunction: (1) a strong showing of likelihood of success on the merits; (2) irreparable injured absent intervention; (3) prejudice to the opposing party; and (4) the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). These factors are essentially the same as those for a stay order under 5 U.S.C. § 705. *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 985-86 (9th Cir. 2025). The same is largely true for a permanent inunction after summary judgment. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).

### A. Plaintiffs Lack an Irreparable Harm.

As explained, Plaintiffs have not shown a likelihood of success. They have failed to demonstrate irreparable harm. That is especially true because Plaintiffs seek a universal injunction preliminary injunction despite not all Plaintiffs moving for one.

First, at most, the claims are of economic injury, and such injury is not irreparable because the Court (in theory) could order the one-time payments returned. *Cf. E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2021). Plaintiffs do not even attempt such a showing that an unnecessary $100,000 payment is irreparable. Indeed, the funds are set up to allow reimbursements if a payment is made for a petition but the visa is ultimately not awarded. As a result, refunds can be made and Plaintiffs could theoretically have a remedy at law if they paid the $100,000 payment. The fact that Plaintiffs chose to bring causes of action that cannot award damages was their choice and does not entitle them to an injunction.

1      Second, as the Court noted, Plaintiffs waited until the week before Christmas to file their

2  preliminary injunction motion. Order (ECF 84) ("Plaintiffs waited over two months before filing

3  their motions" showing a "lack of prior urgency"). Yet the Proclamation went into effect on

4  September 21 and immediately impacted cap-exempt employees and Plaintiffs filed suit in

5  October. Plaintiffs' three month "long delay before seeking preliminary injunction implies a lack

6  of urgency and irreparable harm." *Ojmar US, LLC v. Sec. People, Inc.*, 2017 WL 2903143, at *3

7  (N.D. Cal. July 7, 2017) (Gilliam, J.) (quoting *Oak. Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374,

8  1377 (9th Cir. 1985)). Plaintiffs' decision to delay their motion for a strategic holiday ambush—

9  and to time-pressure the Court into quickly granting the injunction prior to the March lottery—is

10  more consistent with stratagems and less consistent with their claim of imminent and irreparable

11  harm. *Bolbol v. Rowell Ranch Rodeo, Inc.*, 673 F. Supp. 3d 1099, 1101 (N.D. Cal. 2023).

12      Third, if a global injunction were truly necessary, then it is unreconcilable with the

13  undisputable fact that *less than half* of the current Plaintiffs joined the motion.  A review of the

14  Amended Complaint suggests why: Plaintiff Smith is currently in the United States in R-1 status

15  that outlasts the duration of the H-1B Proclamation, so he is not injured by it, even assuming Smith

16  were subject to it in the first place. FAC ¶ 181.  Church on the Hill's claim is duplicative of Smith's,

17  and so their injury is non-existent for the same reasons. FAC ¶¶ 179-81. Likewise, both of the

18  vague examples cited by UAW International (including the one cited by UAW Local 4811) as

19  support for claiming associational standing appear—like Smith and Doe—to be already present in

20  the United States, and thus lack an injury for the same reasons. FAC ¶¶ 190-91.  Thus, UAW

21  International and UAW Local 4811's basis for standing is doubtful. Likewise, the two non-descript

22  examples cited by AAUP to support their associational standing also both appear to be in the

23  United States already, and there is no allegation otherwise. FAC ¶¶ 193-94.  AAUP's standing is

24  doubtful. *See Chamber*, 2025 LX 507601, at *30 n.1. Global Nurse Force's injury depends entirely

25  on business decisions made by third-party care facilities. But in any event, to the extent that

26  hospital facilities are willing to pay domestic nurses more in light of the H-1B Proclamation (and

27  thus incentivize nursing careers domestically) now that demand for nurses is higher, then the H-

28

1B Proclamation will have worked as intended. And further, since there is a cap on H-1B visas, it is speculative that they would have received all of the workers they claim to need in any event.

Finally, at least some Plaintiffs, such as Phoenix Doe, fail to show any injury – much less an irreparable one. As Doe admits, her employer submitted H-1B petition on her behalf without the $100,000 payment and it is currently pending. Doe Decl. ¶ 7. Her injury is premised on USCIS possibly denying a separate discretionary request. Mot. 40-41. According to her, that could then lead to a loss for her employer and her career. *Id.* That is wholly speculative, attenuated, and separate from the Proclamation. Moreover, just one of the six moving Plaintiffs (eight others did not join the motion) seeking relief allege seeking an exceptions. BAE alleges one employee who is affected, but does not allege to have sought an exception or attempted to hire a domestic worker. Zylka Decl. (ECF 75-3). GVAC alleges they will be seeking to fill a vacancy, but GVAC does not allege that they have an eye on any particular replacement from outside of the United States, and admit that they hire mostly from within the United States. Henderson Decl. (ECF 75-6) at ¶ 9. The same goes for LBDS who is seeking to fill just one vacancy for the 2026-27 school year, and speculates that they will not be able to fill that vacancy with an employee already present in the United States (though they have not yet tried). Witte Decl. ¶ 12. Neither LBDS nor GVAC explains their belief that they could not fill their limited vacancies through domestic recruitment efforts. Their conjectural claims that such efforts will fail are speculative, and so is the presupposition that any hypothetical request for an exception for a yet-unselected H-1B candidate will be denied. And as noted above, Nephrology Associates has sought an exception that remains pending, and has also declined to engage in domestic recruitment efforts. These conjectural injuries are far too speculative to support standing, much less irreparable harm for a global preliminary injunction. *See Murthy*, 603 U.S. at 70.

### B. Balance of the Equities.

The balance of hardships and public interest weigh in favor of the Government. Where the Government is the defendant, these factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). By challenging the Proclamation, Plaintiffs seek to block an exercise of the President's broad authority to suspend or regulate the entry of aliens whose entry he determined would be detrimental

to the nation's interests. Here, the Proclamation is directed at resolving "[t]he large-scale replacement of American workers", "suppress[ed] wages" and "a disadvantageous labor market for American citizens" which "has undermined both our economic and national security." *Id*. at 46027. The abuse of the H-1B program is a national security threat because it reduces American wages and "discourage[e] Americans from pursuing careers in science and technology, [thereby] risking American leadership in these fields." *Id*. Those are quintessential national interests, and an injunction severely impedes the Executive's ability to safeguard them. As the D.C. Circuit has explained, such relief "deeply intrudes into the core concerns of the executive branch." *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978). And while Plaintiffs have failed to show irreparable harm, the government suffers irreparable harm when it is "enjoined by a court from effectuating statutes enacted by representatives of its people"—as the Proclamation does. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)) (cited by *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025)). Every day an injunction is in place, the President loses valuable time to implement his policies. And more importantly, the American worker continues to suffer the harm that the AFL-CIO has long flagged. The balance of equities and public interest weigh decidedly in Defendants' (and the public's) favor.

### C.  Scope of Relief

If the Court decides relief is warranted, however, it must limit any relief to the Plaintiffs who show an irreparable harm, not the universal injunction they seek. *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). The same is true for vacatur under the APA. *See United States v. Texas*, 599 U.S. 670, 695–99 (2023) (Gorsuch, J., concurring). As explained, most of the Plaintiffs did not even move for a preliminary injunction and many of them lack any injury, much less an irreparable one.  In addition, for the reasons explained in Defendants' opposition to class certification (ECF 97), there should be no class and thus no injunctive relief to its potentially millions of members. Similarly, members of the Chamber of Commerce and AAU should be excluded from any relief due to the pendency of their claims in *Chamber*, 2025 LX 507601.

### D.  The Court Should Require Bond.

If the Court grants Plaintiffs' preliminary injunction motion, then under Rule 65(c), "[t]he

court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). To the extent the Court is inclined to issue a universal preliminary injunction, it should require bond. Regardless of how the union Plaintiffs have come to the puzzling conclusion that protecting their current members from replacement by foreign labor is somehow an injury to their members— much less consistent with their earlier positions and principles[30]—they possess sufficient assets to post bond without hardship. For instance, UAW has nearly $1.17 billion in net assets,[31] AFL-CIO has nearly $71 million[32] (local CIR has $6.5 million),[33] and AAUP has $10 million.[34] Requiring bond—given the harms that AFL-CIO identified from the H-1B program[35]—would be justified.

### E.  Stay Pending Appeal.

Regardless, for all of the reasons explained the Court should stay any injunction or vacatur pending appeal. *See Nken*, 556 U.S. at 435. Preventing the President from implementing a core policy touching on national security would irreparably harm Defendants. And the balance of equities favor Defendants for the reasons explained. So the Court should not grant injunctive relief or vacate any policy. If the Court does, however, it should stay the relief pending appeal. Defendants request that the Court address this request in any injunctive order so, if necessary, Defendants can quickly seek relief from the Ninth Circuit.

### CONCLUSION

The Court should deny Plaintiffs' motion for preliminary injunction and their alternative request for summary judgment.

---

[30] https://www.judiciary.senate.gov/imo/media/doc/Trumka%20Testimony.pdf
[31] https://olmsapps.dol.gov/query/orgReport.do?rptId=914254&rptForm=LM2Form
[32] https://olmsapps.dol.gov/query/orgReport.do?rptId=924122&rptForm=LM2Form
[33] https://olmsapps.dol.gov/query/orgReport.do?rptId=924965&rptForm=LM2Form
[34] https://olmsapps.dol.gov/query/orgReport.do?rptId=914674&rptForm=LM2Form
[35] AFL-CIO Center for Strategic Research, *supra* n.12; Testimony of AFL-CIO Pres. Trumka, *supra* n.10.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
Civil Division

DREW C. ENSIGN
*Deputy Assistant Attorney General*

TIBERIUS DAVIS
*Counsel to the Assistant Attorney General*

GLENN M. GIRDHARRY
*Acting Deputy Director*
Office of Immigration Litigation

JAIME SCOTT
*Trial Attorney*

*/s/ David J. Byerley*
DAVID J. BYERLEY (DC 1618599)
*Senior Litigation Counsel*
Office of Immigration Litigation
United States Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, D.C.  20044
202-532-4523 | David.Byerley@usdoj.gov

*Counsel for Defendants*

1

**CERTIFICATE OF SERVICE**

2

    I HEREBY CERTIFY that on January 16, 2026, I electronically filed the foregoing

3

document with the Clerk of the Court via CM/ECF and service will be accomplished via the

4

Court's CM/ECF notification system.

5

6

                       */s/ David J. Byerley*
                       DAVID J. BYERLEY (DC 1618599)

7

8

                       *Counsel for Defendants*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28