Testimony of
Richard L. Trumka
President
AFL-CIO

Hearing on the
**"Immigration Reforms Needed to Protect Skilled American Workers"**

Before the
Senate Judiciary Committee
March 17, 2015

Chairman Grassley, Ranking Member Leahy and members of the committee.

Thank you for the opportunity to testify on this important topic.

The AFL-CIO is a federation of 56 unions that represents 12.5 million working men and women.  We strive to ensure that every person who works in this country receives decent pay, good benefits, safe working conditions, and fair treatment on the job.

I know I don't have to tell you that working people are struggling in this economy.  I'm sure you hear that every day from your constituents, just as I do from our members.

In a recent survey, almost 90% of our members said that their income was either falling behind or just staying even with the cost of living.  Just let that sink in.

Nationwide, only 8% of them feel like they are getting ahead, and more than half feel like they are getting pulled under.  And the numbers tell us that their concerns are real.

Wages for the bottom 70% have been flat since the late 1970s, while almost all the gains from the increasing productivity of our workforce have flowed to the top 10%.

This kind of wage stagnation and wealth concentration is not the inevitable outcome of immutable economic forces.

It is the result of powerful elites, big corporations, Wall Street -- and yes, Silicon Valley -- designing and insisting upon an economy where wages stay low so that profits can grow higher.

The rules are rigged against working families, and our unjust immigration system is one of the many forces making it harder for them to get ahead.  We know that real

1

immigration reform is an important part of the larger structural change that needs to happen to once again create an economy where wages grow and where the wealth we produce is shared fairly; an economy that protects workers and favors democracy in the workplace.

For far too long, our rigged immigration system has allowed employers to drive down wages and working conditions in our country.

The brunt of the impact has been borne by immigrant workers, who face the highest rates of wage theft, sexual harassment, and death and injury on the job. But our entire workforce suffers when we allow standards to erode as millions of workers struggle to support their families without the status to assert their rights.

When employers can hire undocumented workers with a wink and a nod and then fire them when they seek to organize a union or complain about unpaid wages or unsafe working conditions, it is not just undocumented workers who are hurt, but all workers.

And when employers like Southern California Edison (SCE) can replace hundreds of steady middle class jobs with captive guest workers who earn a fraction of the wage for the same work, then we know that our broken immigration system is facilitating a race to the bottom.

Recognition of these concerns brought the labor movement together in 2009 around a shared set of principles that would create a different sort of immigration system—one that promotes shared prosperity and shared values of dignity, fairness, opportunity, voice and justice.

That framework guided our participation in historic negotiations with the business community and paved the way for the bipartisan comprehensive immigration reform bill passed by this Chamber in 2013.

The Border Security, Economic Opportunity, and Immigration Modernization Act (S. 744) demonstrated that a comprehensive approach is possible when lawmakers take seriously their obligation to solve problems, and I applaud the leadership that many members of this committee demonstrated in that process.

While far from perfect, the bipartisan immigration reform bill created a broad and inclusive pathway to citizenship, strengthened protections for workers and devised a new type of employment-based visa system tied to real labor market needs, not the whims of employers.

In addition to being the right thing to do, the Congressional Budget Office projected that over time the reforms would net billions in new revenues, substantially reduce the deficit and raise the wages for our entire workforce.

As part of that bill, the labor movement was proud to play a role in creating a new type of visa program, which included core worker protections and can serve as a model for any future immigration reform policies we adopt as a nation.

While we supported S. 744 as a whole, we were disappointed to see Senator Orrin Hatch's amendment pass during mark-up, eroding requirements that all H-1B employers abide by anti-displacement provisions, recruit U.S. workers prior to hiring an H-1B worker and give first preference in hiring to qualified U.S. applicants.

Labor's unity framework for immigration reform includes five carefully balanced and inter-connected components, so we do not support a piecemeal approach to immigration—particularly one that does not include a pathway to citizenship for the 11 million.

If S. 744 had been broken into pieces, we certainly would not have supported the high-skilled provisions as stand-alone legislation.

So today, we ask you to commit to work with us to support the type of real immigration reform that can help build a stronger economic future for our nation and support the basic civil and human rights and dignity of all workers, rather than providing yet another nod to corporate interests.

The labor movement has made overhauling our dysfunctional immigration system a core priority, and we will remain steadfast in pursuing that urgent goal next week, next month and next year.

But I am here to tell you, and I want to be really clear about this, that expanding captive guest worker programs is not the way to do it.

In fact, the types of reforms outlined in the recently-introduced I-Squared bill would take us exactly in the wrong direction.

The insatiable employer demand for more guest worker visas says more about what is wrong with our economy than about the most urgent problems with our immigration system.

As currently structured, the H-1B visa program allows employers to stifle wages, create a captive workforce, and make previously full time jobs insecure and temporary.

At a time when we face unprecedented levels of inequality and decades of wage stagnation, it is irresponsible to expand access to employment-based temporary work

programs that will continue to hold down wages, increase worker vulnerability, and reduce social mobility for deserving workers.

As we have said repeatedly, Congress must consider legislation to reform guest worker programs rather than expand them, and the law should unambiguously state that it is illegal to replace a U.S. worker with an H-1B guest worker under any circumstances, whether directly or through secondary displacement—and there should be no cheap and easy exemptions permitted, as there are now.

In addition, we have a straightforward set of reform recommendations that we believe would address the structural problems with our employment-based visa programs and help to protect all workers:

*1) Employers should be required to fill jobs with the most qualified American applicant, and should be permitted to recruit from abroad only when a real need exists – and can be proven.*

In order to ensure that all workers on American soil feel connected and protected, it is essential to prevent employer practices that exploit guest worker programs to undercut or displace an existing American workforce.

If the need for workers with a specific skill set is real, then we see no reason for employers to object to a real process that verifies it.

I ask you, if employers are seeking to hire immigrant workers on temporary visas for reasons other than shortage, what are their motives?

Hiring that seeks to suppress standards for wages and working conditions harms workers on all sides, and it harms our economy.

That is why we have insisted that the availability of employment-based visas should be tied to the real needs of the U.S. labor market, as determined by a commission of experts – not high paid lobbyists.

If I may quote from a recent letter written by Chairman Grassley:

*"All employers who bring in visa holders should be held accountable and prove that foreign workers are needed. All employers, not just some, should be required to make a good faith effort to recruit U.S. workers. All employers, not just some, should be required to attest that they did not or will not displace a U.S. worker when applying for a foreign worker. All employers, not just some, should be required to offer the job to a U.S. worker who is equally or better qualified. Anything short of this is failing the American people and those struggling to find jobs in today's economy. Acting unilaterally for some businesses without providing protections for U.S. workers would be detrimental to the future of our workforce."*

I couldn't have said it better myself.

Most people I talk to assume that employers already have to document that they cannot find an American worker before they can recruit an H-1B worker—because that is only logical. It is high time our policies supported that logic by requiring a meaningful labor market test.

*2)    Employers should be required to pay workers in the H-1B program at the same rate they would pay American workers.*  As long as we allow guest workers to be paid less than their local counterparts for the same work, we create clear and perverse incentives to prefer to hire through programs like the H-1B and cultivate a race to the bottom.

If the shortage so touted by the tech lobby were real, we should expect to see wages raising in an effort to attract scarce workers.

Yet high tech workers today cannot purchase any more goods with their income than they could in 1998, and they face increased insecurity on the job, as our IT worker brothers and sisters in Southern California can surely attest.

According to a Government Accountability Office analysis of data from the U.S. Department of Labor (DOL), 54 percent of H-1B visas are certified at the Level 1 wage (17th percentile wage) and 29 percent are certified at Level 2 wage (33rd percentile wage).

Both the Level 1 and Level 2 wage are below the local average wage for the occupation (the 50th percentile wage). That means that 83 percent of H-1B visas are certified below the local average wage in the occupation. The AFL-CIO supports an increase in the prevailing wage standard for guest workers to the 75th percentile of the prevailing U.S. wage, so that employers do not have an incentive to hire temporary guest workers. This would also create an incentive for employers to invest in training U.S. workers.

*3)    Workers in the H-1B program should have increased job mobility and the right to self-petition for legal permanent resident status, rather than having to rely upon an employer to petition for them.*

At present, not only are H-1B workers tied to a single employer who can essentially fire them at will by terminating their visa, but even after six years of employment, the power to decide whether that worker can stay in the country and obtain a green card rests solely in the hands of the employer.

Currently, less than 10 percent of firms actually sponsor their workers for permanent status.

Low rates of retention of H-1B workers for permanence make clear that this program is being misused to replace stable, middle class jobs with a contingent, disposable workforce that employers can underpay and then replace at will.

The AFL-CIO continues to insist on these essential reforms before we consider expansion of the H-1B program, and we have a few good models to look to for language.

The H-1B and L-1 Visa Reform Act put forward by Senators Durbin and Grassley in the 111th Congress would increase recruitment of, and investment in, U.S. workers; improve wage standards; and strengthen the Department of Labor's audit authority and ability to prevent and penalize fraud and misrepresentation.

In addition, the worker protections included in S744 would have protected workers from exploitation by foreign labor recruiters, and afforded H-1B workers the right to self-petition for permanence.

Yet instead of enacting common-sense reforms such as these, the I-Squared bill would more than triple the number of H-1B visas, at a time when the U.S. census indicates that only one in four STEM degree holders in the U.S. is able to find work in the field. Perhaps acknowledging the lack of empirical evidence of shortage, the "market-based escalator" in the I-Squared bill would peg visa caps to employer demand for indentured and underpaid guest workers, rather than actual labor market needs – essentially saying to employers that the more H-1B workers they apply for, the more they can get.

This type of escalation could have a catastrophic impact on the ability of new graduates to get work in their fields.

Already in 2011, a staggering two-thirds of college educated IT workers under 30 were guest workers.[i]

It bears noting that many of the very employers who insist that there is a shortage of high skilled workers have a documented record of collusion to suppress wages.

Indeed, high tech employers are actively lobbying for increased access to H-1B workers even as we see significant layoffs in the industry, signaling that it is yet another strategy to prevent the normal escalation of wages for highly skilled employees working in a highly profitable industry.

Tech tycoons have gotten rich while wages in the technology sector have stagnated.

If the hard work of America's tech workers is ever to pay off, we need to craft policy that benefits the people who actually write code, rather than just rewarding industry executives who write checks.

Our goal should be an America in which our young tech workers can pay off their student loans, not one in which Larry Ellison can build ever more extravagant yachts.

Moreover, between 2010 and 2012, 9 of the top 10 users of H-1B visas were companies specializing in offshore outsourcing.

Outplacement firms, also known as "body shops," are staffing companies that hire thousands of H-1B workers and then place the workers with third-party employers.

The third-party employer may then contract the worker to a different employer. Passing a worker from employer to employer increases the difficulty of enforcing H-1B laws, especially because liability and accountability is technically limited to the employer who first petitioned for the visa.

The AFL-CIO believes that staffing companies dependent on temporary visas should be barred from the H-1B program.

As the government's own auditors have reported, the large majority of the wage and hour complaints DOL receives are related to activities at body shops.[ii] Such violations should not be tolerated.

<u>Labor Shortage Claims Are Not Supported by Data</u>

Flat wages, an abundant supply of new talent, and unemployment rates belie industry claims of a labor shortage[iii].

The unemployment rate for engineers has doubled since the last recession and prospects for employment have diminished for all U.S. STEM graduates.

According to the Current Population Survey, in May 2013 there were 403,065 unemployed STEM workers actively looking for work around the country (132,238 of the unemployed were in computer occupations).[iv]

These levels of unemployment demonstrate the folly of raising the H-1B cap without an actual assessment of the labor market.

During the depths of the Great Recession, employment of computer skilled workers dropped 24,310 workers in 2008 and 2009, while American colleges were graduating 131,296 new bachelor and associates degree holders in computer science. Yet, in those two years, while jobs were shrinking and new graduates were desperately looking for work, the Department of Homeland Security granted more than 130,000 new H1-B visas to do computer work.

This is particularly problematic because the presence of a large visa-contingent workforce appears to make it easier for employers to exclude traditionally underrepresented classes of workers, such as women and communities of color.

Indeed, female unemployment in some computer-related occupations was as high as
24 percent in 2014, and women face the highest unemployment rates in occupations that employ a disproportionately high number of guest workers.[v]

Unemployment rates are also unacceptably high for Hispanic computer systems analysts, with 14.5 unemployed in 2012.[vi]

Leading employers in Silicon Valley recently disclosed their record on the diversity of their workforce, showing very weak black representation (roughly 3%).

By contrast, the high presence of African Americans (roughly 17%) in the large Internet computer technology corridor of the District of Columbia and its Maryland and Virginia (DMV) suburbs highlights the underperformance of Silicon Valley in building a representative workforce.

Moreover, expanding de facto guest worker programs like Optional Practical Training (OPT)—through which employers hire more than 120,000 young college graduates per year who hold F-1 visas—but do not even guarantee that those foreign graduates are paid the minimum wage, let alone the prevailing wage, chase Americans out of computer science and creates a self-fulfilling "shortage" as Americans respond to a relatively better market as engineers in other fields.  Second, it is far from a race neutral policy.

Like all Americans, about 30% of African Americans who earned baccalaureates earn them in science and engineering fields.  But African Americans who choose science were once far more likely to choose computer science as a major.

In 2002, 14.5% of black science and engineering majors chose computer science, versus 11.5% for all Americans. But by 2012, because of declining job prospects, the share of black science majors choosing computer science fell to 9.8%.

The next Sergei Brin might be sitting in an American classroom right now, but if that future innovator cannot get an entry-level job in high tech because employers prefer importing temporary workers, entrepreneurial innovations will not occur in the United States.

<u>Greater Scrutiny and Fresh Approaches Needed</u>

Unfortunately, evidence of the abuses and wage suppression that pervade our vast employment-based visa system continues to mount:

- The recent SCE scandal highlights blatant displacement using the H-1B program to undercut local wages by more than $30,000 per worker. Not only were local workers fired, they were forced to train their H-1B replacement and sign non-

8

disparagement agreements as a condition of their severance packages.

- Electronics for Imaging brought intercompany transferees to California through the L-1 program and paid them an outrageous $1.21 per hour, purportedly the same rate they earned in rupees in India, rather than the local market rate of $19-45 per hour.

- The H-2B program has now been halted due to legal challenges brought by employers who did not want to submit to the common-sense wage and local recruitment requirements issued by the Department of Labor, and instead asserted that DOL lacked authority to regulate the terms of the seasonal work program.

Numerous official investigations have documented that violations are not isolated, and indeed are consistently experienced throughout the system.

Considering the overwhelming evidence of problems, a comprehensive review of wage rates and hiring practices across all employment-based visa programs seems clearly warranted, and I urge this committee to call for such a review in order to shed light on the way in which these programs are being used by employers.

A basic premise of that review should be that no employment-based program should lack prevailing wage regulations, and that all visa programs that put workers into the labor market should be regulated as work programs and not disguised as exchanges, internships, or student programs.

This would compel the establishment of prevailing wage standards for the L-1, J-1, and OPT programs, and compel review of the levels and practices of a great number of others.

In addition, we should not lose sight of the important new model that was pioneered with the W Visa.

This hard-negotiated framework created a research bureau that would work to ensure that future flows of workers into our communities are responsive to the real needs of the labor market and aligned with actual market wage rates.

The W program that S744 would have created also would have turned the captive work structure of the dominant U.S. guest worker programs on their head by ensuring that the workers would have a degree of control over their own visas, rather than being entirely controlled by employers, and that the workers would also have a pathway to stay in the country if they desired to do so and were able to meet certain minimum requirements.

Temporary work visa programs have historically been structured to disempower both American workers and those being recruited from abroad.

W model offers a rights-based and data-centered alternative which should be brought to fruition.

Conclusion

We need immigration reform—not just for immigrants' rights, but for the rights of all working people.

Those reforms must be based on the premise that we can build an immigration system that helps to lift all boats, rather than exacerbating the vulnerabilities that workers already feel in our increasingly precarious labor market.

The ability to exploit any worker lowers standards for all workers, and the AFL-CIO insists that strengthening worker protections is essential to reforming our immigration system and getting our economy back on track.

That means that we must defend and expand the rights of all workers, regardless of immigration status, including the right to organize, the right to a living wage, the right to overtime, the right to equal pay, and the right to bargain to raise our wages.

We must also fight for economic policies that put full employment and wages that rise with productivity ahead of Wall Street profits – or Silicon Valley's.

An economy built on wage suppression, radical inequality and racial exclusion does not work.

It produces weak growth, financial crises, and political instability.

But there is another path—one that will restore rights and produce broadly shared prosperity.
We *can* build a system where workers' wages rise as we create more wealth, and implementing reforms that create a fair and just immigration system that adds value to our economy is a necessary component for creating a level playing field—rather than one that's used to degrade wages and working conditions—for immigrant and American workers alike.

Our nation's workers are hungry for accountability from lawmakers, and expect concrete action to build an economy that works for working people.

They know that things do not have to be the way they are, and they are no longer willing to accept the status quo.

They know that they deserve to share in the wealth we all create together, and the labor movement will demand policies that create a more fair economy and a more functional democracy.

As Congress resumes the debate on immigration reform, we hope the Senate will focus on the core flaws in our immigration system that contribute to economic inequality and wage stagnation, rather than advancing low-road employment models that have contributed to the erosion of the middle class.

Instead of wasting time on measures that increase division, discrimination, and exploitation, we look forward to working with you to advance comprehensive immigration reforms that protect worker rights and create a broad and inclusive pathway to citizenship.

---

[i] Hal Salzman, Daniel Kuehn, and B. Lindsay Lowell, "Current and proposed high-skilled guestworker policies discourage STEM students and grads from entering IT," Economic Policy Institute. May 2013.

[ii] *"H-1B Visa Program: Reforms Are Needed to Minimize the Risks and Costs of Current Program."*

[iii] "Guest Worker Programs and the STEM Workforce," DPE Fact Sheet. 2013.

[iv] Anthony P. Carnevale & Ban Cheah, "Hard Times 2013: College Majors, Unemployment and Earnings," Georgetown University Center on Education and the Workforce. May 2013.

[v] "Women in STEM and the Impact of Guest Worker Visas," DPE Fact Sheet. 2014.

[vi] "Impact of Guest Worker Visas on Hispanic STEM Workers," DPE Fact Sheet. 2013.