Cynthia Liao (CA Bar No. 301818)*
Johanna M. Hickman (D.C. Bar No. 981770)*
Jennie L. Kneedler (D.C. Bar No. 500261)*
Steven Y. Bressler (D.C. Bar No. 482492)*
Elena Goldstein (D.C. Bar No. 90034087)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982 (Liao)
cliao@democracyforward.org
hhickman@democracyforward.org
jkneedler@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

*Admitted *pro hac vice*

[Additional co-counsel on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| GLOBAL NURSE FORCE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 4:25-cv-08454-HSG<br><br>**PLAINTIFFS BAE INDUSTRIES, NEPHROLOGY ASSOCIATES OF THE CAROLINAS P.A., LOWER BRULE DAY SCHOOL, GLOBAL VILLAGE ACADEMY COLLABORATIVE, AND GLOBAL NURSE FORCE'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND 5 U.S.C. § 705 STAY**<br><br>Judge:   Hon. Haywood S. Gilliam, Jr.<br>Ctrm:    2, 4th Floor<br>Date:    Thursday, February 19, 2026<br>Time:    2:00 p.m. |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

ARGUMENT ......................................................................................................................... 1

I.    Plaintiffs' claims are justiciable............................................................................... 1

    A.    *Ultra vires* review is available here.......................................................... 1

    B.    The consular nonreviewability doctrine does not apply to Plaintiffs' claims. ................. 3

    C.    Agency Defendants' implementation is final agency action reviewable under the APA. ................................................................................................. 4

    D.    The narrow "committed to agency discretion" exception does not apply........................ 8

II.    Movant Plaintiffs have standing. ............................................................................ 8

III.    Plaintiffs are likely to succeed on the merits of their ultra vires claim........................ 11

    A.    The Proclamation is *ultra vires* because it exceeds § 1182(f)'s and § 1185(a)(1)'s text authorizing only "entry" suspensions, restrictions, and regulations. ..................... 11

    B.    The Proclamation supplants Congress's design for the H-1B program. ...................... 14

    C.    The $100,000 Fee is ultra vires as an unlawful tax. ............................................ 16

IV.    Plaintiffs' Administrative Procedure Act claims are likely to succeed. ...................... 18

    A.    Agency Defendants violated the APA by not conducting notice and comment. ............ 18

    B.    Agency Defendants failed to consider obvious alternatives that could have accommodated reliance interests and reduced harms........................................... 20

V.    Movant Plaintiffs face irreparable harm. ................................................................ 21

VI.    The remaining factors favor Plaintiffs. .................................................................. 23

VII.    Preliminary relief for Movant Plaintiffs and a certified class, or in the alternative, vacatur of the fee, is appropriate.................................................................................... 23

VIII.  The Court should neither require a bond nor stay relief pending appeal.................... 25

CONCLUSION.................................................................................................................... 25

i

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Bates v. UPS*,
  511 F.3d 974 (9th Cir. 2007) ........................................................................................... 11

4

*Bradford v. DOL*,
5   101 F.4th 707 (10th Cir. 2024) ........................................................................................... 5

6

*Chamber of Commerce v. DHS*,
  504 F. Supp. 3d 1077 (N.D. Cal. 2020) ........................................................................... 19

7

*Chamber of Commerce v. DHS*,
8   No. 25-CV-3675, 2025 WL 3719234 (D.D.C. 2025) ........................................... 9, 10, 12

9

*Cmty. Legal Servs. in E. Palo Alto v. HHS*,
  780 F. Supp. 3d 897 (N.D. Cal. 2025) ............................................................................. 25

10

*Consumer Energy Council of Am. v. Fed. Energy Regul. Comm'n*,
11   673 F.2d 425 (D.C. Cir. 1982) ........................................................................................... 20

12

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ............................................................................................................. 8

13

*Dep't of State v. Muñoz*,
14   602 U.S. 899 (2024) ............................................................................................................. 4

15

*Detroit Int'l Bridge v. Canada*,
  189 F. Supp. 3d 85 (D.D.C. 2016) ...................................................................................... 8

16

*DHS v. Regents of the Univ. of California*,
17   591 U.S. 1 (2020) ........................................................................................................ 20, 21

18

*Diamond Alt. Energy, LLC v. EPA*,
  606 U.S. 100 (2025) ........................................................................................................... 22

19

*Doe v. Horne*,
20   115 F.4th 1083 (9th Cir. 2024) ......................................................................................... 22

21

*Durning v. Citibank, N.A.*,
  950 F.2d 1419 (9th Cir. 1991) ............................................................................................. 2

22

*E. Bay Sanctuary Covenant v. Biden*,
23   993 F.3d 640 (9th Cir. 2021) ............................................................................................. 19

24

*E. Bay Sanctuary Covenant v. Garland*,
  994 F.3d 962 (9th Cir. 2020) ............................................................................................. 21

25

*E. Bay Sanctuary Covenant v. Trump*,
26   932 F.3d 742 (9th Cir. 2018) ...................................................................................... 18, 19

27

*Elec. Frontier Found. v. Off. of Dir. of Nat'l Intel.*,
  No. C 08-01023 JSW, 2009 WL 10710750 (N.D. Cal. Oct. 7, 2009) ............................. 25

28

ii

*Fiallo v. Bell,*
   430 U.S. 787 (1977) ................................................................................................... 4, 14

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ........................................................................................................ 4

*Gomez v. Trump,*
   485 F. Supp. 3d 145 (D.D.C. 2020) ......................................................................... 8, 13, 18

*Hawaii v. Trump,*
   878 F.3d 662 (9th Cir. 2017) ........................................................................................ 2, 3

*Hemp Indus. Ass'n v. DEA,*
   333 F.3d 1082 (9th Cir. 2003) ....................................................................................... 18

*ITServe All., Inc. v. United States,*
   122 F.4th 1364 (Fed. Cir. 2024) ..................................................................................... 15

*Los Angeles Haven Hospice, Inc. v. Sebelius,*
   638 F.3d 644 (9th Cir. 2011) ........................................................................................... 8

*Luokung Tech. Corp. v. Dep't. of Def.,*
   538 F. Supp. 3d 174 (D.D.C. 2021) ................................................................................. 21

*Make the Rd. New York v. Pompeo,*
   475 F. Supp. 3d 232 (S.D.N.Y. 2020) .............................................................................. 18

*Marshall Field & Co. v. Clark,*
   143 U.S. 649 (1892) ...................................................................................................... 17

*Milligan v. Pompeo,*
   502 F. Supp. 3d 302 (D.D.C. 2020) .................................................................................. 8

*Murphy Co. v. Biden,*
   65 F.4th 1122 (9th Cir. 2023) .......................................................................................... 2

*Nat. Grocers v. Rollins,*
   157 F.4th 1143 (9th Cir. 2025) ....................................................................................... 24

*Nat'l Ass'n of Mfrs. v. DHS,*
   491 F. Supp. 3d 549 (N.D. Cal. 2020) .................................................................. 2, 14, 16, 24

*Nat'l Cable Tel. Ass'n v. United States,*
   415 U.S. 336 (1974) ................................................................................................. 16, 17

*Nat'l Council of Nonprofits v. OMB,*
   775 F. Supp. 3d 100 (D.D.C. 2025) ................................................................................. 25

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
   567 U.S. 519 (2012) ...................................................................................................... 17

*Nebraska v. Su,*
   121 F.4th 1 (9th Cir. 2024) ....................................................................................... 4, 5, 7

iii

*NetChoice v. Bonta*,
   790 F. Supp. 3d 798 (N.D. Cal. 2025) ........................................................................... 24

*Nuclear Regul. Comm'n v. Texas*,
   605 U.S. 665 (2025) ........................................................................................................... 3

*Ojmar US, LLC v. Sec. People, Inc.*,
   No. 16-CV-04948-HSG, 2017 WL 2903143 (N.D. Cal. July 7, 2017) ........................... 22

*Pacito v. Trump*,
   768 F. Supp. 3d 1199 (W.D. Wash. 2025) ................................................... 8, 12, 14, 16

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ......................................................................................... 24

*Patel v. Reno*,
   134 F.3d 929 (9th Cir. 1997) ........................................................................................... 4

*Purdue Univ. v. Scalia*,
   No. CV 20-3006 (EGS), 2020 WL 7340156 (D.D.C. Dec. 14, 2020) ............................. 20

*RAICES v. Noem*,
   793 F. Supp. 3d 19 (D.D.C. 2025) ................................................................................... 2

*Regents of the Univ. of Calif. v. Am. Broad. Cos.*,
   747 F.2d 511 (9th Cir. 1984) ......................................................................................... 21

*Rent-A-Center, Inc. v. Canyon Tel. & Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991) ......................................................................................... 24

*Sale v. Haitian Centers Council, Inc.*,
   509 U.S. 155 (1993) ....................................................................................................... 13

*Sierra Club v. Trump*,
   379 F. Supp. 3d 883 (N.D. Cal. 2019) ................................................................... 2, 3, 23

*Sierra Club v. Trump*,
   929 F.3d 670 (9th Cir. 2019) ........................................................................................... 3

*Tate v. Pompeo*,
   513 F. Supp. 3d 132 (D.D.C. 2021) ................................................................................. 8

*Thein v. Trump*,
   No. 25-2369, 2025 WL 2418402 (D.D.C. Aug. 21, 2025) ....................................... 12, 13

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ....................................................................................................... 24

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ....................................................................................... 2, 4, 13, 17

*United States ex. rel. Knauff v. Shaughnessy*,
   338 U.S. 537 (1950) .................................................................................................... 2, 4

*United States v. Sanchez,*
   340 U.S. 42 (1950) ............................................................................................................ 17

*Washington v. Trump,*
   847 F.3d 1151 (9th Cir. 2017) ..................................................................................... 3, 14

*Webster v. Doe,*
   486 U.S. 592 (1988) ...................................................................................................... 2, 3

*Yavari v. Pompeo,*
   No. 2:19-CV-02524-SVW-JC, 2019 WL 6720995 (C.D. Cal. Oct. 10, 2019) .................. 2

*Zemel v. Rusk,*
   381 U.S. 1 (1965) ............................................................................................................ 17

**Statutes**

40 U.S.C. § 121(a) ................................................................................................................... 5

5 U.S.C. § 553(a)(1) .............................................................................................................. 18

5 U.S.C. § 553(b)(4)(B) ......................................................................................................... 19

5 U.S.C. § 704 .......................................................................................................................... 4

8 U.S.C. § 1152(a)(1)(A) ....................................................................................................... 13

8 U.S.C. § 1182(f) ......................................................................................................... passim

8 U.S.C. § 1184(c) ................................................................................................................. 14

8 U.S.C. § 1184(c)(5) ............................................................................................................ 15

8 U.S.C. § 1184(c)(8) ............................................................................................................ 15

8 U.S.C. § 1184(c)(9) ....................................................................................................... 15, 16

8 U.S.C. § 1184(g)(5) ............................................................................................................ 16

8 U.S.C. § 1184(g)(6) ............................................................................................................ 15

8 U.S.C. § 1184(g)(7) ............................................................................................................ 15

8 U.S.C. § 1184(l)(2)(A) .......................................................................................................... 9

8 U.S.C. § 1185(a)(1) .................................................................................................... passim

8 U.S.C. § 1201 ...................................................................................................................... 14

8 U.S.C. § 1225 ...................................................................................................................... 14

8 U.S.C. § 1361 ...................................................................................................................... 13

Immigration and Naturalization Act,
   Pub. L. No. 414, 66 Stat. 163(1952) ............................................................................... 12

v

**Regulations**

8 C.F.R. § 214.2(h)(8)(ii)................................................................................................10

**Rules**

Fed. R. App. 8.................................................................................................................25

Fed. R. Civ. P. 65(c) .....................................................................................................25

L.R. 7-5(a).....................................................................................................................23

**Treatises**

H-1B Handbook (2025 ed.)............................................................................................15

**Other Authorities**

E.O. 14026, Increasing the Minimum Wage for Federal Contractors,
  86 Fed. Reg. 22,835 (Apr. 27, 2021) ........................................................................5

Proclamation No. 10,973, 90 Fed. Reg. 46,027 (Sept. 19, 2025) ...........................6, 12

**Miscellaneous**

The Economic Times, *Trump signs order imposing $100,000 annual fee for H-1B visa applications*,
  YouTube (Sept. 19, 2025),
  https://www.youtube.com/watch?v=d9rENKjxMiw ..............................................16, 17

## INTRODUCTION

While Defendants invite the Court to debate the policy decisions behind the Proclamation and the merits of the H-1B program, the Court should decline. Agree or disagree with the Proclamation's findings or policy choices, they are beside the point. This case is about the legal limits on the President and the agencies. The Proclamation exceeds the President's legal authority, and the actions taken by executive agencies to implement it likewise exceed theirs and are arbitrary and capricious.

Courts routinely review such exercises of executive power. And such review is necessary here because, if Defendants' arguments are taken to their logical conclusion, then the President has unchecked power to rewrite the Immigration and Nationality Act ("INA") by imposing an extra-statutory and cost-prohibitive tax on any immigration program or legal pathway to the United States that he disfavors. Defendants' understanding of the President's statutory authority, and of the agencies' power to implement that authority, raises grave constitutional concerns and should be rejected.

This Court should grant Plaintiffs' motion and enjoin Defendants from imposing the $100,000 fee on the Movant Plaintiffs[1] and, if the Court also grants Plaintiffs' Nephrology Associates, BAE, and Lower Brule's motion for class certification (ECF 76), to the members of the employer Class. In the alternative, the Court should grant Plaintiffs' motion for summary judgment and vacate the $100,000 fee pursuant to the Administrative Procedure Act (APA).

## ARGUMENT

I. **Plaintiffs' claims are justiciable.**

Perhaps to distract from the Proclamation's unprecedented executive power grab, Defendants spill much ink to avoid judicial review. However, each of their arguments contravenes Ninth Circuit case law. Plaintiffs' claims are justiciable.

A. *Ultra vires* **review is available here.**

As this Court has stated, "[i]n determining what the law is, the Court has a duty to determine

---

[1] After Plaintiffs filed their motion for a preliminary injunction, Phoenix Doe's H-1B petition and her discretionary change of status request was approved. Therefore, she has voluntarily dismissed her claims. ECF 100. Remaining Movant Plaintiffs are Nephrology Associates of the Carolinas P.A., BAE Industries, Lower Brule Day School, Global Village Academy Collaborative, and Global Nurse Force.

whether executive officers invoking statutory authority exceed their statutory power." *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 909 (N.D. Cal. 2019) (Gilliam, J.), *judgment vacated and remanded in light of changed circumstances sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021). Therefore, a court may grant equitable relief against executive officials to enjoin *ultra vires* acts that exceed their statutory and constitutional authority. *Id.*; *see also Murphy Co. v. Biden*, 65 F.4th 1122, 1129-31 (9th Cir. 2023) (*ultra vires* claim available where plaintiff alleged that the President acted outside his statutory authority).

Contrary to Defendants' suggestion, PI Opp. 17-19 (ECF 98), 8 U.S.C. § 1182(f) and § 1185(a) do not give the President unreviewable authority. The Supreme Court has, in fact, adjudicated claims alleging that officials exceeded their authority under § 1182(f) and § 1185(a), as have numerous lower courts. *See Trump v. Hawaii*, 585 U.S. 667, 682-83 (2018); *see also, e.g.*, *United States ex. rel. Knauff v. Shaughnessy*, 338 U.S. 537, 541, 544 (1950) (reviewing reasonableness of regulation issued pursuant to the predecessor to § 1185(a) providing for "reasonable rules, regulations, and orders"); *Nat'l Ass'n of Mfrs. v. DHS*, 491 F. Supp. 3d 549, 560-61 (N.D. Cal. 2020) ("*NAM*"). And courts, including the Ninth Circuit, have specifically held in § 1182(f) and § 1185(a) cases that an equitable cause of action allows courts to "review *ultra vires* actions by the President that go beyond the scope of the President's statutory authority." *Hawaii v. Trump*, 878 F.3d 662, 682 (9th Cir. 2017), *rev'd and remanded on other grounds*, 585 U.S. 667 (2018).[2] That this case involves immigration does not change the calculus. "[I]n areas of shared presidential and congressional authority, the courts have presumptive authority to determine whether the President has usurped an authority that Congress neither delegated to him nor left for him to exercise unimpeded by statute." *RAICES v. Noem*, 793 F. Supp. 3d 19, 77-78 (D.D.C. 2025), *stayed in part on other grounds*, 2005 U.S. App. LEXIS 177228, at *30-37 (D.C. Cir. Aug. 1, 2025).[3]

The government also argues, as it did unsuccessfully in *Sierra Club*, that "Plaintiffs fail to

---

[2] A vacated decision has no precedential effect, but "a reversal (as in *Hawaii v. Trump*, 878 F.3d 662) still [does]." *Yavari v. Pompeo*, No. 2:19-CV-02524-SVW-JC, 2019 WL 6720995, at *6 n.1 (C.D. Cal. Oct. 10, 2019); *see also Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991).
[3] *Webster v. Doe*, 486 U.S. 592, 592 (1988), is distinguishable as it involved a statute that authorized the CIA Director to terminate CIA employees whenever the Director "shall deem such termination necessary or advisable in the interests of the United States," with no reasonableness limitation, unlike § 1185(a)(1), which requires the President's regulations on entry to be "reasonable."

2

1    identify a statutory private right of action, . . . and that to the extent *ultra vires* review is available,

2    Plaintiffs must show that the challenged action contravenes clear and mandatory statutory language."

3    379 F. Supp. 3d at 910 (cleaned up); *see* PI Opp. 19-20. As this Court explained in *Sierra Club*, "*ultra*

4    *vires* review exists outside of the APA framework, and Defendants' heightened standard for *ultra vires*

5    review only applies where Congress has foreclosed judicial review, which is not the case here." 379 F.

6    Supp. 3d at 910. Defendants have not identified any statute that explicitly forecloses judicial review. Nor

7    have they identified some other exclusive statutory review scheme that might implicitly foreclose

8    judicial review. *Compare id.* at 910 n.14 ("Congress may displace federal courts' equitable power to

9    enjoin unlawful executive action, but a precluding statute must at least display an 'intent to foreclose'

10   injunctive relief."). Defendants rely on *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665 (2025) ("*NRC*"),

11   PI Opp. 19-20, but it is inapposite. *NRC* is consistent with longstanding precedent holding that an *ultra*

12   *vires* claim generally cannot be used to make an end-run around a different statutory review scheme that

13   either provides aggrieved persons with an opportunity for judicial review or forecloses other forms of

14   review. *Id.* at 681. This case presents neither situation. In similar circumstances, multiple courts have

15   accordingly proceeded to consider the merits of claims that a Presidential Proclamation exceeded the

16   President's authority under these statutes, as cited above. Moreover, unlike in *NRC*, Plaintiffs claim here

17   that the Proclamation imposes an unlawful tax, in violation of the separation of powers and Congress's

18   taxing power. *Webster,* 486 U.S. at 603 ("where Congress intends to preclude judicial review of

19   constitutional claims its intent to do so must be clear"); *Sierra Club v. Trump*, 929 F.3d 670, 696-97 (9th

20   Cir. 2019).

**B.  The consular nonreviewability doctrine does not apply to Plaintiffs' claims.**

22   Defendants' consular nonreviewability argument, PI Opp. 15-17, also fails. The Ninth Circuit

23   has consistently held that the doctrine does not apply to challenges to executive policies and practices,

24   only to individual visa determinations. *Washington v. Trump*, 847 F.3d 1151, 1162 (9th Cir. 2017)

25   (distinguishing between cases involving "application of a specifically enumerated congressional policy

26   to the particular facts presented in an individual visa application" and challenges to "the President's

27   *promulgation* of sweeping immigration policy"); *Hawaii*, 878 F.3d at 679 (similar); *see also Patel v.*

28

PLAINTIFFS' REPLY ISO MOT. FOR PRELIMINARY
INJUNCTION AND 5 U.S.C. § 705 STAY                              Case No. 4:25-cv-08454-HSG

1  *Reno*, 134 F.3d 929, 932 (9th Cir. 1997) (doctrine did not bar suit "challenging the consul's authority to

2  suspend [plaintiffs'] visa applications, not challenging a decision within the discretion of the consul").

3  Here, Plaintiffs do not ask the Court to review any individual visa determination or to compel issuance

4  of any particular visa. Plaintiffs challenge the government's legal authority to impose a $100,000 fee as

5  a precondition to having an H-1B petition and visa application processed at all. This is precisely the type

6  of executive policy challenge that is permitted.

7       Defendants' cited cases, PI Opp. 15-16, do not hold otherwise. Defendants' suggestion that the

8  Supreme Court applied the consular nonreviewability doctrine to the President in *Hawaii* is plainly

9  incorrect. *Hawaii* explicitly declined to reach the issue, assuming without deciding that the plaintiffs'

10 claims were reviewable. 585 U.S. at 683. *Knauff*, 338 U.S. 537, and *Dep't of State v. Muñoz*, 602 U.S.

11 899 (2024), both involved individual exclusion or visa denial decisions. *Fiallo v. Bell* actually refutes

12 Defendants' position: it rejected the sweeping nonreviewability argument Defendants raise here, noting

13 "[o]ur cases reflect acceptance of limited judicial responsibility" to review broad sweeping policy, even

14 immigration matters, and resolved plaintiffs' claims on the merits. 430 U.S. 787, 793 n.5, 799-800

15 (1977).

16       **C.  Agency Defendants' implementation is final agency action reviewable under the APA.**

17       Defendants contend that agencies' implementation of the $100,000 fee is neither a "final" nor

18 "agency" action under the APA because (1) the Proclamation itself is not subject to APA review under

19 *Franklin v. Massachusetts*, 505 U.S. 788 (1992), and agencies are "bound to abide the President's

20 Proclamation" and (2) there was no agency action "distinct from the H-1B Proclamation." PI Opp. 21-

21 22. Both of these premises are wrong. First, the Ninth Circuit has already rejected the government's

22 attempt "to extend *Franklin* to cover final agency actions that adopt policy decisions issued by the

23 President in executive orders" as contrary to "the text of the APA." *Nebraska v. Su*, 121 F.4th 1, 15 (9th

24 Cir. 2024) (conducting APA review of an agency rule that adopted a $15/hour minimum wage for federal

25 contractors, as instructed by an executive order). "[T]he APA's language is plain. The APA applies to

26 any 'final agency action.'" *Id.* (quoting 5 U.S.C. § 704). And "[n]o language in the APA prevents or

27 excepts review of an agency action that implements a presidential action. . . . Thus, as a textual matter,

28

PLAINTIFFS' REPLY ISO MOT. FOR PRELIMINARY
INJUNCTION AND 5 U.S.C. § 705 STAY                Case No. 4:25-cv-08454-HSG

final agency actions, even if implementing an executive order, are subject to judicial review under the APA." *Id.* Defendants contend that agencies have no authority to "disobey" or "water down" § 1182(f) proclamations, PI Opp. 41, but *Nebraska* rejected this blind obedience defense to APA review. 121 F.4th at 5, 7. The court noted that it "ignores the dynamic reality of executive branch policy development, which often involves back-and-forth debate between the President and his agents." *Id.* at 16. To exempt agency actions from APA review merely because they implement a presidential order would allow the government to "evade APA-mandated accountability" and "to implement regulations without the public involvement, transparency, and deliberation required under the APA" "by simply issuing an executive order first." *Id.* And, in any event, none of these policy concerns can supersede the text of the APA. *Id.*[4]

Defendants try to distinguish *Nebraska* by suggesting that the executive order there gave more discretion to the agency than the Proclamation does here, PI Opp. 40, but there is no meaningful difference between the two. In *Nebraska*, the President invoked a statute allowing the President to "prescribe" directives and issued an executive order requiring federal contractors to pay a $15 minimum wage starting January 30, 2022. E.O. 14026, Increasing the Minimum Wage for Federal Contractors § 2(a)(i), 86 Fed. Reg. 22,835, 22,835 (Apr. 27, 2021); *Nebraska*, 121 F.4th at 5, 7; 40 U.S.C. § 121(a). The Secretary of Labor was directed to implement the executive order through regulation, including defining relevant terms and, "as appropriate," providing "exclusions from the requirements of this order." 86 Fed. Reg. at 22,836. Based on this language, the Ninth Circuit rejected the argument that DOL could not contravene the President's "clear directive" and held that DOL acted arbitrarily and capriciously by failing to consider modifying the $15 amount, changing the effective date, or phasing in the requirement. *Nebraska*, 121 F.4th at 17. Here, similarly, the President has invoked a statute that allows the President to "prescribe" rules, 8 U.S.C. § 1185(a)(1), and issued a Proclamation that requires a $100,000 payment effective September 21, 2025, directs DHS and State to "coordinate to take all necessary and appropriate action to implement this proclamation," and gives the DHS Secretary discretion to provide exceptions. Proclamation §§ 1(a), 1(c), 2(c). Like in *Nebraska*, this Court should

---

[4] Ninth Circuit law, of course, takes precedence over the out-of-circuit district court cases cited by Defendants. *See* PI Opp. 21-22. *Bradford v. DOL*, 101 F.4th 707 (10th Cir. 2024), does not help Defendants as the Ninth Circuit expressly disagreed with *Bradford*. *Nebraska*, 121 F.4th at 15 n.7.

PLAINTIFFS' REPLY ISO MOT. FOR PRELIMINARY
INJUNCTION AND 5 U.S.C. § 705 STAY                                    Case No. 4:25-cv-08454-HSG

1   reject the government's suggestion that DHS and State should be excused from APA review.

2          Defendants' second premise, that the agencies are "simply complying" with the Proclamation

3   and not exercising any discretion, is also wrong. PI Opp. 21. Even if that was a way to escape APA

4   review, the Proclamation gives the agencies implementation discretion. Proclamation No. 10,973,

5   §§ 1(c), 2(c), 90 Fed. Reg. 46,027 (Sept. 19, 2025). And the agencies' post-Proclamation actions show

6   they are devising their own rules as to who is subject to a $100,000 requirement. For example, the

7   Proclamation stated that "entry into the United States of aliens as nonimmigrants to perform services in

8   a specialty occupation under" H-1B was "restricted, except for those . . . whose petitions are

9   accompanied *or supplemented* by a payment of $100,000," effective September 21, 2025. Proclamation

10  § 1(a) (emphasis added). This, on its face, appeared to require not only that petitions filed after the

11  effective date be "accompanied" by a $100,000 payment but also that already-filed or even already-

12  approved petitions be "supplemented" by a $100,000 payment. Despite this plain language, DHS and

13  State then issued guidance on September 21 stating that the $100,000 requirement would apply only to

14  "new" H-1B petitions filed after the effective date. Their guidance also stated that the Proclamation

15  "[d]oes not change any payments or fees required to be submitted in connection with any H-1B

16  *renewals*," without defining the term. *H-1B FAQ*, USCIS (Sept. 21, 2025) (ECF 46-7) (emphasis added);

17  *H-1B FAQ*, State Dept. (Sept. 21, 2025) (ECF 46-8). The September 21 guidance did not distinguish

18  between "renewals" for individuals inside or outside the country.

19         A month later, after Plaintiffs filed this lawsuit, DHS changed the rules again. DHS dropped the

20  "renewal" language. *See H-1B Specialty Occupations*, USCIS (Oct. 20, 2025) ("Oct. Guidance") (ECF

21  46-9). Instead, the $100,000 requirement would apply to petitions for individuals outside the U.S.

22  without a valid H-1B visa. It would not apply to change of status, amendment, and extension petitions

23  filed for individuals inside the country (if USCIS grants the change of status, amendment, or extension,

24  all discretionary decisions). *Id.* at 2; PI Mot. 10 & n.13 (ECF 75). DHS also announced its criteria for

25  exceptions to the $100,000 payment. The Proclamation's text gave the Secretary discretion to exempt

26  "any individual alien, all aliens working for a company, or all aliens working in an industry" from the

27  $100,000 payment. Proclamation § 1(c). But DHS chose to adopt limitations that do not appear in the

28

PLAINTIFFS' REPLY ISO MOT. FOR PRELIMINARY
INJUNCTION AND 5 U.S.C. § 705 STAY                           Case No. 4:25-cv-08454-HSG

1  Proclamation: there would be a "high threshold" for exceptions and that they would be granted only in

2  "extraordinarily rare circumstances" where, among other things, "no American worker is available to

3  fill the role," a requirement that contradicts the INA. Oct. Guidance, ECF 46-9 at 3.[5]

4   The agencies' shifting decisions about who is subject to the fee have real consequences. For

5  example, BAE's employee left the U.S. on October 15, 2025 to avoid being unlawfully present after his

6  H-1B status expired due to the process for an extension stalling during the 2025 government shutdown.

7  Declaration of Melynn Zylka ("Zylka Decl.") ¶ 10-11 (ECF 75-3). At the time, the operative September

8  guidance provided that "renewals" would not be subject to the fee, without distinguishing between

9  renewals for individuals abroad or in the U.S. *H-1B FAQ*, USCIS (Sept. 21, 2025) (ECF 46-7); *H-1B*

10 *FAQ*, State Dept. (Sept. 21, 2025) (ECF 46-8). Under that regime, BAE should have been able to petition

11 to "renew" their employee's H-1B status without paying the fee, regardless of where he was. Five days

12 after the employee left, however, DHS changed the rules. The October Guidance made petitions for

13 individuals abroad subject to the fee. Oct. Guidance, ECF 46-9 at 2. Had the agencies followed any part

14 of the APA, such as inviting public comment, publishing a rule at least 30 days before its effective date,

15 or considering ways to accommodate reliance interests and mitigate predictable adverse impacts of a

16 sudden, massive fee before acting, harms to those like BAE and its employee could have been avoided.

17 BAE and its employee would not be in a situation where policies meant to keep out new entrants have

18 resulted in blocking entry to someone who has already built a life and career in in the U.S.

19  The agencies are thus not engaging in merely "ministerial" implementation but rather are making

20 their own rules as to whom the $100,000 requirement should apply, whether because the President's

21 directive gives them discretion or they are simply doing it on their own. Courts routinely subject such

22 agency actions to APA review and hold agencies accountable when their actions are unlawful, arbitrary

23 and capricious, or fail to follow required procedures. *See, e.g.*, *Nebraska*, 121 F.4th at 17; *Milligan v.*

---

25 [5] Unlike in other programs, the INA does not require that every employer petitioning for an H-1B
26 employee demonstrate that no U.S. worker was available. That requirement only applies to employers
who are "H-1B dependent" or who have willfully violated program requirements in the past. 8 U.S.C.
27 § 1182(n)(1)(G); 20 C.F.R. § 655.739; Dep't of Labor, Wage & Hour Div, Fact Sheet #620: Must an H-
1B employer recruit U.S. workers before seeking H-1B workers? (Jan. 2025) (Liao Decl. Ex. 1). DHS's
28 exceptions policy contradicts the statute, as it functionally requires every employer to meet a standard
that Congress applied only to a subset of employers.

PLAINTIFFS' REPLY ISO MOT. FOR PRELIMINARY
INJUNCTION AND 5 U.S.C. § 705 STAY      Case No. 4:25-cv-08454-HSG

1  *Pompeo*, 502 F. Supp. 3d 302, 313-14 (D.D.C. 2020); *Gomez v. Trump*, 485 F. Supp. 3d 145, 176-78

2  (D.D.C. 2020).[6]

3  **D.  The narrow "committed to agency discretion" exception does not apply.**

4  Defendants claim that the agencies' actions are "committed to agency discretion" because the

5  President's discretion under the statute "carrie[s] over" to the agencies "[b]y transitive property." PI

6  Opp. 26. But the "committed to agency discretion" exception is "quite narrow[]" and only applies in

7  "rare circumstances" where "there is no law to apply." *Dep't of Com. v. New York*, 588 U.S. 752, 772-

8  73 (2019) (quotations omitted). This case does not present one of those rare situations. Defendants

9  concede that § 1182(f) and § 1185(a) apply. PI Opp. 26. As discussed below, the President's discretion

10 under those statutes is limited to "entry" and does not extend to restricting adjudication of petitions or

11 visa applications. Nor do those statutes delegate the Congress's taxing power to the Executive. Where

12 Congress did give DHS discretion to set petition fees, it required DHS do so by regulation and consider

13 the costs of adjudication. *See* PI Mot. 15-17, 19-22. All of these are laws that apply to determine the

14 lawfulness of the agencies' decisions regarding who must pay $100,000 per petition. *See, e.g.*, *Gomez*,

15 485 F. Supp. 3d at 176-78, 190-95 (rejecting government's APA non-reviewability argument and finding

16 State's refusal of visa processing was "not in accordance with law" and arbitrary and capricious under

17 the APA); *Tate v. Pompeo*, 513 F. Supp. 3d 132, 142-44, 146 (D.D.C. 2021) (similar).

18 **II.  Movant Plaintiffs have standing.**

19 Defendants' attempts to block Plaintiffs from court based on standing are also unavailing. "[A]

20 plaintiff is presumed to have constitutional standing to seek injunctive relief when it is the direct object

21 of regulatory action challenged as unlawful." *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d

22 644, 655 (9th Cir. 2011). Here, the $100,000 fee is specifically required of H-1B petitioners. The

23 employer Plaintiffs either have filed or imminently could and would file an H-1B petition but for the

24

25

---

26 [6] As these courts have explained, *Detroit Int'l Bridge v. Canada*, 189 F. Supp. 3d 85 (D.D.C. 2016)
   (cited at PI Opp. 22), is distinguishable. "In that case, Congress had delegated to the President power

27 over final approvals of such bridges, the President approved the bridge, and State's actions were mere
   'ministerial implementation of presidential action.'" *Milligan*, 502 F. Supp. 3d at 314 (quoting *Gomez*,

28 485 F. Supp. 3d at 178)); *Pacito v. Trump*, 768 F. Supp. 3d 1199, 1227 (W.D. Wash. 2025) (same).

PLAINTIFFS' REPLY ISO MOT. FOR PRELIMINARY
INJUNCTION AND 5 U.S.C. § 705 STAY                    Case No. 4:25-cv-08454-HSG

1  fee; therefore, they are "direct objects" of the challenged regulatory action and have standing.

2  Defendants claim that some Plaintiffs' injuries are speculative because (1) they might get a national

3  interest exception; (2) they need to be selected in the March 2026 lottery to petition; and (3) they can

4  find American workers instead. PI Opp. 12-13.[7] These arguments are unsupported by facts or law.

5      Nephrology Associates filed a cap-exempt H-1B petition on September 24, 2025, and sought a

6  national interest exception on October 20, 2025. USCIS has not adjudicated either request but has

7  required Nephrology Associates to demonstrate by January 29, 2026, that it has either paid the fee or

8  obtained an exemption. Absent such a showing, the petition will be denied. Declaration of Dattie

9  Michaelle Waters ("Waters Decl.") ¶¶ 16,18-19 (ECF 75-2). Defendants' claim that the mere possibility

10 of an exception renders Plaintiffs' claims speculative does not withstand scrutiny when, upon

11 information and belief, the DHS Secretary has not granted any exceptions and Defendants argue that

12 "nothing in the H-1B Proclamation actually requires the Secretary to grant any exceptions." PI Opp. 25.

13     Nephrology Associates was not required to participate in the March 2026 lottery to file its

14 petition because the prospective employee has an approved J-1 waiver. *Id*. ¶¶ 12-14, 16-17; 8 U.S.C.

15 § 1184(l)(2)(A) (providing numerical limitations for H-1B visas do not apply where a J-1 waiver is

16 granted). As for recruitment, Nephrology Associates already went through nine months of recruiting to

17 find its fourth nephrologist, and she was the only one who was qualified for the position and accepted

18 its terms. Waters Decl. ¶ 12. Defendants' blithe suggestion that Nephrology Associates could just hire

19 a domestic employee ignores these facts. In any event, there is no authority for Defendants' proposition

20 that an injured plaintiff must look for alternate ways to remedy that injury in order to have standing to

21 seek relief from Defendants' unlawful conduct.[8] Nor is it a statutory requirement for most H-1B

---

23 [7] Defendants made no challenge to Global Nurse Force's standing. *See* PI Opp. 13-15.
24 [8] Defendants misinterpret *Chamber of Commerce v. DHS*'s holding regarding standing. *See* PI Opp. 14.
25 The district court held that one Chamber member, the University of Arizona, had standing to sue in its own right because, based on its past history with the H-1B program, the university "reasonably expects that, but for the Proclamation, it would submit approximately a dozen" H-1B petitions in the next 12
26 months for new faculty currently located outside the U.S. *Chamber of Commerce v. DHS*, No. 25-CV-3675, 2025 WL 3719234, at *10 (D.D.C. 2025). The court never suggested the university had to show
27 that it tried to recruit U.S. workers before it could have standing to challenge the $100,000 fee. While the district court took issue with the Chamber not naming its other members, except for HJI Supply
28 Chain Solutions (who originally wanted to hire an H-1B employee to fill one opening, but hired a domestic employee instead over the course of the litigation), the district court never squarely addressed

employers. *See supra* n.5.

BAE has also requested a national interest exemption, and it has been pending since November 14, 2025. Supplemental Declaration of Melynn Zylka ("Zylka Supp. Decl.") ¶¶ 3-4. BAE would file an H-1B petition "immediately but for the exorbitant $100,000 fee." Zylka Decl. ¶ 12. BAE similarly is not required to participate in the lottery to file its petition because it seeks to continue the H-1B employment of an employee who was previously counted against the cap. *Id.* ¶¶ 6, 8-9; 8 C.F.R. § 214.2(h)(8)(ii) (providing that certain petitions are not subject to the cap, including where the beneficiary has previously been counted against the numerical limitation). As for recruitment, BAE had planned to promote this employee, who has worked with the company for several years, to Quality Manager following the incumbent's retirement. Because BAE cannot afford the $100,000 fee and has not yet been able to return this employee to the United States, BAE initiated recruitment for the Quality Manager position as a contingency measure, but only two applicants had the necessary experience in metal stamping and in quality management. BAE interviewed both, but neither were suitable for the position. Zylka Supp. Decl. ¶¶ 5-7. Thus, again, while seeking a replacement is not required for standing, BAE cannot simply find a replacement.

Lower Brule and Global Village's schools have not filed petitions yet, but like the University of Arizona in *Chamber*, they have standing because they "reasonably expect[]" they will do so again in the next few months. *Chamber*, 2025 WL 3719234, at *10. These petitions are not speculative. Both Lower Brule and the GVA schools can file petitions without having to participate in the lottery.[9] And, like the University of Arizona, both have regularly relied on the H-1B program in the past to fill teacher vacancies, including with teachers from abroad. Declaration of Lance Witte ("Witte Decl.") ¶¶ 11-13 (ECF 75-4); Declaration of Michael Henderson ("Henderson Decl.") ¶¶ 9-12, 17 (ECF 75-6). As for recruiting U.S. workers, again, Article III does not require exhausting recruiting efforts first. In any event, the notion that Lower Brule and Global Village can simply find U.S. workers is belied by the

---

whether HJI had standing, since the university's standing was sufficient to "clearly establish[]" the Chamber's associational standing. *Id.* at *9 n.1.

[9] Petitions filed by Lower Brule and GVA schools are cap exempt. S*ee* Witte Supp. Decl. ¶ 3; Henderson Decl. ¶ 18 (discussing ability of schools to fill vacancies mid-year).

evidence. Both use the H-1B program precisely because otherwise it is very difficult to recruit the teachers they need. Lower Brule is located on a tribal reservation in rural South Dakota. Witte Decl. ¶ 5. In the past five years, the vast majority of applicants who are willing to live and teach there have been foreign nationals, and the majority have been from abroad. For example, Lower Brule is currently recruiting for two teaching positions for the 2026-2027 school year. Supplemental Declaration of Lance Witte ("Witte Supp. Decl.") ¶¶ 4-5. All current applicants for those positions require H-1B sponsorship, and most are located outside the United States. *Id*. ¶ 5. Global Village's model of immersive language instruction relies on recruiting world language teachers who are native speakers and who can share cultural practices, customs, and awareness from their home countries. GVA schools also generally hire 2-5 teachers for each academic year and will begin recruitment for the next academic year starting in February. Henderson Decl. ¶¶ 9-10, 18. Based on their many years of experience recruiting such teachers, Global Village knows that this special combination of native-language skills and cultural competencies is not easily found if they were to recruit only U.S. workers. *Id*. ¶¶ 9-12.

Contrary to Defendants' arguments, these Plaintiffs have demonstrated concrete, non-speculative harm. Defendants argue that some *non*-movant plaintiffs lack standing, but that is irrelevant to whether Movant Plaintiffs have standing. Three of the Movant Plaintiffs—Nephrology Associates, BAE, and Lower Brule—seek broad relief on behalf of a class, and longstanding precedent holds that only one named plaintiff need satisfy the standing requirements to obtain injunctive relief on behalf of a class. *See Bates v. UPS*, 511 F.3d 974, 985 (9th Cir. 2007); *cf. Healy v. Milliman*, No. 24-3327, 2026 WL 71863, *4 (9th Cir. Jan. 9, 2026) (holding class members must have standing to recover individual damages but expressly leaving undisturbed the Circuit's precedent that standing for injunctive relief is distinct).

**III.    Plaintiffs are likely to succeed on the merits of their ultra vires claim.**

**A.  The Proclamation is *ultra vires* because it exceeds § 1182(f)'s and § 1185(a)(1)'s text authorizing only "entry" suspensions, restrictions, and regulations.**

As explained in Plaintiffs' motion, PI Mot. 15-17 & nn.19-20,[10] the Proclamation is *ultra vires*

---

[10] Defendants suggest that this argument was raised only in a footnote, PI Opp. 39, but Plaintiffs fully articulated it on pages 15-17 of their Motion.

PLAINTIFFS' REPLY ISO MOT. FOR PRELIMINARY
INJUNCTION AND 5 U.S.C. § 705 STAY                    Case No. 4:25-cv-08454-HSG

1  because it reaches beyond suspending or restricting "entry" and instead regulates the adjudication of H-

2  1B petitions and visas. *See* Proclamation § 1(b), 2(b) (stating DHS will "restrict decisions" on H-1B

3  petitions that are "not accompanied by a $100,000 payment" and the Secretary of State will "approve

4  only those visa petitions for which the filing employer has made the [$100,000] payment"). Sections

5  1182(f) and 1185(a)(1) allow the President to restrict, suspend or regulate "entry."[11] But neither the

6  adjudication by DHS of H-1B petitions filed by U.S. employers, nor the issuance of visas by State,

7  constitutes "entry," which Congress defined as "any coming of an alien into the United States, from a

8  foreign port or place or from an outlying possession, whether voluntarily or otherwise." INA, Pub. L.

9  No. 414, § 101(a)(13), 66 Stat. 163, 167 (1952). This is not a mere technicality. Petition adjudication

10  and visa issuance are distinct, statutory steps mandated by Congress that occur before any question of

11  entry arises, and courts have specifically held that § 1182(f) does not authorize *visa,* as opposed to *entry,*

12  restrictions. *See Thein v. Trump*, No. 25-2369, 2025 WL 2418402, at *15 (D.D.C. Aug. 21, 2025) (citing

13  cases); *see also Pacito*, 768 F. Supp. 3d at 1222 ("[t]he plain language of Section 1182(f) does not . . .

14  delegate authority to suspend agency operations directed by Congress.").

15  Defendants argue that entry and visa issuance are "commingled," such that § 1182(f) empowers

16  the President to place any restriction on any "statutorily required step in the process to enter the United

17  States." PI Opp. 30. The district court in *Chamber of Commerce v. DHS* seems to have relied on similar

18  reasoning to conclude that the imposition of the $100,000 payment obligation was "part of an entry

19  restriction authorized under § 1182(f)." 2025 WL 3719234, at *19. But this reasoning would expand the

20  scope of § 1182(f) well beyond its text. A successful H-1B petition and visa application may be

21  prerequisites for entry, but that does not make them the same as entry. This conflation of entry with not

22  only visa issuance but also the adjudication of petitions is the exact opposite of the government's position

23  before the Supreme Court in *Trump v. Hawaii*, where it highlighted "the difference between admissibility

24  to enter the United States and issuance of visas." Br. for Pet. at 49, *Hawaii*, 585 U.S. 667, 2018 WL

---

26  [11] Although Defendants argue and the court held in *Chamber,* 2025 WL 3719234, *12, that § 1185(a)(1)

27  offers broader authority than § 1182(f), both provisions are textually constrained to authorizing only

28  limits on "entry." Section 1185(a)(1) only authorizes "restrictions and prohibitions" the president

prescribes for a noncitizen to "*enter*" or "*attempt to . . . enter*" the United States." (emphasis added).

1050350, at *49. And it is inconsistent with the Supreme Court's ultimate holding in that case. In *Hawaii*, "the basic distinction between admissibility determinations and visa issuance that runs throughout the INA," 585 U.S. at 694, was the linchpin of the Supreme Court's reason for rejecting the plaintiffs' argument that the President's suspension of entry for nationals of six predominantly Muslim countries violated 8 U.S.C. § 1152(a)(1)(A)'s prohibition on nationality-based discrimination in the issuance of immigrant visas. The Court held that this country-based entry suspension was lawful because "§ 1182 sets the boundaries of admissibility into the United States," while § 1152(a)(1)(A)'s protections apply only "to the issuance of immigrant visas."[12] *Id.* (internal punctuation omitted).

Multiple district courts faithfully applying *Hawaii* have held that § 1182(f)'s language permitting *entry* suspensions and restrictions does not permit restrictions on visa issuance. *See, e.g.*, *Gomez*, 485 F. Supp. 3d at 191-94 (holding § 1182(f) addresses "only entry, not visa issuance" and noting the sound practical reasons for the distinction); *Thein*, 2025 WL 2418402, at *15 (citing cases); *see also* PI Mot. 16 n.20 (collecting cases). Defendants do not address any of these cases. Rather, Defendants cite primarily to *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), for the proposition that "[t]he authority under Sections 1182(f) and 1185(a) are not limited to border inspections." PI Opp. 30. But *Sale* is inapposite. It involved a challenge to the interdiction of Haitians on the high seas. It did not address whether the power to restrict "entry" under § 1182(f) includes the power to limit visa issuances or petitions. Indeed, *Sale*'s discussion of the President's § 1182(f) authority was dicta, because that authority was not challenged. If Congress had intended to give the President authority to restrict the adjudication of visa petitions and issuance of visas, or indeed any "statutorily required step in the process to enter the United States," PI Opp. 30, "it could easily have chosen language directed to that end." *Hawaii*, 585 U.S. at 695. But it did not.

---

[12] 8 U.S.C. § 1361, cited by Defendants, PI Opp. 30, helps illustrate the distinction. Under § 1361, if a person "fails to establish to the satisfaction of the consular officer that he is eligible to receive a visa or other document required for entry, no visa or other document required for entry shall be issued to such person, nor shall such person be admitted to the United States unless he establishes to the satisfaction of the Attorney General that he is not inadmissible under any provision of this chapter." The provision reinforces that the issuance of visas or other documents (addressed in the first half of the sentence) is distinct from admission (addressed in the second half). Defendants italicize "other documents" but do not explain why. Nor have Defendants cited any authority for their absurd suggestion that the power to require use of a form includes the power to impose $100,000 fees. *See* PI Opp. 30.

1    Defendants' expansive interpretation of "entry" would eviscerate the statutory distinction the

2    Supreme Court identified between admissibility and visa issuance. Congress specifically delineated

3    between entry, 8 U.S.C. § 1225, the adjudication of visa petitions, § 1184(c), and the issuance of visas,

4    § 1201. And when conferring the authority encompassed by § 1182(f), Congress expressly limited the

5    President's power to restrictions on entry only.

6    **B.  The Proclamation supplants Congress's design for the H-1B program.**

7    Because the Proclamation exceeds the authority granted by § 1182(f) and § 1185(a)(1), the

8    Court's *ultra vires* inquiry may end there. But the Proclamation also fundamentally transforms the H-

9    1B program and supplants Congress's considered judgment on the contours of the H-1B program, thus

10   exceeding the President's § 1182(f) and § 1185(a)(1) authority. Under *Hawaii*, neither of these statutes

11   authorizes the President to supplant a Congressionally created statutory scheme.

12   In opposition, Defendants argue that Plaintiffs' complaint boils down to a policy disagreement

13   with the Proclamation, and that this Court should defer to the President's discretion. PI Opp. 27, 31. But

14   any policy disagreement here is between the President and Congress. The Supreme Court "has repeatedly

15   emphasized that 'over no conceivable subject is the legislative power of Congress more complete than

16   it is over the admission of aliens.'" *Fiallo*, 430 U.S. at 792 (citation omitted). Here, Congress has

17   exercised that legislative power over decades to enact multiple provisions that "reflect[] a set of

18   legislative judgments that the entry of international workers is in the national interest provided they enter

19   the market under the specific terms and conditions provided by the statute." *NAM*, 491 F. Supp. 3d at

20   566. By replacing these carefully considered policy judgments with a pay-to-play scheme bearing no

21   resemblance to the detailed H-1B program Congress created, "the President unlawfully nullifies and

22   overrides [the statutory program] with a 'different and inconsistent' approach to the same issue."[13] *See*

23   *Pacito*, 768 F. Supp. 3d at 1222 (citation omitted).

24   Congress's H-1B statutory scheme is detailed and extensive, codified in nearly two dozen

25   different statutory provisions in the INA and encompassing multiple legislative refinements over more

---

[13]  Defendants' claims of unreviewability "run[] contrary to the fundamental structure of our
constitutional democracy." *Washington*, 847 F.3d at 1161.

14

than three decades. *See, e.g.*, H-1B Handbook §§ 1:1-1:15 (2025 ed.) (describing H-1B's creation in 1990 and subsequent statutory amendments); *ITServe All., Inc. v. United States*, 122 F.4th 1364, 1368 (Fed. Cir. 2024) (describing some of the amendments to H-1B fee provisions). As discussed, Congress specified the number of H-1B workers, the process to petition, the requirement of a labor certification, and established various checks and balances against fraud and abuse of the program, including fees specifically to deter fraud and abuse. PI Mot. 4-8. In doing so, Congress made extremely detailed judgments, such as a reduced fee for certain kinds of employers, including small businesses. 8 U.S.C. § 1184(c)(9). Other examples include details like when H-1B employees count towards the annual 65,000 cap (such as when they change employment or where an individual has already been counted against the cap within the preceding six-year period), *id.* § 1184(g)(6), (7)); annual reporting requirements to Congress, *id.* § 1184(c)(8); and who must cover terminated H-1B employees' costs of return transportation, *id.* § 1184(c)(5)). The level of detail in these and multiple other provisions in the INA reflect Congress's comprehensive and detailed deliberations about and codification of the H-1B program.

Defendants insist that the $100,000 fee is consistent with the statutory scheme because the "existing provisions of the INA remain in effect." PI Opp.at 33. But the record demonstrates that Defendants' contention is wrong. Plaintiffs' declarations all affirm that they can no longer access the H-1B visa program because of the $100,000 fee, which far exceeds the maximum total fee existing statutes and regulations impose on an employer. For Lower Brule it is nearly double an H-1B employee's salary.[14] The fee has already had negative system-wide impacts on entire occupations in the health care

---

[14] Witte Decl. ¶ 12 ("There is no way LBDS can pay even one $100,000 fee. It is approximately twice a starting teacher's salary. It is not viable or sustainable."); *see also* Waters Decl. ¶¶ 19-21; Zylka Decl. ¶ 12; Henderson Decl. ¶¶ 12, 14-18.

1   industry.[15] By intentionally making it "noneconomic" for most employers to sponsor an H-1B worker,[16]

2   the Proclamation nullifies the many provisions Congress enacted to provide access to the H-1B program

3   for all employers, including educational institutions, non-profit organizations, and small businesses. *See,*

4   *e.g.*, 8 U.S.C. § 1184(g)(5) (exempting educational and nonprofit organizations from the annual 65,000

5   cap); *id.* § 1184(c)(9) (excusing the H-1B fee for education institutions and nonprofits and halving it for

6   small employers). Regardless of the Proclamation's policy goals, it conflicts with the statutory scheme

7   and, thus, exceeds the President's authority.

8       By limiting participation in the H-1B program to only extraordinarily wealthy employers, the

9   Proclamation "rewrites the carefully delineated balance between protecting American workers and the

10  need of American businesses to staff their operations with skilled, specialized, and temporary workers."

11  *NAM*, 491 F. Supp. 3d at 565. "[T]he President may not employ Section 1182(f) to effect a wholesale

12  reversal of legislatively established policy, nor may he use the provision to nullify an entire statutory

13  framework through executive decree." *Pacito*, 768 F. Supp. 3d at 1221.

14      **C.  The $100,000 Fee is ultra vires as an unlawful tax.**

15      Finally, the Proclamation unlawfully operates as a tax, in violation of the separation of powers

16  and Congress's taxing power, U.S. Const. art. I, sec. 8, cl. 1. The Executive Branch has no inherent

17  authority to impose taxes without an express delegation of power from Congress, *see Skinner v. Mid-*

18  *Am. Pipeline Co.*, 490 U.S. 212, 224 (1989), and there is no such delegation here.[17]

19  _____

20  [15] Declaration of Lalit Pattanaik ¶ 11-12 (ECF 75-7) ("Now that the Proclamation requires a $100,000

21  fee for each new H-1B hire from abroad, . . . the majority of clients we work with, have paused their
    hiring . . . with the new $100,000 fee per nurse, hiring these 200 nurses would cost the system over $20

22  million in visa fees alone, a financially impossible burden."); Decl. of Sarah K. Peterson ¶ 14 (ECF 75-
    9) ("[S]ome employers have already had to make a variety of immediate and significant decisions,"

23  including "suspending the allocation of medical slots to [international medical graduates] during the
    current and ongoing National Resident Matching Program ('the Match') process, pausing new job offers

24  for physician vacancies, and/or rescinding previous job offers because of the Proclamation.").

25  [16] The Economic Times, *Trump signs order imposing $100,000 annual fee for H-1B visa applications*,
    YouTube at 2:00 (Sept. 19, 2025), https://www.youtube.com/watch?v=d9rENKjxMiw ("Signing

26  Video").

27  [17] Even where Congress has expressly delegated money-exacting authority to the Executive Branch,
    courts are wary of giving the Executive Branch too much leeway, lest it usurp Congress's tax power. *See*

28  *Nat'l Cable Tel. Ass'n v. United States*, 415 U.S. 336, 341 (1974) (reading statute narrowly to allow
    agencies to set fees based on "value to the recipient" but not "public policy or interest served," out of

16

Defendants defend the Proclamation's $100,000 fee as a "regulatory payment" and not a "tax" that usurps Congress's taxing power. PI Opp. 36. But any purported regulatory purpose of the $100,000 does not alter its character as a tax that Congress must authorize,[18] and in any event, the "choice of label" does not affect whether a monetary exaction is "authorized by Congress's taxing power"—rather, the inquiry concerns the exaction's "substance and application." *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564-65 (2012) (collecting cases). Here, the President stated his intent that the Proclamation's $100,000 would generate money "to reduce taxes" and "reduce debt"[19]—evidence that the substance and application of the fee is in fact a tax. Defendants have not identified any cases where courts have interpreted language like that used in § 1182(f) and § 1185(a) as explicitly or implicitly permitting the Executive Branch to create a tax or fee. Neither *Hawaii* nor *Zemel v. Rusk*, 381 U.S. 1 (1965), concerned monetary payments; and in *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892), Congress "itself prescribed, in advance, the duties to be levied." *See* PI Opp. 36-37. Defendants have pointed to no prior use of § 1182(f) or § 1185(a) to levy a monetary assessment. Hr'g Tr. 74:14-75:9, *Chamber*, 2025 WL 3719234 (Liao Decl. Ex. 2) (government counsel conceding that § 1182(f) has never been used to impose a monetary restriction).

Section 1182(f) does not tolerate the expansive reading that Defendants propose. If it did, there would be no limiting principle to the president's power to use monetary exactions to reshape the immigration pathways Congress has created and would raise serious nondelegation concerns. The

---

concern that the latter "carries an agency far from its customary orbit and puts it in search of revenue in the manner of an Appropriations Committee of the House").

[18] *See, e.g.*, *United States v. Sanchez*, 340 U.S. 42, 44 (1950) (holding that "a tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed"); *Nat'l Cable*, 415 U.S. at 341 (while a "lawmaker" may choose, "in light of the 'public policy or interest served,'" to make a financial assessment "heavy" or "slight," "[s]uch assessments are in the nature of 'taxes' which under our constitutional regime are traditionally levied by Congress").

[19] The President's comments were not limited only to the Trump Gold Card. *See* PI Opp. 36. Responding to a question about both the Gold Card and the H-1B Proclamation, he discussed the revenue-raising power of both proclamations in the order in which he signed them, referencing first the "hundreds of billions of dollars" that the Gold Card will purportedly raise, then remarking that "companies will be able to keep some people that they need, you know they need people of expertise, great expertise"—i.e., employees with the specialized knowledge required to obtain an H-1B visa. *See* Signing Video at 0:00-4:44. After mentioning *both* proclamations, the President pledges that "[w]e're gonna take that money and we're gonna reduce taxes, we're gonna reduce debt." *Id.*

17

Proclamation and any implementation of it are ultra vires and unauthorized by § 1182(f)'s text.

## IV.   Plaintiffs' Administrative Procedure Act claims are likely to succeed.

### A.  Agency Defendants violated the APA by not conducting notice and comment.[20]

Agency Defendants' imposition of a $100,000 requirement is a legislative rule that must go through notice and comment, because it "imposes new obligations" on H-1B petitioners. *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1088 (9th Cir. 2003). Defendants' sole response is that the obligation comes from the Proclamation rather than the agencies. PI Opp. 26. But implementing a proclamation is not a defense to compliance with procedural requirements of the APA. *See supra* Argument I.C. This argument also ignores that the agencies here have been making new standards regarding who is subject to the fee. Courts have held in similar situations that agency rules are legislative rules. For example, in *Make the Rd. New York v. Pompeo*, an emergency notice that implemented a § 1182(f) proclamation requiring entering individuals to have health insurance was a legislative rule, where the notice provided "standards for consular officers to implement the Proclamation with 'direct and appreciable legal consequences' for visa applicants" that were "not previously contained in statute or regulation." 475 F. Supp. 3d 232, 257, 264-65 (S.D.N.Y. 2020); *see also Gomez*, 485 F. Supp. 3d at 191, 195 (finding State Department's policy of not issuing visas to individuals barred by proclamations from entering was a legislative rule because the policy went beyond the proclamations at issue and because § 1182(f) and § 1185(a) address only entry and not visa issuance). Here, as discussed above, the October Guidance similarly establishes standards that govern who is subject to the $100,000 fee. These standards deviated from the Proclamation, the INA, and even previous guidance. *See supra* Argument I.C.

Contrary to Defendants' suggestion, the foreign affairs exception to notice and comment rulemaking, 5 U.S.C. § 553(a)(1), PI Opp. 39, does not apply whenever a rule involves immigration, § 1182(f), or § 1185(a). The government must "do more than merely recite that the Rule 'implicates' foreign affairs." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775 (9th Cir. 2018). It must prove

---

[20] Defendants' sole defense against Plaintiffs' Regulatory Flexibility Act claim is that the RFA only applies if a rule must go through notice and comment. PI Opp. 39. If the Court agrees that the agencies' rules regarding the $100,000 fee did have to go through notice and comment, then Plaintiffs are likely to succeed on both their APA and RFA claims.

1   that immediate rule publication, instead of announcement of a proposed rule followed by a 30-day notice

2   and comment period, would lead to "definitely undesirable international consequences" that warrant

3   bypassing notice and comment. *Id.* at 776. In *E. Bay Sanctuary Covenant*, the Ninth Circuit rejected the

4   government's argument that the foreign affairs exception applied to a rule that, together with a § 1182(f)

5   proclamation, made asylum unavailable to anyone entering from Mexico outside a lawful port of entry,

6   despite the government's arguments that the President was negotiating with Mexico and other countries

7   and trying to address a large number of people transiting through Mexico "right now." *Id.* If that was

8   insufficient, so is Defendants' far less compelling allegation here that foreign countries and the United

9   States have "long" had concerns about foreign skilled workers coming to the U.S. PI Opp. 39.

10       Defendants also claim that they had "good cause" to bypass notice and comment. PI Opp. 38-

11  39. But agencies must state their good cause findings and the "reasons therefor in the rules issued," 5

12  U.S.C. § 553(b)(4)(B), which they did not do here. *See* ECF 46-5, 46-6, 46-7, 46-7, 46-9. In any event,

13  Defendants' post hoc rationale does not stand up to scrutiny. "Because the good cause exception is

14  essentially an emergency procedure, it is narrowly construed and only reluctantly countenanced." *E. Bay*

15  *Sanctuary Covenant*, 932 F.3d at 777 (cleaned up). "[S]uccessfully invoking the good cause exception

16  requires the agency to 'overcome a high bar' and show that 'delay would do real harm' to life, property,

17  or public safety." *Id.*; *see Chamber of Commerce v. DHS*, 504 F. Supp. 3d 1077, 1090-92 (N.D. Cal.

18  2020) (rejecting argument that high unemployment in the U.S. during COVID pandemic made it

19  "impracticable" to seek comment on rules changing the H-1B program). Defendants claim that potential

20  petitioners would have been able to "quickly apply and avoid the Proclamation altogether," PI Opp. 39,

21  but this government argument has been rejected before and should be rejected again. "The lag period

22  before any regulation, statute, or proposed piece of legislation allows parties to change their behavior in

23  response." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 676 (9th Cir. 2021). If that constitutes

24  "good cause" to bypass notice and comment, without evidence that the "delay caused by notice-and-

25  comment . . . might do harm to life, property, or public safety," the good cause exception would swallow

26  the rule. *Id.* (rejecting the government's claim that notice and comment could be bypassed because

27

28

1  asylum seekers might act before a rule and a § 1182(f) proclamation took effect).[21] Here, Defendants

2  have not even attempted to explain, let alone prove, that kind of harm. Defendants' contention that

3  comments would have been "meaningless" because the agencies had no discretion under the

4  Proclamation, PI Opp. 37-38, is simply another variation of their non-reviewability arguments. As

5  discussed above, the agencies did have discretion and in fact implemented the Proclamation in ways that

6  departed from the Proclamation's text. *Supra* Argument I.C. Furthermore, an agency's belief that only

7  one outcome is legally permissible is not a sufficient reason to skip notice and comment, as the legality

8  of an action is itself "one worthy of notice and an opportunity to comment." *See Consumer Energy*

9  *Council of Am. v. Fed. Energy Regul. Comm'n*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982).[22]

10    **B. Agency Defendants failed to consider obvious alternatives that could have**

11       **accommodated reliance interests and reduced harms.**

12       Agency Defendants' implementation of the $100,000 Requirement is also arbitrary and

13  capricious. Aside from rehashing its blind obedience argument (which, as discussed above, was rejected

14  in *Nebraska*, *supra* Argument I.C), Defendants argue that the agencies were not required to consider

15  "every alternative and thought conceivable," PI Opp. 40, but modifying or phasing in compliance

16  timelines, providing discounts, or making exceptions to accommodate reliance interests or lesser ability

17  to pay are obvious alternatives that the agencies should have considered. Indeed, in *DHS v. Regents of*

18  *the Univ. of California*, the Court struck down DHS's recission of the Deferred Action for Childhood

19  Arrivals (DACA) program where the DHS Secretary provided some flexibility to let the agency deal

20  with "administrative complexities," but she failed to consider "whether she had similar flexibility in

21  addressing any reliance interests of DACA recipients." 591 U.S. 1, 32 (2020). As the Court pointed out,

22  she could have considered offering "more accommodating termination dates" or instructing immigration

23

24

25  [21] *See also Purdue Univ. v. Scalia*, No. CV 20-3006 (EGS), 2020 WL 7340156, at *11 (D.D.C. Dec. 14, 2020) (rejecting similar price evasion argument in case challenging rule raising the prevailing wage for

26  H-1B workers, and noting that the H-1B process "has built-in legal safeguards that limit the extent to which employers could take advantage of advance notice-and-comment procedures to evade the rule").

27  [22] *Make The Rd. New York v. Wolf*, 962 F.3d 612, 632 (D.C. Cir. 2020), is distinguishable. In that case, a statute explicitly gave the DHS Secretary's "sole and unreviewable discretion" to make certain

28  designations and to modify them "at any time," which suggested that Congress intended to override the notice and comment requirements in the APA. Here, there is no comparable statutory language.

20

1  officials "to give salient weight to any reliance interests . . . when exercising individualized enforcement

2  discretion." *Id.* at 32-33. Here, similarly, the agencies narrowed the Proclamation in some respects, but

3  they failed to consider whether they had similar flexibility to address reliance interests for employers

4  and employees whose operations and careers were suddenly disrupted by the $100,000 requirement.

5  **V.    Movant Plaintiffs face irreparable harm.**

6      Each of the five Movant Plaintiffs is currently suffering types of harm that the Ninth Circuit has

7  held to be irreparable. *See* PI Mot. 38-40 (describing damage to ongoing recruitment efforts and

8  goodwill, the loss of prospective customers, disruption of business operations, cutting off of programs,

9  and a substantial loss of business). Defendants' arguments to the contrary are unpersuasive. As the Ninth

10 Circuit case Defendants cite *in their opposition* (PI Opp. 41) held, monetary harms can be irreparable,

11 especially in the APA context where Plaintiffs are unable to recover monetary damages. *E. Bay*

12 *Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2020). Defendants claim that "refunds can

13 be made," PI Opp. 41, but Nephrology Associates and BAE cannot afford to pay the fee now, so the

14 potential of later reimbursement does not help them, nor does it remedy the harm they are suffering due

15 to not having a nephrologist to see patients on their waiting list, Waters Decl. ¶¶ 10, 19-20, or a highly

16 valued employee in their quality control department, Zylka Decl. ¶¶ 12-15. Defendants again raise the

17 potential for a national interest exemption but ignore that USCIS's delay in deciding the Nephrology

18 Associates' and BAE's exemption requests is exacerbating their harm because it is keeping them from

19 filling crucial vacancies. Waters Decl. ¶¶ 18-19; Zylka Supp. Decl. ¶¶ 3-4. Plaintiffs are not aware of a

20 single national interest exemption being granted to date (and the record does not show otherwise). The

21 existence of a theoretical exemption does not obviate Plaintiffs' experience of actual harm.

22     Lower Brule and GVA schools also cannot afford to pay the fee, and their current inability to

23 use the H-1B program to recruit and retain teachers from abroad constitutes irreparable harm. Witte

24 Decl. ¶¶ 12-13; Henderson Decl. ¶¶ 15-18; Witte Supp. Decl. ¶¶ 4-8; *see Regents of the Univ. of Calif.*

25 *v. Am. Broad. Cos.*, 747 F.2d 511, 520 (9th Cir. 1984) (impairment of colleges' ability to attract and

26 retain student athletes constituted irreparable harm); *Luokung Tech. Corp. v. Dep't. of Def.*, 538 F. Supp.

27 3d 174, 194 (D.D.C. 2021) (the inability to "recruit and retain employees to build—or even maintain—

28

PLAINTIFFS' REPLY ISO MOT. FOR PRELIMINARY
INJUNCTION AND 5 U.S.C. § 705 STAY                    Case No. 4:25-cv-08454-HSG

1  a plaintiff's business also constitutes irreparable harm" (citation modified)).

2      Defendants' arguments regarding Global Nurse Force similarly fail. Global Nurse Force's

3  business model is based on matching U.S. healthcare facilities with qualified nurses from abroad. Global

4  Nurse Force has already lost $5 million in revenue and continues to lose revenue as its clients have

5  paused hiring in response to the Proclamation. Declaration of Lalit Pattanaik ("Pattanaik Decl.") ¶¶ 4-

6  5, 11-15 (ECF 75-7). All of its clients are cap-exempt, meaning they do not need to participate in the

7  lottery and could file H-1B petitions for nurses today, but for the $100,000 fee. *Id*. ¶ 4. Defendants'

8  speculation that Global Nurse Force's clients can simply find nurses within the U.S. is belied by the

9  uncontroverted factual record. *Id*. ¶¶ 3, 9-13 (discussing acute shortage of nurses in the U.S.).

10  Defendants also argue that Global Nurse Force's injury depends on third-party business decisions, but

11  there is no question here that Global Nurse Force's injuries are a result of Defendants' actions. *Cf.*

12  *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025) ("This case presents what the Court has

13  described as the 'familiar' circumstance where government regulation of a business 'may be likely' to

14  cause injuries to other linked businesses.").

15      Nor does the timing of this Motion undermine the irreparability of Movant Plaintiffs' harm.

16  Movant Plaintiffs sought relief less than two months after USCIS published its October 20, 2025

17  guidance, and on the same day that three new employer plaintiffs—Nephrology Associates, BAE, and

18  Lower Brule—joined the case and sought the certification of an employer class. This "delay" is far from

19  the nearly year-long delay in *Ojmar US, LLC v. Sec. People, Inc.*, No. 16-CV-04948-HSG, 2017 WL

20  2903143, at *3 (N.D. Cal. July 7, 2017). Moreover, delay alone is rarely a sufficient reason to deny a

21  preliminary injunction. *Doe v. Horne*, 115 F.4th 1083, 1111 (9th Cir. 2024) (seven-month delay "was

22  not a long delay in this context, and even if it were, delay is but a single factor to consider in evaluating

23  irreparable injury and courts are loath to withhold relief solely on that ground") (cleaned up). And "even

24  a long delay is not particularly probative in the context of ongoing, worsening injuries" such as those

25  being suffered by Nephrology Associates and BAE as they must operate without a crucial employee,

26  and Global Nurse Force as its lost revenue compounds due to the fee. *Id*. (internal quotation omitted).

27  As the Court's December 23, 2025 order (ECF 90) recognized, the issues in this case are complex,

28

1    particularly given the government's shifting positions on who is subject to the fee, and it reasonably

2    required time for Movant Plaintiffs to prepare motions to present the issues to the Court.

3    **VI.    The remaining factors favor Plaintiffs.**

4    Defendants have not established that any harm they would suffer would outweigh that to

5    Plaintiffs and to the public. After all, "the public . . . has an interest in ensuring that statutes enacted by

6    their representatives are not imperiled by executive fiat." *Sierra Club*, 379 F. Supp. 3d at 927 (finding

7    this factor weighed in favor of plaintiffs where they had demonstrated irreparable harm and a likelihood

8    of success on the merits). Defendants have made no effort to show that their evidence from 2015 is

9    reflective of current realities (ECF 98-1, 98-2)[23] let alone that those concerns outweigh the real and

10    immediate harms that the Movant Plaintiffs are experiencing. Nor do Defendants address the broader

11    harms to American communities that Plaintiffs and *amici* have demonstrated. PI Mot. 42-43; States'

12    Amicus Br. 6, 9-21 (ECF 82-1) (discussing importance of the H-1B program to hospitals, public schools,

13    and universities to address critical unmet labor needs, particularly in underserved rural and low-income

14    communities) And in any event, the proper audience for Defendants' concerns is Congress, which

15    created the H-1B program. Their evidence cannot be used to support a claim that the President has the

16    authority to unlawfully override the H-1B program by executive fiat.

17    **VII.    Preliminary relief for Movant Plaintiffs and a certified class, or in the alternative, vacatur**

18        **of the fee, is appropriate.**

19    Defendants contend that relief should be limited to those who have established irreparable harm.

20    PI Opp. 44. Each of the Plaintiffs seeking preliminary relief—Nephrology Associates, BAE, Lower

21    Brule, Global Village, and Global Nurse Force—has established irreparable harm. Whether non-movant

22    plaintiffs have done so, *see* PI Opp. 42, is irrelevant, as they are not seeking preliminary relief.

23    Nephrology Associates, BAE, and Lower Brule also seek to represent a class of employers who

24    are subject to the $100,000 fee, except for members of the U.S. Chamber of Commerce or Association

25    of American Universities, the plaintiffs in the parallel *Chamber* case. Class Reply § II.A (proposing

26    carve out). If the Court finds that the Rule 23 criteria are satisfied and certifies the class, the Court should

27    _____

28    [23] Also, this evidence was not "appropriately authenticated by an affidavit or declaration." L.R. 7-5(a).

23

1   also grant preliminary relief to the class. Defendants argue against a "universal" injunction, *see* PI Opp.

2   44, but Movant Plaintiffs are not asking for a "universal" injunction. Movant Plaintiffs are asking for

3   relief on behalf of a Rule 23 class. *See Trump v. CASA, Inc.*, 606 U.S. 831, 849-50 (2025) (distinguishing

4   universal injunctions from "properly conducted class actions" that "satisf[y] Rule 23's requirements").

5   Variation in the degree of harm is not a barrier to class-wide injunctive relief under Rule 23(b)(2). For

6   example, a class of all prisoners subject to a prison's policy and practice of not hiring enough doctors

7   "can be remedied on a class-wide basis by an injunction that requires [the prison] to hire more doctors,"

8   *Parsons v. Ryan*, 754 F.3d 657, 689 (9th Cir. 2014), even though individual prisoners' medical needs

9   will vary. Here, a class of employers filing petitions subject to the $100,000 fee can be remedied on a

10  class-wide basis by enjoining the fee, even if some employers' situations vary. *Cf. NetChoice v. Bonta*,

11  790 F. Supp. 3d 798, 810 (N.D. Cal. 2025) (harm to some members suffices even if others voluntarily

12  incur costs).

13          While larger employers may not experience the $100,000 fee as acutely as others, Class Opp. 7-

14  8, that does not negate the unrecoverable costs and business disruptions faced by many class members.

15  According to DHS, 84.8% of H-1B petitioning employers are small entities. *See* PI Mot. 31. Small

16  businesses likely make up an even larger percentage of the Class, to the extent larger employers are more

17  likely to be members of the Chamber or AAU and thus not part of the Class. Further, a $100,000 *per*

18  *petition* fee is not just a drop in the bucket even for larger employers. *See* Pattanaik Decl. ¶ 12 ("hiring . . .

19  200 nurses would cost [a Louisiana healthcare] system over $20 million in visa fees alone, a financially

20  impossible burden"). The sudden imposition of such fees also inevitably causes "damage to ongoing

21  recruitment efforts," "disruption of business operations," "closing of open positions" constitute

22  irreparable harm. *See Rent-A-Center, Inc. v. Canyon Tel. & Appliance Rental, Inc.*, 944 F.2d 597, 603

23  (9th Cir. 1991); *NAM*, 491 F. Supp. 3d at 569.

24          Alternatively, the Court may "set aside" or vacate the $100,000 fee pursuant to the APA.

25  Defendants' contention that vacatur must be limited to specific parties is not the law in the Ninth Circuit.

26  *Nat. Grocers v. Rollins*, 157 F.4th 1143, 1170 n.7 (9th Cir. 2025) (rejecting government's argument that

27  vacatur must be "limited and tailored to redress the parties' particular injury") (cleaned up).

28

1  **VIII.    The Court should neither require a bond nor stay relief pending appeal.**

2      The Court should not require the Movant Plaintiffs to post a bond for an injunction sought "to

3  protect the public interest and ensure compliance with federal law." *Cmty. Legal Servs. in E. Palo Alto*

4  *v. HHS*, 780 F. Supp. 3d 897, 926 (N.D. Cal. 2025) (declining to impose a bond). Defendants request

5  that the union plaintiffs pay a bond, PI Opp. 45, but Rule 65(c) requires "the movant" to give security in

6  an amount considered proper by the court, and the union plaintiffs are not movants.

7      Defendants' request for a stay pending appeal, *see* PI Opp. 45, is premature, as no order has been

8  issued and no party has appealed. If the Court issues an order that Defendants decide to appeal,

9  Defendants can seek a stay pending appeal at that time, in the normal course. *See* Fed. R. App. 8; *Nat'l*

10  *Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 130 n.14 (D.D.C. 2025) (denying government's

11  stay request as premature); *Elec. Frontier Found. v. Off. of Dir. of Nat'l Intel.*, No. C 08-01023 JSW,

12  2009 WL 10710750, at *1 (N.D. Cal. Oct. 7, 2009) (denying stay where government had not yet decided

13  to appeal). This would allow both Plaintiffs and the Court to properly assess the stay factors based on an

14  actual order.

15                                    **CONCLUSION**

16      For these reasons, Plaintiffs' motion for preliminary relief should be granted.

17

18  Date: January 23, 2026                    Respectfully submitted,

19  */s/ Karen C. Tumlin*                     */s/ Cynthia Liao*

20  Karen C. Tumlin (CA Bar No. 234691)       Cynthia Liao (CA Bar No. 301818)*
    Esther H. Sung (CA Bar No. 255962)        Johanna M. Hickman (D.C. Bar No. 981770)*

21  Laura Flores-Perilla (CA Bar No. 355645)  Jennie L. Kneedler (D.C. Bar No. 500261)*
    Hillary Li (GA Bar No. 898375)*           Steven Y. Bressler (D.C. Bar No. 482492)*

22  Brandon Galli-Graves (TX Bar No. 24132050)* Elena Goldstein (D.C. Bar No. 90034087)*
    Emily Satifka (NJ Bar No. 330452020)*     **DEMOCRACY FORWARD FOUNDATION**

23  **JUSTICE ACTION CENTER**                  P.O. Box 34553
    P.O. Box 27280                            Washington, DC 20043

24  Los Angeles, CA 90027                     (202) 808-1982 (Liao)
    (323) 450-7272                            cliao@democracyforward.org

25  karen.tumlin@justiceactioncenter.org      hhickman@democracyforward.org
    esther.sung@justiceactioncenter.org       jkneedler@democracyforward.org

26  laura.flores-perilla@justiceactioncenter.org sbressler@democracyforward.org
    hillary.li@justiceactioncenter.org        egoldstein@democracyforward.org

27  brandon.galli-graves@justiceactioncenter.org

28

Emily.satifka@justiceactioncenter.org

*/s/ Charles H. Kuck***
GA Bar No. 429940
**KUCK BAXTER LLC**
365 Northridge Rd., Suite 300
Atlanta, GA 30350
404-949-8154
Ckuck@immigration.net

*/s/ Zachary R. New*
Zachary R. New**
Atty. Reg. No. (Colorado): 53992
**JOSEPH & HALL, P.C.**
12203 East Second Ave.
Aurora, CO 80011
(303) 297-9171
zachary@immigrationissues.com

*/s/ Harini Srinivasan*
Harini Srinivasan (D.C. Bar No. 1032002)*
Aniko Schwarcz (D.C. Bar No. 980631)*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Suite 800
Washington, D.C. 20005
(202) 408-4600
hsrinivsan@cohenmilstein.com
aschwarcz@cohenmilstein.com

Alexandra Gray (NY Bar No. 6019590)*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine St., 14th Floor
New York, New York 10005
(212) 838-7797
agray@cohenmilstein.com

*/s/ Kalpana Peddibhotla*
Kalpana Peddibhotla (CA Bar No. 200330)
**SOUTH ASIAN AMERICAN JUSTICE COLLABORATIVE (SAAJCO)**
333 W. San Carlos Street, Suite 600
San Jose, CA 95110
(408) 550-9240
kalpana@saajco.org

*/s/ Jesse M. Bless*
JESSE M. BLESS*
MA Bar # 660713
**BLESS LITIGATION LLC**
6 Vineyard Lane
Georgetown MA 01833
781-704-3897
jesse@blesslitigation.com

*/s/ Greg Siskind*
Greg Siskind**
TN Bar No. 14487
**SISKIND SUSSER**
1028 Oakhaven Road
Memphis, TN 38119
(901) 682-6455
gsiskind@visalaw.com

*Counsel for Plaintiffs*

* Admitted *pro hac vice*
** Motion to appear *pro hac vice* forthcoming

PLAINTIFFS' REPLY ISO MOT. FOR PRELIMINARY
INJUNCTION AND 5 U.S.C. § 705 STAY

Case No. 4:25-cv-08454-HSG