Cynthia Liao (CA Bar No. 301818)*
Johanna M. Hickman (D.C. Bar No. 981770)*
Jennie L. Kneedler (D.C. Bar No. 500261)*
Steven Y. Bressler (D.C. Bar No. 482492)*
Elena Goldstein (D.C. Bar No. 90034087)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982 (Liao)
cliao@democracyforward.org
hhickman@democracyforward.org
jkneedler@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

*Admitted *pro hac vice*

[Additional co-counsel on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| GLOBAL NURSE FORCE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 4:25-cv-08454-HSG<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Judge:  Hon. Haywood S. Gilliam, Jr.<br>Ctrm:  2, 4th Floor<br>Date:  Thursday, April 2, 2026<br>Time:  2:00 p.m. |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

STATEMENT OF ISSUES ........................................................................................ 1

BACKGROUND ........................................................................................................ 1

PROCEDURAL HISTORY ........................................................................................ 4

LEGAL STANDARD ................................................................................................ 5

ARGUMENT .............................................................................................................. 6

I.    Plaintiffs have standing .............................................................................. 6

    A.    Plaintiffs Nephrology Associates, BAE Industries, Lower Brule, Global Village Academy Collaborative, and Global Nurse Force ................................ 7

    B.    Union Plaintiffs .............................................................................. 7

        1.    The interests the Union Plaintiffs seek to protect are germane to their organizational purposes. ................................................... 7

        2.    Union Plaintiffs' members have standing to sue in their own right. ................... 9

        3.    The district court *Chamber of Commerce* decision does not affect UAW International and UAW Local 4811's standing. ................................. 13

    C.    Religious Plaintiffs ........................................................................ 14

II.   Plaintiffs have stated a reviewable ultra vires claim ................................ 17

III.  Plaintiffs have stated APA and RFA claims. ........................................... 18

    A.    Agency Defendants' implementation of the $100,000 fee was final agency action. ...... 18

    B.    Judicial review is not precluded under 5 U.S.C. §§ 701(a)(1) and (2). ........................... 19

    C.    Agency Defendants' implementation of the $100,000 fee was contrary to law, arbitrary and capricious, and failed to follow required procedures under the APA and RFA. ................. 20

CONCLUSION ......................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Air Courier Conf. of Am. v. Am. Postal Workers Union AFL-CIO*,
    498 U.S. 517 (1991).................................................................................................18

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013)..................................................................................................12

*Am. Pub. Health Ass'n v. Nat'l Institutes of Health*,
    786 F. Supp. 3d 237 (D. Mass. 2025).......................................................................8

*Apple Inc. v. Vidal*,
    63 F.4th 1 (Fed. Cir. 2023).....................................................................................20

*Arizona Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014).................................................................................10

*Ayuda, Inc. v. Att'y Gen.*,
    661 F. Supp. 33 (D.D.C. 1987)................................................................................20

*Block v. Cmty. Nutrition Inst.*,
    467 U.S. 340 (1984).................................................................................................19

*Califano v. Sanders*,
    430 U.S. 99 (1977)...................................................................................................18

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996).................................................................................17

*Chamber of Com. v. DHS*,
    No. 25-CV-3675, 2025 WL 3719234 (D.D.C. 2025)..............................................13

*Chicago John Dineen Lodge #7 v. Kersten*,
    No. 24-CV-7376, 2025 WL 1207314 (N.D. Ill. Apr. 24, 2025)................................8

*City & Cnty. of S.F. v. USCIS*,
    944 F.3d 773 (9th Cir. 2019).....................................................................................6

*Dalton v. Spencer*,
    511 U.S. 462 (1994).................................................................................................17

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019).................................................................................................19

*Dep't of State v. Muñoz*,
    602 U.S. 899 (2024).................................................................................................17

*Durning v. Citibank, N.A.*,
    950 F.2d 1419 (9th Cir. 1991).................................................................................11

*Emami v. Nielsen,*
    465 F. Supp. 3d 991 (N.D. Cal. 2020) ..................................................................... 18, 19

*Eminence Cap., LLC v. Aspeon, Inc.,*
    316 F.3d 1048 (9th Cir. 2003) ................................................................................. 14

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,*
    544 U.S. 280 (2005) ................................................................................................. 14

*FBI v. Fikre,*
    601 U.S. 234 (2024) ................................................................................................. 12

*GP Vincent II v. Estate of Beard,*
    68 F.4th 508 (9th Cir. 2003) ................................................................................... 14

*Hawaii v. Trump,*
    859 F.3d 741 (9th Cir. 2017) ................................................................................... 11

*Hawaii v. Trump,*
    878 F.3d 662 (9th Cir. 2017), *rev'd on other grounds,* 585 U.S. 667 (2018)................... 11

*Humane Soc. of the U.S. v. Hodel,*
    840 F.2d 45 (D.C. Cir. 1988) .................................................................................... 7

*J. N. by & through Cisneros v. Oregon Dep't of Educ.,*
    No. 24-2080, 2025 WL 1863189 (9th Cir. July 7, 2025) ........................................... 13

*Jajati v. CBP,*
    102 F.4th 1011 (9th Cir. 2024) ................................................................................ 19

*Keller Wurtz v. USCIS,*
    No. 20-CV-2163-JCS, 2020 WL 4673949 (N.D. Cal. Aug. 12, 2020) ........................ 16

*Khoja v. Orexigen Therapeutics, Inc.,*
    899 F.3d 988 (9th Cir. 2018) .................................................................................... 6

*Leite v. Crane Co.,*
    749 F.3d 1117 (9th Cir. 2014) ............................................................................. 5, 10

*Los Angeles Haven Hospice, Inc. v. Sebelius,*
    638 F.3d 644 (9th Cir. 2011) .................................................................................... 6

*Matushkina v. Nielsen,*
    877 F.3d 289 (7th Cir. 2017) ................................................................................... 16

*Narambatla v. DHS,*
    No. 2:23-CV-01275, 2024 WL 1659025 (W.D. Wash. Apr. 17, 2024) ........................ 16

*Nat'l Cable Television Ass'n, Inc. v. United States,*
    415 U.S. 336 (1974) ................................................................................................. 20

*Nat'l Mar. Union of Am. v. Commander, Mil. Sealift Command,*
   824 F.2d 1228 (D.C. Cir. 1987) ............................................................................................ 9

*Nebraska v. Su,*
   121 F.4th 1 (9th Cir. 2024) ................................................................................ 13, 18, 20

*Planned Parenthood Great Nw. v. Labrador,*
   122 F.4th 825 (9th Cir. 2024) ........................................................................................ 13

*President & Fellows of Harvard Coll. v. HHS,*
   798 F. Supp. 3d 77 (D. Mass. 2025) ........................................................................... 6, 8

*Presidio Golf Club v. Nat'l Park Serv.,*
   155 F.3d 1153 (9th Cir. 1998) ........................................................................................ 7

*Refugee & Immigrant Ctr. & Legal Servs. v. Noem,*
   793 F. Supp. 3d 19 (D.D.C. 2025) ................................................................................ 19

*Rowe v. Educ. Credit Mgmt. Corp.,*
   559 F.3d 1028 (9th Cir. 2009) ........................................................................................ 6

*San Luis Obispo Mothers for Peace v. U.S. Nuclear Reg. Comm'n,*
   100 F.4th 1039 (9th Cir. 2024) ...................................................................................... 6

*Sanchez v. Nintendo of Am. Inc.,*
   No. C 20-06929 WHA, 2022 WL 4099154 (N.D. Cal. Sept. 7, 2022) ........................... 10

*Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.,*
   343 F.3d 1036 (9th Cir. 2003) ........................................................................................ 5

*Skaff v. Meridien N. Am. Beverly Hills, LLC,*
   506 F.3d 832 (9th Cir. 2007) .......................................................................................... 6

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
   600 U.S. 181 (2023) ....................................................................................................... 6

*Tenrec, Inc. v. USCIS,*
   No. 3:16-CV-995-SI, 2016 WL 5346095 (D. Or. Sept. 22, 2016) ................................. 10

*Teter v. Lopez,*
   125 F.4th 1301 (9th Cir. 2025) ..................................................................................... 13

*Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.,*
   594 F.2d 730 (9th Cir. 1979) .......................................................................................... 5

*Trudeau v. FTC,*
   456 F.3d 178 (D.C. Cir. 2006) ...................................................................................... 18

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,*
   517 U.S. 544 (1996) ....................................................................................................... 8

*United States v. Joelson*,
    7 F.3d 174 (9th Cir. 1993) ................................................................................................. 11

*Valenzuela v. Ducey*,
    No. CV-16-03072-PHX-DGC, 2017 WL 6033737 (D. Ariz. Dec. 6, 2017) ...................... 16

*Vasquez Perdomo v. Noem*,
    148 F.4th 656 (9th Cir. 2025) ............................................................................................. 7

*Vaz v. Neal*,
    33 F.4th 1131 (9th Cir. 2022) ............................................................................................ 18

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ........................................................................................... 17

*Waterkeeper All. v. EPA*,
    140 F.4th 1193 (9th Cir. 2025) .......................................................................................... 18

*Xinyi Jiang v. USCIS*,
    No. C20-1693 TSZ, 2021 WL 764264 (W.D. Wash. Feb. 26, 2021) .............................. 12

**Statutes**

5 U.S.C. § 553 ........................................................................................................................... 20

5 U.S.C. § 603 ........................................................................................................................... 20

5 U.S.C. § 604 ........................................................................................................................... 20

5 U.S.C. § 701(a) ...................................................................................................................... 19

5 U.S.C. § 701(a)(1) .................................................................................................................. 19

5 U.S.C. § 701(a)(2) .................................................................................................................. 19

8 U.S.C. § 1182(f) ....................................................................................................... 1, 13, 17, 19

8 U.S.C. § 1184(*l*)(2) ................................................................................................................. 10

8 U.S.C. § 1185(a) ...................................................................................................... 1, 13, 17, 19

8 U.S.C. § 1258(a) ................................................................................................................. 3, 12

8 U.S.C. § 1356(m) .................................................................................................................... 19

28 U.S.C. § 1331 ........................................................................................................................ 18

29 U.S.C. § 152(5) ....................................................................................................................... 8

31 U.S.C. § 9701 ........................................................................................................................ 20

**Regulations**

8 C.F.R. § 106.4(a) ..................................................................................................................... 16

8 C.F.R. § 106.4(c)(2) ........................................................................................................ 17

8 C.F.R. § 106.4(e)(2) ........................................................................................................ 17

8 C.F.R. § 106.4(f)(1) ........................................................................................................ 17

8 C.F.R. § 214.1(c)(7) .......................................................................................................... 3

8 C.F.R. § 248.1(a) ............................................................................................................. 12

8 C.F.R. § 248.1(b) ............................................................................................................. 12

8 C.F.R. § 248.2(a) ............................................................................................................. 12

**Rules**

Fed. R. Civ. P. 12(b)(1) ................................................................................................. 5, 14

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 6, 9, 14

Fed. R. Civ. P. 15(a) ......................................................................................................... 14

Fed. R. Evid. 201 ................................................................................................................. 6

**Other Authorities**

Proclamation No. 10,949, Restricting the Entry of Foreign Nationals To Protect the
United States From Foreign Terrorists and Other National Security and Public Safety Threats,
    90 Fed. Reg. 24,497 (June 10, 2025) .......................................................................... 16

Proclamation No. 10,973, Restricting on Entry of Certain Nonimmigrant Workers,
    90 Fed. Reg. 46,027 (Sept. 19, 2025) ................................................................. 1, 2, 12

Improving Continuity for Religious Organizations and Their Employees,
    91 Fed. Reg. 2,049 (Jan. 16, 2026) ............................................................................ 15

## INTRODUCTION

Plaintiffs challenge the President's September 19, 2025 Proclamation and federal agencies' policies, which together impose an enormous $100,000 fee—many times more than the fees Congress intended—on employers for each H-1B petition. Defendants' actions threaten employers who stand to lose doctors, engineers, teachers, pastors, and priests they otherwise would have hired or retained through the H-1B program, and the skilled foreign workers who planned their livelihoods and their families' future around this congressionally created immigration pathway. Plaintiffs also include a company whose business of connecting nurses abroad with U.S. hospitals facing nurse shortages is imperiled, and unions representing physicians who intend to serve in medically underserved areas and STEM researchers whose research and career trajectories have been disrupted by the $100,000 Requirement.

Each Plaintiff met their burden to allege facts demonstrating their standing at the time of the complaint. Defendants' subsequent change in policy regarding change of status petitions is not sufficient to meet their formidable burden to moot the union and religious Plaintiffs' claims where the government reserves the right to deny change of status and charge the $100,000 fee, at its discretion. Plaintiffs have also stated cognizable ultra vires, Administrative Procedure Act ("APA"), and Regulatory Flexibility Act ("RFA") claims. Defendants' contrary arguments, mostly focused on reviewability, are unpersuasive because they confuse and mischaracterize Plaintiffs' claims. In any event, in the Ninth Circuit, ultra vires review of proclamations issued under § 1182(f) and § 1185(a) is available and so is APA review of agency actions implementing proclamations. The Court should deny Defendants' motion to dismiss.

## STATEMENT OF ISSUES

1. Whether Plaintiffs have adequately alleged Article III standing at the motion to dismiss stage.

2. Whether Plaintiffs have stated ultra vires claims.

3. Whether Plaintiffs have stated claims under the APA and the RFA.

## BACKGROUND

On Friday, September 19, 2025, President Trump issued a Proclamation that restricted entry of H-1B workers, except for those "whose petitions are accompanied or supplemented by a payment of $100,000." *See* Proclamation No. 10,973, Restriction on Entry of Certain Nonimmigrant Workers, § 1(a), 90 Fed. Reg. 46,027 (Sept. 19, 2025). The Proclamation directed the Department of Homeland

Security ("DHS") to "restrict decisions on petitions not accompanied by a $100,000 payment," *id.* § 1(b), and directed the State Department to "approve only those visa petitions for which the filing employer has made the [$100,000] payment," *id.* § 2(b). The $100,000 fee is more than ten times the fees that the Immigration and Nationality Act and regulatory fee schedules require employers to pay, which is $7,595 at most, with discounts for small employers and non-profits. *See* First Amend. Compl. ("FAC") ¶¶ 70-80 (ECF 74) (describing statutes and regulations governing H-1B fees in more detail); USCIS Form G-1055, Fee Schedule (ECF 46-3 at 3; ECF 46-4 at 3-5) (listing H-1B fees). The only way for an H-1B petitioning employer to avoid the $100,000 fee is by obtaining a "national interest" exception granted by the Secretary of Homeland Security in her discretion. Proclamation § 1(c) (granting the Secretary discretion to determine that the hiring of "any individual [H-1B worker], all [H-1B workers] for a company, or all [H-1B workers] working in an industry" is in the national interest).

After the President's Friday afternoon announcement of the new policy, which was to be effective less than 48 hours after issuance—i.e., after "12:01 a.m. eastern daylight time on September 21, 2025"—current H-1B workers who were outside the United States began receiving urgent messages from their employers to return before the Proclamation went into effect. Chaos resulted, with some workers spending thousands of dollars on return travel to the United States. FAC ¶ 101. Others cancelled planned trips, and some workers who had already boarded flights made panicked requests to deplane. *Id.*

The sudden announcement left many questions unanswered. DHS, through its component agencies U.S. Citizenship and Immigration Services ("USCIS") and Customs and Border Protection ("CBP"), and the State Department (together, "Agency Defendants") scrambled to put out a flurry of public statements on September 20 and 21 ("September Guidance").[1] The announced policies were in some respects broader and in others narrower than the Proclamation. The Agency Defendants required a one-time payment of $100,000 "on submission" of "any" new H-1B petition filed after the Proclamation's effective date, without differentiating between petitions for individuals outside the

---

[1] Joseph B. Edlow, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B*, USCIS (Sept. 20, 2025) (ECF 46-5); Matthew S. Davies, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers [H-1B]*, CBP (Sept. 20, 2025) (ECF 46-6); *H-1B FAQ*, USCIS (Sept. 21, 2025) (ECF 46-7); *H-1B FAQ*, State Dep't (Sept. 21, 2025) (ECF 46-8).

United States and those inside the United States who might be changing to H-1B from another immigration status, for example. H-1B FAQ at 1, USCIS (Sept. 21, 2025) (ECF 46-7); H-1B FAQ at 1-2, State Dep't (Sept. 21, 2025) (ECF 46-8); *see* FAC ¶ 109 (noting that, under the September Guidance, "the $100,000 Requirement applied even where workers are already lawfully present in the United States under, for example, a student visa or another immigration status, and are seeking to change to H-1B status").

The agency policies also provided that the $100,000 Requirement would only apply to "new" petitions filed after the effective date, *id.*, even though the Proclamation said entry would be restricted unless a petition was "accompanied *or supplemented* by a payment of $100,000." The agency policies further provided that the Proclamation "[d]oes not change any payments or fees required to be submitted in connection with any H-1B *renewals*," a term that does not appear in the statute or regulations. H-1B FAQ at 1, USCIS (Sept. 21, 2025) (ECF 46-7) (emphasis added); H-1B FAQ at 2, State Dep't (Sept. 21, 2025) (ECF 46-8).

On October 20, roughly a month after the Proclamation, USCIS issued new guidance that again changed the rules. The October Guidance dropped "renewal." *See H-1B Specialty Occupations*, USCIS (Oct. 20, 2025) ("Oct. Guidance") (ECF 46-9). Rather, the $100,000 Requirement now applies to petitions for individuals outside the United States without a valid H-1B visa. It does not apply to change of status, amendment, and extension petitions filed for individuals inside the country, but *only if* USCIS grants the change of status, amendment, or extension. *Id.* at 2. Whether to grant change of status, an amendment, or extension is a discretionary decision by USCIS.[2] The Guidance also for the first time provided instructions for paying the $100,000 fee, notwithstanding that the requirement had already been in place for a month.

---

[2] *See* 8 U.S.C. § 1258(a) ("The Secretary of Homeland Security may, under such conditions as he may prescribe, authorize a change from any nonimmigrant classification to any other nonimmigrant classification . . . ."); 8 C.F.R. § 214.1(c)(7) ("Where an applicant or petitioner demonstrates eligibility for a requested extension or amendment of stay, USCIS may grant the extension or amendment in its discretion. The denial of an extension or amendment of stay request may not be appealed."); USCIS Policy Manual Vol. 2, Part A, Ch. 4.A (ECF 46-10 at 1) ("The decision to grant or deny an extension of stay or change of status request involves an exercise of discretion by USCIS."); USCIS Policy Manual Vol. 1, Part E, Ch. 8.C.2 (ECF 46-11 at 7-8) ("non-exhaustive" list of numerous discretionary factors to consider).

The October Guidance also announced DHS's policy regarding national interest exceptions, creating a considerably more onerous showing than that required under the Proclamation. Under the new policy, exceptions to the $100,000 payment will be granted by the Secretary of DHS only "in the extraordinarily rare circumstance where the Secretary has determined that a particular alien worker's presence in the United States as an H-1B worker is in the national interest, that no American worker is available to fill the role, that the alien worker does not pose a threat to the security or welfare of the United States, and that requiring the petitioning employer to make the payment on the alien's behalf would significantly undermine the interests of the United States." *Id.* at 3. Plaintiffs are not aware of any exemptions being granted. *See* FAC ¶ 113.

## PROCEDURAL HISTORY

Plaintiffs—a coalition of individuals and entities from healthcare, education (K-12 and higher education), and STEM fields, as well as religious organizations—filed suit on October 3, 2025, two weeks after the Proclamation was issued and two weeks before the October Guidance was issued. On December 18, 2025, Plaintiffs filed the FAC, the operative complaint, to add three additional plaintiffs and class allegations. The coalition now includes:

- **Employers/putative class representatives:** Nephrology Associates of the Carolinas, PA; BAE Industries; and Lower Brule Day School

- **Network of K-12 schools:** Global Village Academy Collaborative

- **Nurse recruiter:** Global Nurse Force

- **Unions:** Plaintiffs International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW International"); UAW Local 4811; Service Employees International Union, AFL-CIO Committee on Interns and Residents ("CIR"); and American Association of University Professors ("AAUP")

- **Religious organizations:** Society of the Divine Word ("SVD"); Fathers of St. Charles; Church on the Hill

- **Individual:** John Smith (pastor employed by Church on the Hill)[3]

---

[3] The second individual Plaintiff, Phoenix Doe, voluntarily dismissed her claims. *See* ECF 100.

1   That same day, the three new Plaintiffs—Nephrology Associates, BAE Industries, and Lower

2   Brule—moved to certify a class of employers filing petitions subject to the $100,000 fee and they, along

3   with Plaintiffs Global Nurse Force and Global Village Academy, moved for a preliminary injunction.

4   Pls.' Mot. for Class Cert. ("Class Cert Mot.") (ECF 76); Pls.' Mot. for Prelim. Inj. ("PI Mot.") (ECF 75).

5   The class certification and preliminary injunction motions are fully briefed and pending before this

6   Court.

7   On January 29, 2026, Defendants moved to dismiss the FAC. Defs.' Mot. to Dismiss ("Mot.")

8   (ECF 104). Aside from the standing arguments regarding the union Plaintiffs and religious Plaintiffs,

9   Defendants mostly incorporate the arguments they made in their preliminary injunction briefing. In this

10  opposition, Plaintiffs focus largely on the standing of the union and religious Plaintiffs and incorporate

11  their previous briefing from the preliminary injunction on the other issues.

12                                    **LEGAL STANDARD**

13  Rule 12(b)(1) allows for dismissal for lack of subject-matter jurisdiction. "Rule 12(b)(1) attacks

14  on jurisdiction can be either facial, confining the inquiry to allegations in the complaint, or factual,

15  permitting the court to look beyond the complaint." *Savage v. Glendale Union High Sch., Dist. No. 205,*

16  *Maricopa Cnty.*, 343 F.3d 1036, 1040 n.2 (9th Cir. 2003). "A 'facial' attack accepts the truth of the

17  plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction.'"

18  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). "A 'factual' attack, by contrast, contests the

19  truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id.*

20  "When the defendant raises a factual attack, the plaintiff must support her jurisdictional allegations with

21  'competent proof,' . . . under the same evidentiary standard that governs in the summary judgment

22  context." *Id.* (citation omitted). "Where the jurisdictional issue is separable from the merits of the case,

23  the judge may consider the evidence presented with respect to the jurisdictional issue and rule on that

24  issue, resolving factual disputes if necessary." *Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d

25  730, 733 (9th Cir. 1979).

26  Rule 12(b)(6) allows for dismissal for "failure to state a claim upon which relief can be granted."

27  In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as

28  true and construe the pleadings in the light most favorable" to the non-moving party. *Rowe v. Educ.*

1  *Credit Mgmt. Corp.*, 559 F.3d 1028, 1029-30 (9th Cir. 2009) (quotation omitted). "Generally, district

2  courts may not consider material outside the pleadings when assessing the sufficiency of a complaint

3  under Rule 12(b)(6)," except under "the incorporation-by-reference doctrine, and judicial notice under

4  Federal Rule of Evidence 201." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

5  **ARGUMENT**

6       The Court should deny Defendants' motion to dismiss. Each Plaintiff properly alleged standing

7  in the complaint, Agency Defendants' subsequent actions do not moot their claims, and Plaintiffs have

8  stated statutory and non-statutory claims that merit relief.

9  **I.    Plaintiffs have standing.**

10      Each Plaintiff alleged standing to bring their claims. "To establish standing, the plaintiff . . . must

11  show that an injury-in-fact was caused by the challenged conduct and can be redressed by a favorable

12  judicial decision." *San Luis Obispo Mothers for Peace v. U.S. Nuclear Reg. Comm'n*, 100 F.4th 1039,

13  1054 (9th Cir. 2024). Plaintiffs "need only establish a risk or threat of injury to satisfy the actual injury

14  requirement." *City & Cnty. of S.F. v. USCIS*, 944 F.3d 773, 787 (9th Cir. 2019). "[A] plaintiff is

15  presumed to have constitutional standing to seek injunctive relief when it is the direct object of regulatory

16  action challenged as unlawful." *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655 (9th

17  Cir. 2011). "The existence of standing turns on the facts as they existed at the time the plaintiff filed the

18  complaint." *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007).

19      Associations, such as unions, may have standing in two ways: by showing the organization (1)

20  "suffered an injury in its own right," or (2) "as the representative of its members." *Students for Fair*

21  *Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). To invoke the

22  latter, an association must allege that (a) the association's members would "otherwise have [had]

23  standing to sue in their own right," (b) the interests the association seeks to protect are germane to its

24  organizational purposes, and (c) "neither the claim[s] asserted nor the relief requested requires the

25  participation of individual members in the lawsuit." *Id.*

26

27

28

### A. Plaintiffs Nephrology Associates, BAE Industries, Lower Brule, Global Village Academy Collaborative, and Global Nurse Force

As explained in detail in Plaintiffs' pending motion for preliminary injunction and reply brief, Plaintiffs Nephrology Associates, BAE Industries, Lower Brule, Global Village, and Global Nurse Force have each established standing. PI Mot. 33-37; Pls.' Reply in Support of Prelim. Inj. ("PI Reply") 8-11 (ECF 101). As Defendants have done, *see* Mot. 3, Plaintiffs incorporate their previous arguments by reference.

### B. Union Plaintiffs

The Union Plaintiffs also had standing at the time they filed their Complaint, as their members otherwise had standing in their own right and the interests the unions sought to protect were germane to their organizational purposes. Agency Defendants' later decision that the $100,000 Requirement would not apply to change of status petitions—but only if USCIS exercised discretion to grant the change of status—is not sufficient to moot the Union Plaintiffs' claims.

### 1. The interests the Union Plaintiffs seek to protect are germane to their organizational purposes.

Defendants challenge only the first two requirements for associational standing (germaneness and whether the unions' members would have had standing to sue in their own right). Defendants do not contest that the claims asserted or relief sought require participation of individual union members in the litigation. Taking germaneness first, the germaneness test is an "undemanding" one that requires "mere pertinence between litigation subject and organizational purpose." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998); *Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988). For instance, an association having "institutional goals" to protect "a broad range of rights" for their members is sufficient to establish germaneness. *Vasquez Perdomo v. Noem*, 148 F.4th 656, 677 (9th Cir. 2025). Even an "unstated but obvious side goal" is sufficient. *Humane Soc.*, 840 F.2d at 59.

Defendants appear to make a factual attack on this issue, as they cite evidence outside the complaint to dispute facts regarding the goals of the union Plaintiffs. *See* Mot. 7. But germaneness is amply satisfied here. "Courts often hold that a union has a germane interest in protecting the rights of its members" where the lawsuit involves its members' employment. *Chicago John Dineen Lodge #7 v.*

1   *Kersten*, No. 24-CV-7376, 2025 WL 1207314, at *3 (N.D. Ill. Apr. 24, 2025) (collecting cases); *see also*

2   *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 n.6 (1996)

3   (recognizing "the paramount role, under federal labor law, that unions play in protecting the interests of

4   their members"); 29 U.S.C. § 152(5) (labor organizations "exist[] for the purpose, in whole or in part, of

5   dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment,

6   or conditions of work"). This Court should as well.

7        Plaintiff CIR's mission is to "empower interns, residents and fellows to fight for excellence for

8   our patients, our training, and our healthcare system through organizing, collective bargaining, and

9   advocacy." *See* Liao Decl. Ex. 1 at 1. Immigrants' rights and diversity, inclusion, and anti-racism

10  (including health justice) are two of CIR's mission and organizing priorities. *See* Liao Decl. Ex. 2 at 3-

11  4. Fighting to preserve an important pathway that allows their "numerous members who plan to seek H-

12  1B visas" to live and work in the United States and allows their members to serve in medically

13  underserved communities, is obviously pertinent to those purposes. *See* FAC ¶¶ 129-134 (two examples

14  of CIR members seeking H-1B visas to serve in medically underserved communities). Plaintiff "AAUP's

15  mission is to advance academic freedom and shared governance in higher education, define fundamental

16  professional values and standards for higher education, promote the security of faculty, academic

17  professionals, graduate students, postdoctoral fellows, and all those engaged in teaching and research in

18  higher education; to help the higher education community organize to make its goals a reality; and to

19  ensure higher education's contribution to the common good." FAC ¶ 32; Liao Decl. Ex. 3 at 1. Stopping

20  an unlawful $100,000 fee policy that could disrupt the careers of academic researchers furthers those

21  purposes. *See President & Fellows of Harvard Coll. v. HHS*, 798 F. Supp. 3d 77, 113 (D. Mass. 2025)

22  (finding lawsuit to stop funding cuts to Harvard that could end academics' careers germane to AAUP's

23  purpose). The same applies to UAW International and Local 4811, who similarly fight for their

24  members' interests, including those members who seek H-1B visas. *See* FAC ¶ 189; *Am. Pub. Health*

25  *Ass'n v. Nat'l Institutes of Health*, 786 F. Supp. 3d 237, 252 (D. Mass. 2025) (finding lawsuit to stop

26  NIH funding cuts that would require UAW members "to leave their current postdoctoral positions or

27

28

1    otherwise significantly alter their career paths" germane to UAW's representation of its members'

2    interests).[4]

3         Defendants cite to two AFL-CIO statements regarding the H-1B program from 11 and 20 years

4    ago, Mot. 7-8, but neither of them defeat germaneness. First, the Court should not consider these

5    statements because they have not been authenticated as required by Local Rule 7-5(a). Second, even if

6    considered, they do not undermine the pertinence of this lawsuit, which seeks to preserve the Union

7    Plaintiffs' members' ability to live and work in the United States, to the Union Plaintiffs' organizational

8    purposes of fighting for their members and improving their workplaces and communities. The AFL-CIO

9    statements (cited at Mot. 7 n.7, 8 n.8) show the AFL-CIO's concern for "both native-born and foreign"

10   workers and its support for a pathway to stable, non-exploitative employment and legal status for

11   workers.[5] Further, both were issued while Congress was considering legislation to change the H-1B

12   program. Neither statement suggests that the AFL-CIO supported (or now supports, 11 to 20 years later)

13   unlawful executive action to wipe out the program overnight, as the Proclamation aims to do, to the

14   detriment of Plaintiff union members who need H-1B visas to live and work in the United States.[6]

15        **2. Union Plaintiffs' members have standing to sue in their own right.**

16        The remainder of Defendants' challenges to the Union Plaintiffs' standing go to the legal

17   sufficiency of their injury allegations. In resolving these facial attacks, a district court applies the same

18   standard as in the Rule 12(b)(6) context. It must take factual allegations as true and make reasonable

19

---

20   [4] That protecting their non-citizen members' ability to live and work in the United States is part of UAW
21   and Local 4811's mission is evident from the work that they have done. Local 4811, for example,
     advocates for its international scholar members, provides know-your-rights materials on immigration
22   law issues, and has established a legal defense fund for those experiencing immigration issues. *See* Liao
     Decl. Ex. 4. UAW has won paid time off for members to attend immigration appointments so that they
23   can maintain their ability to live and work here. *See* Liao Decl. Ex. 5 at 8.
     [5] Defendants also cite to a 2016 op-ed by Columbia University administrators, who obviously were not
24   speaking for the unions, as the op-ed advocated against unionization. Mot. 8 n.8. Like Defendants here,
     the op-ed selectively quotes from an AFL-CIO policy statement while omitting AFL-CIO's commitment
25   to "eliminat[ing] all real and perceived ways in which immigration status can be used to divide working
     people." Liao Decl. Ex. 6 at 2.
26   [6] To the extent Defendants are suggesting that not all union members share the same goals, "[t]he mere
     fact of conflicting interests among members of an association does not of itself defeat the association's
27   standing to urge the interests of some members in litigation, even though success may harm the legal
     interests of other members." *Nat'l Mar. Union of Am. v. Commander, Mil. Sealift Command*, 824 F.2d
28   1228, 1234 (D.C. Cir. 1987).

1    inferences in Plaintiffs' favor. *Leite*, 749 F.3d at 1121. The district court is limited to reviewing the

2    allegations in the complaint, any documents incorporated by reference in the complaint, and any facts

3    subject to judicial notice. *See, e.g.*, *Sanchez v. Nintendo of Am. Inc.*, No. C 20-06929 WHA, 2022 WL

4    4099154, at *2 (N.D. Cal. Sept. 7, 2022).

5        Each Union Plaintiff identified members with standing to sue in their own right at the time the

6    Complaint was filed. CIR identified two physician members who were finishing fellowship or residency

7    training programs and are applying for jobs in federally designated Health Professional Shortage Areas

8    and Medically Underserved Areas. Congress designed a pathway that allows physicians on J-1 visas who

9    are willing to serve in such areas to remain in the country on an H-1B visa. 8 U.S.C. § 1184(*l*)(2).

10   Employers operating in these underserved areas would ordinarily petition for H-1B visas for physicians

11   like the CIR members; however, they lack resources to pay the $100,000 fee. FAC ¶¶ 131-134. These

12   allegations are sufficient to establish standing.

13       Losing "the significant opportunity to obtain authorization to live and work in the United States"

14   is a cognizable injury for standing purposes. *Tenrec, Inc. v. USCIS*, No. 3:16-CV-995-SI, 2016 WL

15   5346095, at *6 (D. Or. Sept. 22, 2016) (cleaned up). If forced to leave, CIR's member from Pakistan is

16   unlikely to find employment adequate to support himself and his family. FAC ¶ 132. CIR's member

17   from Canada would be separated from his U.S. citizen fiancée and would have to incur costs to be re-

18   credentialed in Canada. *Id.* ¶ 135. Loss of early-career opportunities are also cognizable injuries. *Cf.*

19   *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (recognizing such injuries as

20   irreparable harm). And these injuries are not speculative. CIR members are already seeing that employers

21   who otherwise would normally sponsor them for H-1B visas are unable to do so because of the fee. FAC

22   ¶¶ 132, 134; *see also id.* ¶ 137 ("Many of the hospitals that hire foreign trained physicians are non-profits

23   and will not be able to afford this fee.").[7]

24

25

26

---

27   [7] Defendants appear to misunderstand CIR's allegations. CIR members are not employers who "hire
     physicians." Mot. 6. Their identified members are physicians currently on J-1 visas who seek to stay in

28   the United States by obtaining H-1B status, but are being hampered from doing so because the $100,000
     fee is unaffordable for employers who would otherwise petition for them. FAC ¶¶ 131, 133.

1    UAW International and Local 4811 identified a member who is a post-doctoral researcher at a

2    major U.S. research institution working on biomedical modeling projects to advance drug treatments for

3    tuberculosis and breast cancer. *Id.* ¶ 190. His lab recommended that the research institute file an H-1B

4    petition on his behalf, but the $100,000 fee would be extremely burdensome on the research institute and

5    would jeopardize his research. *Id.* UAW International also identified another member who is a post-

6    doctoral neuropharmacologist at a major research institution on the East Coast. His institution similarly

7    planned to sponsor him for an H-1B visa so he can continue his research on fentanyl in pain management,

8    meant to identify ways to reduce the risk of addiction. *Id.* ¶ 191. AAUP identified a member completing

9    a postdoc at a major research university, whose employer intended to seek an H-1B visa for her. But the

10   university placed the visa process on hold due to the $100,000 fee. *Id.* ¶ 193.

11   The Union Plaintiffs thus all alleged cognizable harm to their members, and Defendants' contrary

12   arguments are unavailing. First, Defendants fail to identify any authority for their position that, in order

13   to have standing, UAW International, UAW Local 4811, and AAUP's members had to first apply for a

14   national interest exception, particularly where no exceptions have been granted, to Plaintiffs' knowledge.

15   *Id.* ¶ 113.[8] The Ninth Circuit has rejected similar arguments and this Court should reject it here as well.

16   *See Hawaii v. Trump*, 878 F.3d 662, 678-79 (9th Cir. 2017), *rev'd and remanded on other grounds,* 585

17   U.S. 667 (2018) (rejecting argument that "Plaintiffs' claims are speculative and not ripe for adjudication

18   until a specific applicant is denied a visa" and noting that "the Proclamation's waiver provisions are not

19   a 'sufficient safety valve'"); *Hawaii v. Trump*, 859 F.3d 741, 767 (9th Cir.), *vacated and remanded as*

20   *moot,* 583 U.S. 941 (2017) ("We are unpersuaded by the Government's arguments that *until* a student or

21   faculty member requests a waiver and it is denied . . . , Plaintiffs injuries are not ripe.").[9]

22   Second, Defendants suggest that "major U.S. research institutions" should be able to pay the

23   $100,000 fee for UAW International, UAW Local 4811, and AAUP's members. Mot. 7. But it is

24   _____

25   [8] Defendants did not make this argument as to CIR, *see* Mot. 6, perhaps because the American Medical

26   Association sought a national interest exception for physicians on September 25, 2025. Plaintiffs are not
     aware of any exceptions being granted. FAC ¶¶ 113, 136 & n.30.

27   [9] A Ninth Circuit decision that was reversed on different grounds, but not vacated, still has precedential
     effect. *See Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991). While a vacated decision

28   has no precedential effect, it can nevertheless be persuasive. *See United States v. Joelson*, 7 F.3d 174,
     178 n.1 (9th Cir. 1993).

1  reasonable to infer that charging $100,000 extra per H-1B petition will make even large employers less

2  likely to sponsor employees for H-1Bs. *See* FAC ¶ 190 (the $100,000 fee would be "extremely

3  burdensome" on CIR member's research institute and would jeopardize his research); *id.* at 53 n.44

4  (citing news article discussing "huge costs" to universities). Indeed, that is the whole point of the policy.

5  *See* Proclamation, 90 Fed. Reg. at 46,027-28 (targeting tech companies with thousands of employees).

6         Third, the Agency Defendants' new change of status policy alone does not moot the Union

7  Plaintiffs' claims. Under the voluntary cessation doctrine, it is a defendant's "formidable burden" to

8  show "that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to

9  recur." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). The government has not met its burden here

10 because, under the October Guidance, change of status petitions can escape the $100,000 fee *only if*

11 USCIS exercises its discretion favorably and grants the change of status. Some individuals are

12 categorically ineligible to change status.[10] Even for those who are eligible, USCIS's exercise of

13 discretion entails consideration of a "non-exhaustive list" of two dozen factors, with "no formula for

14 determining the weight" of the factors. USCIS Policy Manual Vol. 1, Part E, Ch. 8.C.2 (ECF 46-11 at

15 7-8). Furthermore, at least one court in this circuit has adopted Defendants' view that the ultimate

16 decision is unreviewable. *See* Oct. Guidance, ECF 46-9 at 2; *Xinyi Jiang v. USCIS*, No. C20-1693 TSZ,

17 2021 WL 764264, at *2 (W.D. Wash. Feb. 26, 2021). Where the government, under its new policy,

18 reserves the right to subject change of status petitions to the fee, the policy does not provide "assurance"

19 that the government will not resume applying its unlawful fee to such petitions. *See Fikre*, 601 U.S. at

20 242.

21        The factual circumstances surrounding the issuance of the Proclamation and Agency Defendants'

22 implementing guidance, including the October Guidance, also counsel against finding mootness based

23 on the change of status policy. As the Ninth Circuit has explained, while a legislative change made

24 through "a process requiring coordinated action by a multi-member body representing a diverse array of

25

26 ───────────────

   [10] Individuals with certain immigration statuses or individuals who lack lawful status, such as Deferred
27 Action for Childhood Arrivals ("DACA") recipients, are categorically ineligible to change status to H-
   1B from within the United States and thus must leave and come back to obtain H-1B status, which under
28 USCIS's current guidance triggers the $100,000 fee. *See, e.g.*, 8 U.S.C. § 1258(a); 8 C.F.R. § 248.1(a)-
   (b); *id.* § 248.2(a).

1  interests" make it unlikely that the legislature will have the "agility and coordination" to go back to its

2  old ways, *Teter v. Lopez*, 125 F.4th 1301, 1307 (9th Cir. 2025), "[a]n executive action that is not

3  governed by any clear or codified procedure cannot moot a claim," *Planned Parenthood Great Nw. v.*

4  *Labrador*, 122 F.4th 825, 841 (9th Cir. 2024). Neither can an agency's changes in policies or practices

5  that "could be easily abandoned or altered in the future" moot a plaintiff's claim. *J. N. by & through*

6  *Cisneros v. Oregon Dep't of Educ.*, No. 24-2080, 2025 WL 1863189, at *2 (9th Cir. July 7, 2025). Here,

7  the Proclamation was announced with no notice on September 19, 2025 and went into effect less than

8  48 hours later. On September 20 and 21, without any prior announcement at all, the Agency Defendants

9  issued binding guidance that significantly changed the universe of employers and workers subject to the

10  $100,000 fee. The Agency Defendants then again, without warning, changed the rules on October 20,

11  after this lawsuit was filed. The President and Agency Defendants' haphazard and unpredictable changes

12  to  the $100,000 Requirement—coupled with the government's sweeping claims that these decisions are

13  unreviewable and exempt from "the public involvement, transparency, and deliberation required under

14  the APA," *Nebraska v. Su*, 121 F.4th 1, 16 (9th Cir. 2024)—similarly provide no assurance that the

15  unlawful fee will not be applied. This is particularly the case where the Proclamation itself does not

16  carve out change of status petitions and Agency Defendants have repeatedly claimed to have no authority

17  to depart from the Proclamation (despite having done so). *See, e.g.*, Mot. 11 ("agencies lack authority to

18  either disobey or disregard" President's actions under § 1182(f) and § 1185(a)). Thus, declaratory or

19  injunctive relief or vacatur would still provide relief to Union Plaintiffs' members here.

**3.  The district court *Chamber of Commerce* decision does not affect UAW International and UAW Local 4811's standing.**

22  Defendants allege that there is overlap between the members of UAW International and UAW

23  Local 4811 and the members of the U.S. Chamber of Commerce ("Chamber") and the Association of

24  American Universities ("AAU"), the plaintiffs in *Chamber of Com. v. DHS*, No. 25-CV-3675, 2025 WL

25  3719234 (D.D.C. 2025), who lost a similar case challenging the Proclamation before a D.C. district

26  court.[11] Mot. 7. However, Defendants' suggestion that any UAW members whose H-1B petitions are or

---

[11] The *Chamber* case is currently pending before the D.C. Circuit. No. 25-5473 (D.C. Cir. oral argument scheduled Mar. 9, 2026).

1   would be filed by employers who are members of the Chamber or AAU no longer have standing is

2   incorrect. The Chamber and AAU have not obtained any relief from the $100,000 fee. Thus, such UAW

3   members would still be injured by the $100,000 fee.[12]

4                                              * * *

5           For these reasons, the Court should decline to dismiss the Union Plaintiffs' claims. Should their

6   claims be dismissed, the Court should grant leave to amend to allege additional facts regarding

7   continuing harms to the Union Plaintiffs' members caused by the $100,000 fee. *See* Fed. R. Civ. P. 15(a)

8   ("The court should freely give leave [to amend] when justice so requires."); *Eminence Cap., LLC v.*

9   *Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("Dismissal with prejudice and without leave to amend

10  is not appropriate unless it is clear on de novo review that the complaint could not be saved by

11  amendment.").

12  **C. Religious Plaintiffs**

13          Plaintiffs Fathers of St. Charles, Society of the Divine Word ("SVD"), and Church on the Hill,

14  as well as Church on the Hill's employee Plaintiff John Smith, also have standing. As explained in the

15  FAC, the Fathers of St. Charles and SVD use the H-1B program to retain priests to serve diverse ethnic

16  communities. Fathers of St. Charles are called by their faith to serve migrants and refugees, particularly

17  the poorest migrants, and thus it is critical that the members of their order be able to perform all

18  sacramental and liturgical activities in a linguistically and culturally appropriate manner. FAC ¶ 171.

19  Within the United States, its members minister to Latin American, Vietnamese, and Brazilian

20  communities. *Id.* ¶ 171. Most of the members of the Fathers' order speak at least two to three different

21  languages and rotate to different locations within their province as well as to other Scalabrinian provinces

22  around the world. *Id.* SVD's priests similarly provide spiritual counsel and guidance in a variety of

23  languages and serve as church canon law consultants, which requires specialized training. *Id.* ¶ 167.

24  _____

25  [12] Defendants have not raised a claim preclusion defense in their motion; thus, the issue has been forfeited
26  and dismissal on this basis is not appropriate. Moreover, "[p]reclusion, of course, is not a jurisdictional
    matter." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005). Thus, it is not the
27  proper subject of a Rule 12(b)(1) motion. Whether non-parties were "adequately represented by someone
    with the same interests who was a party to the prior litigation . . . is a fact-intensive inquiry in this case
28  best determined outside the confines of a Rule 12(b)(6) motion." *GP Vincent II v. Estate of Beard*, 68
    F.4th 508, 518 (9th Cir. 2003).

1   Neither the Fathers nor SVD can afford to pay $100,000 per petition. *Id.* ¶¶ 169, 174. Defendants claim

2   that the Fathers and SVD failed to explain why they cannot find workers with language skills outside of

3   the H-1B program, Mot. 4, but Plaintiffs did explain: The "ongoing changing realities in the American

4   Catholic Church, such as an aging native-born clergy and religious community, and fewer American

5   (born and naturalized) candidates becoming priests" make it difficult to find individuals with the required

6   cultural and language skills, religious training, and desire to serve as priests in the United States. FAC

7   ¶ 166.

8          Defendants suggest other pathways religious employers can use, *see* Mot. 4, but none provide

9   the same level of continuity that H-1B offers. As Plaintiffs explained, while there is a way to lawful

10  permanent residence (colloquially, a "green card") if an employer sponsors a religious worker for an

11  Employment Based Fourth Preference ("EB-4") immigrant visa, there is currently a lengthy wait time

12  for immigrant visas to become available. FAC ¶ 168. Church on the Hill and its pastor John Smith are

13  in this precise situation. *Id.* ¶ 181. While the R-1 visa program allows religious employers to sponsor

14  priests and pastors to work in the United States for five years, once those five years are up, the individual

15  must leave the country. At the time Plaintiffs filed the Complaint, the individual had to wait at least one

16  year abroad before he would be able to obtain another R-1 visa. Compl. ¶ 134; *see also* FAC ¶ 168.

17  Recently, DHS issued an interim final rule that removes the one-year requirement, but the individual

18  still must leave the country, wait for a visa appointment, and re-enter. Improving Continuity for Religious

19  Organizations and Their Employees, 91 Fed. Reg. 2,049 (Jan. 16, 2026). Leaving and re-entering is

20  risky, however. Under the Trump Administration, the rules governing visas and entry frequently change

21  on a dime, as exemplified by the chaotic rollout of the H-1B Proclamation at issue here. *See* FAC ¶¶ 9-

22  10 (describing H-1B employees' scramble to return to the U.S. after the Proclamation's Friday afternoon

23  issuance, before the new fee took effect on Sunday after midnight); *see also* PI Reply 7 (describing BAE

24  Industries' employee leaving the U.S. under the September Guidance, which would have allowed BAE

25  to petition for him to re-enter on an H-1B visa without paying the fee, only to be trapped outside the

26  country when USCIS changed the rules in the October Guidance five days later).[13] The H-1B pathway

27  ───────────────

28  [13] *See also, e.g.*, Proclamation No. 10,949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, 90 Fed.

15

1    allows Plaintiffs' priests and pastors to continue working in the United States without risking being

2    separated from their congregations for an extended period of time.

3            As to Plaintiff John Smith, Defendants baldly contend that living in the United States in H-1B

4    status is not a legally protected interest. Mot. 5. But losing the "significant opportunity to obtain

5    authorization to live and work in the United States, earning United States wages, and enjoying life in the

6    United States" is an injury for Article III standing purposes. *Tenrec*, 2016 WL 5346095, at *6; *see also*

7    *Narambatla v. DHS*, No. 2:23-CV-01275, 2024 WL 1659025, at *5 (W.D. Wash. Apr. 17, 2024) ("loss

8    of an opportunity to receive a nonimmigrant visa is an injury in fact"); *cf. Matushkina v. Nielsen*, 877

9    F.3d 289, 293 (7th Cir. 2017) ("A right of entry . . . is not a prerequisite to standing in the case of someone

10   seeking entry to the United States."). Defendants contend that because Pastor Smith's R-1 visa expires

11   on November 1, 2026, i.e., after September 21, 2026 (the current expiration date of the Proclamation,

12   absent extensions), Mot. 5, Pastor Smith does not have standing. But USCIS's own data shows that the

13   median processing time for Form I-129, used to submit H-1B petitions, is 3.5 months, Liao Decl. Ex. 7

14   at 1,[14] making it reasonable to infer that Pastor Smith's employer will need to file an H-1B petition for

15   him before September 21, 2026, i.e., while the $100,000 Requirement is still in place, to avoid loss of

16   status when his R-1 visa expires.[15] Last, Defendants rehash the same exception and change of status

17

18   _____

     Reg. 24,497 (June 10, 2025) (restricting entry of individuals from 19 countries, effective in 5 days); U.S.

19   State Dep't, *Announcement of Expanded Screening and Vetting for Visa Applicants* (June 18, 2025)
     (Liao Decl. Ex. 8) (announcing online vetting of student and exchange visitor nonimmigrant visa

20   applicants, effective immediately); U.S. State Dep't (@StateDept), X (Jan. 14, 2026, at 11:40 am)
     (announcing pause of immigrant visa processing for nationals of 75 countries) (Liao Decl. Ex. 9); *see*

21   *also* U.S. State Dep't, *Immigrant Visa Processing Updates for Nationalities at High Risk of U.S. Public*
     *Benefits Reliance* (last updated Feb. 2, 2026) (Liao Decl. Ex. 10) (75-country visa pause effective

22   January 21, 2026, 7 days after announcement).

23   [14] This data is subject to judicial notice. *See, e.g.*, *Keller Wurtz v. USCIS*, No. 20-CV-2163-JCS, 2020
     WL 4673949, at *4 (N.D. Cal. Aug. 12, 2020) (taking judicial notice of USCIS processing times);

24   *Valenzuela v. Ducey*, No. CV-16-03072-PHX-DGC, 2017 WL 6033737, at *4 (D. Ariz. Dec. 6, 2017)
     (taking judicial notice of USCIS data charts).

25   [15] While an employer can pay an extra $2,805 for premium processing within 15 business days, premium
     processing does not guarantee that USCIS will approve a petition within that time. 8 C.F.R. § 106.4(a),

26   (c)(2), (e)(2). The premium processing regulation only requires USCIS to "issue an approval notice,
     denial notice, a notice of intent to deny, *or a request for evidence* within the premium processing

27   timeframe." 8 C.F.R. § 106.4(f)(1). Moreover, forcing an employer to choose between paying an extra
     $100,000 to file before September 21, 2026, or paying an extra $2,805 for premium processing to file

28   after September 21, 2026, where the employer otherwise could have just paid the regular fees, is itself

1    arguments it made for the Union Plaintiffs, but those arguments fail for the same reasons discussed
2    above.[16]

3                                           * * *

4          Accordingly, the Court should decline to dismiss the Religious Plaintiffs' claims. Should their
5    claims be dismissed, the Court should grant leave to amend.

6    **II.    Plaintiffs have stated a reviewable ultra vires claim.**

7          Defendants' attempts to escape judicial review as to the Proclamation itself fail. Under Ninth
8    Circuit precedent, the consular nonreviewability doctrine does not apply to cases like this challenging
9    "the President's *promulgation* of sweeping immigration policy," as opposed to cases concerning
10   individual visa determinations (such as *Dep't of State v. Muñoz*, 602 U.S. 899 (2024)). *Washington v.*
11   *Trump*, 847 F.3d 1151, 1162 (9th Cir. 2017); *Hawaii*, 878 F.3d at 679; *see also* PI Reply 3-4 (citing
12   additional cases). As for ultra vires review, the Ninth Circuit has held, in a § 1182(f) and § 1185(a) case
13   no less, that courts may "review ultra vires actions by the President that go beyond the scope of the
14   President's statutory authority." *Hawaii*, 878 F.3d at 682; *see also* PI Reply 1-3. *Dalton v. Spencer*, 511
15   U.S. 462 (1994), cited by Defendants (Mot. 10), "merely stands for the proposition that when a statute
16   entrusts a discrete specific decision to the President and contains no limitations on the President's
17   exercise of that authority, judicial review of an abuse of discretion claim is not available." *Chamber of*
18   *Com. of U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996). But here Plaintiffs do not seek abuse of
19   discretion review of the Proclamation itself.

20

21

22   _____

    an injury.
23   [16] Defendants also incorporate by reference their previous arguments that Pastor Smith should not be
     permitted to proceed pseudonymously. Mot. 5 n.5 (citing Defs.' Opp. to Pls.' Mot. to Proceed
24   Pseudonymously (ECF 69). The Court should first resolve Pastor Smith's pending motion to proceed
     pseudonymously, which has been fully briefed. *See* ECF 4, 69, 89. If the Court grants the motion and
25   adopts Plaintiff's proposed order, the parties would confer on and submit a joint protective order that
     permits Pastor Smith to reveal his identity to the Court and to Defendants' counsel under seal while
26   limiting (1) government-wide sharing of his identity for non-litigation related immigration actions and
     (2) public disclosure of his identity, measures designed to protect Pastor Smith from retaliation by the
27   government and from public harassment. *See* Pls.' Proposed Order (ECF 4-3). If the Court denies the
     motion, Pastor Smith should be given an opportunity to amend the complaint with his real name or
28   voluntarily dismiss his claims.

1    As for the merits of Plaintiffs' ultra vires claim, Defendants rely on their preliminary injunction

2    briefing. Plaintiffs similarly incorporate their arguments from the preliminary injunction briefing. PI

3    Mot. 15-22; PI Reply 11-18. Plaintiffs have sufficiently stated an ultra vires claim.

4    **III.    Plaintiffs have stated APA and RFA claims.**

5    Defendants' challenges to Plaintiffs' APA and RFA claims also fail.

6    **A.  Agency Defendants' implementation of the $100,000 fee was final agency action.**

7    Defendants argue that there was no final "*agency*" action, Mot. 8,[17] but as explained in detail in

8    Plaintiffs' motion for preliminary injunction and reply brief, PI Mot. 23-25; PI Reply 4-8, and

9    incorporated here, Defendants cannot escape APA review that way. "No language in the APA prevents

10   or excepts review of an agency action that implements a presidential action." *Nebraska*, 121 F.4th at 15.

11   Defendants' argument rests on the mistaken assumption that the agencies here were simply complying

12   with the Proclamation and not exercising discretion. However, the agencies' actions in September and

13   October 2025 show that Agency Defendants were not engaged in merely ministerial implementation of

14   the Proclamation. They made their own rules regarding when and to whom the $100,000 fee would

15   apply, in some respects broadening the reach of the Proclamation and other respects narrowing it. *See*

16   FAC ¶¶ 104-113. Those new rules were binding and had immediate legal consequences for employers.

17   *See* PI Reply 7 (describing impact of agencies changing the rules on BAE Industries' employee). Thus,

18   Plaintiffs alleged final agency action. *Cf. Emami v. Nielsen*, 465 F. Supp. 3d 991, 995 (N.D. Cal. 2020)

19   (finding State Department guidance issued and process created to implement a proclamation's waiver

20   provision were final agency action).

21

22   _____

23   [17] Defendants treat this issue as jurisdictional and some older Ninth Circuit cases have described it as
     such, but more recently, the Ninth Circuit has recognized that courts have jurisdiction over APA claims

24   under the federal question jurisdiction statute, 28 U.S.C. § 1331, and that "the requirements for obtaining
     relief under the APA go to the merits, not to subject matter jurisdiction." *Vaz v. Neal*, 33 F.4th 1131,

25   1135 (9th Cir. 2022). The Ninth Circuit has also noted the tension between the older cases and Supreme
     Court cases holding that "[t]he judicial review provisions of the APA are not jurisdictional."

26   *Waterkeeper All. v. EPA*, 140 F.4th 1193, 1206 n.6 (9th Cir. 2025) (quoting *Air Courier Conf. of Am. v.
     Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 523 n.3 (1991)); *see also Califano v. Sanders*, 430

27   U.S. 99, 100-01 & n.1, 104 (1977) (holding that section 10 of the APA, which includes 5 U.S.C. §§ 701-
     704, did not independently grant jurisdiction); *Trudeau v. FTC*, 456 F.3d 178, 183-84 (D.C. Cir. 2006)

28   (explaining why "final agency action" requirement is not jurisdictional).

**B.  Judicial review is not precluded under 5 U.S.C. §§ 701(a)(1) and (2).**

Defendants also claim that "the Court lacks jurisdiction to review the Proclamation," citing the APA, 5 U.S.C. § 701(a). Mot. 9. But Defendants mischaracterize Plaintiffs' APA claims. Plaintiffs do not seek APA review of the President's Proclamation but of the actions that Agency Defendants have taken in implementing the Proclamation. "There is a strong presumption in favor of judicial review of final agency action under the APA." *Jajati v. CBP*, 102 F.4th 1011, 1016 (9th Cir. 2024) (cleaned up). Defendants have not identified any statutes that preclude judicial review of the Agency Defendants' implementation of the $100,000 fee. *See* Mot. 9. That courts recognize a deferential standard of review of presidential proclamations under 8 U.S.C. § 1182(f) and § 1185(a)(1) does not mean that those statutes preclude judicial review of agencies' implementing actions. *Cf. Emami*, 465 F. Supp. 3d at 995 ("Agency action is not immunized from review just because it might be linked to a Presidential Proclamation.").[18]

As for § 701(a)(2), as discussed in Plaintiffs' preliminary injunction briefing and incorporated here, PI Mot. 23-24, PI Reply 4-8, because there is law to apply, the "committed to agency discretion" exception does not apply here. *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (quotations omitted). Whatever discretion § 1182(f) and § 1185(a) give to the President to take certain actions, they do not speak to agency discretion. *See Refugee & Immigrant Ctr. for Educ.& Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 80 (D.D.C. 2025) (rejecting suggestion that "the President's authority under § 1182(f) is delegable to USCIS"). Further, § 1182(f) and § 1185(a) allow the President to act only as to "entry"; he does not have authority or discretion to restrict adjudication of petitions or visa applications, nor to delegate such non-existent authority or discretion to agencies. Nor do those statutes delegate the Congress's taxing power to the President or the agencies. Where Congress did give DHS discretion to set user fees, it required DHS to do so by regulation and to consider the costs of adjudication. 8 U.S.C. § 1356(m).[19] The Regulatory Flexibility Act requires agencies to consider impacts on small businesses

---

[18] *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984), cited at Mot. 9, is inapt. There, the government identified a statute that created an administrative and judicial review procedure to challenge an agency's market order for milk handlers but not for milk consumers, which suggested that Congress did not intend to allow milk consumers to challenge the agency's action. *Id.* at 345-48. Here, however, the government has not identified any such statute.

[19] Similarly, Congress delegated authority to agencies generally to promulgate user fees in the Independent Offices Appropriations Act ("IOAA"), 31 U.S.C. § 9701, and DHS's predecessor, the

1  and to consider alternatives to minimize impacts on small businesses when promulgating rules subject

2  to notice and comment rulemaking under 5 U.S.C. § 553. *See* 5 U.S.C. §§ 603-604. Further, "the use or

3  non-use of notice-and-comment rulemaking procedures is [not] a matter 'committed to agency discretion

4  by law,'" but rather is governed by 5 U.S.C. § 553. *Apple Inc. v. Vidal*, 63 F.4th 1, 15 (Fed. Cir. 2023).

5  **C.  Agency Defendants' implementation of the $100,000 fee was contrary to law, arbitrary**

6  **and capricious, and failed to follow required procedures under the APA and RFA.**

7  Defendants' remaining arguments against Plaintiffs' APA claims are unpersuasive. Aside from

8  incorporating their previous arguments from the preliminary injunction briefing, which Plaintiffs have

9  already addressed, *see* PI Mot. 25-32; PI Reply 18-21, Defendants rehash their theory that the agencies

10  could not disobey or disregard the Proclamation. Mot. 11. But this blind obedience theory is foreclosed

11  by the Ninth Circuit's decision in *Nebraska*, 121 F.4th at 15. PI Reply 4-6. Moreover, the Proclamation

12  gave the agencies discretion in how they implemented it and the agencies in fact made their own rules

13  that deviated from the Proclamation. PI Reply 6-8; FAC ¶¶ 104-113.

### CONCLUSION

15  For these reasons, Defendants' motion to dismiss should be denied.

17  Date: February 12, 2026                              Respectfully submitted,

18  */s/ Karen C. Tumlin*                                */s/ Cynthia Liao*

19  Karen C. Tumlin (CA Bar No. 234691)                  Cynthia Liao (CA Bar No. 301818)*

Esther H. Sung (CA Bar No. 255962)                   Johanna M. Hickman (D.C. Bar No. 981770)*

20  Laura Flores-Perilla (CA Bar No. 355645)             Jennie L. Kneedler (D.C. Bar No. 500261)*

Hillary Li (GA Bar No. 898375)*                      Steven Y. Bressler (D.C. Bar No. 482492)*

21  Brandon Galli-Graves (TX Bar No. 24132050)*         Elena Goldstein (D.C. Bar No. 90034087)*

Emily Satifka (NJ Bar No. 330452020)*               **DEMOCRACY FORWARD FOUNDATION**

22  **JUSTICE ACTION CENTER**                            P.O. Box 34553

23  P.O. Box 27280                                       Washington, DC 20043

Los Angeles, CA 90027                                (202) 808-1982 (Liao)

24  (323) 450-7272                                       cliao@democracyforward.org

karen.tumlin@justiceactioncenter.org                hhickman@democracyforward.org

25

26  Immigration and Naturalization Service, occasionally used this authority before § 1356(m), *see Ayuda,*

27  *Inc. v. Att'y Gen.*, 661 F. Supp. 33 (D.D.C. 1987). When delegating this authority, however, Congress

required agencies to assess whether the charge would be "fair" and based on "the costs to the

28  Government" and "the value of the service or thing to the recipient." 31 U.S.C. § 9701; *see Nat'l Cable*

*Television Ass'n, Inc. v. United States*, 415 U.S. 336, 337, 342-43 (1974).

esther.sung@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
hillary.li@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org
Emily.satifka@justiceactioncenter.org

/s/ Charles H. Kuck**
GA Bar No. 429940
**KUCK BAXTER LLC**
365 Northridge Rd., Suite 300
Atlanta, GA 30350
404-949-8154
Ckuck@immigration.net

/s/ Zachary R. New
Zachary R. New**
Atty. Reg. No. (Colorado): 53992
**JOSEPH & HALL, P.C.**
12203 East Second Ave.
Aurora, CO 80011
(303) 297-9171
zachary@immigrationissues.com

/s/ Harini Srinivasan
Harini Srinivasan (D.C. Bar No. 1032002)*
Aniko Schwarcz (D.C. Bar No. 980631)*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Suite 800
Washington, D.C. 20005
(202) 408-4600
hsrinivasan@cohenmilstein.com
aschwarcz@cohenmilstein.com

Alexandra Gray (NY Bar No. 6019590)*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine St., 14th Floor
New York, New York 10005
(212) 838-7797
agray@cohenmilstein.com

jkneedler@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

/s/ Kalpana Peddibhotla
Kalpana Peddibhotla (CA Bar No. 200330)
**SOUTH ASIAN AMERICAN JUSTICE COLLABORATIVE (SAAJCO)**
333 W. San Carlos Street, Suite 600
San Jose, CA 95110
(408) 550-9240
kalpana@saajco.org

/s/ Jesse M. Bless
JESSE M. BLESS*
MA Bar # 660713
**BLESS LITIGATION LLC**
6 Vineyard Lane
Georgetown MA 01833
781-704-3897
jesse@blesslitigation.com

/s/ Greg Siskind
Greg Siskind**
TN Bar No. 14487
**SISKIND SUSSER**
1028 Oakhaven Road
Memphis, TN 38119
(901) 682-6455
gsiskind@visalaw.com

*Counsel for Plaintiffs*

* Admitted *pro hac vice*
** Motion to appear *pro hac vice* forthcoming