Pages 1 - 65

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Haywood S. Gilliam, Jr., Judge

GLOBAL NURSE FORCE, et al.,      )
                                 )
          Plaintiffs,            )
                                 )
  VS.                            )      NO. 25-CV-08454-HSG
                                 )
DONALD J. TRUMP, in his          )
official capacity as President   )
of the United States, et al.,    )
                                 )
          Defendants.            )
_____)

                          Oakland, California
                          Thursday, February 26, 2026

                TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:
                    JUSTICE ACTION CENTER
                    P.O. Box 27280
                    Los Angeles, CA 90027
              BY:   ESTHER HSIAO-IN SUNG, ATTORNEY AT LAW
                    VANESSA RIVAS-BERNARDY, ATTORNEY AT LAW
                    KAREN C. TUMLIN, ATTORNEY AT LAW

                    COHEN MILSTEIN SELLERS & TOLL PLLC
                    88 Pine Street, 14th Floor
                    New York, NY 10005
              BY:   ALEXANDRA GRAY, ATTORNEY AT LAW

                    COHEN MILSTEIN SELLERS & TOLL PLLC
                    1100 New York Avenue, N.W., Suite 800
                    Washington, DC 20005
              BY:   HARINI SRINIVASAN, ATTORNEY AT LAW

     (APPEARANCES CONTINUED ON THE NEXT PAGE.)

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                       Official United States Reporter

**APPEARANCES:** (Continued)

            DEMOCRACY FORWARD FOUNDATION
            P.O. Box 34553
            Washington, DC 20043
   BY:  **CYNTHIA LIAO, ATTORNEY AT LAW**

            SOUTH ASIAN AMERICAN JUSTICE COLLABORATIVE
            333 W. San Carlos Street, Suite 600
            San Jose, CA 95110
   BY:  **KALPANA V. PEDDIBHOTLA, ATTORNEY AT LAW**

For Defendants:

            DEPARTMENT OF JUSTICE
            Civil Division
            950 Pennsylvania Avenue, Suite 400
            Washington, DC 20530-0001
   BY:  **TIBERIUS T. DAVIS, ATTORNEY AT LAW**

<u>**Thursday - February 26, 2026**</u>                          <u>**1:59 p.m.**</u>

**P R O C E E D I N G S**

---oOo---

THE COURTROOM DEPUTY:  Your Honor, we're calling Case Number 25-CV-8454, Global Nurse Force, et al. v. Trump, et al.

Counsel, please step forward to the podiums and state your appearances for the record, starting with counsel for plaintiff.

THE COURT REPORTER:  I'm sorry.  Can we start the --

MS. SUNG:  Good afternoon.

THE COURT REPORTER:  Can we start the -- okay.  We're good.  Thank you.

THE COURTROOM DEPUTY:  Go ahead.  State your appearance.

THE COURT:  Who was that?

THE COURTROOM DEPUTY:  That's Kendra --

THE COURT:  Ah.

THE COURTROOM DEPUTY:  -- the court reporter.

MS. SUNG:  Good afternoon, Your Honor.  Esther Sung for the plaintiffs.

THE COURT:  Good afternoon.  Why don't you just introduce your whole team rather than have everybody come up separately.

MS. SUNG:  Sure, happy to.  We have, at the table for plaintiffs, Karen Tumlin, Kalpana Peddibhotla, Vanessa

Rivas-Bernardy, Alexandra Gray, Harini Srinivasin, and Cynthia Liao.

THE COURT:  All right.  Good afternoon.

MS. SUNG:  Thank you.

MR. DAVIS:  Good afternoon, Your Honor.  Tiberius Davis on behalf of the defendants.

THE COURT:  All right.  Good afternoon.

All right.  So we're here for a hearing on nominally three motions.  One, is the plaintiffs' motion for a preliminary injunction.  There then is a motion for class certification. And then there was a motion to stay that the Government filed some time ago.  So let's start -- and whoever is going to be arguing should just come and stay at the podium.  We'll probably be having a discussion on a rolling basis.  I don't know who that is for the plaintiffs.

MS. SUNG:  Yes, Your Honor.  We have three oral advocates for the plaintiffs today.  We can all stand up here, pop up and down, however you would like it.

THE COURT:  How is it divided up?

MS. SUNG:  I'm going to be handling the 212(f) claim and the *ultra vires* claim for the motion for preliminary injunction.  Ms. Srinivasin is handing the motion for class certification.  And my colleague, Ms. Liao, is handling everything else.

THE COURT:  All right.  Well, at least these first

issues are probably for whoever is lead counsel, because they're really some pragmatic questions that I have.

THE COURTROOM DEPUTY:  And I'll just ask, because there are three of you, please make sure you're stating your name each time so that the court reporter knows who's speaking.

THE COURT:  All right.

THE COURTROOM DEPUTY:  Sorry, Judge.  We're having some technical difficulties.  That one is echoing, so we turned it off.  And so we're just going to have defense stand in the center.

THE COURT:  Okay.  That sounds good.

All right.  Really, the first questions are just being sure I understand the lay of the land.  Obviously, there's some time sensitivity here.  But I want to understand the details of that as much as I can.

I mean, obviously there is a lot that's happening that's relevant.  We just got the tariffs decision from the Supreme Court earlier this week.  I know that the plaintiffs filed a notice of recent authority.  I had seen the case before that.

In an ideal world, I'd want supplemental briefing on the import of the case.  I mean, I think it's likely to be relevant at some level.  I'm not saying what outcome it drives.  But I certainly would like the chance for the parties to address it in writing.  I mean, obviously we can do that at some level here today, but it would be more helpful to have that written.

Second, I know that the D.C. Circuit is hearing the argument in the *Chamber of Commerce* case, as I understand it, on March 9th.  And in an ideal world, I would actually listen to that argument and see what the D.C. Circuit does.  Obviously, the issues teed up there are, if not identical, substantially overlapping with the ones here.  But I don't think that a stay is likely warranted in the manner that the Government's requesting.  And that whatever the D.C. Circuit does, it would be potentially persuasive.  And it's obviously not binding.  And I don't know that making the plaintiffs here wait for anything that happens there is warranted.

But -- so the question -- the immediate question I had on these issues is, as I understand it, the parties that are actually moving for the preliminary injunction have all confirmed that they're not participants in the lottery that starts on March 4th and ends on the 19th; is that right?

MS. LIAO:  Correct.

THE COURT:  All right.  And so given that, how does that affect what I'm saying?  And most particularly, I'd like to give the parties some short period of time to submit briefs on the tariff case so that I can review those.  How -- how does the state of affairs play into whether that is doable or not?

THE COURT REPORTER:  If you could state your name first.  I'm not sure which attorney you are.

MS. LIAO:  Your Honor -- sure.  Cynthia Liao for the

plaintiffs.

Your Honor, we understand the desire for supplemental briefing on this new case. And we're happy to do that in short order. We can maybe provide something by next week, if that works.

In terms of how the lottery plays into this, the plaintiffs who are moving for preliminary injunction indeed are not participating in the lottery. They don't have to. But they do have ongoing harms that are occurring each day that they're not able to file their petitions or not progress in their petitions because of the fee.

So I think Your Honor is correct in the instinct that a stay, as defendants have asked for, isn't warranted here, in terms of waiting for the D.C. Circuit, because we don't know when they will decide the case. But, of course, you know, if -- Your Honor obviously needs the time you need to decide the issues, including this new tax issue.

THE COURT: Right. The main thing I just wanted to understand -- and I think I do now -- is it's not as though, with respect to the parties who have sought the injunctive relief, you know, some right is gone forever as of March 19th. If they were participating in the lottery, then I think they would be missing their chance for 2026. And that would create its own sort of urgency.

I understand that there's inherent urgency, given the

nature of the issues.  But am I right that it's not tied directly to that March 4th to March 19th window?

MS. LIAO:  So I will say that there is at least one plaintiff who hasn't been part of the preliminary injunction motion that is planning to participate in the lottery.  And that is the Church on the Hill plaintiff.

We also are seeking to represent a class here.  And the employers who are participating in the lottery I think would find it very helpful to know if the fee is going to be something they will have to pay as they're making their decisions about hiring and about participating in the lottery and so forth.

THE COURT:  Well, understood.  But the -- it sounds like the one named plaintiff who has actually sought the injunctive relief -- no -- the one named plaintiff actually in the case that's not seeking injunctive relief is the one that would be participating in the lottery; is that right?

You know, you say one plaintiff who hasn't been part of the preliminary injunction that's planning to participate in the lottery.  So that's a plaintiff that's present but didn't move for preliminary injunctive relief.

MS. LIAO:  Correct.  So I think, in the end, Your Honor, as I said before, we understand the need for some time for Your Honor to decide the case.  But we still submit there's some urgency for our plaintiffs who are moving, even if they're

not participating in the lottery, because of the harm they're facing in terms of not being able to proceed with their petitions.

THE COURT:  All right.  Fair enough.

What's the Government's perspective?

MR. DAVIS:  I think, to start, Your Honor, that is quite reflective of irreparable harm that these named class plaintiffs have supposedly been ongoing this injury since the time the proclamation came down in September, but they waited until December to move.  And I think it's also reflective of the lack of typicality and commonality that the named plaintiffs don't face any harm from the lottery, but they seek to represent an unknown amount of employees and employers who do -- who are subject to the lottery.

And I think it's also telling that the one plaintiff they have who's subject to the lottery didn't move for preliminary injunction or summary judgment, seemingly because of a lack of irreparable harm.

As far as timing goes, Your Honor, we're happy to do supplemental briefing on the impact of *Learning Resources*.  If you want us to do that at the same time or sequentially, either way works, but also ready to talk about the case today.

THE COURT:  That makes sense.  Well, let's do this:  I think having briefs of no more than ten pages -- and I think this should just be simultaneous.  I understand the issues.

I've read the case. I just am interested in getting each side's representation about how it does or doesn't affect this case. And I think the plaintiffs appropriately didn't argue that in their notice, because it's not allowed by the local rules. But I would find it helpful.

So let's say simultaneous briefs of no more than ten pages by -- how about a week from today? And then I don't need any responses or oppositions. I just -- you know -- take your best shot at explaining what you think the import of the case is for the issues here, if any, and then I'll take that into consideration as part of the record.

MS. LIAO: Will do, Your Honor.

MR. DAVIS: Understood.

THE COURT: All right.

Okay. Then with respect to the substance, I have a number of questions. Some are about the -- essentially the Constitutional *ultra vires*-type claims. Some are about the APA claims. And, obviously, they just said Judge Howell spent a number of pages analyzing the issue that's now on appeal. But I think she laid out the basis for her position and her conclusions in that case at some length.

And so, really, for the plaintiffs, the question is whether you think that the *Chamber of Commerce* decision was just incorrect or it is inapplicable in a way, because there's relevant law in the Ninth Circuit that's different than the law

in the D.C. Circuit or some combination of those.

MS. SUNG:  Esther Sung for the plaintiffs, Your Honor.

I think it's a combination of those things.  I think the first order response that we would have as to why the cases are different and why Judge Howell's decision shouldn't dictate the outcome here is that you do have different plaintiffs before you.  There's a different evidentiary record and different arguments.  And, of course, there's also a different legal landscape, Your Honor.

We made reference to this earlier.  But when Judge Howell issued her opinion, she did not have the benefit of the *Learning Resources* case.

And so I do think that with regards to our arguments as to why the proclamation is *ultra vires*, Judge Howell does touch on the three main arguments that we have in her opinion.  But I would submit that her reasoning, in a lot of respects, doesn't support the conclusions that she reaches.  And I can go into that some more, if you'd like.

THE COURT:  I think I understand the -- your arguments.  But when you say that there's a different evidentiary record and different types of plaintiffs, how is that relevant?

MS. SUNG:  So our evidentiary record here on behalf of a variety of different employers, but particularly certain small and nonprofit employers who are not represented in the

*Chamber of Commerce* case, have made clear that the proclamation's $100,000 payment effectively eliminates the H-1B visa for them.  They simply cannot access the H-1B visa the way that Congress intended for them to be able to.  And there are declarations from each of them saying that it is simply unaffordable for them.

For example, the $100,000 payment is twice the starting salary of a teacher who would teach at any of the schools represented in the case.  And so --

THE COURT:  And I take your point, but my read of the decision of that case is that it was legal.  It wasn't based on, for example, an idea that -- you know -- as to what the harm wouldn't be.  It was really these paralegal arguments. That section 1182(f) and 1185 authorize the restriction and characterize it as a restriction.  I know that's a big point of dispute.  And probably we're not going to know the answer to that until the Supreme Court takes it up.  But that's the -- that was the basis.

And so, in that regard, it sounds as though -- at least as to the *ultra vires* claims -- we'll talk about the APA claim, because there I really do think the Ninth Circuit law is meaningfully different than the D.C. Circuit law.  But those -- it sounds like the legal arguments are more or less the same. And it's just a question of whether they will prevail or not.

MS. SUNG:  Well, we certainly have multiple arguments

why we think that the proclamation is unlawful.  And some of them do rest, in part, on the evidentiary record.  Because I would submit that the evidentiary record here that establishes that the H-1B visa is effectively eliminated for small and nonprofit employers, as well as other employers, brings this case closer to, for example, *National* -- sorry -- *National Association of Manufacturers* than it does to, say, for example, *Hawaii*.

In the *National Association of Manufacturers* case, that court -- which is also a court here in the Northern District of California -- they were dealing with a proclamation that did actually eliminate the H-1B visa category, along with a bunch of other visa categories, in response to the coronavirus pandemic.

And the court there in *National Association of Manufacturers* found that that proclamation rewrites the carefully delineated balance that Congress had struck between protecting American workers and allowing American employers to hire, on a temporary basis, specialty occupation workers, and found that this contravened Congress' intent.

And so the same is happening here for many of the plaintiffs, as their declarations attest.  The pathway -- the H-1B pathway is simply nonexistent for them now.

THE COURT:  Right.  Although it seems to me, again, that goes to the question of whether, I think, there's anything

in the proclamation that is inconsistent with other provisions of the INA.

MS. SUNG:  Certainly.  And I can go into those arguments, too, if you'd like.

THE COURT:  Well, let me ask this:  I mean, what is -- you know, really, the -- on this point, one of the core issues is, what's the best basis for your argument that the $100,000 payment here is not a restriction on the entry of aliens, which was basically the conclusion that the court reached in D.C., and how much of that is bound up in whether it's viewed as a tax as opposed to something else?

MS. SUNG:  Let me break that into two -- into the separate pieces.  So with regards to the proclamation being a restriction on entry, we do disagree with Judge Howell.  The INA -- the structure of the INA makes very clear that the different stages in the H-1B application process are separate and distinct.  They cannot be conflated with entry.

The Department of Labor certification, which is the first stage that an employer has to undertake in order to sponsor an employee, is governed by 20 different -- at least 20 different separate statutory provisions -- the USCIS petition that the employer must file, also governed by at least 20 separate statutory provisions that are distinct and not overlapping -- and also there must be an application for a visa made to a consular officer with the State Department.  And that is all

before you even get to the worker attempting to enter the United States.

And so --

THE COURT: But is it your argument that somehow -- obviously, yes, there are many, many steps in this complicated administrative process. But the language of the statute is straightforward, which is: "Impose on the entry of aliens any restriction he," the President, "may deem to be appropriate."

And so is it your argument that to avoid the *ultra vires* problem, you're presenting this statute would have to have read what? Impose on the entry of aliens any visa restrictions? Or why is that -- why is the category of restrictions on entry not broad enough to cover all of the ancillary pieces that go into determining whether someone is ultimately eligible to enter?

MS. SUNG: It's a good question. I think it's -- it's a question of interpretation, I think. The term is "entry." And that has a distinct meaning that is treated differently by the INA with regards to other, again, predicate steps that are necessary for someone to be able to enter the United States.

And so I think that there are two cases that I'd point the Court to, to help illustrate this point. The first one is *Pacito v. Trump*. And the citation I have for you is 768 F. Supp. 3d 1199. And, in that case, the court was dealing with an executive order that concerned refugee admissions. And that order, similar to the order here, also directed the DHS

Secretary to suspend decisions on applications for refugee status.  And the *Pacito* court held that the plain language of Section 1182(f) does not reference refugee applications, much less delegate authority to suspend agency operations directed by Congress.  And so that -- that -- the court found that that section of the proclamation exceeds the statutory language of section 1182(f).

THE COURT:  Although, I thought -- in that case, wasn't the issue that the agency had, itself, decided just to stop processing these applications because presumably the thought was, what's the point, because the proclamation is operating?

MS. SUNG:  No.  I think that's the *Gomez* line of cases.  *Pacito* dealt with refugees and did not deal with visas. I actually -- the other case that I was going to bring the Court's attention to is the *Gomez* case.  And I think it -- the court there did parse the language and structure of the INA and illuminated an important point to show that entry and visa issuance are not the same.  And that's that Congress has made clear, through the application processes, that it has set out in the INA that visa issuance must be an independent process. And the cite I have for you here is 485 F. Supp. 3d at 194. And so, if you'll bear with me, the *Gomez* court walks through different statutory provisions.

First, 8 USC 1104(a) outlines the very considerable powers

that Congress gives to the Secretary of State in administering and enforcing the provisions of the INA.  But that same section actually explicitly carves out and does not give the Secretary of State power over -- or influence over the powers, duties, and functions of consular officers as to the granting or refusal of visas.  Congress gives the power over whether to issue or not issue a visa to consular officers in 8 USC Section 1202(d).  And --

THE COURT:  I read this in your papers.

MS. SUNG:  Yeah.

THE COURT:  I -- and, obviously, those are persuasive cases, just like *Chamber of Commerce*.  But what, in your view -- what sort of entry -- when the statute grants the power to impose entry restrictions, in addition to those enumerated in the INA, which is the way that the Hawaii Supreme Court put it, in your view, what does that mean?  That can't have anything at all to do with the visa process?

MS. SUNG:  Yes.  I think that the INA makes very clear that entry suspension is only an entry suspension.  And that's because, if you look at 1182 itself --

THE COURT:  But the statute uses "suspend" and "restrict."  So if "restrict" is only "suspend," "restrict" would be superfluous.

MS. SUNG:  I suppose, I will confess, I haven't thought through how a restriction would look different from a

suspension.  But -- but very -- but I still think it's the case that 11 -- if you look at 1182, if you -- if you took the President at his -- well, at the -- if you took the President's power that he's claiming at face value, then a restriction or a suspension on entry would translate into a restriction or a suspension on visa issuance.  And the INA -- the language of the INA doesn't support or permit that.

1182(a) makes clear when an individual is not eligible to enter the United States and also not eligible to receive a visa.

And 1182(f) specifies that the President only has the power to specify when an individual is not eligible to enter. It doesn't say anything about rendering that person ineligible to receive a visa.

And so, for that reason, the President attempting to suspend visa issuance, as well as any of the other predicate steps in the process, we think it's just not permitted by the language of the statute.

**THE COURT:**  All right.  Let me ask this.  I think it goes to the second piece of my initial question that you were going to circle back to.  Is your *ultra vires* argument necessarily dependent on the finding that there's an excess delegated power under the taxing clause?  Or are there -- is there an independent way that that argument could be made?

**MS. SUNG:**  I think I'm going to try and answer Your

Honor's question.  But if I don't, please correct me.

I think that the -- the proclamation is *ultra vires* for independent reasons.  One of them is that it is an unconstitutional tax and in violation of the powers that Congress has delegated to the President.

But then, in addition to that, it's our position that the proclamation is independently unlawful, because it exceeds the statutory grant that Congress has made to restrict or suspend entry and only entry.  And then, again, separate from that, under the *Hawaii v.* -- sorry -- *Trump v. Hawaii* reasoning that the Supreme Court set out, it's our position that the proclamation does, in fact, conflict with and override the INA in an impermissible way with respect to the H-1B visa.

THE COURT:  All right.  I see.  And so with respect to the statutory delegation argument, in your view -- and I'm not previewing any actual finding.  I'm just trying to walk through the analytical --

MS. SUNG:  Sure.

THE COURT:  -- flow.  If I were to find that the proclamation was within the scope of delegated authority under section 1182(f) for the -- you know -- on the grounds that we've just been talking about, I don't find that it impermissibly shades into this visa issuance piece.  I don't find that there's a conflict.  But, in your view, would I then still ask whether the delegation was broad enough to allow the

imposition of what you're characterizing as a tax, if I were to find it was a tax?

MS. SUNG: Yes. I think that's an independent reason to find the proclamation unconstitutional or unlawful. That the -- that Congress did not delegate specifically to the President in 1182(f) the power to impose a monetary assessment of this kind.

THE COURT: All right. I see.

So why don't I hear from the Government with respect to -- first, set aside the APA claim for now. But just talking about the *ultra vires* claims we've been talking about.

MR. DAVIS: So a couple of responses, Your Honor. I do think that they have three arguments. The first one essentially being that this is outside the scope of 1182(f), which they say both that it's essentially regulating domestic entities impermissibly and that it applies to visa issuance.

To the domestic entities point, *Chambers* rejected this and was partially reliant on *Doe* from the Ninth Circuit. That merits decision admittedly was vacated as moot later, but noted that almost all of the restrictions under 1182 are motivated by domestic concerns. *Hawaii* was motivated about safety and national security concerns within the county.

So the simple fact that there might be some domestic policy interest has no bearing on whether the proclamation is valid or not. That would be true of a lot of visas that

require sponsors, such as J and F visas, and there have been proclamations restricting those, as well.

On the visa issuance issue, again, we think the court got it right in *Chambers*, which said:  It's a myopic view to see this as just about the moment they gain entry.  For example, in *Hawaii*, the Supreme Court noted that the delegation for restrictions is extremely broad.  It's any restrictions he may deem appropriate.  And they cited to *Sale* and said, look, *Sale* allowed for a blockade in international waters.  It's not just about entry ports.

And visa issuance is -- you know -- the point of a visa is to gain entry.  And the Supreme Court in *Hawaii*, while there is a distinction between the two, says that Sections 1182(f) and 1152(a)(1), which there was about discrimination in allocation of visa issuance, operate in different spheres.  Section 1182 defines the universe of aliens who are admissible into the United States and therefore eligible to receive a visa.

So, there, they were responding to this argument about 1152, and saying, well, that doesn't really apply here.  But the Court acknowledges that 1182 as a section -- which 1182(f), the Supreme Court says, has ample authority to add in addition to the restrictions there -- both has admissibility requirements at the visa side and the entry side.

And I think if Your Honor took their argument seriously in parsing the two out so finely, and saying 1182(f) could never

apply to visa issuance, you'd end up with some really weird circumstances, especially here, where some aliens who might be trying to enter subject to the cap, would get a petition and get a visa issued and count against the cap, but then not be able to enter, and essentially just take that position away from anybody else who otherwise might be able to enter.

And that's why I think the court in *Chambers* really found that that distinction isn't in 1182(f) and doesn't make a lot of sense.  Again, it's any restriction he may deem appropriate. And I think --

**THE COURT:**  What -- what do you make -- or what am I supposed to make of that discussion that you were just talking about in *Hawaii*, which is at, it looks like, page 694 --

**MR. DAVIS:**  Yes.

**THE COURT:**  -- where it's talking about 1182 defining the universe of aliens who are admissible, and then once those boundaries are set, 1152(a) speaks to visas?

I have struggled a little bit with those D.C. court -- District Court cases that plaintiffs' counsel was talking about, in terms of what -- what does it actually mean, though, for these purposes, and how do those graph to the issue that's presented here?  I'm having some trouble figuring that out.

**MR. DAVIS:**  Yeah.  I mean, it's a fairly complicated system, and one that's not super clearly delineated.  I think what the Supreme Court in *Hawaii* was dealing with -- everybody

agrees, that was just -- on entry, there was a restriction. And the plaintiffs were arguing 1152, which is an antidiscrimination provision applies. But that's just about the allocation of visas. And the Supreme Court was just saying, okay, 1182 deals with both. There can be admissibility bars at both. But since this is just entry, and that's about the allocation of visas, that doesn't apply --

**THE COURT REPORTER:** I'm sorry. Will you please slow down?

**MR. DAVIS:** Yes, will do.

-- that that doesn't apply to the proclamation there.

But if you read through the section, the Supreme Court is saying that Section 1182 as a whole determines admissibility at two stages. The first stage being, when they try to apply for a visa, they can be ineligible there, and that can be under 1182, and the second stage, at entry.

And so 1182(f), as Supreme Court said, gives ample power to add restrictions in addition to those elsewhere in the INA. And I think it would be weird to read that as to not include other restrictions in 1182, which includes the visa issuance process.

And, quickly, on *Pacito*, Your Honor, I argued *Pacito* in the Ninth Circuit. And part of the issue was that the State Department stopped processing refugee applications, which was beyond the proclamation, and they thought it made sense to do

so.  And the Court was concerned with that.

But the District Court, Your Honor, that they keep relying on, has been stayed about four times by the Ninth Circuit, including by the merits panel, which said that the proclamation there was likely to be lawful on the merits under *Hawaii*.

And the case there -- the plaintiffs argued many of the same arguments here -- that it was overriding Congress' reticulated scheme for refugees, saying, well, if you just suspend the entry of all refugees, that gets rid of this entire scheme.  And the Ninth Circuit continually has said, in stays, that the proclamation is likely lawful.

And so I think that also rejects their argument about this replacing H-1B; same reasons that the court in *Chambers* relied on.  This is their restriction in addition.  It's not replacing any of the qualifications.  All the same people can apply.  So it's not replacing the H-1B program.  It's just a temporary restriction of $100,000 in order to enter the country.

And I think it's also important to know, Your Honor, that in both *Chambers* and here, they talk about the fees.  If you look at the fees, none of them are exclusive.  None of them are prohibitory of other payments.  None of them occupy the field of what the proclamation is doing here.

And, even so, if you look at some of the fees, like the premium visa fee and the fraud fee, they acknowledge that there can be other fees that can apply.  None of them restrict

additional payments.

If you take plaintiffs' argument seriously to its logical extent, it's basically any time Congress lays out a fee or lays out a visa eligibility requirement, that implies there can be no other restrictions. But that runs completely contrary to what the Supreme Court said about 1182(f) as being ample power to impose restrictions in addition to the INA. All those fees, all the qualifications for H-1B remain in place.

And to the factual point, Your Honor, about some of the individual plaintiffs maybe not being able to make the payments here, there are always people who can't make the fee payments. Obviously these fee payments are higher. These payment requirements are higher than they have been. But, in *Chambers*, they had members who argued the exact same thing. So I don't think that that's really a basis for making a distinction here.

And if we want to talk about the taxing power, I can talk about that piece, as well.

**THE COURT:** You can. Is the *Pacito* case still on appeal?

**MR. DAVIS:** So we had the merits argument. After the merits argument, that panel issued another stay to replace the previous ones from a different panel and reiterated that at least the proclamation was likely to succeed and the injunctions against that would stay. There's a separate piece about funding that they didn't stay, but that's not

particularly relevant here.  They have not issued the final decision yet.  So it's still awaiting the final decision.

THE COURT:  I see.  When was the argument?

MR. DAVIS:  It was in September.

THE COURT:  I see.  All right.  Well, why don't you address the taxing clause piece.  And then I'll allow plaintiffs' counsel to talk to that too.

MR. DAVIS:  So I think our first point, Your Honor, is the Supreme Court has recognized that not every payment requirement is a tax.  The Eighth Amendment, for example, speaks of excessive fines.  And so in *NFIB v. Sebelius*, dealing with the individual mandate under ObamaCare, the Supreme Court went through an analysis to figure out whether that was a penalty or was a tax.  One of the things it looked at was who collects the payment.  And it said, well, the IRS does.  So that favors it being a tax.

Here, it's USCIS, like any other sort of payments for visas.  The court also looked at, well, is this prohibitory or not.  And the Supreme Court said, well, the individual mandate can't be prohibitory, because it can't possibly be more than the insurance you're getting.

Here, on the other hand, while we don't think it's prohibitory, the other side says it is.  Their whole argument is that there's an irreparable harm, because some of these companies are prohibited from being able to buy or pay the fee.

So we think that that cuts against it being a tax.  And in *Learning Resources*, the Supreme Court noted that the whole purpose and the central focus of a tax is to raise revenue.

Now, admittedly, this was not in the record, Your Honor, because we sort of figured out the numbers as it has gone on. But I can tell you, it is not raising revenue from where H-1B fees typically are.  And the only evidence that plaintiffs have to the contrary is a quote of a video and an article.  And if you watch the full video, the President is actually talking about the Gold Card.  And they try to make that ambiguous, but if that's their only evidence that it's raising revenue, which isn't the case, that cuts against it being a tax.

But even if Your Honor thinks, okay, this is a tax, then we get to the next question of, did Congress delegate that authority?  And we think clearly the answer is yes.

Under both *Skinner* and *FCC v. Learning Resource*s, which was very recent, Congress can delegate taxing authority to the executive.  And it doesn't have to be any more clear than any other authority.  And *Learning Resources* didn't change that. And we think that the delegation here is quite broad.

Ruth Bader Ginsburg, when she was on the D.C. Circuit, said that the power is sweeping in *Hawaii*.  That goes throughout the entire opinion, saying exudes deference.  This is broad discretion, a broad delegation.  And the language is "any restriction he may deem appropriate."  We think that that

quite easily encompasses a limited payment here.  It's for a temporary time on the entry of particular aliens.  And we don't think *Learning Resources* changes that outcome.

First, Your Honor, the only majority opinion there was for the textual analysis.  But the text and context here are quite different.  There, the text was regulation of importations with about 16 words separating the two, as the Supreme Court pointed out.  Again, here, we have a very broad, in the Supreme Court's own words, delegation -- as Ruth Bader Ginsburg said, a sweeping delegation -- of any restriction he may deem appropriate.

And, in fact, the Supreme Court, in *Learning Resources*, distinguished a case where the President did -- was allowed to impose tariffs under a different statute that said -- I believe that the precise words was "adjust imports."  But it says "adjust imports as he deems necessary."  And they said, well, that delegation there is much broader than the one here.  But if you listen to that language, "as he deems necessary," is quite similar to "as he may deem appropriate," under 1182(f).

But even if we get into the major questions doctrine, which a majority didn't join in *Learning Resources*, that still starts with the texts in the context, as we just went over, but also it's about the match between how broad the delegation is and how broad the authority asserted is.  And we disagree with the Supreme Court on this, but the Supreme Court characterized

the tariff power being asserted there as the President being able to raise tariffs as high as he wanted, as long as he wanted, on whatever countries he wanted.  And they said that's quite broad.  And that's a traditional tariff power for Congress.

But, here, 1182 is restricted to the entry of aliens.  And it's temporary.  So the power being asserted is much narrower than the power there, but the delegation is much broader.  And the Court also noted there, the Government admitted there was a $15 trillion impact on the economy.  There's no evidence like that here.  They also talked about the history, which plaintiffs also say there hasn't been another 1182 proclamation that imposed a payment requirement.

But the plaintiffs, in *Hawaii*, made very similar arguments.  That there wasn't a history of similar proclamations there.  And the Supreme Court said that doesn't have any impact on how broad we read this language and the deference that's due.  So, frankly, Your Honor, we think *Learning Resources* has no bearing on it.  We don't think this is a tax.  But even if Your Honor disagrees and looks even at major questions doctrine, we think 1182(f) is a broad enough delegation to accomplish the narrow proclamation at issue in this case.

**THE COURT:**  And just one factual point I want to be sure I understood.

**MR. DAVIS:**  Yeah.

**THE COURT:**  You suggested that the H-1B provision isn't raising revenue.  Do you mean as a matter of fact it's not raising much revenue?  What do you mean?

**MR. DAVIS:**  So this has not been in the record, because these are numbers that are still sort of coming in, admittedly.  But, yes, as a matter of fact, the proclamation with the provision, when you offset that against the other fees that would be coming in for petitions, it is not raising revenue at all.

**THE COURT:**  Well, although, that might be because people are deciding they can't afford to pay.

**MR. DAVIS:**  That -- sure, Your Honor, there are fewer petitions.  And so -- but -- but I think that goes to showing that it's not a tax.  Because its purpose and effect is not to raise revenue.  And so that's my only point with that.

And I think, you know, again, we don't think it's prohibitory, in the sense that it's overriding H-1B or nobody can do it.  About 70 people have so far already paid for it -- 70 employers.  But plaintiffs' whole position is that it's prohibitory.  They were just saying that.  And, again, under *Sebelius* --

**THE COURT REPORTER:**  Please slow down.  Sorry.  Please slow down.

**MR. DAVIS:**  And, again, under *Sebelius*, if that's the

case, that cuts against it being a tax in the first instance. And so that's -- that's my point with the revenue.

THE COURT:  All right.  Although, it did seem -- you know -- the *Consumers' Research* decision at least seems to suggest it doesn't matter whether we call it a tax or something else.  I mean, did the *Sebelius* principles apply regardless, when I'm trying to decide if the congressional taxing power is being exercised?

MR. DAVIS:  Yes, Your Honor.  I see *Skinner* and the *Center for Research* case just saying that Congress can delegate the texting authority in the way it can delegate any other authority.  It doesn't have to be more clear.  But the question in *Sebelius* is still what operates here.  Because in *Sebelius*, the challengers were arguing that it wasn't a tax; it was a penalty.  And the Court did this analysis to say, okay, what bucket does it fall into?  Because not every payment requirement's a tax.

Again, the Eighth Circuit -- or the Eighth Amendment talks about excessive fines.  There are penalties.  There are regulatory fees.  And so I think whether you figure out whether it's a tax or not is still the *Sebelius* analysis.

THE COURT:  All right.  Why don't I give the plaintiffs the last word on this piece, and then we'll move on to the APA.

MS. SUNG:  Yeah.  Sure, Your Honor.

So I think the first response I have here is that, with regards to the question whether it's a tax or a fee or what have you, the Supreme Court has abandoned distinctions between regulatory and revenue raising taxes.

For example, *Bob Jones University v. Simon*, 416 U.S. 725, 741, note 12.  And I think, as Your Honor was alluding to, the *Skinner* case that we cite in our briefs is just one of many cases in which the Supreme Court has reiterated that when Congress is going to delegate the discretionary authority to the executive to impose monetary assessments of any kind, regardless of whether they are characterized as fees or taxes, it has to do so clearly.  That delegation has to be expressed.

And the Supreme Court's decision in *Learning Resources* only reinforces that point.  That the delegation must be clear and with limits.  And that's because it's an exercise of the taxing power.  And, in fact, in *Learning Resources*, the Supreme Court was very clear that that power is granted to Congress and the Constitution.  That Congress gives -- excuse me -- that the Constitution gives only to Congress the power to access the pockets of the people.  And that all bills raising revenue must originate in the House of Representatives.

And so to speak to the language in the delegation, yes, 1182(f) the Supreme Court did hold -- although it was Chief Justice Roberts who wrote the majority opinion in *Hawaii* and not Ruth Bader Ginsburg -- that 1182(f) does exude deference to

the President in every clause, but the President's still bound by the terms of the clause.  All of the language in 1182(f) concerns entry.

And there's nothing in 1182(f) that concerns fees, taxes, monetary assessments of any kind.  And so the lesson from *Learning Resources* is that when you do have the President claiming a power that encroaches upon Congress' birthright power to tax, then there must be a clear delegation -- one with limits -- and that's just not what has happened here.

And the Supreme Court did emphasize, again, the power of -- the power to tax.  The power to reach into someone's pocketbook is so powerful and has such an impact that the delegation must be clear.  And simply to say -- for Congress to say that it's giving the executive the power to regulate anything is not the same thing as granting the power to tax.

The Supreme Court said it does not follow that the power to regulate something includes the power to tax it as a means of regulation.  And they -- the Court expressed skepticism that within the language of the IEEPA, Congress hid a delegation of its birthright power to tax.

**THE COURT:**  Though our delegation statute doesn't use "regulate."  It uses "restrict" or "suspend" or --

**MS. SUNG:**  That's correct.  But also 1185 does talk about reasonable rules and regulations and orders relating, again, specifically to entry.  And I think the greater point

here is that none of those words touch on taxing or imposing monetary assessments of any kind.

And I'd point out that the Supreme Court, in *Learning Resources*, did look at other provisions within the IEEPA and other provisions in which Congress had delegated tariff imposing power to the President.  And I think that exercise is useful here, because the INA does show that Congress knows how to delegate its taxing power and how to exercise its taxing power.

It delegated, to the agency, the authority to set fees in Section 1356(m).  And the agency has done that over the years with notice-and-comment rulemaking.  And Congress has also set fees through at least five other statutory provisions relating to the H-1B visa.

And so I think the reason why *Learning Resources* has such import here is because if you do consider 1182(f) to delegate to the President the power to impose, unilaterally, a payment requirement of any amount on anyone at any time, as long as that payment is nominally connected to the entry of a foreign national into the United States, then there is no boundary within Section 1182(f) for that authority.

And so my colleague here keeps on talking about our position and taking that to its logical extreme, but -- or logical end.  But I think the problem that we have here is that there -- the position that the Government advancing is -- is

unbounded.  There is no constraint on the President's power if this is a permissible exercise of the restriction or suspension on -- the power to restrict or suspend entry granted in Section 1182(f).

And if I could address some of the other things that my colleague here said with regards to some of the other statutory interpretation issues.  With regards to *Pacito* -- so, yes, the District Court's decision there has been stayed.  But none of the Ninth Circuit opinions that have stayed the District Court's opinion specifically touched on this issue and this holding.  And that's why we've been citing to it.

With respect to the idea that Congress must expressly say:  And the President can't add any more when it comes to fees, and that that must be the case all the time -- that is certainly not our position.  Our position here, with respect to this case, is that Congress has stepped into the space and filled it, and has solved the specific problem that the proclamation is trying to address with a specific solution.

And that's actually key to the Supreme Court's analysis in *Hawaii v. Trump*.  It found, in that case, that -- well, it considered, in that case, whether Congress had stepped into the space and solved the exact same problem addressed by -- in that case, the Muslim ban -- the travel ban -- and it decided that the hadn't -- that Congress hadn't done that.  But we have very different facts here -- a very different statutory scheme

here -- and our argument is based on that.

The H-1B visa -- we go through this in our papers -- it is legislatively dense. It is the most legislated visa in the INA. And there are multiple -- there are dozens of statutory provisions expressing Congress' intent as to the contours of the program. And also the legislative history of the H-1B visa reflects that Congress has calibrated the program multiple times over the years, adjusting the cap on visas that are allowed, altering which employers are subject to the cap, adjusting the fees.

And the $100,000 payment requirement sweeps away all of that congressional calibration. It obviates all of those provisions. And, again, in a space where Congress has filled the space. And to read Section 1182(f) the way that the Government is proposing, it does allow the President to render superfluous or effectively meaningless all of Congress' -- all of the many dozens of enactments that Congress has made to calibrate the H-1B program.

THE COURT: Although, it -- I assume your argument is not that there's something express in the statute that says only X dollars may be charged. There's no conflict in that regard; right?

MS. SUNG: No. But -- so what -- certainly, though, Congress did not say that. And I actually think that that's part of what Judge Howell based her opinion on. She said that

there's no -- that there's nothing in, for example, 1356(m) that says and the -- that the President can't do more.

But the language in *Hawaii* indicates that that kind of direct instruction from Congress is not required.  *Hawaii* said we may assume that Section 1182(f) does not allow the President to expressly override particular provisions of the INA.

But then the court went on to say, but plaintiffs have not identified any conflict between the statute and the proclamation that would implicitly bar the President from addressing deficiencies the nation's vetting system.  And then it did go on to consider, again, whether Congress has stepped into the space.

And with regards to the national -- the visa waiver program, it found that Congress had not.  But our point here simply is that we're dealing with a very, very different statutory scheme here, where Congress has, in fact, stepped into the space.

And also, just very quickly, the Government's argument with regards to 1182 and admissibility and entry -- the Government's court addresses this in its opinion.  So I won't belabor the point.  But when the Supreme Court talked about admissibility and the issuance of visas and the -- and tried to express if they are indistinct fears, all of the provisions that the Supreme Court relied on to talk about sort of ineligibility for entry or for admissibility to the United

States and also ineligibility to enter -- excuse me -- to receive a visa -- again, that goes to the distinction that the *Gomez* court found between 1182(a), which, again, specifies those individuals who are both ineligible to enter the United States and ineligible to receive a visa.  But 1182(f) is separate.  It only speaks to entry.

And my friend here is trying to muddy the waters.  And that's not actually what the Supreme Court did.  And the *Gomez* court does provide a very good explication of a statutory structure there.

And also *Sale* -- we discussed this in our papers.  They were -- in *Sale*, the Government was enforcing an 1182(f) ban by denying entry.  And so it doesn't speak to visa issuance or anything of that nature.

**THE COURT:**  Let me ask this before we switch over to the APA issue.  I did see in your papers -- and this was something that Judge Howell, in her opinion, ended up identifying as a potential difference between Ninth Circuit law and D.C. Circuit law, which is the principle from the preliminary injunction order in *Doe 1* that talks about, you know, essentially this domestic versus foreign affairs distinction.

But my reading was that the merits decision just flatly abrogated that.  And I know that the merits decision was then vacated as moot too.  But are you relying on that principle

from the *Doe* PI order in any way?  Because it seemed to me that it didn't carry through to the merits decision.

MS. SUNG:  No.  Your Honor's right.  And the Government likes to hold this up as a straw man, I would submit.  Because that's actually not what we're arguing here.

And as you know, even in the Ninth Circuit in the decision that did get vacated, it found that the District Court's distinction between domestic and foreign impacts wasn't supported by the language of 1182(f), because 1182(f) itself does not say anything about domestic versus foreign.

What we were trying to do in our papers in bringing up the domestic impact of the $100,000 payment requirement is to speak to, again, the breadth of the power that the President is claiming here, and why, you know, with the benefit of the *Learning Resources* decision from the Supreme Court, it is an unconstitutional tax.  Because the President is claiming, again, the unilateral power to impose a payment requirement of any kind, any amount, on anyone, including here, U.S. employers, so long as that payment requirement is made, again, nominally in connection with the entry of a foreign national.

And the language of the statute doesn't -- just doesn't support that.  And as a matter of constitutionality, it's -- I think the *Learning Resources* case says that it's unconstitutional because only Congress is given the power to reach into the pockets of people in the United States.  And --

but that's the power that the President is claiming here.

THE COURT:  All right.  Then some questions about the APA claims for both sides.  And, really, just for the plaintiffs, I'm trying to understand whether all of your APA claims are derivative of the claims against the proclamation or are there some that are freestanding?  You know, so, for example, in the motion, you say section 1182(f) does not authorize either the President or executive agencies to go beyond the parameters that your cocounsel was just laying out.

But I'm interested in understanding which are arguments that would be maintained even if the proclamation were found to be lawful.  Potentially, I think the procedural notice-and-comment claim probably is independent.  I'm wondering if, for example, you're saying that there is a stand-alone claim of arbitrary and capricious action in determining eligibility for an exemption, for example, which is not spelled out in the proclamation, and was interpreted narrowly by the agency.

But, at any rate, which, if any, of your APA claims would independently proceed to be analyzed if I were to find that the proclamation was not *ultra vires*?

MS. LIAO:  Cynthia Liao for the plaintiffs.

Yes, Your Honor.  That's -- what you're saying is correct.  There are APA claims here that would be an independent basis to set aside or enjoin the agencies of implementation.  And those

are the arbitrary and capricious claims and the notice-and-comment claims.

THE COURT:  But not the -- for example -- the contrary to law claim, because that would depend on -- that would rise and fall with the proclamation; wouldn't it?  The idea that imposing a $100,000 payment is not authorized by the law -- that comes from the proclamation.  And so that one's dependent on the proclamation; is it not?

MS. LIAO:  Correct.  If the proclamation -- if our tax argument goes the other way, then that would fall away.  If it was lawful for the proclamation to cover more than just entry, then that would fall away, as well.

THE COURT:  I see.  And then one of the obvious disputes is over whether there was final agency action.  And in that regard, what is it -- what are the actions that you've identified?  I understand there are some memos.  There's a frequently asked questions page.  But what -- what, in your view, is the agency action that would be the subject of your APA claim?  And what are you asking to have vacated?  You know, in a normal APA case, there's a rule.  And the request is for vacatur of the rule.  Here, we have memos and website pages.  But what is your conception, if I were to agree with you on the APA piece -- and, again, I'm not saying I've decided that -- but what would the relief be?

MS. LIAO:  So the guidances that the agencies have put

out -- September guidance and the October guidance -- particularly the October guidance, since that's what seems to be operative right now -- those are the -- those are rules under the APA.  And I would refer to the 5 USC 551(4), which defines "rule" as:  "An agency statement of general applicability and future effect designed to implement, interpret, or prescribe law or policy."  And that definition includes prescription for the future of rates, prices, or practices bearing on the foregoing.

THE COURT:  No, I get it.  But the -- the discussion we're -- let's say I agree with you, there's final agency action, and it is these documents.  What -- what is the ask?  You know, normally, if it's vacating the rule, then the rule gets vacated, and it goes back to the agency, and they come up with a different rule or flesh out the record on the rule.  What would you be seeking to have enjoined?  The application of those processes?  What's the -- what's the actual ask?

MS. LIAO:  So we would ask that the agencies be enjoined from requiring the $100,000 payment from employers.

THE COURT:  But, see, that part, it really does seem, is contingent on the proclamation.  How could they not do -- if I found the proclamation was lawful, how could I order them not to follow the proclamation?  I don't understand.

MS. LIAO:  Yeah.  So I'm happy to address that, Your Honor.  So I think earlier you had mentioned that this might be

an area where there is a difference in terms of Ninth Circuit law versus other circuits' law.  And I think this is hitting on that point.  So in the *Nebraska v. Su* case, there were similar facts to what we have here, where there was an executive order that required $15 an hour minimum wage.

THE COURT:  Right.  And I've read *Su* really carefully.  But what the court there didn't do is say you can't impose the $15.  They -- the court said you should have considered other things.  You've got to go back.  You've got to do more work.  But definitely the order there was not, we are directing you to not impose the $15 minimum wage.  Do you read it differently than that?

MS. LIAO:  Well, it's actually pretty typical practice for rules to fall in their entirety, even if there -- for those kinds of reasons, where the agency didn't consider something or didn't do notice-and-comment.  That doesn't mean that after doing notice-and-comment are properly considering the factors that they should have considered, that they theoretically couldn't come to the same conclusion later.  And that principle is illustrated in the *DHS v. Regents* case.  But in the meantime, because they haven't followed the legal procedures under the APA, that rule should not be in place and should be set aside.

THE COURT:  So, I see.  It's the idea -- the idea would be essentially a bar on the implementation of the

proclamation, even if the proclamation itself is lawful, until the requirements of the APA are complied with.

**MS. LIAO:**  Correct.  And that comes, I think, from the -- it comes, in part, from how the language of the proclamation is written.  So the proclamation gives the Secretary of DHS discretion to grant exceptions by industry, by company, or by individual, which really gives the agency a lot of discretion in shaping who is subject to this fee.

And because there's that kind of discretion, and because the agencies have gone out and exercised that, they are subject to the APA.  And so they need to be reasonable and reasonably explain their decisions as to who is subject to the fee, because they are imposing real legal practical consequences on people.

For example, our plaintiff, BAE Industries, currently has an employee who's stuck outside the country because of the fee. And are plaintiff, Nephrology Associates, has their fourth nephrologist that they finally found, after nine months of recruiting, not able to start because of the fee.  These are -- this is a final rule -- final agency action that is reviewable and needed to go through notice-and-comment.

**THE COURT:**  All right.

So then, for the Government, on this point, I don't know how you read *Su* to say anything other than, even where there's a concrete directive from the executive, the agency still needs

to conduct inquiry and explain its reasoning.  And I do think that probably is unique among circuits.

The *Bradford* case from the Tenth Circuit that you cited was one that the Ninth Circuit actually directly rejected in *Su*.  And so why doesn't *Su* impose an obligation that is separate from the proclamation itself to, you know, conduct reasoned decision-making?  And, there, they actually -- the agency went through notice-and-comment rulemaking.  And even there, the Ninth Circuit found that it wasn't enough.  So how is *Su* not controlling on this point?

**MR. DAVIS:**  I think the fact that the agencies acknowledged and historically had done notice-and-comment rulemaking there cuts against its applicability here.  Because, in *Nebraska v. Su*, that was an executive order.  Executive orders generally don't have the force of law in and of themselves.  They rely on agencies to then implement them.

And, historically, including the change under Obama, they had gone through notice-and-comment rulemaking.  They had done sort of the normal APA analysis, but they just failed to do it for the $15 part.  And that's what the court focused on.

But, here, the actual authority that Congress delegated in 1182(f) was that the President can issue proclamations.  And that is what has the force of law.  It's the President's proclamation that has the force of law.  And the agencies are merely implementing it.  And the agencies have no ability

under -- since that has the force of law -- to diverge from what the President lays out in the proclamation.

And I think plaintiffs are making very clear here today, and in their papers, that what they're really challenging is the $100,000 fee.  But there's no discretion about that.  That is required by the proclamation.  And so -- you know --

**THE COURT:**  But why -- but there was no discretion in *Su* either.

**MR. DAVIS:**  Well, I think that -- again, the difference there, Your Honor, is that the Government essentially conceded they had to go through rulemaking; that they did arbitrary and capricious for everything but that; and historically had done so; and that that was an executive order, which, again, by itself, does not have the force of law.  Where here, Congress gave the President the force of law through a proclamation.  That's what 1182(f) is.  That's why a proclamation is different than an executive order.  And so the agencies have no ability to move off of that.

And I think, you know, that the plaintiffs sort of give the game away when, in a footnote, they hide *Trump v. Orr*, which is a Supreme Court stay.  And, there, the plaintiffs were arguing, well, that even was an executive order saying, well, the agencies didn't engage in a clear review.  And it's arbitrary and capricious that they made this change to the passport.

And the Supreme Court said, they're not likely -- the Government's likely to succeed on the merits on that, because the President has the authority to sort of dictate that.  And they couldn't do differently.

And I think, you know, the D.C. Circuit -- and I don't think you have to read *Nebraska* and *Su* and the D.C. Circuit's decision in *Make the Road* separately.  I think they can be read in harmony for this EO reason.  But, there, the Secretary of DHS had a lot of discretion.  And the D.C. Circuit unanimously said, well, if they have to -- if the DHS Secretary has a lot of discretion and can dictate this, there's no point making them go through notice-and-comment.  There's no point with arbitrary and capricious, because they have to follow it, regardless of what the comments are.  And that's the same here.

THE COURT:  But I -- again, I -- it sounds like your only distinction as to the reasoning of *Nebraska v. Su* is that an executive order is different than a proclamation; is that fair?

MR. DAVIS:  I think that is a core distinction.  And I think that distinction matters.  Because an EO, again, is a directive to agencies, but doesn't, by itself, have the force of law.  Where a proclamation, especially under 1182(f), is Congress giving the President the power of law there.  So they're just implementing it.

There's a long line of D.D.C. cases acknowledging this.

It would be a complete circumvention of the rule against applying the APA to the President.  And especially when the power is given to him to issue a proclamation, to say that they then have to engage in arbitrary and capricious review or notice-and-comment for things that the proclamation says and dictates itself.

And the only thing that they say goes beyond the proclamation here are the exceptions.  But they don't show that they're injured by the exceptions.  They don't show how vacating the guidance would really remedy anything.  That's just one USCIS guidance.  There actually wasn't a rule there.  The agency was just providing some notice to the public.

But the Secretary still has complete discretion to do any sort of exception she wants.  And that would be committed to agency discretion.  And I don't see how it's -- redresses their injuries to vacate that when they could literally just issue a new guidance without that exception piece in it.

What they're really trying to do is circumvent *Franklin* and attack the proclamation directly, which we think is impermissible.  And we think there's plenty of case law that justifies that.

**THE COURT:**  Yeah.  The piece I really need is whatever cases you think stand for the idea that, for these purposes that we're talking about, which is what the APA requires in the face of a Presidential directive to action, that an executive

order is meaningfully different than a proclamation.

Because the *Su* case straightforwardly says that even with an executive order that directs particular action, APA processes are required.  What cases do you think stand for the principle that the executive order at issue in *Su* is jurisdictionally or doctrinally different than the proclamation so as to make *Su* inapplicable?

**MR. DAVIS:**  Well, I don't know that I have a case on the proclamation front, because, frankly, plaintiffs almost never bring these types of notice-and-comment challenges to the implementation of proclamations, even though 90 of them have been done since the '50s.  I think that itself is telling.

I think *Trump v. Orr*, although it's not a massively explained interim order, does stand for the proposition that when the President has authority and dictates what the agencies should do, that it's not arbitrary and capricious for them to do that.

And I think one of the guidelines you can think about with *Nebraska v. Su* is there is a lot of cases saying that executive order themselves are -- do not have the force of law.  But that's just not the case for proclamations.  That's the whole point of Congress giving the President the power to issue the proclamations.  That does have the force of law itself.

And it would be a complete circumvention of that -- of *Franklin* and of a lot of these doctrines -- if all the

plaintiffs had to do was say, well, the agencies are implementing it.  So we get to challenge it, and essentially make them go through notice-and-comment, and say it's arbitrary and capricious that they're doing exactly what the President has the authority to say that they must do.  Like, that is completely contrary to *Make the Road*.  And I don't think *Make the Road* is contrary to *Nebraska v. Su*, Your Honor.

**THE COURT:**  And the way that the *Su* court put it is that the Supreme Court has never accepted a final rule from APA review because it carried out a Presidential directive, nor have we or any other circuit.  So what's the limiting principle to that?

**MR. DAVIS:**  I think it's the same thing.  It's the difference between a directive without the force of law, like an EO, versus a proclamation, which, itself, has the force of law.

And I think if we don't take that to be true, that's a complete circumvention of giving this power to the President. Because of course the President can't literally implement it by himself.  *Tulare*, *Seila Law* acknowledges itself that of course the President has agencies, has officers that have to carry out his directives.  But to say that just because -- that he has to have somebody implement it -- as long as they're just implementing the proclamation, that can't be challenged.

And, again, what they're really challenging here is the

$100,000 payment, saying, well, they have to go through notice and comment.  And we would have told them why they shouldn't have imposed that.  But they have no discretion to not impose it.  The proclamation says so.

As *Make the Road* from the D.C. Circuit says, it's completely pointless to have them go through this process when they have literally no discretion.  And they don't have any discretion here.

**THE COURT:**  But they did have discretion to define the scope of exceptions.  And they defined it exceedingly narrowly, with no input from anyone.

**MR. DAVIS:**  Well, I would disagree with that, Your Honor.  USCIS, in their guidance, which is not a substantive rule -- it's merely interpretive and has no real binding effect -- and, in fact, USCIS cannot bind the Secretary.  The Secretary did not make a decision or a final agency decision to restrict her discretion.  And even if she did, that's committed to agency discretion.  She has complete ability to choose how to do exceptions the way that she wants to do.  That's sort of the nature of the exceptions.  Then I don't think that they can use that as a back door in order to take down the entire proclamation itself.

And sort of getting to what you asked here, Your Honor -- so we're just talking about the USCIS guidance document.  If you vacate that, and you say the final agency action or the

thing they need to consider was the exceptions, I don't see why the agency just couldn't issue a new guidance not saying anything about exceptions.  And then they still have to face the $100,000 fee.  I think there's a real redressability issue here.

THE COURT:  Why wouldn't I be able to order notice and comment if I find that it's a rule that should have been subject to notice-and-comment?

MR. DAVIS:  Well, I -- that would be subjecting, essentially, the proclamation to notice-and-comment.  And I don't think that that's permissible for then reasons *Make the Road* does.

And there's, I think, a few other responses there, Your Honor.  That would completely undermine the point of 1182(f), which is that the President can quickly, whenever he finds, issue a proclamation to have any restrictions he deems appropriate.  It completely undermines that if they have to do -- if the agency has to do notice-and-comment just to implement the exact things the President sets out.

And even if you think that that -- that these are final agency actions and substantive rules, which we disagree with -- we think, at best, they're interpretive rules of the proclamation, which has the force of law -- there are a couple of exceptions to notice-and-comment that are clearly applicable here.

One, being good cause, because, by the nature of proclamations, they're supposed to be whenever the President finds. And they're time limited. This one is only a year. But if you require them to go through notice-and-comment, people will come in, they'll get the petitions, and then they can't really easily be removed and subject to requirements for payment later. So it's kind of a one-way ratchet in that sense.

And, in fact, plaintiffs' own evidence that talks about even the 48 hours before the proclamation went into effect, a ton of people were rushing back and trying to get in petitions beforehand. So it completely undermined the purpose of 1182(f) to be this flexible tool of the President to quickly, whenever he shall find, make a proclamation, unless good cause applies.

We also think the foreign affairs exception applies. And in the Supreme Court's decision in *Hines*, in *Knauff v. Shaughnessy*, in *Hawaii*, they repeatedly make clear that issues of immigration are tied up with national affairs -- with foreign affairs and national security -- and that the President has a lot of authority there.

*Knauff* says, sure, Congress has authority here, but the executive also has inherent authority. And since Congress gave this delegation in this realm here, under *Youngstown*, this is the maximum of his power. And so we think, you know, given the international aspect of immigration that the Supreme Court has

repeatedly recognized, it obviously falls within foreign affairs.  And the plaintiffs --

**THE COURT:**  So, obviously, so did *Trump v. Hawaii*.

**MR. DAVIS:**  Yes.  I mean, I agree.  And -- but, there, nobody argued about the cause of action.  There was a judiciability argument about consular reviewability.  And what the Supreme Court said was, that's a really difficult question.  And we're not going to address it, because it's lawful.

So I don't think *Trump v. Hawaii* stands for the proposition that there can have these broad APA challenges.  I think it's telling that nobody made those types of comment and comment challenges to the proclamation in *Trump v. Hawaii*, even though there were so many rounds of litigation against it.  Because, again, I think it would undermine the core purpose of 1182 and how it has historically been used for over 90 proclamations since the 1950s.

And I'll just -- real quick, the main case that they rely on to be the contrary point is *East Bay*.  *East Bay* was kind of a strange case, Your Honor, because DOJ and DHS actually did issue a rule, which they acknowledge was a rule, separate from the proclamation.  And with the proclamation, they were supposed to work in tandem in order to change the rule of decision for asylum within the United States.

So it wasn't sort of an entry determination.  And the rule for DHS and DOJ was issued under a separate authority from the

proclamation. And, there, they didn't go through notice-and-comment or do arbitrary and capricious for that rule. And the Ninth Circuit said, well, we don't necessarily think that it's exempt from going through rules there. But I don't think that necessarily would carry over to just a pure application of the proclamation that we have here.

THE COURT: And why, given that there was a rule and a proclamation that were essentially simultaneous, it looks like?

MR. DAVIS: Well, because they were mostly -- they were really challenging the rule. And the rule was promulgated subject to separate authority under DOJ and DHS's authority. It wasn't just implementing the proclamation. And they were supposed to work in tandem. And they sort of acknowledged that that was a rule. But they tried to get out of notice-and-comment for that separate rule.

So that's not the same as it just being the proclamation, and they're simply ministerially implementing the proclamation, which is precisely what's happening here.

THE COURT: Although, I guess -- I'm just looking at the *East Bay Sanctuary* at 770. And the Court said: We don't have any authority, under Section 706 of the APA, to review the proclamation, which is consistent with what you're saying. However, we may review the substantive validity of the rule together with the proclamation. What does that mean?

MR. DAVIS: I think, again, that goes to the fact that

DOJ and DHS were issuing a rule separate and under separate authority, and that's what was being challenged there.  And, again, they acknowledged that that was a sort of separate rule under separate authority.  They were just supposed to work in conjuncture.  But also, those weren't entry restrictions.  They were a rule of decision for asylum within the United States, which I think is also an important distinction when we're talking about the foreign affairs implications and the intersection of immigration law and also national security in foreign affairs that the Supreme Court has repeatedly recognized in *Hines*, *Fiallo v. Bell*, *Knauff v. Shaughnessy*, and *Hawaii* -- and that Bybee, at certain points in this opinion, in *East Bay*, also acknowledges.

THE COURT:  And so I'm just reading same page:  The rule and the proclamation together create an operative rule of decision for asylum eligibility.  It is the substantive rule of decision, not the rule itself, that the organizations have challenged under the APA.  And insofar as DOJ and DHS have incorporated the proclamation by reference into the rule, we may consider the validity of the agencies' proposed action, including its rule or the equivalent.

What does that mean?

MR. DAVIS:  I think that I read that in conjunction with what I've been saying.  That that was a separate rule under separate authority.  And they were challenging that rule.

And to the extent the rule was just trying to rely on the proclamation or incorporate it, they could still be challenged. But they were doing something different there under different authorities, and they were working in conjunction.

But, again, here, all we have is the proclamation and the mere implementation of that proclamation. And if that's enough, then there are essentially no limits on challenging a proclamation. And the proclamation can be second-guessed by notice-and-comment and arbitrary and capricious, even though the agencies have no discretion, because Congress gave the lawful authority to issue proclamations and to set any restrictions he may deem appropriate.

And I would just -- want to pause real quick on the implications of applying arbitrary and capricious here. Because in *Trump v. Hawaii*, they said the proclamation -- the President doesn't have to lay out all of his justifications. We're not going to second-guess his policy choices. He doesn't have to connect all of the change and connect all of the dots to do it.

But that's precisely what's subjecting the proclamation vis-à-vis the implementation by agencies to arbitrary and capricious would be. It would be the public and courts second-guessing the policy determinations as plaintiffs want to of whether to impose $100,000. But the Supreme Court flatly rejected that in *Hawaii*. And I think it's telling that, until

recently, there haven't really been these notice-and-comment challenges to proclamations.  And I think that's part of the reason why.

THE COURT:  All right.  Last word from the plaintiffs on this point.

MS. LIAO:  Yes, Your Honor.  That was a lot, so let me just go through point by point.

So in terms of *Nebraska*, the statute that the Government relied on there is similar to the one that is at issue here. It allowed the President to prescribe directives.  So there's no meaningful difference between *Nebraska* and this case in that sense.  And there -- there is discretion that the agencies have under the proclamation and that they have just simply been simply exercising on their own.

So one example is the development of the agencies' exceptions policy, which is much narrower than the exceptions provision in the proclamation.

Another example is what they did in the September and October guidance that we talked about in our reply brief, where, in September, the agencies created a rule that the fee applies to new petitions, but not to renewal positions. "Renewal" is not a term that's been used like that before. It's not in the statute.  It's not in the regs.  It's not in the proclamation.  They created that new categorization for this new rule they were creating.

**THE COURT:** Right. But the challenge here -- I mean, I take -- I take your opposing counsel's point. And this is going to be tricky. And I'm going to have to really drill down into this, because this is a place where a misstep is very possible.

You're not saying, though, go back and come up with a better explanation for the exemptions or, you know, consider alternatives to the exemptions, the kind of things that *Su* was talking about. You're saying -- you said it, and it makes sense -- you're saying, until you do these things, you can't impose the $100,000 payment requirement. But how is that anything other than using the APA to negate the proclamation itself?

**MS. LIAO:** I feel it goes to the fundamental, I think, misconception underlying the Government's theory. So *Nebraska* was very clear that the APA's text doesn't carve out agency actions that implement Presidential directives.

**THE COURT:** Right. Although, what about this idea that proclamations are different than executive orders? I mean, I have to do a lot of research on that myself. But what's your response?

**MS. LIAO:** Well, the defendants haven't been able to point to anything. And, as I discussed, *Nebraska* involved a statute that had similar language to what we have here. That statute said prescribe directives -- the President can

prescribe directives.  1185 talks about the President prescribing rules, regulations, et cetera.  There's not really a meaningful difference as far as we're aware.

So, here, even if you take what defendants call the "ministerial implementation" kind of approach to the APA, in that world, if the agency is just merely following what a proclamation says, then it's not subject to APA review.  Even if that's the standard.  That's not what the agencies are doing here.  The agencies are, on their own, creating rules about who is going to be subject or excepted from this fee.  And so notice-and-comment would have been meaningful here.

So as I was talking about, when the September guidance was the operative regime, BAE Industries employee went abroad under the understanding that if he was to renew his visa, even if he was abroad, his employer wouldn't have to pay the fee.  But five days later, without notice, without comment, without advance warning, the agency issued new guidance changing the rules.  They dropped the renewal language.  Now if you're abroad, and you need to renew your visa, your employer does have to pay the fee.

And as a result --

THE COURT:  But doesn't that cut against the idea that there's any final agency action?  That's -- you're saying it wasn't final.  They said one thing and then they did something else.

MS. LIAO:  It wasn't --

THE COURT:  What's the final action that you're challenging at this point?

MS. LIAO:  So finality is -- there's two prongs; right?  One, is that the agency has decided; right?  And so at the time of the September guidance, that was their decision.  That's how they wanted to slice and dice who is in and who is out.  And then they had another final agency action in October, when they changed the rules and sliced it a different way.

And the second prong is that there needs to be legal consequences that flow, which can be met if there's direct and immediate effect on the day-to-day operations of the subject party.  And that's exactly what we're seeing with BAE Industries.  One day they were under one legal regime.  The second day, they were under a different one.

And so those legal consequences really illustrate what -- why we have the APA, which is to promote reasonable, deliberative policymaking, as the Ninth Circuit talked about in *Nebraska*.  If there had been an opportunity for employers like BAE Industries to chime in, they could have pointed out that, agency, as you are figuring out who to accept, which industries to grant exceptions to, or who this applies to, please consider that we have people in this kind of situation.

Plaintiffs like Nephrology Associates could point out that, you know, we're in rural North Carolina.  We are in a

medically underserved area recognized by HHS.  There's a specific pathway Congress created for J-1 physicians to work in those areas on H-1Bs.  And please consider having an exception for -- for this pathway.  But there was no such opportunity. And that failure to conduct notice-and-comment was prejudicial.

THE COURT:  All right.  Well, I think, here, the question that I'm going to have to figure out is whether just as a matter of law, notice-and-comment applies or not.  I mean, really, that will be the driver of the result.  And I think there's some more drill-down research I need to do on these questions we've been talking about.

MR. DAVIS:  Your Honor, can I make two quick points?

THE COURT:  Sure.

MR. DAVIS:  So if you look at -- I believe this is 760 in *East Bay* -- the court in the background breaks down the rule and the proclamation.  It says the rule was invoked under the Attorney General's power pursuant to 1158(b)(2)(C).  Explains what that rule is.

If you go over to the analysis of the substantivity of the rule, *East Bay* makes clear they're not subject to -- they're not reviewing the proclamation, and talks about how the rule is contrary to other parts of 1158, which is the section that the rule was promulgated under.

THE COURT:  Where are you -- where are you getting this?

MR. DAVIS:  That's under -- let me see if I can find -- 770 through 771.  And if you look, it says the INA grants the Attorney General the power to set additional limitations and conditions beyond those listed in 1155(a)(8)(B)(ii)(A).  It's talking about the Attorney General's power, but then talks about how they believe that that's inconsistent with other parts of 1158.

And, briefly, on the -- whether this is ministerial or going beyond the proclamation, I don't -- I at least understand the exceptions argument.  We disagree that that's a final agency action that the Secretary has made any sort of final decision or that that could be subject to review.  I don't really understand their argument for there being any other action that goes beyond the proclamation.

What the guidance says and what I think they're talking about is that, if you're in the United States and you seek a change in status, an extension, an amendment, those change-in-status attempts are not subject to the proclamation.

Their own plaintiff, Phoenix Doe, is proof positive of that.  She sought a change in status and received it without having to pay the fee and dropped out of the case.  But people abroad, if you're trying to do that, or if you have to leave the country to make those sorts of things, then it does apply.

That follows directly from the proclamation, section 3, which is about the scope.  Says that it applies on entry or

attempt of entry after the effective date.  That's just the difference between them being in the United States or being in entry bar.  So that's not an extension or a change in the proclamation.  And even so, making more people not subject to the fee in no way harms plaintiffs.  In fact, it's a benefit to them.  And that can't be used as a back door to sort of bring down the entire proclamation the way plaintiffs want to.

THE COURT:  Right.  You're saying that narrowing the scope of the proclamation can't be injurious.

MR. DAVIS:  Right.  If that's the agency action that they say is going beyond implementation.

MS. LIAO:  Your Honor, if I may be heard on that?

THE COURT:  Sure.

MS. LIAO:  So our point about the changes from September to October is not to say that narrowing the proclamation is something we want to take away.  The point is to show that the agencies are making their own decisions as to who is subject to the fee, even apart from what is in the text of a proclamation.  And because they're doing that, it's an agency action that's reviewable under the APA, and it's subject to arbitrary and capricious review.  And because it's a legislative rule, it is also subject to notice-and-comment.

THE COURT:  All right.  Well, I'm going to have to decide that.

Those are the questions that I had.  I actually don't need

to hear any argument on the class certification piece of it.

As to the motion to stay, I'll just deny it for reasons indicated already. I mean, obviously I think we're all in line to get some valuable guidance from what we hear from the D.C. Circuit. But given that the -- that that decision is not binding on the plaintiffs here, I don't think the equitable right direction is to formally stay this case.

Now, I will certainly be tuning in on March 9th to see what we hear in that argument. But I don't think a formal stay is warranted. And so I'll deny that motion for that reason.

**MR. DAVIS:** Understood, Your Honor.

**THE COURT:** All right. I'll take it under submission, pending the submission of your supplemental briefs a week from today. And then it will be considered submitted, unless I hear otherwise.

**MS. LIAO:** Thank you, Your Honor.

**MR. DAVIS:** Thank you, Your Honor.

**THE COURT:** All right. Thank you. Your arguments were helpful. Thank you.

(Proceedings adjourned at 3:31 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Sunday, March 1, 2026

_____

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court