Cynthia Liao (CA Bar No. 301818)*
Johanna M. Hickman (D.C. Bar No. 981770)*
Jennie L. Kneedler (D.C. Bar No. 500261)*
Steven Y. Bressler (D.C. Bar No. 482492)*
Elena Goldstein (D.C. Bar No. 90034087)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982 (Liao)
cliao@democracyforward.org
hhickman@democracyforward.org
jkneedler@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

*Admitted *pro hac vice*

[Additional co-counsel on signature page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| GLOBAL NURSE FORCE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Case No. 4:25-cv-08454-HSG <br><br> **PLAINTIFFS BAE INDUSTRIES, NEPHROLOGY ASSOCIATES OF THE CAROLINAS P.A., LOWER BRULE DAY SCHOOL, GLOBAL VILLAGE ACADEMY COLLABORATIVE, AND GLOBAL NURSE FORCE'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND 5 U.S.C. § 705 STAY** <br><br> Judge: Hon. Haywood S. Gilliam, Jr. <br> Ctrm: 2, 4th Floor <br> Date: Thursday, February 26, 2026 <br> Time: 2:00 p.m. |

# INTRODUCTION

This case concerns whether, in 8 U.S.C. § 1182(f) or § 1185(a), Congress authorized the President to exercise Congress's constitutional tax power and to charge fees of any amount he likes, of anyone, to spend however he likes, in his sole (and according to Defendants, unreviewable) discretion, so long as there is some connection to a noncitizen's entry. The answer is no, for reasons similar to those in the Supreme Court's recent decision *Learning Resources, Inc. v. Trump*, 607 U.S. ---, 2026 WL 477534 (2026). *Learning Resources* underscored the constitutional baseline: the Framers gave Congress "alone . . . access to the pockets of the people." *Id.* at *7 (quoting The Federalist No. 48, at 310 (J. Madison)). Because the Framers "did not vest any part of the taxing power in the Executive Branch," *id.*, the President and executive agencies have no power to extract money from the people unless Congress delegates its "birth-right power to tax," *see id.* at *10. Congress did not delegate that power in § 1182(f) or § 1185(a). Despite the "facial breadth" of some of the language in § 1182(f) and § 1185(a), *Learning Resources*, 2026 WL 477534, at *10, like the statute at issue in *Learning Resources*, those provisions of the Immigration and Nationality Act ("INA") do not make any mention of fees or other charges nor set any parameters around that authority, in contrast to Congress's typical practice when delegating the authority to establish fees or charges. The President thus had no authority to require employers to pay $100,000 per H-1B petition, and the Agency Defendants acted contrary to law in implementing the Proclamation.

# ARGUMENT

**I. The $100,000 payment requirement is a tax for constitutional purposes.**

*Learning Resources* confirms that the $100,000 payment requirement is, for constitutional purposes, a tax and thus the President can only impose such a requirement if Congress delegates its taxing power to him. *Learning Resources* described raising revenue as "the defining feature of a tax," 2026 WL 477534, at *7 (citing *United States v. Kahriger*, 345 U.S. 22, 28 & n.4 (1953)), and held that the tariffs at issue in that case were "a branch of the taxing power" because they "operate[d] directly on domestic importers to raise revenue for the Treasury," *id.* at *12. Here, the $100,000 requirement operates directly on domestic employers and Defendants have admitted that the money goes to the Treasury. *See* Declaration of Jerome Jackson ¶ 7 (ECF 75-16). And, at oral argument, the government

shared for the first time that about 70 employers have made the $100,000 payment. *See* Hr'g Tr. 30:19-20 (Feb. 26, 2026). That means the government has so far raised at least $7 million in revenue (70 x $100,000), more if some employers filed more than one petition. Thus, the payment requirement here, like the tariffs, is a tax.

The government cannot escape the conclusion that the $100,000 requirement raises revenue by trying to downplay the amount. *See* PI Opp. 36 (calling $100,000 a "limited payment"); Hr'g Tr. 30:7-10 (suggesting revenue collected thus far should be "offset" against revenue that would otherwise be coming in). A payment requirement is still a revenue-raising tax even if the amount of revenue is less than expected or "the revenue obtained is negligible." *Kahriger*, 345 U.S. at 28 & n.4 (cited in *Learning Resources*). And the $7 million collected thus far is not negligible—it is many times more than some of the other examples the Supreme Court has recognized as revenue-generating taxes. *See id.* at 28 n.4 ("$3,501 collected under the tax on adulterated and process or renovated butter and filled cheese, . . . and the $28,911 collected under the tax on firearms transfer and occupational taxes" based on government data from October 1952);[1] *Sonzinsky v. United States*, 300 U.S. 506, 514 n.1 (1937) (upholding a $200 license tax on firearms dealers as an exercise of Congress's taxing power where it was "productive of some revenue," having been paid by 27 dealers in 1934 and 22 dealers in 1935).

*Learning Resources* also confirms the error of the government's argument that the $100,000 requirement does not impinge on Congress's taxing power because it is not intended to raise revenue and thus is a prohibitory "regulatory" payment, rather than a tax. *See* PI Opp. 36 (ECF 98). The Supreme Court reiterated what it has held many times before: "Taxes . . . may accomplish regulatory ends." *Learning Resources*, 2026 WL 477534, at *11 (citing *Sonzinsky*, 300 U.S. at 513). In other words, "a tax is not any the less a tax because it has a regulatory effect." *Sonzinsky*, 300 U.S. at 513. Indeed, there are numerous Supreme Court cases where "[t]he intent to curtail and hinder, as well as tax, was . . . manifest . . . and in each of them the tax was upheld" as an exercise of Congress's tax power. *Kahriger*, 345 U.S.

---

[1] According to the Bureau of Labor Statistics' inflation calculator, $3,501 in October 1952 is the equivalent of $42,648.21 in January 2026. $28,911 in October 1952 is the equivalent of $352,185.79 in January 2026. Bureau of Labor Statistics, CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm.

at 27 (listing cases). A tax to discourage employers from sponsoring employees on H-1B visas is no less a tax than a tax to curtail paper money issued by state banks, artificially colored oleomargarine, narcotics, marijuana, or firearms. *See id.* It is also no different from a tax to encourage people to buy health insurance. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 567 (2012) ("*NFIB*") ("[T]axes that seek to influence conduct are nothing new.").

Nor can Defendants escape *Learning Resources* and the Supreme Court's other cases through post-hoc characterization of the $100,000 requirement as a penalty. *See* USCIS, G-1055 Fee Schedule at 5 (ECF 46-4) (describing $100,000 as a "fee"). A "penalty" is fundamentally a "punishment for an unlawful act or omission." *NFIB*, 567 U.S. at 567. In *NFIB*, the Affordable Care Act did not make failure to buy health insurance "unlawful," as it did not attach negative legal consequences to it aside from requiring non-buyers to make a payment; thus, the payment was a "tax" and not a "penalty." *Id.* at 567-68. Here, similarly, the Proclamation does not impose negative legal consequences on filing an H-1B petition aside from the $100,000 payment, and thus the payment is similarly a "tax" rather than a "penalty."

## II. Congress did not delegate its taxing power in § 1182(f) or § 1185.

Because the $100,000 requirement is a tax for constitutional purposes, the President can only require such payment if Congress has delegated its taxing power to him. For reasons set out in the majority opinion in *Learning Resources*, Congress did not do that in § 1182(f) or § 1185(a).

First, the Court held that the International Emergency Economic Powers Act ("IEEPA") did not delegate the power to impose tariffs because "[a]bsent from [the] lengthy list of powers" given to the President in the statute "is any mention of tariffs or duties" and that the power to "regulate" does not include the power to tax. *Learning Resources*, 2026 WL 477534, at *10. Here, similarly, § 1182(f) allows the President to "suspend . . . entry" or "impose on the entry of aliens any restrictions he may deem to be appropriate." Section 1185(a) allows the President to "prescribe" "reasonable rules, regulations, and orders" and "limitations and exceptions" concerning a noncitizen's departure from or entry into the United States. But neither statute mentions fees or other charges. While some of the terms in the statutes are facially broad, their "facial breadth . . . places in stark relief what the term[s are] not usually thought to include: taxation." *Learning Resources*, 2026 WL 477534, at *10. Indeed, many of the terms used in

3

§1182(f) and § 1185(a) are similar to "regulate," in that they are broad, generic terms describing general governmental functions. *See id.* ("'Regulate,' as that term is ordinarily used, means to 'fix, establish, or control; to adjust by *rule*, method, or established mode; to direct by *rule* or *restriction*; to subject to governing principles or laws.'") (emphases added); *see also id.* (describing power to regulate as "quotidian"); *Prescribe*, Webster's Collegiate Dictionary 761 (1919) ("To lay down authoritatively as a guide, direction, or rule of action; dictate; ordain"); *Rule*, Black's Law Dictionary 1046 (2nd ed. 1910) ("An established standard, guide, or regulation; a principle or regulation set up by authority, prescribing or directing action or forbearance"); *Regulation*, Black's Law Dictionary 1009 (2nd ed. 1910) ("The act of regulating, a rule or order prescribed for management or government"); *Restrict*, Black's Law Dictionary 1478 (4th ed. 1951) ("To restrain within bounds; to limit; to confine."). While "§ 1182(f) vests the President with 'ample power' to impose entry restrictions," the President is still bound by the statute's textual limits. *Trump v. Hawaii*, 585 U.S. 667, 684, 687-88 (2018). The lack of any mention of fees or charges in § 1182(f) indicates that Congress did not authorize fees or charges.

Second, Congress's "pattern of usage" shows that, when Congress imposes fees or gives the Executive Branch the authority to impose fees related to the H-1B program, it typically "does so clearly and with careful constraints." *Learning Resources*, 2026 WL 477534, at *11. For example, the INA has several provisions that explicitly direct agencies to impose "fees" of specific amounts on H-1B employers. 8 U.S.C. § 1184(c)(9)(A) ("The Attorney General shall impose a fee…"); *id.* § 1184(c)(11)(A) ("the Secretary of Homeland Security or the Secretary of State, as appropriate, shall impose a fee…"); *id.* § 1184(c)(12)(A) ("the Secretary of Homeland Security shall impose a fraud prevention and detection fee…"). Congress also gave detailed instructions on how the fees collected are to be used. *See id.* § 1356(s) (dividing amounts collected from § 1184(c)(9)-(11) among agencies to be used for demonstration programs and projects and STEM education); *id.* §§ 1184(c)(12)(E), 1356(v) (dividing fraud fees among agencies to be used for preventing and detecting fraud and enforcement activities). In 8 U.S.C. § 1356(m), Congress similarly authorized the Attorney General to designate "fees for providing adjudication and naturalization services" and set parameters: the Attorney General can charge fees "at a level that will ensure recovery of the full costs of providing all such services," including the cost of subsidizing similar services provided without charge to asylum applicants or other

4

immigrants. 8 U.S.C. § 1356(m).[2] Also illustrative is the Independent Offices Appropriation Act, where Congress generally permitted agencies to charge user fees by "prescrib[ing] regulations establishing the charge for a service or thing of value provided by the agency" and requiring the charge to be "fair" and "based on" factors including "the costs to the Government" and "the value of the service or thing to the recipient." 31 U.S.C. § 9701(b). These examples, among others,[3] show that, when Congress delegates fee-setting authority, it does so clearly and with parameters.

Third, it matters not whether, as a practical matter, a fee can serve as a means of suspending or restricting entry because that "answers the wrong question." *Learning Resources*, 2026 WL 477534, at *11. The key question is "instead whether *Congress*, when conferring the power to [impose restrictions on entry], gave the President the power to impose [fees] at his sole discretion." *Id.* The answer is no. Here, like in *Learning Resources*, Congress has a "pattern" of specifically identifying when it delegates fee authority and setting parameters around that authority. *Id.* In light of that "plain" pattern, which is the most relevant to answering the question, *id.*, it is unlikely that Congress intended for § 1182(f) and § 1185(a)—which say nothing about fees[4]—to give the President virtually unlimited (and, according to the government, unreviewable) power to extract fees of any amount whenever he wishes, from whomever he wishes, to spend however he wishes, so long as there is a nominal connection to entry of

---

[2] *Learning Resources* also helps clarify the meaning of 8 U.S.C. § 1356(m). Defendants have argued that § 1356(m) does not prevent the government from charging other fees beyond adjudication fees as the statute says that fees "may" be set at a level to recover certain costs. PI Opp. 33-34. But the constitutional baseline is that only Congress can reach into "the pockets of the people." *Learning Resources*, 2026 WL 477534, at *7; *cf. Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 (1986) ("[A]n agency literally has no power to act, . . . unless and until Congress confers power upon it"). Understood in that context, the term "may" gives the Executive Branch the option to charge fees up to a level that recovers the full costs of adjudication and naturalization services if it wishes to. It could also choose to charge fees that recover less than the full cost of services or not charge fees at all. But "may" does not imply that the Executive Branch has free rein to charge more than the cost of those services or to create wholly new fees.
[3] Other examples of explicit, constrained fee delegations in the INA include the provisions governing premium processing fees, 8 U.S.C. § 1356(u), and adjudication fees for EB-5 petitions, EB-5 Reform and Integrity Act, Pub. L. No. 117-103, div. BB, sec. 106(b)-(c), 136 Stat. at 1104.
[4] That § 1182(f) and § 1185(a) do not mention fees distinguishes this case from *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976). The Trade Expansion Act in *Algonquin* is another example of a statute where, unlike in § 1182(f) and § 1185(a), Congress explicitly referred to a monetary assessment (there, a "duty") in describing the actions the President could or could not take. *Learning Resources*, 2026 WL 477534, at *13 (quoting 19 U.S.C. § 1862(a) (1970 ed.)).

a foreign national.[5] If Congress intended for the President to be able to charge fees of any amount, at any point of the process leading up to entry, as the government's position goes, there would be little point to Congress authorizing the Attorney General to recover costs of adjudicating petitions through fees and specifying the level of fees that can be set. *See* 8 U.S.C. § 1356(m); *Learning Resources*, 2026 WL 477534, at *10 (rejecting broad reading of "regulate" that would render other parts of the statute "simply wasted ink"); *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (quotation marks omitted).

Finally, the fact that no President has ever found revenue-raising power in § 1182(f) "is strong evidence that it does not exist." *Learning Resources*, 2026 WL 477534, at *11. Here, the government has admitted that § 1182(f) has never been used to impose a monetary restriction. Hr'g Tr. 74:14-75:9, *Chamber of Commerce v. DHS*, 2025 WL 3719234 (D.D.C. Mar. 15, 2025) (ECF 101-5). At oral argument, the government tried to downplay the unprecedented nature of the Proclamation by pointing to the unprecedented nature of the Muslim Ban upheld in *Hawaii*. Hr'g Tr. 29:14-18. But while the Supreme Court rejected the *Hawaii* plaintiffs' attempt to "confine expansive language in light of its past applications," *Hawaii*, 585 U.S. at 693, the proclamation at issue in *Hawaii* created a prohibition on entry and was similar in that respect to previous proclamations. In contrast, this Proclamation for the first time creates a $100,000 fee to deter employers from filing H-1B petitions, an act that is "different in kind" from "an outright compulsion or prohibition," because it "operate[s] directly on domestic [employers] to raise revenue for the Treasury" and thus impinges on Congress's power to tax. *Learning Resources*, 2026 WL 477534, at *12; *see also Nat'l Cable Tel. Ass'n v. United States*, 415 U.S. 336, 341 (1974) ("The lawmaker may, in light of the 'public policy or interest served,' make the assessment heavy if the lawmaker wants to discourage the activity; or it may make the levy slight of a bounty is to be

---

[5] The government contends that the Proclamation is temporary. Hr'g Tr. 28:2. But the Proclamation itself contemplates extensions. *See* Proclamation No. 10,973, §§ 1(a), 3(b), 90 Fed. Reg. 46,027 (Sept. 19, 2025). Moreover, the Proclamation's temporary-unless-extended nature is not a basis on which to distinguish *Learning Resources*. A President's declaration of a national emergency, a condition precedent of using his powers under IEEPA, is also temporary unless extended, *Learning Resources*, 2026 WL 477534, at *61 (Thomas, J., dissenting) (arguing that IEEPA has "a default 1-year limit on emergencies," citing 50 U.S.C. § 1622(d)), and that made no difference to the Court's analysis.

bestowed . . . . Such assessments are in the nature of 'taxes' which under our constitutional regime are traditionally levied by Congress.").[6]

The unprecedented nature of the Proclamation, in combination with the constitutionally intrusive and unlimited kind of power that the President claims here—a tax power belonging to Congress not clearly delegated—indicates that the President has exceeded his statutory authority under § 1182(f) and 1185(a).

**III.    Under the major questions doctrine, Congress must speak clearly to delegate the extraordinary authority the Executive Branch claims here, but it did not do so.**

The government's interpretation of § 1182(f) and § 1185(a) as giving boundless authority to the President to charge fees even though the statutes do not clearly say so runs afoul of the major questions doctrine. Chief Justice Roberts's opinion (Parts II-A-2 and III, joined by Justices Barrett and Gorsuch) is persuasive here. The major questions doctrine applies because, like in *Learning Resources* and the Court's other recent major questions cases, the government "claim[s] broad, expansive power on an uncertain statutory basis." *Learning Resources*, 2026 WL 477534, at *7 (Roberts, C.J., op.). Like in those cases, the text of § 1182(f) and § 1185(a) might "'[a]s a matter of definitional possibilities' . . . [be] read to delegate the asserted power." *Id.* (quoting *W. Va. v. EPA*, 597 U.S. 697, 732 (2022)). However, the "constitutional context" suggests that, where "the purported delegation involves the core congressional power of the purse"—described by James Madison as Congress's "'most complete and effectual weapon'"—Congress would delegate it "clearly," not through ambiguous statutory text. *Id.* at *8 (quoting The Federalist No. 58, at 359), 13. The undisputedly unprecedented nature of the fee "is also telling." *Id.* at *9; *see supra* p. 6.

---

[6] The Court's recognition that the authority to raise revenue is simply different also answers the government's argument that the President has inherent authority over immigration. PI Opp. 15, 39. Even if the President has inherent power to exclude foreign nationals altogether, *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950), that does not imply the power to impose taxes or fees. Furthermore, that power derives from the President's authority over foreign affairs generally, the same general power that the government claimed in trying to justify limitless Presidential power over tariffs in *Learning Resources*. *See* Br. for Pet. at 44-45, *Learning Resources*, 2026 WL 477534 (No. 24-1287), 2025 WL 2772085, at *44-45; Reply Br. for Pet. at 33, *Learning Resources*, 2026 WL 477534 (No. 24-1287), 2025 WL 3093454, at *33. The government's argument found no purchase in *Learning Resources* and there is no reason for this Court to credit it here.

The "economic and political significance of the authority the President has asserted likewise provides a reason to hesitate before concluding that Congress meant to confer such authority." *Learning Resources*, 2026 WL 477534, at *9 (Roberts, C.J., op.) (cleaned up). From FY 2022 to FY 2024, an average of 429,315 H-1B petitions were filed each year. *See* USCIS, Characteristics of H-1B Specialty Occupation Workers, Fiscal Year 2024, at 24 (Table 1a) (Apr. 29, 2025) (ECF 75-21) ("FY 2024 Characteristics"). The $100,000 fee affects hundreds of thousands of jobs across various sectors. *Id.* at 45 (Table 7) (listing petitions by major occupation groups); *see W. Va.*, 597 U.S. at 714 (finding major questions doctrine applied to action that would affect "tens of thousands of jobs across various sectors").[7] While many employers are simply unable to pay $100,000 or multiples thereof, the sheer magnitude of the taxing power that the President claims is still astounding. At $100,000 per petition and approximately 429,000 petitions, the President claims legal authority to extract some $42.9 billion from employers. This sum dwarfs USCIS's $6.22 billion of total fee revenue (for all benefit types, not just H-1B) in FY 2024, which accounts for over 90% of its budget. USCIS Statement of Financial Condition: Fiscal Year 2024 Report to Congress Immigration Examinations Fee Account 2, 7 (June 2025), https://perma.cc/JQN3-3UYK. It is highly implausible that Congress meant to give the President the power to raise revenue many times that of USCIS's budget and to let him do whatever he wishes with that money without express authorization.

Chief Justice Roberts' opinion also answers the government's contention that Congress can paint with a broader brush in the foreign affairs context. PI Opp. 36. There is no blanket foreign affairs exception from the major questions doctrine. *Learning Resources*, 2026 WL 477534, at *10 (Roberts, C.J., op.). Where a constitutional power belongs to Congress alone, such as the taxing power, "we would not expect Congress to relinquish its . . . power through vague language, or without careful limits," even in a foreign affairs context. *Id.*; *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1336 (Fed. Cir. 2025) ("While the President of course has independent constitutional authority in [the foreign affairs and

---

[7] The Proclamation does not distinguish between types of petitions to which the fee applies. *See* Proclamation No. 10,973, 90 Fed. Reg. 46,027 (Sept. 19, 2025). But even if only "initial" petitions were counted because USCIS decided the fee would not apply to amendment or extension petitions *if* USCIS favorably exercises discretion and grants them, that would still be 138,730 jobs. *See* FY 2024 Characteristics at 2 n.3, 24 (Table 1a); PI Mot. 10 & n.13 (ECF 75).

national security] spheres, the power of the purse (including the power to tax) belongs to Congress. . . . Absent a valid delegation by Congress, the President has no authority to impose taxes."); *cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015) ("The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue.").

Because the major questions doctrine applies, "the President must 'point to clear congressional authorization' to justify his extraordinary assertion of the power to impose" fees and he has failed to do so here. *Learning Resources*, 2026 WL 477534, at *10.[8]

## CONCLUSION

Under the reasoning of *Learning Resources*, in § 1182(f) and § 1185(a), Congress did not authorize the President to charge whatever fee he likes, to use however he likes, as long as it has some connection to entry of noncitizens. The $100,000 payment requirement imposed by the President and the agencies is unlawful. Plaintiffs' motion for preliminary relief should be granted.

Date: March 5, 2026

Respectfully submitted,

/s/ Karen C. Tumlin
Karen C. Tumlin (CA Bar No. 234691)
Esther H. Sung (CA Bar No. 255962)
Laura Flores-Perilla (CA Bar No. 355645)
Hillary Li (GA Bar No. 898375)*
Brandon Galli-Graves (TX Bar No. 24132050)*
Emily Satifka (NJ Bar No. 330452020)*
Vanessa Rivas-Bernardy (CA Bar No. 341464)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

/s/ Cynthia Liao
Cynthia Liao (CA Bar No. 301818)*
Johanna M. Hickman (D.C. Bar No. 981770)*
Jennie L. Kneedler (D.C. Bar No. 500261)*
Steven Y. Bressler (D.C. Bar No. 482492)*
Elena Goldstein (D.C. Bar No. 90034087)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982 (Liao)
cliao@democracyforward.org
hhickman@democracyforward.org
jkneedler@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

---

[8] Even if the major questions doctrine did not apply, normal principles under the nondelegation doctrine lead to the same conclusion. *See Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989) ("Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to recover administrative costs not inuring directly to the benefit of regulated parties by imposing additional financial burdens, whether characterized as 'fees' or 'taxes,' on those parties."); *see also FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (Congress must make "clear both the general policy that the agency must pursue and the boundaries of its delegated authority.") (cleaned up).

hillary.li@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org
Emily.satifka@justiceactioncenter.org
vanessa.rivas@justiceactioncenter.org

/s/ Charles H. Kuck*
GA Bar No. 429940
**KUCK BAXTER LLC**
365 Northridge Rd., Suite 300
Atlanta, GA 30350
404-949-8154
Ckuck@immigration.net

/s/ Zachary R. New
Zachary R. New**
Atty. Reg. No. (Colorado): 53992
**JOSEPH & HALL, P.C.**
12203 East Second Ave.
Aurora, CO 80011
(303) 297-9171
zachary@immigrationissues.com

/s/ Harini Srinivasan
Harini Srinivasan (D.C. Bar No. 1032002)*
Aniko Schwarcz (D.C. Bar No. 980631)*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Suite 800
Washington, D.C. 20005
(202) 408-4600
hsrinivasan@cohenmilstein.com
aschwarcz@cohenmilstein.com

Alexandra Gray (NY Bar No. 6019590)*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine St., 14th Floor
New York, New York 10005
(212) 838-7797
agray@cohenmilstein.com

/s/ Kalpana Peddibhotla
Kalpana Peddibhotla (CA Bar No. 200330)
**SOUTH ASIAN AMERICAN JUSTICE COLLABORATIVE (SAAJCO)**
333 W. San Carlos Street, Suite 600
San Jose, CA 95110
(408) 550-9240
kalpana@saajco.org

/s/ Jesse M. Bless
JESSE M. BLESS*
MA Bar # 660713
**BLESS LITIGATION LLC**
6 Vineyard Lane
Georgetown MA 01833
781-704-3897
jesse@blesslitigation.com

/s/ Greg Siskind
Greg Siskind**
TN Bar No. 14487
**SISKIND SUSSER**
1028 Oakhaven Road
Memphis, TN 38119
(901) 682-6455
gsiskind@visalaw.com

*Counsel for Plaintiffs*

* Admitted *pro hac vice*
** Motion to appear *pro hac vice* forthcoming