UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| STATE OF CALIFORNIA et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 25-13829-LTS |
| | ) | |
| MARKWAYNE MULLIN et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT (DOC. NO. 86) AND DEFENDANTS' CROSS-MOTION
FOR SUMMARY JUDGMENT AND MOTION TO DISMISS (DOC. NO. 92)

June 8, 2026

SOROKIN, J.

On September 19, 2025, President Trump signed a Proclamation instituting a $100,000 payment requirement for employers submitting petitions for new H-1B visas. Plaintiffs are twenty states that have sued various executive departments and officials for their role in implementing the Proclamation. Plaintiffs contend that Defendants' implementation of the Proclamation violates the separation of powers and the Administrative Procedure Act ("APA").

The parties have cross-moved for summary judgment. Doc. No. 86; Doc. No. 92.[1] Defendants have also moved to dismiss the complaint. Doc. No. 92. For the reasons that follow, the Court DENIES Defendants' motion for summary judgment. Defendants' motion to dismiss

---

[1] Citations to "Doc. No. __" reference items filed on the electronic docket ("ECF") in the action that is the subject of this Order; pincites are to the page numbers in the ECF header or, where applicable, to the paragraph numbering within the document.

is ALLOWED IN PART and DENIED IN PART.  Plaintiffs' motion for summary judgment is ALLOWED.

I.    BACKGROUND

   A.    The H-1B Program

The Constitution provides Congress with the power to "establish an uniform Rule of Naturalization . . . throughout the United States."  U.S. Const. art. 1, § 8, cl. 4.  Pursuant to this constitutional authority, Congress enacted the Immigration and Nationality Act of 1952 ("INA"), which "established a comprehensive federal statutory scheme for regulation of immigration and naturalization and set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country."  Chamber of Com. of U.S. v. Whiting, 563 U.S. 582, 587 (2011) (citation modified).

Within the INA, Congress created a predecessor for the H-1B visa—the "H visa"—establishing temporary visas for nonimmigrant foreign workers in specialty occupations.  Doc. No. 1 ¶ 52.  In 1990, Congress amended the INA and created the H-1B program that is still in effect today.  Id. ¶ 53.  The H-1B program allows a U.S. employer to petition the government to hire a nonimmigrant worker in a specialty occupation for a maximum duration of six years.  Id. A "specialty occupation" is an occupation that requires "(A) theoretical and practical application of a body of highly specialized knowledge, and (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States."  8 U.S.C. § 1184(i)(1).

To protect the domestic labor force, Congress has capped H-1B visa approvals for most private employers at 65,000 per year, with another 20,000 for holders of advanced degrees.  8 U.S.C. § 1184(g).  Some employers, however, are not constrained by any cap.  In particular, the cap does not apply to (1) "an institution of higher education" "or a related or affiliated nonprofit

2

entity," or (2) "a nonprofit research organization or governmental research organization." Id. § 1184(g)(5). These cap-exempt employers enjoy other benefits under the H-1B visa program. Unlike private employers, cap-exempt employers do not need to register in the annual H-1B lottery and may file petitions with United States Citizenship and Immigration Services ("USCIS") using Form I-129 at any time. Doc. No. 1 ¶ 57.

The H-1B program also requires employers to pay certain fees. Some are statutory fees set by Congress, which include a $500 fraud-prevention fee, 8 U.S.C. § 1184(c)(12)(A)-(C), as well as a $1,500 filing fee, id. § 1184(c)(9)(A)-(C). See also Doc. No. 1 ¶¶ 62-69 (listing fees set by Congress through statute).

The INA also delegates to the Department of Homeland Security ("DHS") the authority to set visa-related adjudication fees. That statutory provision reads:

> Provided . . . [t]hat fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected.

8 U.S.C. § 1356(m). Based on this authority, DHS has imposed various adjudication fees for H-1B visas through notice-and-comment rulemaking. Doc. No. 1 ¶¶ 70-73.

On occasion, Congress and DHS have waived certain fees for cap-exempt employers. For example, Congress has passed an education-and-training fee that does not apply to cap-exempt employers. Id. ¶¶ 63, 79. Similarly, cap-exempt employers do not have to pay a $215 non-refundable registration fee set by DHS. Id. ¶ 78.

B.    Presidential Powers Under the INA

In addition to establishing a comprehensive federal statutory scheme governing immigration and naturalization, the INA also confers upon the President "broad discretion to suspend the entry of aliens

3

into the United States." Trump v. Hawaii, 585 U.S. 667, 683-84 (2018).  In particular, Section 212(f) of the INA provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).  The INA contains one more provision concerning the President's authority to regulate entry into the United States.  Section 215(a) provides that, "[u]nless otherwise ordered by the President, it shall be unlawful . . . for any alien to . . . enter or attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe."  8 U.S.C. § 1185(a)(1).  The President's authority under this section "substantially overlaps" with the President's power under Section 212(f).  Hawaii, 585 U.S. at 693 n.1.

### C.    Proclamation 10973

Relying on the foregoing statutory powers under the INA, on September 19, 2025, President Trump signed Proclamation 10973 ("Proclamation"), which adds a $100,000 supplemental payment requirement to all H-1B petitions.  See Proclamation 10973, Restriction on Entry of Certain Nonimmigrant Workers, 90 Fed. Reg. 46027 (Sep. 24, 2025).  The Proclamation begins by setting out the President's reasons for instituting the measure.  It notes that the H-1B program "has been deliberately exploited to replace, rather than supplement, American workers with lower-paid, lower-skilled labor," which has subsequently "undermined both our economic and national security."  Id. at 46027.  It proceeds:

> Some employers, using practices now widely adopted by entire sectors, have abused the H-1B statute and its regulations to artificially suppress wages, resulting in a disadvantageous labor market for American citizens, while at the same time making it more difficult to attract and retain the highest skilled subset of temporary

4

workers, with the largest impact seen in critical science, technology, engineering, and math (STEM) fields.

Id.  Additionally, the Proclamation lays out data about the rising share of STEM jobs filled by foreign workers, focusing on IT firms and tech companies.  Id. at 46027-28.  The Proclamation does not specifically address these employment trends as they pertain to state employers, nonprofit employers, or institutes of higher education.

The Proclamation contains five sections, the first three of which are relevant to the claims in this case.  Section 1—"Restriction on Entry"—cites sections 212(f) and 215(a) of the INA as the statutory basis for the President's authority to impose the $100,000 payment.  Id. at 46028.  This section also states that the new payment requirement goes into effect on September 21, 2025, and expires after twelve months (if not extended).  Id.  Furthermore, subsection 1(b) directs the Secretary of Homeland Security to enforce the Proclamation and further directs the Secretary of State  to "issue guidance, as necessary and to the extent permitted by law, to prevent misuse of B visas by alien beneficiaries of approved H-1B petitions that have an employment start date beginning prior to October 1, 2026."  Id. at 46029.  Subsection 1(c) grants the Secretary of Homeland Security broad discretion to waive the $100,000 fee for any "individual alien," "company," or "industry" where such waiver is "in the national interest and does not pose a threat to the security or welfare of the United States."  Id.

Section 2—"Compliance"—requires employers to, "prior to filing an H-1B petition on behalf of an alien outside the United States, obtain and retain documentation showing that the [$100,000] payment . . . has been made."  Id.  In addition, it instructs the Secretary of State to "verify receipt of payment . . . during the H-1B visa petition process" and " approve only those visa petitions for which the filing employer has made the payment."  Id.  The section further directs DHS and the State Department to "coordinate to take all necessary and appropriate action

5

to implement this proclamation and to deny entry to the United States to any H-1B nonimmigrant for whom the prospective employer has not made the payment." Id.

Section 3—"Scope and Implementation of Restriction on Entry"—notes that the Proclamation only applies to nonimmigrants entering the United States after the effective date of the Proclamation. Id. It also directs the Secretary of State, the Attorney General, the Secretary of Labor, and the Secretary of Homeland Security to "jointly submit to the President . . . a recommendation" on whether to extend or renew the $100,000 payment beyond the twelve-month period established by the Proclamation. Id.

D.      Defendants' Implementation of the Proclamation

Defendants swiftly took action to implement the terms of the Proclamation. On September 19, 2025, the same day the President announced the Proclamation, the Bureau of Consular Affairs of the Department of State sent an email to the Visa Office explaining that the Proclamation "takes effect at 12:01 a.m. EDT on September 21, 2025." Doc. No. 84-2 at 3. On September 20, 2025, USCIS published a memorandum, clarifying that the Proclamation "only applies prospectively to petitions that have not yet been filed." Doc. No. 84-3 at 3. U.S. Customs and Border Protection ("CBP") and the Department of State issued similar memoranda to their staff on the same day. Doc. No. 84-1 at 11; Doc. No. 84-2 at 4-8.

The next day, both the Department of State and USCIS issued "H-1B FAQ" documents further noting that the Proclamation's payment requirement applies prospectively. Doc. No. 84-2 at 9-10; Doc. No. 84-3 at 4-5. Also on September 21, 2025, the Department of State published a webpage entitled, "Restriction on Entry of Certain Nonimmigrant Workers," confirming that the Proclamation's restrictions only apply to H-1B petitions filed after the Proclamation's effective date of September 21, 2025. Doc. No. 84-2 at 12.

On October 20, 2025, USCIS published additional information on its "H-1B Specialty Occupations" webpage explaining that the $100,000 payment applies to new petitions filed on or after September 21, 2025, "on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa"; new petitions that request "consular notification, port of entry notification, or pre-flight inspection for an alien in the United States"; and new petitions for change of status, amendment, or extension where the USCIS has determined that the individual is not eligible for the request. Doc. No. 84-3 at 7-8. That same day, USCIS published an updated fee schedule on its website listing the $100,000 payment as an additional fee requirement for H-1B petitions. Id. at 9-13. USCIS also created a payment website for petitioners paying the $100,000 fee. Id. at 14-15.

The foregoing materials (collectively, the "Policy") reflect the agency actions that are the subject of Plaintiffs' lawsuit.

E.     Impact on Plaintiffs

The Proclamation and the corresponding Policy have significantly increased the cost of H-1B petitions, which, prior to the Proclamation, totaled somewhere between $960 and $7,595 in regulatory and statutory fees. Id. ¶ 80. Plaintiffs allege that they stand to suffer various harms from the new payment requirement. First, Plaintiffs allege that the Policy will impede their ability to hire educators for their primary and secondary schools, exacerbating existing teacher shortages. Id. ¶¶ 114-136. Second, Plaintiffs assert that the Policy will negatively impact their ability to staff public colleges and universities and stymie critical academic research. Id. ¶¶ 137-157. Finally, Plaintiffs allege that the Policy will lead to a decline in H-1B medical workers, which, in turn, will worsen staffing shortages in medical facilities and diminish access to healthcare. Id. ¶¶ 158-188. Plaintiffs contend that the Proclamation's impact on healthcare professionals "will cause cascading harm throughout the Plaintiff States" by impairing public

healthcare providers' ability to provide adequate services to residents and by heightening costs to state insurance programs. Id. ¶¶ 187-88.

F.    Procedural History

Plaintiffs commenced this lawsuit on December 12, 2025. Doc. No. 1. Their complaint advances four causes of action: Count I alleges a violation of the APA's procedural requirements; Count II alleges a violation of the APA for an agency action in excess of statutory authority; Count III alleges arbitrary and capricious acts in violation of the APA; and Count IV alleges an unconstitutional ultra vires act.

On January 23, 2026, the parties jointly proposed a summary judgment briefing schedule, stipulating that the parties' claims and defenses are suitable for resolution through summary judgment. Doc. No. 83. The Court adopted the schedule. Doc. No. 85. Pursuant to the schedule, Plaintiffs filed their motion for summary judgment on February 6, 2026. Doc. No. 86. On March 9, 2026, Defendants filed a cross-motion for summary judgment, an opposition to Plaintiffs' motion for summary judgment, and a motion to dismiss, which were all supported by one memorandum. Doc. Nos. 92, 93. On March 17, 2026, the Federation for American Immigration Reform submitted an amicus brief in support of Defendants' cross-motion for summary judgment after obtaining leave to do so.[2] Doc. No. 97. On April 2, 2026, Plaintiffs submitted a single memorandum as their reply in support of their motion for summary judgment and their opposition to Defendants' cross-motion and motion to dismiss.[3] Doc. No. 99.

---

[2] The Court considers "the amicus brief[] only insofar as [it] concern[s] legal issues and positions raised by the parties." New Jersey v. Trump, 131 F.4th 27, 32 n.1 (1st Cir. 2025).
[3] In their reply, Plaintiffs agreed to voluntarily dismiss their claims against the Department of Justice, the Attorney General, the Department of Labor, and the Secretary of Labor without prejudice. Doc. No. 99 at 27 n.16. Accordingly, the Court ALLOWS Defendants' motion to dismiss the claims against these four parties and dismisses those claims without prejudice.

Defendants replied on April 13, 2026.  Doc. No. 100.  The Court held a hearing on the motions on May 29, 2026.

## II.   LEGAL STANDARD

A movant is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In the administrative law context, however, a motion for summary judgment "is simply a vehicle to tee up a case for judicial review."  Bos. Redev. Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016).  Thus, "an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" was unlawful.  Id.

In addition to their cross-motion for summary judgment, Defendants also move to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim.  Doc. No. 93 at 21.  On a motion to dismiss for lack of subject matter jurisdiction, a court must "construe the Complaint liberally and treat all well-pleaded facts as true, according the plaintiff the benefit of all reasonable inferences."  Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995).  To survive a motion to dismiss for failure to state a claim, the complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## III.   DISCUSSION

### A.   Standing

The Court begins with standing.  To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent;

9

(ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021).

Plaintiffs have met these requirements. They allege that the imposition of the $100,000 H-1B payment requirement negatively impacts their ability to staff publicly run colleges and universities, primary and secondary schools, and healthcare systems. Doc. No. 1 ¶¶ 114-188. They contend that these hiring challenges will, in turn, exacerbate staffing shortages in these sectors and endanger Plaintiffs' ability to provide important medical and educational services. Id. ¶¶ 114-115, 134-136, 143, 161-169, 187-188. These allegations sufficiently demonstrate injuries caused by Defendants' actions in enacting the Policy, which are redressable by the judicial relief sought in this case—declaratory judgment, vacatur, and injunctive relief.

Nothing in the record before the Court undermines Plaintiffs' standing arguments. Nor do Defendants raise any objection to standing. Accordingly, the Court finds that Plaintiffs have standing to bring this lawsuit.

B.     Consular-Nonreviewability Doctrine

As an initial matter, Defendants contend that Plaintiffs' claims are foreclosed by the doctrine of consular nonreviewability. That doctrine establishes that "the federal courts cannot review" an executive officer's "denial of a visa." Dep't of State v. Munoz, 602 U.S. 899, 908 (2024). This is because "Congress may delegate to executive officials the discretionary authority to admit noncitizens immune from judicial inquiry or interference," and, "[w]hen it does so, the action of an executive officer to admit or to exclude an alien is final and conclusive." Id. (citation modified).

Here, Plaintiffs' claims do not neatly fit within the ambit of consular nonreviewability. Plaintiffs do not seek to challenge the denial of any visa. Rather, they challenge the Proclamation and the Policy as actions exceeding the President's delegated authority under the

10

INA. Defendants argue that because the President's Proclamation arises from the "sweeping" discretionary authority granted to him via INA §§ 212(f) and 215(a), it is not reviewable unless Congress expressly authorizes such review—which it has not done here. Doc. No. 93 at 22. But this line of argument misses the central thrust of Plaintiffs' claims. Plaintiffs allege that the President treaded beyond the scope of his discretionary authority under the INA; indeed, one of Plaintiffs' theories is that the President created (and the Defendants implemented) an unauthorized tax on H-1B petitions. In other words, Plaintiffs' case centers on their contention that Congress did not leave the challenged actions to the executive's discretion. Such claims diverge from the types of discretionary actions that the consular-nonreviewability doctrine is designed to shield from judicial review. And, Defendants cite no cases expanding the scope of the consular-nonreviewability doctrine in the manner they urge.

In any event, "it is well settled that when plaintiffs pursue forward-looking challenges to the lawfulness of regulations or policies governing consular decisions, courts may review them to assure that the executive departments abide by the legislatively mandated procedures." Pietersen v. U.S. Dep't of State, 138 F.4th 552, 560 (D.C. Cir. 2025) (citation modified). Here, Plaintiffs do not seek retrospective review of an executive officer's decision to exclude a noncitizen but rather advance a forward-looking challenge regarding the lawfulness of the Policy carrying out the Proclamation. For these reasons, the Court rejects Defendants' argument that the claims are not justiciable under the doctrine of consular reviewability. Having resolved that issue, the Court turns to evaluating Plaintiffs' claims. Because many aspects of Plaintiffs' ultra vires claim bear on their claims under the APA, the Court begins with the ultra vires claim before addressing the APA claims.

11

C.    Ultra Vires Claim

1.    *Reviewability*

Plaintiffs' separation-of-powers claim arises from their allegations that the Policy "usurps Congress's exclusive and plenary constitutional authority to set immigration policy and to raise revenue" and "exceeds the carefully and explicitly limited fee-setting authority delegated to the executive branch by Congress."  Doc. No. 1 ¶¶ 234-235.  Before evaluating the merits of this claim, the Court addresses the preliminary issue of whether Plaintiffs' separation-of-powers claim is reviewable as a non-statutory ultra vires claim.

"The basic premise behind nonstatutory review is that, even after the passage of the APA, some residuum of power remains with the district court to review agency action that is *ultra vires*."  R.I. Dep't of Env't Mgmt. v. United States, 304 F.3d 31, 42 (1st Cir. 2002).  "To act *ultra vires* a government official is either acting in a way that is impermissible under the Constitution or acting outside of the confines of his statutory authority."  New York v. McMahon, 784 F. Supp. 3d 311, 352 (D. Mass. 2025), appeal dismissed, No. 25-1495, 2025 WL 3451815 (1st Cir. Sep. 15, 2025) (citation modified).

Defendants raise various objections to ultra vires review, but their arguments are unavailing.  Defendants first contend that "[i]t is doubtful that *ultra vires* review is available to challenge presidential actions at all."  Doc. No. 93 at 28.  They cite to American Foreign Service Association v. Trump, a per curiam decision of the District of Columbia Circuit, which found that an ultra vires action against President Trump was likely unavailable because "an *ultra vires* action is a suit in equity . . . and courts generally lack authority to enjoin the President."  2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025).  Plaintiffs do not face the same hurdle here because they seek to enjoin executive departments and their officials, rather than the President.  While it is true that Plaintiffs seek to enjoin Defendants from taking action pursuant to the

12

President's instruction, this link between Defendants' actions and the President's directive is not enough to bar ultra vires review. It is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" Chamber of Com. of U.S. v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting Franklin v. Massachusetts, 505 U.S. 788, 815 (1992) (Scalia, J., concurring)). This is because "courts have power to compel subordinate executive officials to disobey illegal Presidential commands." Id. (citation modified).

Next, Defendants argue that the Plaintiffs' ultra vires claim is statutory, rather than constitutional, in nature. Doc. No. 93 at 27. They contend that asserting "pure separation of powers concerns based on statutory limits is impermissible because 'plaintiffs would otherwise be able to avoid statutory limits on review by reframing any alleged statutory violation by the President as a constitutional one.'" Id. at 27-28 (quoting Glob. Health Council v. Trump, 153 F.4th 1, 14-15 (D.C. Cir. 2025)).

Defendants are correct that there is a different presumption of reviewability for constitutional versus statutory claims against the President and other executive officials. An executive official's action is reviewable for constitutionality. Franklin, 505 U.S. at 801. However, not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." Dalton v. Specter, 511 U.S. 462, 472 (1994). To the contrary, courts "often distinguish[] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." Id.

The Supreme Court elucidated this distinction in Dalton, which involved a lawsuit alleging that the President's decision to shut down a particular naval shipyard violated the procedural requirements of the Defense Base Closure and Realignment Act of 1990. Id. There,

13

the Court of Appeals concluded that the claim had a "constitutional" dimension, reasoning that the President violates the constitutional separation-of-powers doctrine when he acts in excess of his statutory authority. Id. at 471. The Supreme Court reversed, concluding that the plaintiffs' claim was "not a constitutional claim, but a statutory one," and that it could not go forward under the limited scope of judicial review available for such statutory claims. Id. at 477-78.

The Supreme Court reached this conclusion based upon several findings. The Court first noted that the plaintiffs' claim challenging the closure of the shipyard amounted only to a claim that the President had "exceeded his authority" under the relevant statute. Id. at 477. Namely, the plaintiffs alleged that the President exceeded his statutory authority by adopting recommendations to close certain military bases, even though those recommendations had violated the statute's procedural requirements. Id. at 474. Because the claim was premised on the President's alleged violation of the statute, the Court found that the claim was simply a statutory claim, rather than a constitutional claim subject to judicial review. Id. at 475-77. From there, the Court noted that the same statute did "not at all limit the President's discretion in approving or disapproving . . . recommendations." Id. at 476. Accordingly, the Court concluded that the plaintiffs' statutory claim was not reviewable because, "[w]here a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." Id. at 477.

The matter before this Court is distinguishable from Dalton for a variety of reasons. First, Plaintiffs' challenge to the Policy is not a mere statutory claim. Plaintiffs allege both that the Policy exceeds the scope of the President's authority under the INA, and that it encroaches upon Congress's exclusive power to tax under the Constitution. Thus, Plaintiffs do not simply claim that the Executive Branch failed to comply with the terms of the INA. Their allegations

14

implicate weighty constitutional concerns regarding the balance of power between the executive and legislative branches. Indeed, Defendants, themselves, repeatedly contend that the Proclamation is a permissible exercise of the President's "inherent" executive power to control the foreign affairs of the nation—an argument that suggests that the President's relevant powers exceed his statutory authority under the INA or do not derive from the statutory provisions cited. Doc. No. 93 at 32, 36, 40; Doc. No. 100-1 at 10, 15. As such, this case presents significant constitutional separation-of-powers issues that veer far beyond the statute-based dispute at issue in Dalton.[4]

Moreover, even if the Court were to accept Defendants' assertion that Plaintiffs' claim is statutory rather than constitutional (it does not), Plaintiffs' claim differs materially from the one advanced in Dalton. In Dalton, the Supreme Court found that the challenged actions fell within the unlimited discretion granted to the President under the relevant statute to approve or reject recommendations for base closures. 511 U.S. at 476. As a result, the Court found that it could not review the claim, noting that, "where a claim 'concerns not a want of [Presidential] power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves

---

[4] Defendants additionally argue that the ultra vires claim is unreviewable because "Plaintiffs fail to identify any 'specific prohibition in a statute' that . . . would render the Proclamation 'entirely in excess of [the President's] delegated powers.'" Doc. No. 93 at 29 (quoting Nuclear Regul. Comm'n v. Texas, 605 U.S. 665, 666, 681 (2025)). They contend that this deficiency "alone is fatal to" Plaintiffs' ultra vires claim. Id. But, the requirement articulated in the Nuclear Regulatory Commission case pertained to an allegation that an agency acted in violation of a relevant statute. 605 U.S. at 681. Based on the nature of the claim, the Court observed that the plaintiffs were "basically dress[ing] up a typical statutory-authority argument as an ultra vires claim." Id. at 682. In that particular context, the Court noted that ultra vires review applies "only when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." Id. at 681 (citation modified). Defendants have not shown that the same requirement of a "specific prohibition in a statute" applies to cases, such as this one, that raise constitutional separation-of-powers concerns.

15

considerations which are beyond the reach of judicial power.'" Id. at 474 (quoting Dakota Cent. Tel. Co. v. South Dakota ex rel. Payne, 250 U.S. 163, 184 (1919)).

Here, Plaintiffs' claim does not require the Court to evaluate whether the President abused the discretion granted to him by the INA.  Instead, Plaintiffs contend that the President lacked the power to impose the additional $100,000 payment requirement to H-1B applications, alleging (among other things) that the payment obligation intrudes upon Congress's taxing power.  Such a claim is plainly subject to judicial review.  While Defendants urge that the President's policy decisions involving immigration and national security are squarely within the executive's discretion and immune from judicial intervention, Doc. No. 93 at 28-29, this line of argument misconstrues the nature of the issues here.  The ultra vires claim in this case does not call upon the Court to question the President's exercise of his policy-making discretion.  Rather, this case asks the Court to evaluate whether the President and Defendants had the requisite authority to issue and implement the Proclamation.[5]  While "[t]he Executive has broad discretion over the admission and exclusion of aliens, . . . that discretion is not boundless." Abourezk v. Reagan, 785 F.2d 1043, 1061 (D.C. Cir. 1986), aff'd, 484 U.S. 1 (1987).  Such discretion "may not transgress constitutional limitations" or "the statutory authority conferred by Congress."  Id. It is "the duty of the courts . . . to say where those statutory and constitutional boundaries lie."

---

[5] The Court does not dispute Defendants' position that immigration and national security policies are within the prerogative of the political branches.  However, "in areas of shared presidential and congressional authority," such as the entry of noncitizens, "the courts have presumptive authority to determine whether the President has usurped an authority that Congress neither delegated to him nor left for him to exercise unimpeded by statute." Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem, 793 F. Supp. 3d 19, 77-78 (D.D.C. 2025), aff'd sub nom. Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin, No. 25-5243, 2026 WL 1110616 (D.C. Cir. Apr. 24, 2026).

Id. This Court declines Defendants' invitation to step away from its essential duty in this matter.[6]

> 2. *Merits*

Having resolved the reviewability of Plaintiffs' ultra vires challenge, the Court evaluates the merits of the claim. Plaintiffs contend that the Policy violates separation-of-powers principles because it "usurps both" Congress's constitutional "powers to regulate the admission of noncitizens . . . and to levy taxes." Doc. No. 87 at 20.

The Court begins with Plaintiffs' assertion that the Policy intrudes upon Congress's taxing power. The first inquiry is whether the $100,000 payment requirement constitutes a tax. The parties quibble about whether the requirement resembles a tax or a "penalty" as characterized by two Supreme Court precedents: Bailey v. Drexel Furniture Company and National Federation of Independent Business v. Sebelius. In Drexel, the Supreme Court held that the Child Labor Tax Law—which required employers to pay the government one-tenth of their net income if they were found to knowingly employ child laborers—was a penalty, not a tax. 259 U.S. 20, 36 (1922). The Court reasoned that the "heavy exaction" functioned as a prohibitory regulation, rather than a mere tax, because it was "imposed to stop the employment of children within the age limits prescribed." Id. at 36-37.

---

[6] One more issue warrants mention. Case law suggests that a non-statutory ultra vires claim cannot proceed "if a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review." Nuclear Regul., 605 U.S. at 681 (citation modified); see also President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs., 798 F. Supp. 3d 77, 133-35 (D. Mass. 2025) (granting defendants' motion for summary judgment as to plaintiff's ultra vires and separation-of-powers claims because plaintiffs successfully brought APA claim alleging same issues). Here, Plaintiffs bring several claims under the APA which overlap substantially with the allegations underlying their ultra vires claim. However, Defendants make no argument in their papers that Plaintiffs cannot proceed on their ultra vires claim because of their possible APA claims. Because this argument was not raised in the briefing, it is waived.

In Sebelius, the Supreme Court further clarified the distinction between a tax and a punishment. There, the Court found that the Affordable Care Act's requirement that individuals pay an additional fee to the Internal Revenue Service ("IRS") for not obtaining health insurance amounted to a tax, not a penalty. 567 U.S. 519, 574 (2012). In distinguishing penalties from taxes, the Court explained that, "if the concept of penalty means anything, it means punishment for an unlawful act or omission." Id. at 567 (citation modified). Applying this principle, the Court concluded:

> While the individual mandate clearly aims to induce the purchase of health insurance, it need not be read to declare that failing to do so is unlawful. Neither the Act nor any other law attaches negative legal consequences to not buying health insurance, beyond requiring a payment to the IRS.

Id. at 567-68.

Here, the $100,000 payment requirement for all H-1B petitions does not aim to establish that hiring H-1B workers is illegal. The payment is not a penalty, just as the IRS fee in Sebelius was not, because it is not "punishment for an unlawful act or omission." Id. at 567. Hiring workers pursuant to the H-1B program is plainly lawful. Of course, rendering the hiring of H-1B workers "unlawful" would eliminate the program established by Congress through the statute, which would raise a different separation-of-powers concern. See Clinton v. City of New York, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."); Hawaii, 585 U.S. at 689 ("We may assume that § 1182(f) does not allow the President to expressly override particular provisions of the INA."). Nor is this case analogous to Drexel. There, the exaction was clearly imposed to outlaw the hiring of child laborers and to punish employers who deviated from this standard. 259 U.S. at 37-38. The Supreme Court's reasoning in this pair of precedents supports a finding that the $100,000 payment requirement amounts to a tax, not a penalty.

18

Defendants' arguments to the contrary are unpersuasive. They note that the $100,000 fee is collected by DHS and not the IRS, which they argue resembles Drexel, where the penalty was collected by the Secretary of Labor. But neither Sebelius nor Drexel stands for the proposition that the particular agency charged with collecting the fee determines whether the fee constitutes a tax. Indeed, the Supreme Court recently found that tariffs assessed by DHS amount to taxes for the purposes of the Constitution's Taxing Clause. Learning Res., Inc. v. Trump, 146 S. Ct. 628, 638 (2026). Next, Defendants contend that that the payment requirement cannot constitute a tax because the purpose of a tax is to raise revenue, and the Policy has had the result of decreasing the number of H-1B petitions as well as the total fees collected by USCIS from H-1B applications. Doc. No. 93 at 36. This argument falls short. An obvious purpose of the Policy is to raise revenue—it charges a substantial fee for all H-1B petitions. That total revenue from H-1B petitions has declined does not mean raising revenue was not a purpose of the Policy; rather, it means that such a purpose was not achieved. Purpose and effect are different. Moreover, every $100,000 payment made pursuant to the Policy does raise revenue. That is indisputable. No legal authority suggests that a payment requirement qualifies as a tax only if it increases the total revenue generated from that particular tax.[7] Finally, as Plaintiffs point out, the government may impose a tax with the purpose of curbing the purchase of undesirable goods (e.g., a tobacco tax). Doc. No. 99 at 19; see also Sebelius, 567 U.S. at 572 (acknowledging that Congress can

---

[7] A simple example makes the point. If Congress lowered all income tax rates across the board to a flat 4% of taxable income, while making no change in the definition of taxable income, total revenue from income taxes would plainly decline. But this decline in total revenue would not change the nature of the tax. When a person pays 4% of their taxable income to the United States, that payment would still constitute a tax payment (and it would still generate revenue for the government).

19

"use its taxing power to influence conduct"). Such a tax does not lose its identity as a tax because its ultimate aim or effect is to reduce revenue.

Furthermore, Defendants claim that the $100,000 payment requirement is "a regulatory payment," which is "not the same as a tax." Doc. No. 93 at 35. This is mere ipse dixit. Defendants offer no definition for what constitutes "a regulatory payment," cite no cases or statutes employing the term, and advance no reasoned argument explaining how this term encompasses something different than a tax or a penalty. They have waived this theory. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). In any event, the manner in which a particular payment is labeled "does not determine whether the payment may be viewed as an exercise of Congress's taxing power," because what matters is the "substance and application" of the payment, not its "designation." Sebelius, 567 U.S. at 564-65. Here, the substance and application of the $100,000 payment reveal that it is a tax, regardless of what the payment is called.

That does not end the Court's analysis. While the Constitution exclusively vests Congress with the "Power To lay and collect Taxes, Duties, Imposts, and Excises," U.S. Const. art. 1, § 8, cl. 1, Congress can delegate the taxing power to the executive branch so long as it "clearly" indicates "its intention to delegate." Skinner v. Mid-Am. Pipeline Co., 490 U.S. 212, 224 (1989). Thus, the relevant inquiry here is whether the provisions of the INA granting the President discretionary powers to regulate the entry of noncitizens reflect a delegation of Congress's taxing power. Under INA § 212(f), the President has the authority to "impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). INA

20

§ 215(a) additionally grants the President the power to impose "reasonable rules, regulations, and orders" as well as "limitations and exceptions" to the entry of noncitizens. Id. § 1185(a)(1).

Plaintiffs argue that these provisions do not confer the power to impose taxes, relying on the Supreme Court's recent guidance in Learning Resources. That case involved a challenge to the President's imposition of tariffs under the IEEPA. Learning Res., 146 S. Ct. at 635. The IEEPA permits the President to "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any . . . importation or exploration of . . . any property in which any foreign country or a national thereof has any interest" when responding to a national emergency. Id. at 636. The Court found that the IEEPA does not delegate taxing powers to the President, noting that the specific powers listed in the IEEPA do not include "any mention of tariffs or duties." Id. at 642. The Court further noted that the power to "regulate . . . importation" does not encompass the power to tax, because the term "regulate" "means to 'fix, establish, or control; to adjust by rule, method, or established mode; to direct by rule to restriction; to subject to governing principles or laws'"—none of which captures the power to tax. Id. at 642-43 (quoting Regulate, Black's Law Dictionary (5th ed. 1979)).

Applying Learning Resources to the case at hand, the Court finds that INA §§ 212(f) and 215(a) do not delegate taxing power to the President. These sections allow the President to impose "restrictions," "rules," "regulations," "orders," "limitations," and "exceptions" to the entry of noncitizens to the United States. Like the powers delineated in the IEEPA, none of these terms, by their ordinary meaning, include the power to tax. See, e.g., Restriction, Black's Law Dictionary (12th ed. 2024) (defining "restriction" as "[c]onfinement within bounds or limits; a limitation or qualification").

21

In response, Defendants contend that INA § 212(f)'s broad language allowing the President to "impose . . . any restrictions he may deem to be appropriate" provides a more sweeping delegation of power than the IEEPA. Doc. No. 93 at 37. They assert that this situation more closely mirrors <u>Algonquin</u>, in which the Supreme Court held that Section 232(b) of the Trade Expansion Act of 1962—which allows the President to "adjust . . . imports . . . as he deems necessary" to protect national security—includes the power to impose license fees. <u>Id.</u>

<u>Learning Resources</u> again provides instructive guidance on how to make sense of <u>Algonquin</u>'s expressly "limited" holding. 607 U.S. at 645-46. The Court set out two factors distinguishing the IEEPA from Section 232(b). First, the Court noted that Section 232(b) authorizes the President not only to "adjust . . . imports" but also to "take such action . . . as he deems necessary" to adjust the imports of a good. <u>Id.</u> The Court pointed out that IEEPA "does not contain such sweeping, discretion-conferring language." <u>Id.</u> Second, the Court explained that the "context" of Section 232(b) makes it clear that the statute delegates the power to impose taxes; more specifically, the preceding provision of the statute, Section 232(a), states that "[n]o action shall be taken" to "decrease or eliminate" an existing "duty or other import restriction" if doing so would threaten national security, rendering it "natural for Section 232(b) itself to authorize duties." <u>Id.</u>

These distinguishing factors are not found in the INA. While § 212(f) arguably contains sweeping, discretion-conferring language (i.e., "any restrictions he may deem to be appropriate"), Defendants point to no other provision in the INA or elsewhere making it clear that Congress intended to delegate the taxing power through § 212(f). Without such "context," § 212(f) cannot be understood as falling within the scope of <u>Algonquin</u>'s "limited" holding. <u>Id.</u> The most Defendants can do is point to language in § 212(f) that appears to provide broad

22

discretion to the President to restrict the entry of noncitizens.  However, ambiguous language is not sufficient for establishing the delegation of the taxing power.  The Supreme Court has "long expressed reluctance to read into ambiguous statutory text extraordinary delegations of Congress's powers."  Id. at 638 (citation modified).  Both "separation of powers principles and a practical understanding of legislative intent suggest Congress would not have delegated highly consequential power through ambiguous language."  Id. (citation modified).  And these principles "apply with particular force where, as here, the purported delegation involves the core congressional power of the purse."  Id. at 639.  Indeed, Defendants concede that the taxing power is "core to Congress."  Doc. No. 100-1 at 12.  These considerations preclude reading INA §§ 212(f) and 215(a) as delegating Congress's exclusive power to tax.

Finally, Defendants' miscellaneous arguments that the President has the authority to impose the $100,000 tax based on his "immigration and commerce powers" are nowhere to be found in the authorities they cite.  They note that the "Supreme Court previously struck down a head count fee imposed on immigrants by states because the laws intruded on Congress's power over foreign *commerce*, not taxing," citing to Smith v. Turner and Henderson v. Mayor of New York.  Doc. No. 93 at 36.  From there, Defendants urge the Court to perceive the taxing power as somehow embedded within the foreign commerce powers delegated to the President.  Doc. No. 100-1 at 12.

However, Defendants' cited cases do not support this logical leap.  Smith and Henderson concerned a completely different separation-of-powers issue than the situation at hand.  In both cases, states (not the President) attempted to impose a tax on vessels bringing foreign passengers to their ports.  Smith v. Turner, 48 U.S. 283, 296 (1849); Henderson v. Mayor of N.Y., 92 U.S. 259, 267 (1875).  In Smith, the Court struck down the state tax as unconstitutional without

23

producing a majority opinion; indeed, eight justices delivered separate opinions, failing to reach a "harmony of views as would give that weight to the decision which it lacks by reason of the divided judgments of the members of the court." Henderson, 92 U.S. at 269.  Over twenty years later, the Court's opinion in Henderson clarified that a similar state tax was unconstitutional because it clashed with Congress's power to regulate foreign commerce. Id. at 274.  In reaching this conclusion, the Court focused on the fact that Congress was in a superior position than states to deal with issues of foreign affairs that were "national in [their] character" and "may be, and ought to be, the subject of a uniform system or plan." Id. at 272-73.  In this manner, the driving concern in Henderson was about drawing the line between the spheres of state and federal sovereignty.  To the extent Smith and Henderson indicate that a tax on foreigners entering the country touches on Congress's commerce powers, they do not, by any means, establish that the tax falls solely within Congress's commerce powers rather than its taxing power.  Nor do the cases come close to suggesting that Congress implicitly delegates such a taxing power to the Executive Branch when it delegates its commerce powers.[8]  Indeed, such a premise overlooks the Supreme Court's admonition that Congress "must indicate clearly its intention to delegate" its taxing power to the Executive. Skinner, 490 U.S. at 225.

Defendants also cite Merrion v. Jicarilla Apache Tribe, in which the Supreme Court held that a Native American tribe's inherent "power to exclude" non-tribal members from its reservation includes "the lesser power to place conditions on entry, on continued presence, or on reservation conduct, such as a tax on business activities conducted on the reservation." 455 U.S.

---

[8] In deciding Smith and Henderson, the Supreme Court had no reason to delve into the delegation of Congress's taxing power because states have the power to levy taxes (so long as they do not run afoul of constitutional limits).  Unlike states, the President has no standalone power to impose taxes without congressional delegation.

24

130, 144 (1982). But that scenario is inapposite to the President's authority here. A tribe possesses the inherent authority to tax, "whether this authority is deemed to arise from the Tribe's inherent power of self-government or from its inherent power to exclude nonmembers." Id. at 159. The Court also emphasized that "[v]iewing the taxing power of Indian tribes as an essential instrument of self-government and territorial management has been a shared assumption of all three branches of the Federal Government." Id. at 139. The President enjoys no such "inherent" powers here. A tribe's power to tax does not derive from the Constitution or any federal statute; rather, it exists as an essential and unique feature of tribal sovereignty. Unlike a tribe, however, the President has no authority to levy a tax unless such a power is delegated by Congress through statute. See Skinner, 490 U.S. at 220-21; see also Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 631 (1952) (Douglas, J., concurring) ("The President has no power to raise [revenues]. That power is in the Congress by Article I, Section 8 of the Constitution."). And as already described, Defendants have not shown that Congress delegated its taxing power to the President through the INA.[9]

---

[9] Defendants' contrary interpretation regarding the scope of the President's power under INA § 212(f) offers no perceivable limits. Their position that § 212(f) allows the President to impose any tax so long as it connects to a "restriction" on the "entry of aliens" deviates from the text of the statute. Congress authorized the President to "impose on the entry of aliens any restrictions he may deem to be appropriate" when he finds that the entry "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). This phrase limits the President's authority to "restrictions." Taxes are not "restrictions." Notably, Congress did not authorize the President to "impose on the entry of aliens any conceivable tax, penalty, or condition." While this case does not squarely require resolution of the outer bounds of the authority delegated under INA § 212(f), it does require interpretation to some degree of the scope of the delegation by Congress. The government perceives no limits imposed by the terms of the statute such that, in its view, the President could: demand a business seeking an H-1B visa to forfeit to the United States ten percent of the equity in the business; or require a United States citizen seeking to sponsor entry of her foreign spouse to give over half her assets to the United States. In the government's view, even incarceration of the sponsoring citizen may well be within the scope of the statute, though the government's counsel recognized during the motion hearing that such a condition would run afoul of other constitutional provisions. These hypotheticals illustrate that the government offers

For these reasons, the Court finds that the Policy imposes a tax on H-1B petitions without the requisite delegation by Congress. Accordingly, Plaintiffs' motion for summary judgment is ALLOWED as to their separation-of-powers claim (Count IV), and Defendants' cross-motion for summary judgment and motion to dismiss are both DENIED as to this claim. Because the Court resolves the claim on the basis that the Policy improperly levies a tax on H-1B petitions, the Court need not address the merits of Plaintiffs' other arguments in support of Count IV.

D.    APA Claims

1.    *Reviewability*

The Court turns to Plaintiffs' claims under the APA. Plaintiffs contend that Defendants' Policy implementing the Proclamation violates the APA in three ways: (1) the Policy is a legislative rule that did not follow the APA's procedures for notice-and-comment rulemaking (Count I), (2) the Policy exceeds the fee-setting authority delegated by Congress (Count II), and (3) the Policy is arbitrary and capricious (Count III). Doc. No. 1 ¶¶ 189-219. Defendants counter that the Policy is not susceptible to judicial review under the APA because agency actions implementing the Proclamation merely reflect an "extension of the President's action" that "carry[] out directives of the President." Doc. No. 93 at 23 (quoting Tulare Cnty. v. Bush, 185 F. Supp. 2d 18, 28-29 (D.D.C. 2001)).

The APA provides for judicial review of "final agency action." 5 U.S.C. § 704. However, "the President is not an agency within the meaning of the [APA]," and his actions may not "be reviewed under the APA standards." Franklin, 505 U.S. at 796. This raises a critical line-drawing exercise: At what point does an agency's implementation of a presidential directive

---

no useful principle by which to interpret the statute beyond asserting that the delegation is "sweeping." Doc. No. 93 at 27.

26

amount to an exercise of the President's power (which is unreviewable under the APA) rather than an exercise of agency action (which is subject to APA review)?

A recent decision from this District offers helpful guidance. In <u>New York v. Trump</u>, plaintiffs brought APA claims against several agencies that had implemented the President's executive memorandum calling for an indefinite moratorium on the issuance of approvals for wind energy projects. 811 F. Supp. 3d 215, 225-26 (D. Mass. 2025). Confronting the question of whether such claims were subject to APA review, the court relied on Justice Kagan's treatment of the issue:

> It is true that the Supreme Court held in <u>Franklin v. Massachusetts</u> that the President is not an "agency" as defined in the APA and his actions therefore are not subject to the judicial review provisions of that statute. This decision, however, arose from a challenge to an action that Congress had committed to the sole discretion of the President, separate from and subsequent to agency involvement. When the challenge is to an action delegated to an agency head but directed by the President, a different situation obtains: then, the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern.

<u>Id.</u> at 238 n.10 (quoting Elena Kagan, <u>Presidential Administration</u>, 114 Harv. L. Rev. 2245, 2351 (2001)). Following this approach, the court concluded that the agency actions at issue were subject to APA review because "Congress has not 'committed to the sole discretion of the President' the ability to suspend wind energy authorizations." <u>Id.</u> at 239 (quoting Kagan, <u>supra</u>).

<u>New York v. Trump</u> is not the only case promoting this reasoning. In <u>Detroit International Bridge Company v. Government of Canada</u>, the D.C. District Court noted:

> [T]here is a difference between actions involving discretionary authority delegated by Congress to the President and actions involving authority delegated by Congress to an agency. Courts lack jurisdiction to review an APA challenge in the former circumstances, regardless of whether the President or the agency takes the final action. However, "[w]hen the challenge is to an action delegated to an agency head but directed by the President, a different situation obtains: then, the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern."

27

189 F. Supp. 3d 85, 104 (D.D.C. 2016) (quoting Kagan, supra); see also Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec., 801 F. Supp. 2d 383, 404 (D. Md. 2011) (noting that agency actions "taken pursuant to delegated presidential authority under the [statute] will not be held subject to review under the APA"); Renew Ne. v. Dep't of Interior, No. 25-cv-13961-DJC, 2026 WL 1078282, at *16-17 (D. Mass. Apr. 21, 2026) (citing New York v. Trump with approval). This Court, too, is persuaded by the rule emerging from these cases, which is that an agency action implementing a presidential directive amounts to unreviewable presidential action when the action is taken pursuant to an authority delegated to the President by Congress. Applying this principle to the matter at hand, the question becomes whether Defendants' implementation of the Proclamation involved actions "that Congress had committed to the sole discretion of the President." Kagan, supra.

At first glance, Defendants' actions appear to carry out powers delegated to the President by the INA. The Proclamation expressly invokes the President's authority under INA §§ 212(f) and 215(a) to impose restrictions on the entry of noncitizens. By creating an additional payment obligation for H-1B petitions, the Proclamation narrows the entry of workers who are authorized to enter the country with an H-1B visa. While adding a payment requirement for H-1B petitions does not restrict noncitizens at the moment of entry and instead tacks on an eligibility requirement at an earlier stage of the visa-application process, the payment requirement is part of the process for legally entering the United States and effectively imposes a restriction on entry. See Chamber of Com. of U.S. v. U.S. Dep't of Homeland Sec., 815 F. Supp. 3d 73, 101-03 (D.D.C. 2025) (finding that Proclamation's payment obligation constitutes entry restriction authorized by INA § 212(f)); cf. Hawaii, 585 U.S. at 695 ("Section 1182 defines the universe of aliens who are admissible into the United States (and therefore eligible to receive a visa)."). In

28

this light, the Proclamation and the Policy can be understood as creating an entry restriction—a type of measure that Congress committed to the President's discretion.

But, of course, the Proclamation does more than restrict the entry of noncitizens. As already discussed, the Proclamation's payment requirement amounts to a tax, which exceeds the scope of the President's discretionary authority under the INA. Neither INA § 212(f) nor § 215(a) delegates Congress's taxing power. Thus, Defendants' implementation of the payment requirement cannot be reasonably understood as an action "that Congress had committed to the sole discretion of the President."[10] Kagan, supra. Accordingly, the Court rejects Defendants' argument that their issuance of the Policy amounts to an unreviewable presidential action.

### 2.    *Final Agency Action*

The next threshold question governing APA review is whether Defendants' issuance of the Policy amounts to a final agency action. For an agency action to be "final" within the meaning of § 704, two conditions must be satisfied: (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (citation modified).

Both prongs are met here. First, Defendants' memoranda, FAQs, and other materials implementing the Proclamation have resulted in a policy imposing a $100,000 payment requirement on H-1B petitions. There is no indication that these actions are "of a merely

---

[10] For the same reason, Defendants' argument that APA review is unavailable because the challenged actions were committed to agency discretion fails. Doc. No. 93 at 26-27. It is true that an agency's action is not subject to APA review when the President delegates his own discretion under a statute to the agency. See, e.g., Detroit Int'l Bridge Co., 189 F. Supp. 3d at 105-06 (no APA review when Congress gave President broad authority to approve international bridges and President delegated this authority to Secretary of State). But that is not what occurred here. Because the President had no delegated power to levy a tax on H-1B petitions, he had no authority to delegate this power to Defendants.

tentative or interlocutory nature." Id. at 178. Second, legal consequences flow out of Defendants' actions. Because of the Policy, employers seeking to hire workers through the H-1B program face a new payment obligation that did not exist before. These agency actions have altered the legal status quo for applicants to the H-1B program. Therefore, Defendants' issuance of the Policy constitutes final agency action. As Defendants' actions are subject to APA review, the Court turns to the merits of Plaintiffs' APA claims.

### 3. *Procedural Violation*

Under Count I, Plaintiffs contend that Defendants violated the APA by issuing the Policy without complying with the APA's notice-and-comment procedures. It is undisputed that Defendants issued the challenged memoranda, FAQ documents, and other materials without undergoing notice and comment. Nonetheless, Defendants contend that Count I fails for the following reasons: (1) Defendants lacked authority to disobey a presidential directive made pursuant to INA §§ 212(f) and 215(a), (2) the agency materials are not legislative rules because the Proclamation already created new obligations with the force of law, (3) the good-cause exception to notice-and-comment rulemaking applies, (4) the foreign-affairs exception applies, and (5) any failure to engage in notice-and-comment rulemaking is harmless because the agencies lacked discretion to deviate from the Proclamation's $100,000 requirement. Doc. No. 93 at 39-41.

All of these arguments are unpersuasive. To begin, Defendants' first, second, and fifth arguments fail because the President's decision to implement a tax was not within his inherent constitutional powers nor his delegated authority under the INA. Because the Proclamation was not a proper exercise of the powers vested in the President, the agency was not obliged to follow it. Cf. Chamber of Com., 815 F. Supp. 3d at 111 n.16 (noting that agency does not violate APA when it "adheres closely to the [presidential] directive and the President acted in a constitutional

30

manner, pursuant to his inherent powers or under an enabling statute"). And because the President had no power to levy a tax on H-1B petitions, the Proclamation did not carry the force of law. Cf. Indep. Meat Packers Ass'n v. Butz, 526 F.2d 228, 234 (8th Cir. 1975) ("Presidential proclamations and orders have the force and effect of laws when issued pursuant to a statutory mandate or delegation of authority from Congress." (emphasis added)).

Indeed, it was the agency materials that "create[d] rights, assign[ed] duties, [and] impose[d] obligations" by effectuating the $100,000 payment requirement. N.H. Hosp. Ass'n v. Azar, 887 F.3d 62, 70 (1st Cir. 2018). Therefore, these agency materials are legislative rules triggering the APA's procedural requirements. And here, Defendants' failure to undergo notice-and-comment rulemaking was not harmless error. These additional procedures could have altered Defendants' decision to impose an unconstitutional tax on the H-1B program or, at the very least, required Defendants to consider the impact of the $100,000 payment obligation on regulated entities, such as Plaintiffs.

Finally, the foreign-affairs and good-cause exceptions to the APA's procedural requirements cannot save the Policy. Courts approve of the foreign-affairs exception "where the international consequence is obvious or the Government has explained the need for immediate implementation of a final rule." E. Bay Sanctuary Covenant v. Trump, 932 F.3d 742, 776 (9th Cir. 2018). In the immigration context, the exception applies only when the government shows that undergoing the ordinary notice-and-comment process will "provoke definitely undesirable international consequences." Id. (citation modified); accord. Roe v. Mayorkas, No. 22-cv-10808-ADB, 2023 WL 3466327, at *16 (D. Mass. May 12, 2023). Here, Defendants have not offered any evidence of the undesirable international consequences that would have flowed from

31

complying with the APA's procedural requirements.  Nor have they explained any need for the immediate implementation of the $100,000 payment requirement.

Similarly, the good-cause exception to the APA's procedural requirements is "narrowly construed and only reluctantly countenanced," usually in "emergencies" where "delay would do real harm to life, property, or public safety."  California v. Azar, 911 F.3d 558, 575-76 (9th Cir. 2018) (citation modified).  Here, Defendants articulate no such emergency, merely arguing that notice and comment would have been "impracticable" and caused delay to the implementation of the Proclamation.  Doc. No. 93 at 40.  This explanation fails to overcome the "high bar" that agencies must clear in order to invoke the good-cause exception.  Azar, 911 F.3d at 575.  Furthermore, the exception applies when an agency publishes its "good cause" basis for bypassing the notice-and-comment procedure with its rule.  5 U.S.C. § 553(d).  Here, the challenged agency materials were not accompanied by any statement invoking the good-cause exception.  Under these circumstances, Defendants have not demonstrated any good cause for their failure to comply with the APA's procedures.  Because Defendants issued a legislative rule without engaging in notice-and-commenting rulemaking, the Court ALLOWS Plaintiffs' motion for summary judgment and DENIES Defendants' cross-motion for summary judgment and motion to dismiss as to Count I.

### 4.  *Excess of Statutory Authority*

Next, under Count II, Plaintiffs argue that the Policy constitutes agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  Doc. No. 87 at 28 (quoting 5 U.S.C. § 706(2)(C)).  They contend that the Policy is in excess of the President's authority under the INA and the fee-setting delegation to USCIS by Congress.  Doc. No. 1 ¶ 205.

An agency "literally has no power to act . . . unless and until Congress confers power upon it."  La. Pub. Serv. Comm'n v. F.C.C., 476 U.S. 355, 374 (1986).  Here, there are no

statutory powers authorizing Defendants to implement a $100,000 tax on H-1B petitions.  As already discussed, INA §§ 212(f) and 215(a) do not authorize the President to levy a tax on the entry of noncitizens.  Nor are there any statutory provisions granting this power to executive agencies.  The INA authorizes the Attorney General to designate "adjudication fees" that "may be set at a level that will ensure recovery of the full costs of providing all such services" and of "any additional costs associated with the administration of the fees collected."  8 U.S.C. § 1356(m).  The $100,000 payment requirement plainly does not constitute an adjudication fee under this statutory provision.  As Defendants concede, the Proclamation "does not impose a fee to cover costs, does not displace that fee, and is not collected or used in the same manner."  Doc. No. 93 at 34.  Defendants point to no other statute empowering agencies to impose a tax on H-1B petitions.  Accordingly, the Court finds that Defendants' actions in issuing the Policy exceeded their statutory authority in violation of the APA.  Plaintiffs' motion for summary judgment is ALLOWED for Count II, and Defendants' cross-motion for summary judgment and motion to dismiss as to this claim are DENIED.

### 5.    *Arbitrary and Capricious*

Lastly, Count III alleges that the Policy is arbitrary and capricious in violation of the APA.  Doc. No. 1 ¶¶ 208-219; see also 5 U.S.C. § 706(2)(A) (instructing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion").  An agency action is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Here, Plaintiffs contend that Defendants acted arbitrarily and capriciously by (1) failing

33

"to acknowledge that the Policy represents a significant divergence from past practice or offer any justification for that shift"; (2) failing to consider Plaintiffs' "significant reliance interests"; and (3) relying on factors Congress did not intend for them to consider "by basing the Policy on domestic economic policy considerations and failing to consider Congress's statutory scheme." Doc. No. 87 at 29.

In response, Defendants do not dispute that they did not consider these aspects of the Proclamation before implementing it. However, they assert that Plaintiffs' claim fails because "an agency does not act 'arbitrarily and capaciously' or 'contrary to law' when it implements a legally permissible presidential directive." Doc. No. 93 at 41 (quoting Chamber of Com., 815 F. Supp. 3d at 110). But the operative phrase is "legally permissible," and here, the President had no power or delegated authority to impose a tax on H-1B petitions. While an agency may be bound to follow a legally valid presidential order, Defendants cite no cases suggesting that an agency is obligated to follow a presidential directive that falls outside of the President's powers, or that the Court lacks authority to set aside agency action on the theory the agency was merely following the illegal directive of the President. Cf. Bradford v. U.S. Dep't of Lab., 101 F.4th 707, 731 (10th Cir. 2024) (agency did not act arbitrarily and capriciously when it issued rule implementing valid executive order without considering alternatives to the rule); Trump v. Orr, 146 S. Ct. 44, 46 (2025) (no arbitrary and capricious agency action where agency followed "Presidential rules that Congress expressly required it to follow"); Sherley v. Sebelius, 689 F.3d 776, 784 (D.C. Cir. 2012) (agency "must implement the President's policy directives to the extent permitted by law" (emphasis added)).

Thus, the mere fact that Defendants followed a presidential directive does not grant them free rein to ignore the requirements of the APA. See Massachusetts v. Dep't of Educ., No. 26-

34

cv-11229-FDS, 2026 WL 918941, at *13 (D. Mass. Apr. 3, 2026) ("Presidential directives do not enable agencies to bypass [APA] requirements."). And here, the administrative record is devoid of any indication that Defendants "reasonably considered the relevant issues and reasonably explained the decision" to implement a $100,000 tax on H-1B petitions. FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021). Even though the Policy significantly increases the cost of an H-1B visa, none of the Policy documents provide any "reasoned explanation" for this change in course. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009). The September 20 memoranda issued by USCIS and CBP both note that the Proclamation was issued "to address systemic abuse of H-1B nonimmigrant visas." Doc. No. 84-3 at 3; Doc. No. 84-1 at 11. The FAQs published by the Department of State and USCIS state that the Proclamation marks "an important, initial, and incremental step to reform the H-1B visa program to curb abuses and protect American workers." Doc. No. 84-2 at 9; Doc. No. 84-3 at 4. USCIS's "H-1B Specialty Occupations" webpage similarly echoes that the Proclamation reflects "an important initial step to reform the H-1B nonimmigration visa program." Doc. No. 84-3 at 7. None of these cursory policy rationales offer a reasoned explanation for enacting a heavy tax on the H-1B program.

Moreover, agencies are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 33 (2020). Nothing on the record indicates that Defendants accounted for reliance on the previous H-1B petition requirements when it added the new $100,000 payment obligation. Furthermore, no evidence before the Court suggests that Defendants contemplated any reasonable alternatives to

35

the Policy, such as discounting or exempting the payment requirement for cap-exempt employers or evaluating alternative payment amounts above or below $100,000.

To the extent Defendants incorporate the reasoning set out in the Proclamation as the basis for their actions, the policy justifications asserted in the Proclamation also fail to survive Plaintiffs' arbitrary-and-capricious challenge. The Proclamation expresses concern about the share of foreign workers filling jobs in the science and technology fields, specifically focusing on the IT sector. 90 Fed. Reg. 46027-28. However, the Proclamation fails to consider or discuss these policy concerns as they pertain to other human-services sectors, such as education and healthcare. Doc. No. 1 ¶ 97. Therefore, the Proclamation does not provide any explanation for imposing a tax on employers in these sectors, let alone address these employers' reliance interests on the H-1B program as it existed before the Policy.

Under these circumstances, the Court finds that the Policy is arbitrary and capricious and ALLOWS Plaintiffs' motion for summary judgment as to Count III. As to this claim, Defendants' cross-motion for summary judgment and motion to dismiss are DENIED.

## IV.    RELIEF

Where, as here, a court determines that an agency action is arbitrary and capricious or contrary to law, the APA authorizes the court to "hold unlawful and set aside" that action. 5 U.S.C. § 706(2). Defendants urge that any relief granted must be limited to Plaintiffs, arguing that the APA "makes no mention of vacatur" and that "remedies under the APA should reflect historical equitable remedies with the same limits." Doc. No. 93 at 43.

Both arguments are misguided. The APA's text, which allows the court to "set aside" unlawful agency action, has long been thought to include vacatur. 5 U.S.C. § 706(2); see also Set Aside, Black's Law Dictionary (12th ed. 2024) (defining "set aside" as "to annul or vacate"). "The Federal Government and the federal courts have long understood § 706(2) to authorize

36

vacatur of unlawful agency rules." Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). In light of this well-established understanding, courts in this Circuit routinely vacate agency action found to be unlawful. See, e.g., Gailius v. I.N.S., 147 F.3d 34, 47 (1st Cir. 1998); Harrington v. Chao, 280 F.3d 50, 60 (1st Cir. 2002); Ass'n of Am. Univs. v. Nat'l Sci. Found., 788 F. Supp. 3d 106, 138-39 (D. Mass. 2025).

Additionally, vacatur under the APA is "fundamentally unlike the equitable injunction with which Defendants incorrectly equate it." Ass'n of Am. Univs. v. Dep't of Def., 806 F. Supp. 3d 79, 122 (D. Mass. 2025). As another Judge in this District has recently explained:

> "[A]n injunction is a judicial process or mandate operating *in personam . . .* directed at someone, and govern[ing] that party's conduct." . . . "By contrast, instead of directing the conduct of a particular actor, [vacatur] operates upon the [agency action] itself." . . . Vacatur is not "a coercive order against the Government, but rather . . . [a] setting aside of the source of the Government's authority" to act.

Id. (quoting Nken v. Holder, 556 U.S. 418, 428-29 (2009)). This "act-centric nature" of the APA is precisely what distinguishes it from the party-specific considerations underlying traditional equitable remedies. Id. Accordingly, remedies under the APA do not have to be "tailored to injured parties before the Court" as Defendants argue. Doc. No. 93 at 43. The Court declines to depart from the longstanding view that vacatur of an unlawful agency action is a proper remedy under the APA.[11]

Defendants further assert that vacatur is "especially inappropriate here because there are obvious collateral estoppel and *res judicata* concerns, as many of the state universities' alleged

---

[11] Defendants' reliance on Trump v. CASA overextends that case's holding. There, the Supreme Court held that universal injunctions "likely exceed the equitable authority that Congress has granted to federal courts." 607 U.S. at 837-38. However, the Court expressly declined to resolve the "distinct question" of whether a similar principle circumscribes the federal courts' remedial powers under the APA. Id. at 847 n.10.

injuries are being litigated in two other cases challenging the Proclamation." Id. at 44. This argument is unavailing. As an initial matter, one of the cases cited by Defendants—Global Nurse Force v. Trump, 4:25-cv-08454-HSG (N.D. Cal. 2025)—has not yet reached a final judgment on the merits and thus has no preclusive effect. See Gonzalez-Pina v. Rodriguez, 407 F.3d 425, 429-30 (1st Cir. 2005) (noting that claim preclusion and issue preclusion both require final judgment on the merits).

The other case raised by Defendants recently reached a final judgment on the merits. Chamber of Com., 815 F. Supp. 3d. at 113. There, the Chamber of Commerce and the Association of American Universities ("AAU") advanced ultra vires and APA claims against DHS, the Department of State, and their respective Secretaries based on their implementation of the Proclamation. Id. at 79. Both the Chamber of Commerce and AAU invoked standing to sue based on the harms that the Proclamation posed to their members. Id. at 89. The district court in that case granted final judgment in favor of the federal government and against the plaintiffs for all claims. Id. at 112-13. Relying on that judgment, Defendants contend that claim preclusion applies because "AAU's members include some of the allegedly injured entities here, especially many of the state universities." Doc. No. 93 at 44; see also Doc. No. 93-6 at 2-3 (listing public universities that are members of AAU). Consequently, they argue that, "[a]t a minimum, the overlapping members must be excluded from relief." Doc. No. 100-1 at 16.

While Defendants' briefing contains only a perfunctory reference to "collateral estoppel and *res judicata* concerns," Doc. No. 93 at 44, the Court analyzes their argument in light of the requirements governing claim preclusion.[12] "For a claim to be precluded, there must be:

---

[12] The term "res judicata" encompasses both claim preclusion and issue preclusion (also known as collateral estoppel). Taylor v. Sturgell, 553 U.S. 880, 892 (2008). While Defendants mention both "collateral estoppel" and "res judicata," Doc. No. 93 at 44, the Court limits its analysis to

(1) a final judgment on the merits in an earlier action; (2) sufficient identity between the causes of action asserted in the earlier and later suits; and (3) sufficient identity between the parties in the two suits." Bay State HMO Mgmt., Inc. v. Tingley Sys., Inc., 181 F.3d 174, 177 (1st Cir. 1999). While the first two elements are likely satisfied here, Defendants falter on the third. Under that element, nonparties to the prior action may be precluded "if they were in privity with a party to the previous action." In re Iannochino, 242 F.3d 36, 45 (1st Cir. 2001). "Though privity is an elusive concept," courts have found privity "if a nonparty either substantially controlled a party's involvement in the initial litigation or, conversely, permitted a party to the initial litigation to function as his de facto representative." Id. at 46 (citation modified).

Defendants contend that many of Plaintiffs' public universities were represented by AAU in the Chamber of Commerce case, "creating the necessary privity as to those entities for *res judicata*." Doc. No. 100-1 at 16. However, they have not provided sufficient evidence to prove privity. See also Taylor v. Sturgell, 553 U.S. 880, 907 (2008) (noting that claim preclusion "is an affirmative defense for the defendant to plead and prove"). While it is true that AAU's standing to pursue the prior litigation depended on the Proclamation's alleged injury to its members, that alone does not establish privity between AAU and each of its members. "A final judgment in federal court against a trade association will not be res judicata against a member unless the member authorized the litigation in some way." Cal. Cosmetology Coal. v. Riley, 871 F. Supp. 1263, 1267 (C.D. Cal. 1994) (citation modified), aff'd, 110 F.3d 1454 (9th Cir. 1997). For example, the First Circuit has found privity between a trade association and its member where the member helped finance the trade association's prior litigation, thereby impliedly

---

claim preclusion, as Defendants' briefing does not contend with the required elements of issue preclusion in any manner.

39

authorizing the association to represent him in that action.  Gen. Foods Corp. v. Mass. Dep't of Pub. Health, 648 F.2d 784, 787-88 (1st Cir. 1981).  In another case, the D.C. District Court declined to find privity between a trade association and one of its members where defendants produced no evidence that the member actively participated in the trade association's prior litigation.  Cigar Ass'n of Am. v. FDA, 436 F. Supp. 3d 70, 82 (D.D.C. 2020).

Here, Defendants have submitted no evidence that the overlapping members helped finance or otherwise participated in AAU's prior litigation, let alone authorized AAU to represent them in the lawsuit.  The only piece of information they have produced is a list of AAU members, which shows that some of the members are public institutions within Plaintiff States.  Doc. No. 93-6.  But "[u]nder federal law, mere membership in a trade association alone does not create the privity necessary to bind the member to a judgment against an organization."  Cal. Cosmetology, 871 F. Supp. at 1267; see also 18A Wright & Miller's Federal Practice & Procedure § 4456 (2d ed. 2017) ("[G]reat care should be taken before binding all members to an association loss.").  In the absence of any evidence about the overlapping members' roles in the previous litigation, the Court declines to find that the universities' claims are precluded by the final judgment in the Chamber of Commerce case.[13]  Moreover, even assuming the universities are in privity with AAU, Defendants' res judicata argument still fails.  They would also need to establish that these universities are in privity with the Plaintiffs in this matter, which they have not done.  Public universities are typically separate legal entities from the state in which they are

---

[13] In any event, barring the claims of the specific public universities that are members of AAU on claim-preclusion grounds would not impact the Court's remedy of vacatur in this matter.  While claim preclusion would lead to the dismissal of those universities' claims in this case, the Court would still grant vacatur based on the APA claims of the non-precluded parties.  In that scenario, the Court would not need to carve out the precluded universities from vacatur, given that vacatur is a remedy targeted at an agency's unlawful action, rather than one limited to the particular parties in a given case.  See Dep't of Def., 806 F. Supp. 3d at 122.

located.  To establish privity, Defendants would need to submit either factual evidence or legal rules to demonstrate the necessary link.  This Defendants have not done.  Thus, the Court rejects their invocation of claim preclusion.

Accordingly, the Court VACATES the Policy materials implementing the Proclamation's $100,000 payment requirement.  In addition to vacatur, Plaintiffs seek a "judicial declaration that the Policy is unlawful in violation of the APA and the Constitution."  Doc. No. 87 at 31.  Defendants' only objection to this requested relief is that "declaratory judgment alone would not redress Plaintiffs' alleged injuries because  . . . that judgment would not affect the Proclamation nor would it enjoin any future action."  Doc. No. 93 at 47.  But this concern is not applicable here, where the Court has also ordered vacatur of the challenged agency action.  Therefore, the Court issues declaratory judgment.

Finally, Plaintiffs state that they are "entitled to a permanent injunction" "to the extent vacatur does not provide Plaintiffs sufficient relief."  Doc. No. 87 at 31-32.  In light of the Court's decision to vacate the Policy in its entirety, which provides Plaintiffs with complete relief, a separate permanent injunction is not necessary.  See Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165-66 (2010) ("If a less drastic remedy (such as partial or complete vacatur of [agency action]) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted.").[14]  The Court accordingly declines to grant a permanent injunction.

---

[14] "To be clear, a permanent injunction would be warranted, if . . . Defendants successfully contend on appeal that vacatur is not available under the APA."  Nat'l Sci. Found., 788 F. Supp. 3d at 143 n.8.

41

V.    CONCLUSION & ORDERS

For the foregoing reasons, the Court ALLOWS Plaintiffs' motion for summary judgment, Doc. No. 86, and DENIES Defendants' cross-motion for summary judgment, Doc. No. 92.  At the parties' request, the Court DISMISSES WITHOUT PREJUDICE the claims against the Department of Justice, the Attorney General, the Department of Labor, and the Secretary of Labor.  Defendants' motion to dismiss, id., is OTHERWISE DENIED.  The Policy implementing the Proclamation is declared unlawful and is VACATED in its entirety.  The Clerk shall enter judgment in favor of Plaintiffs and against Defendants, with each side bearing its own fees and costs.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge