UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GLOBAL NURSE FORCE, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

Case No. 25-cv-08454-HSG

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION, AND DENYING MOTION FOR CLASS CERTIFICATION AND MOTION TO DISMISS**

Re: Dkt. Nos. 75, 76, 104

Plaintiffs filed this action in October 2025, challenging Presidential Proclamation 10973, which requires that employers provide a $100,000 payment with each petition H-1B petition they file.[1] Dkt. No. 1. Pending before the Court are several motions: a motion for preliminary injunction brought by a subset of Plaintiffs ("PI Plaintiffs"),[2] Dkt. No. 75; a motion for

[1] Defendants include Donald J. Trump, in his official capacity as the President of the United States; the U.S. Department of Homeland Security ("DHS"); Markwayne Mullin, in his official capacity as the Secretary of Homeland Security; U.S. Citizenship and Immigration Services ("USCIS"); Joseph B. Edlow, in his official capacity as USCIS Director; U.S. Customs and Border Protection ("CBP"); Rodney Scott, in his official capacity as CBP Commissioner; the U.S. Department of State; and Marco Rubio, in his official capacity as Secretary of State. *See* Dkt. No. 74 ("FAC"); *see also* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

[2] These PI Plaintiffs include BAE Industries, a small automotive parts manufacturing company based in Detroit, Michigan; Nephrology Associates of the Carolinas PA, a small medical practice providing kidney care in rural North Carolina; Lower Brule Day School, a K–12 school on a Sioux reservation in rural South Dakota; Global Village Academy Collective ("GVAC"), a nonprofit operating three tuition-free, public charter schools providing second language immersion instruction; and Global Nurse Force, a staffing agency that connects nurses with healthcare facilities worldwide. *See* FAC at ¶¶ 21–23, 33–34; *see also* Dkt. No. 75. The Court notes that Plaintiff Phoenix Doe voluntarily dismissed her case after her H-1B petition and discretionary change of status request was approved. *See* Dkt. No. 100.

United States District Court
Northern District of California

preliminary class certification filed by a subset of employer Plaintiffs, Dkt. No. 76; and a motion to dismiss filed by Defendants, Dkt. No. 104. The Court held a hearing on the motions. *See* Dkt. No. 113. Having carefully considered the parties' arguments and supplemental briefing, the Court **GRANTS IN PART** and **DENIES IN PART** the motion for preliminary injunction; **DENIES** the motion for class certification; and **DENIES** the motion to dismiss.

## I. BACKGROUND

It is important at the outset for the Court to make clear that this case is not about whether the challenged Proclamation is good or bad, or the appropriate policy response to the concerns it describes. These policy questions are the subject of extensive, and often intense, differences of opinion, and this Court cannot—and does not—express any view as to them. The Court considers only the legal questions presented here regarding whether the Proclamation and resulting agency policies exceed the Executive Branch's constitutional and statutory authority.

The Court also acknowledges that it does not decide this motion—or consider this case—in a vacuum. Two other lawsuits have challenged the Proclamation and reached different conclusions. In *Chamber of Commerce v. United States Department of Homeland Security*, the district court for the District of Columbia upheld the Proclamation and its $100,000 fee for H-1B petitions, finding that the President acted within his statutory authority under the Immigration and Nationality Act ("INA") and that the agency's policies implementing the fee did not violate the Administrative Procedure Act ("APA"). 815 F. Supp. 3d 73, 79 (D.D.C. 2025). The case is currently on appeal in the U.S. Court of Appeals for the D.C. Circuit.

In *California v. Mullin*, the district court for the District of Massachusetts recently declared unlawful and vacated the Department of Homeland Security's and the Department of State's policies implementing the $100,000 fee. 833 F. Supp. 3d 50, 60–84 (D. Mass. 2026). The First Circuit later denied the government's request for a stay pending appeal. *See California v. Mullin*, 183 F.4th 42, 46–52 (1st Cir. 2026) ("*Mullin II*"). The agency policies discussed further below are thus currently vacated. This Court is not, however, precluded from considering Plaintiffs' motion and requested relief as the parties in both *Chamber of Commerce* and *Mullin* are pursuing further judicial review. *Cf. Chafin v. Chafin*, 568 U.S. 165, 172 (2013) ("As long as the parties have a

concrete interest, however small, in the outcome of the litigation, the case is not moot." (quotation omitted)); *United States v. Mendoza*, 464 U.S. 154, 160 (1984) (discussing the "benefit [the Supreme Court] receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari"); *Am. Encore v. Fontes*, 152 F.4th 1097, 1121 (9th Cir. 2025) ("[N]o authority [] holds that issuing a duplicative injunction is a bar to preliminary injunctive relief."). As *Chamber of Commerce* and *Mullin* illustrate, these are complex legal issues on which reasonable minds have differed. The Court further notes that DHS has proposed a new rule requiring the payment of a $103,265 fee for H-1B petitions. *See* Fee for Certain H-1B Petitions, 91 Fed. Reg. 54,817 (Aug. 25, 2026). And on September 18, 2026, the President issued another proclamation extending Proclamation 10973 for an additional 12 months.[3] *See* Proclamation No. 11069, 91 Fed. Reg. 60,497 (Sept. 18, 2026). This Court accordingly considers the parties' arguments below, with the understanding that the United States Supreme Court is likely to eventually provide further clarity.

### A. The H-1B Visa Program

The Immigration and Nationality Act ("INA") governs the admission of noncitizens into the United States. *See* 8 U.S.C. §§ 1101 *et seq.* To enter the United States, noncitizens must generally present a valid visa or other travel document, such as a passport, and be found admissible upon inspection by an immigration officer at a port of entry. *See* 8 U.S.C. §§ 1181, 1182(a)(7)(A)(i) and (B)(i), 1185(d), 1201(h), 1225(a); *cf. Trump v. Hawaii*, 585 U.S. 667, 694 (2018) (recognizing "the basic distinction between admissibility determinations and visa issuance").

In 1990 Congress established the H-1B visa program, which provides a pathway for American employers to hire skilled, nonimmigrant foreign workers in certain "specialty occupations."[4] *See* 8 U.S.C. § 1101(a)(15)(H)(i)(B); 8 U.S.C. § 1184(i). H-1B visas fall into two

[3] The recent Proclamation states that "without an extension of the 2025 Proclamation, it is highly likely that progress will halt and program abuse will resume, undermining American workers and posing a threat to the labor market that would be detrimental to the interests of the United States." However, it does not appear to substantively change the prior Proclamation or the $100,000 fee.

[4] A "specialty occupation" is one that requires "theoretical and practical application of a body of

categories: cap-subject petitions and cap-exempt petitions. For "cap-subject" petitions, Congress has set strict numerical limits on the number of H-1B visas available each year (65,000, plus an additional 20,000 for holders of an advanced degree from a United States university). *See* 8 U.S.C. §§ 1184(g)(1)(A)(vii), (g)(5)(C). Because demand for these visas significantly outpaces their availability, USCIS has implemented a lottery. *See* 8 C.F.R. § 214.2(h)(8)(iii)(A). For "cap-exempt" petitions, however, Congress has exempted certain employers, such as universities and nonprofit organizations, from these numerical limits. *See* 8 U.S.C. § 1184(g)(5)(A)–(B).

Before submitting a petition, both cap-subject and cap-exempt employers must file an application with the Department of Labor ("DOL") affirming that they will comply with wage and working condition requirements. *See* 8 U.S.C. § 1182(n)(1); 20 C.F.R. § 655.730(d). For example, employers must affirm that they will pay any H-1B employee either the actual wage paid to others with similar experience and qualifications or the prevailing wage for the same occupational classification, whichever is greater. *See* 8 U.S.C. § 1182(n)(1)(i). Employers also are prohibited from bringing in H-1B visa workers during a strike or lockout. *See* 8 U.S.C. § 1182(t)(1)(B). Once DOL certifies the application, the employer may submit an H-1B petition to USCIS. *See* 8 C.F.R. § 214.2(h)(4)(i). Assuming USCIS grants the petition, the employee—if located outside the United States—must apply for an H-1B visa at a U.S. embassy or consulate abroad.[5] *See* 8 U.S.C. §§ 1201(a)(1)(B), 1202(c); 22 C.F.R. §§ 41.53, 41.101. If the employee is already in the United States, the employer may request permission for the employee to change to H-1B status without first leaving the county. *See* 8 U.S.C. § 1258(a); 8 C.F.R. § 248.1(a)–(b).

Congress also created a detailed fee structure for the H-1B visa program. Congress has imposed certain explicit statutory fees. For example, Congress imposed a $1,500 fee on employers for initial petitions. *See* 8 U.S.C. § 1184(c)(9)–(11). The statute halves this fee for employers with 25 or fewer employees and does not apply to cap-exempt employers. *Id.*

---

highly specialized knowledge," and "a bachelor's or higher degree in the specific specialty (or its equivalent." 8 U.S.C. § 1184(i)(1)(A)–(B).

[5] Under the INA, this process is referred to as an "application for admission." *See* 8 U.S.C. §§ 1101(a)(4), (a)(13)(A).

Congress also imposed a "fraud prevention and detection fee" on employers. *See* 8 U.S.C. § 1184(c)(12). The fraud prevention and detection fee is $500. *See* 8 U.S.C. § 1184(c)(12)(C). However, certain high-volume H-1B employers must pay a higher fee (currently $4,000). *See* Consolidated Appropriations Act, 2016 Pub. L. No. 114-113, 129 Stat. 2242 (2015). Congress also permitted DHS to collect "fees for providing adjudication and naturalization services . . . at a level that will ensure recovery of the full costs of providing all such services . . . ." 8 U.S.C. § 1356(m). "Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." *Id.* Current regulatory H-1B fees include a fee to register for the lottery, file a petition, and subsidize asylum application processing. *See* 8 C.F.R. §§ 106.2(a)(3), (c)(11), (c)(13). At the high end, the regulatory and statutory fees together total $7,595. Employers must pay all statutory and regulatory fees when they file a petition. *See* 8 C.F.R. § 103.2(a)(1); *see also* 20 C.F.R. §§ 655.731(c)(9)(iii)(C), (c)(10)(ii).

### B. Presidential Proclamation 10973

On September 19, 2025, the President signed Proclamation 10973, which requires a supplemental payment of $100,000 for all H-1B petitions.[6] *See* 90 Fed. Reg. 46,027 (Sept. 19, 2025). It became effective two days later, on September 21, 2025, and based on the recent extension it will not expire until September 21, 2027. *See id.* at 46,028; *see also* 91 Fed. Reg. 60,497 (Sept. 18, 2026). The Proclamation states that this payment is necessary to curb "systemic abuse" of the H-1B visa program, which "has undermined both our economic and national security." 90 Fed. Reg. at 46,027.

The Proclamation states that "the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation [under the H-1B visa program] is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000 . . . ." *Id.* (Section 1(a)). The Proclamation accordingly directs the Secretary of Homeland Security to "restrict decisions on petitions not accompanied by a $100,000 payment for H-1B specialty

[6] The Proclamation is comprised of five sections. Section 1 is entitled "Restriction on Entry"; Section 2 is entitled "Compliance"; and Section 3(a) is entitled "Scope and Implementation on Restriction on Entry." The Court references the relevant—and challenged—provisions below.

occupation workers [] who are currently outside the United States, for 12 months following the effective date of this proclamation." *Id.* at 46,028–29 (Section 1(b)); *see also id.* at 46,029 (Section 3(a) (noting that "[t]he restriction on entry pursuant to section 1 of this proclamation shall apply only to aliens who enter or attempt to enter the United States after the effective date of this proclamation").

The Proclamation directs the Secretary of State to verify payment, and to "approve only those visa petitions for which the filing employer has made the payment . . . ." *Id.* (Section 2(b)). The Secretary of Homeland Security may, however, waive the new payment requirement "if the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States." *Id.* at 46,029 (Section 1(c)). The Proclamation also directs DHS and the Department State to "coordinate to take all necessary and appropriate action to implement this proclamation and to deny entry to the United States to any H-1B nonimmigrant for whom the prospective employer has not made the payment described in section 1 of this proclamation." *Id.* (Section 2(c)).

The Proclamation explicitly invokes two provisions of the INA as authorization, 8 U.S.C. §§ 1182(f) and 1185(a). *See id.* at 4,6027 (Section 1). Section 1182(f) states:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). The Supreme Court has stated that "[b]y its terms, § 1182(f) exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. Section 1185(a), in relevant part, states:

> Unless otherwise ordered by the President, it shall be unlawful—
>
> (1) for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules,

> regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.

8 U.S.C. § 1185(a)(1). The President's authority under this section "substantially overlaps" with the President's power under § 1182(f). *Hawaii*, 585 U.S. at 693, n.1.

**C. Implementing the Proclamation**

On September 20, 2025, the day after the President signed the Proclamation, USCIS issued a memorandum clarifying that the Proclamation "only applies prospectively to petitions that have not yet been filed." *See* Dkt. No. 46-5, Ex. 4 ("USCIS Memo") (emphasis omitted). The memorandum states that the Proclamation thus "does not apply to aliens who: are the beneficiaries of petitions that were filed prior to the effective date of the proclamation, are the beneficiaries of currently approved petitions, or are in possession of validly issued H-1B non-immigrant visas." *Id.* That same day, CBP in turn issued a memorandum similarly explaining that the Proclamation is prospective, and explaining that USCIS and the Department of State were "instructed to begin implementing the new monetary requirements for employers submitting petitions on behalf of aliens outside the United States for new H-1B petitions only." *See* Dkt. No. 46-6, Ex. 5 ("CBP Memo"). The CBP Memo stated that the Proclamation "does not impact the ability of any current visa holder to travel to or from the United States." *Id.*

On September 21, 2025, the day the Proclamation took effect, both USCIS and the Department of State released "FAQs" regarding the Proclamation. *See* Dkt. No. 46-7, Ex. 6 ("USCIS FAQ"); Dkt. No. 46-8, Ex. 7 ("State Dept. FAQ"). Like the earlier memorandums, the FAQs reiterated that the Proclamation required a $100,000 payment for "new" visa petitions as of September 21, 2026, but did not "[a]pply to any previously issued H-1B visas." *Id.* The FAQs further stated that the payment did not apply to "any H-1B renewals." *See id.* This guidance, however, did not explain how to make the payment or how to seek a national interest exception.

A month later, on October 20, 2025, USCIS updated its guidance. *See* Dkt. No. 46-9, Ex. 8 ("USCIS H-1B Update"). USCIS stated that the Proclamation "applies to new H-1B petitions" filed after the effective date "on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa," and as to beneficiaries inside the United States if "USCIS determines



United States District Court
Northern District of California

that the alien is ineligible for a change of status or an amendment or extension of stay . . . ."[7] *Id.* USCIS directed petitioners to submit the $100,000 through Pay.gov prior to filing a petition with USCIS. *See* USCIS H-1B Update. USCIS also explained that the Secretary of Homeland Security would grant exceptions "in the extraordinarily rare circumstance where the Secretary has determined that a particular alien worker's presence in the United States as an H-1B worker is in the national interest, that no American worker is available to fill the role, that the alien worker does not pose a threat to the security or welfare of the United States, and that requiring the petitioning employer to make the payment on the alien's behalf would significantly undermine the interests of the United States." *Id.* Such exceptions may be requested by email. *Id.* Collectively, these materials constitute the "Agency Policies" that Plaintiffs challenge here: in short, a one-time payment of $100,000 that is required "on submission" of any "new" H-1B petition filed on or after September 21, 2025. *See* FAC at ¶¶ 11–13, 15, 105–13, 227–52.

## II. PROCEDURAL HISTORY

Plaintiffs initially filed this case on October 3, 2025, Dkt. No. 1, and filed an amended complaint on December 18, 2025, FAC. As discussed further below, Plaintiffs contend that the Proclamation and related Agency Policies have significantly increased the cost of H-1B visa petitions and that they have suffered—or will suffer—harm as a result. Plaintiffs challenge the Proclamation and Agency Policies on several bases, though fundamentally they contend that the President and the agencies lacked the authority to unilaterally impose the new $100,000 fee. *See* FAC at ¶¶ 14–15, 86, 97, 105–113, 227–52. Plaintiffs contend that the President acted *ultra vires*, in excess of his statutory authority; and that the agencies similarly violated the APA by acting in excess of their authority, issuing policies that were arbitrary and capricious, and failing to conduct notice and comment rulemaking before promulgating the policies. *See id.* at ¶¶ 211–52.

As noted above, a subset of Plaintiffs have moved for a preliminary injunction. Dkt. No. 75. PI Plaintiffs seek to preliminarily enjoin and/or stay Defendants from enforcing or implementing Sections 1, 2, and 3(a) of the Proclamation and the resulting Agency Policies,

---

[7] Such change of status or extension of stay approvals are discretionary. *See* 8 U.S.C. § 1258(a); 8 C.F.R. § 214.1(c)(7).

including the requirement to pay a $100,000 fee as a condition of an H-1B petition. *Id.* A smaller subset of these PI Plaintiffs—BAE, Nephrology Associates, and Lower Brule Day School—seek injunctive and declaratory relief on behalf of a class of employers, defined as:

> [A]ll U.S. employers who have filed or will file an H-1B petition that is subject to the $100,000 fee under [the Proclamation] or the Proclamation's implementing guidance, or would file such a petition but for the fee, with [USCIS] received on or between September 21, 2025 and September 21, 2026, to employ a qualified temporary nonimmigrant worker in a specialty occupation in the United States under 8 U.S.C. § 1101(a)(15)(H)(i)(b) and 8 C.F.R. § 214.2(h)(1)(i).

FAC at ¶¶ 196–210. They have moved to provisionally certify this employer class under Federal Rule of Civil Procedure 23(b)(2) in conjunction with the motion for preliminary injunction.[8] *See* Dkt. No. 76. These Putative Class Plaintiffs urge that class treatment is particularly appropriate "because the legality of Defendants' Proclamation and implementing policies present a single, dispositive question common to every class member: *Is the $100,000 H-1B fee lawful or not?*" *Id.* at 3 (emphasis in original). These Putative Class Plaintiffs contend that "[c]ertification ensures that any declaratory and injunctive relief will apply consistently and fairly to all those affected—not just the three Named Plaintiffs." Dkt. No. 102 at 1–2.

Defendants, for their part, filed a motion to dismiss. Dkt. No. 104. In doing so, Defendants explicitly invoke the arguments they raised in their opposition to the motion for preliminary injunction. *See id.* The arguments across the three motions thus largely collapse into the same analysis: can Plaintiffs challenge—and the Court review—the Proclamation and resulting Agency Policies? The Court begins its analysis with the motion for preliminary injunction, but incorporates its analysis as relevant to the other pending motions.

//

//

//

---

[8] Rule 23(b)(2) provides that "[a] class action may be maintained if Rule 23(a) is satisfied," and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

## III. LEGAL STANDARD

### A. Motion for Preliminary Injunction

Plaintiffs seeking preliminary relief must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Preliminary relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. Where, as here, the government is a party, the public interest and the balance of equities factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

A court must find that "a certain threshold showing" is made on each of the four required elements. *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011). Under the Ninth Circuit's sliding scale approach, a preliminary injunction may issue if there are "serious questions going to the merits" if "a hardship balance [also] tips sharply towards the [movant]," and "so long as the [movant] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Under either standard, Plaintiffs bear the burden of making a clear showing that they are entitled to this extraordinary remedy. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). "Likelihood of success on the merits is the most important *Winter* factor." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quotation omitted).

### B. Motion to Dismiss

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible

United States District Court
Northern District of California

on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek*, 519 F.3d at 1031. Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

## IV. DISCUSSION

### A. Standing

As an initial matter, Defendants contend that Plaintiffs lack Article III standing to challenge the Proclamation and Agency Policies. Dkt. No. 98 at 11–15; *see also* Dkt. No. 104 at 3–8. Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *Id.* (quotation omitted). Specifically, to meet its burden of establishing standing, a plaintiff must show it has (i) "suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "At the preliminary injunction stage, [] the plaintiff must make a 'clear showing' that [it] is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22).

Here, Defendants urge that Plaintiffs' "injuries rest on a 'speculative chain of possibilities' that are not clearly traceable to the Proclamation." *See* Dkt. No. 98 at 13 (quoting *Murthy*, 603 U.S. at 70). The Court is not persuaded.[9]

[9] The Court does not address Defendants' argument that Plaintiff Phoenix Doe lacks standing, Dkt. No. 98 at 11–13, because she has voluntarily dismissed her case, Dkt. No. 100.

Defendants argue that the PI Plaintiffs do not allege that they sought, but failed to obtain, an exception to the $100,000 payment for any prospective workers, or adequately allege that they could not hire American workers to fill any vacancies. *See* Dkt. No. 98 at 13–14.

Defendants do not explain why seeking a discretionary exception is a prerequisite to standing. The Proclamation itself states that the decision about whether to waive the new payment is "in the Secretary [of Homeland Security]'s discretion." *See* 90 Fed. Reg. at 46,029 (Section 1(c)). The USCIS guidance that followed likewise explained that such exceptions will be "extraordinarily rare," and turn on the overall interests of the United States rather than those of any specific employer or employee. *See* USCIS H-1B Update. For an employer even to be eligible for such an exception, the Secretary must have "determined that a particular alien worker's presence in the United States as an H-1B worker is in the national interest, that no American worker is available to fill the role, that the alien worker does not pose a threat to the security or welfare of the United States, and that requiring the petitioning employer to make the payment on the alien's behalf would significantly undermine the interests of the United States." *Id.* Neither the Proclamation nor the USCIS guidance, however, explains when a worker's presence in the United States would be in the national interest or under what circumstances requiring the payment of the new fee "would significantly undermine the interests of the United States." *Id.* There is simply no basis in the record for the Court to conclude that any Plaintiff would qualify for and obtain a national interest exception such that some Plaintiffs' failure to seek the exception somehow undermines their standing.

Defendants' reliance on *Murthy v. Missouri* is also misplaced. *See* 603 U.S. at 70. In *Murthy*, the plaintiffs sought to enjoin government agencies from pressuring social media platforms into restricting user speech. *See id.* at 53–54. In holding that the plaintiffs lacked standing, the Supreme Court explained that the plaintiffs' actual injury was "one[] step removed" from the government—the entity they sought to enjoin. *Id.* at 57. The actual suppression of the plaintiffs' speech turned on "the independent action of some third party [*i.e.*, the social media platform] not before the court." *Id.* (quotation omitted). The plaintiffs were also seeking prospective relief, and the Court thus explained that "the plaintiffs must show a substantial risk

that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant." *Id.* at 58. However, the Court noted that the platforms independently had "moderated similar content long before any of the Government defendants engaged in the challenged conduct," consulted with outside experts, and at times pushed back when government officials flagged specific content that did not violate the platforms' policies. *Id.* The existence of a causal chain was thus not the problem, but rather the lack of evidence supporting this causal chain for any individual plaintiff. *See id.* at 62–72.

Not so here. BAE, for example, is a privately held automotive manufacturing company headquartered in Auburn Hills, Michigan. *See* FAC at ¶ 153. BAE alleges that "[r]ecruiting has been a challenge for BAE due to the highly competitive nature of the market in Detroit," and that as a result, it has "hired several employees through the H-1B visa program." *Id.* at ¶ 154. Specifically, and as relevant here, BAE explained that one of its critical employees in the Quality Department had been on H-1B status since 2019. *See id.* at ¶¶ 155–56; *see also* Dkt. No. 75-3 ("Zylka Decl.") at ¶¶ 8–11. Given his integral contributions to the company, BAE began the process of sponsoring him for employer-based permanent residence, and USCIS approved the petition (Form I-140). *See* FAC at ¶ 157. However, the employee is still waiting for an immigrant visa to become available so he can apply for permanent residence status. *Id.* Given the I-140, BAE prepared an H-1B extension petition, but was unable to complete the process before the employee's H-1B status expired, in part because of the government shutdown. *Id.* at ¶¶ 158–59; Zylka Decl. at ¶¶ 10–11. The employee returned to India to avoid being out of status. *See* FAC at ¶ 159.

Any new H-1B visa application for the employee thus appears subject to the $100,000 fee. *See id.* at ¶¶ 160–61. However, BAE recently lost a significant portion of its business and simply cannot afford the fee. *Id.* at ¶ 161. BAE requested a "national interest" exception on November 14, 2025, but has yet to receive a response. See Dkt. No. 101-1 ("Supp. Zylka Decl.") at ¶¶ 3–4. In the meantime, it is suffering harm "due to the importance of [the employee's] role, his tenure with the company, and the respect he has developed within the company." *See* FAC at ¶¶ 160–61; *see also* Zylka Decl. at ¶¶ 14–15. As the company's Chief Financial Officer explained, building

United States District Court
Northern District of California

relationships within the company is especially important because "[p]eople in internal quality control positions often encounter resistance from other employees who are reluctant to admit errors." *See* Zylka Decl. at ¶ 15.

Nephrology Associates, a rural medical practice that serves patients with kidney issues, similarly expressed difficulty in recruiting physicians with the necessary specialized knowledge given its geographic location. *See* FAC at ¶¶ 115–18. The company explained that "[n]early all of [its] physicians have been or are currently on an H-1B visa." *See* Dkt. No. 75-2 ("Waters Decl.") at ¶ 11. Recently, after retaining a recruiting company and a nine-month search, Nephrology Associates only received ten applications for an open physician position, and only one applicant—an Indian physician completing her fellowship in the United States on a J-1 visa—was qualified for the position and willing to accept its terms. *See id.* at ¶ 119. The physician returned to India following completion of her J-1 program and the company filed the H-1B petition, which remains pending. *See id.* at ¶¶ 120–22; Waters Decl. at ¶¶ 16–17. Following the USCIS's additional guidance, Nephrology Associates requested a "national interest" exception. *See* FAC at ¶ 122; Waters Decl. at ¶¶ 18–19. Nephrology Associates has not received a response to its request for an exception, and USCIS indicated that it would not resume processing the case until the company provided evidence either that it paid the $100,000 or received an exception. *See* Waters Decl. at ¶ 19. Nephrology Associates, which operates a small practice in a rural and underserved community, cannot afford to pay the fee. *See id.* at ¶¶ 19–20. Because it has been unable to hire another physician in the interim, the company has had to move patient appointments and delay essential care, and now has a waitlist of approximately 100 new patients.[10] *See id.* at ¶¶ 20, 21.

---

[10] Defendants do not make any standing arguments specific to Global Nurse Force. *See generally* Dkt. No. 98. But relatedly, Global Nurse Force is a company that helps with the recruitment and hiring of international nurses for healthcare facilities, including in the United States under the H-1B visa program. *See* FAC at ¶¶ 33, 124. Global Nurse Force has stated that the Proclamation and the accompanying $100,000 fee "eliminates [its] ability to operate its H-1B placement business in the United States." *See* Dkt. No. 75-7 ("Pattanaik Decl.") at ¶ 15. The company explained that despite the growing and unmet demand for nursing services, their clients have largely paused hiring due to the $100,000 fee. *Id.* at ¶¶ 10–12. For example, the company pointed to one healthcare system in the Washington, D.C. area that, prior to the Proclamation, had successfully hired three H-1B nurses into their operations and identified a need for 60 to 70 additional specialized nurses. *See id.* at ¶ 11. However, after the Proclamation, the healthcare system paused hiring. *Id.*

Contrary to Defendants' assertion, Nephrology Associates' basis for standing does not "depend on the contingency that the pending exception will be denied," or on some "speculative" chain of inferences that its future recruiting efforts will fail. *See* Dkt. No. 98 at 14–15. Rather, the company provided a concrete example of its rigorous recruiting efforts and inability to hire American physicians to fill the position. Nephrology Associates also has been waiting almost a year for a decision on its request for a national interest exception but has not heard anything. *See* Waters Decl. at ¶¶ 19–20. Defendants' indefinite delay does not make Plaintiffs' harm speculative. If that were the case, Defendants could preclude anyone from challenging the Proclamation or Agency Policies by refusing to ever act on a discretionary exception request. The Court declines to adopt an interpretation of standing that could be manipulated this way.

The Court is similarly unpersuaded by Defendants' arguments that Plaintiffs only speculate that they will be unable to fill their existing roles with domestic workers. *See* Dkt. No. 98 at 14–15. Defendants emphasize that Lower Brule Day School, a K–12 school located on a Sioux reservation in rural South Dakota, has only identified "limited vacancies" for the 2026–2027 school year. *Id.* Defendants appear to suggest that a single teaching position could be readily filled even in the absence of the H-1B visa program. But Defendants ignore Lower Brule Day School's detailed discussion of the challenges it has experienced in hiring qualified teachers, especially in special education. *See* FAC at ¶¶ 142–43. For the two positions for the 2026–2027 school year, the school received just ten applications, and all ten candidates are foreign nationals who would require H-1B visa sponsorship. *See* Dkt. No. 101-2 ("Supp. Witte Decl.") at ¶¶ 4–5. The school's superintendent indicated that this is consistent with their prior recruitment efforts: "In the last 5 years, at least 90% of [the school's] applicants for teacher positions have been foreign nationals, and the majority of them have been from abroad." *Id.* at ¶ 5. Ten of the school's 45 teachers are on H-1B visas. *See* Dkt. No. 75-4 ("Witte Decl.") at ¶ 11. Moreover, the school has stated that it is unable to make even one $100,000 payment, as that amount is "approximately twice a starting teacher's salary," which is already "above the median" for the area. *See* Witte Dec. at ¶ 12; Supp. Witte Decl. at ¶ 5.

Similarly, Defendants urge that GVAC has not explained its "belief that [it] could not fill

[its] limited vacancies by focusing [its] efforts to recruit domestically." *See* Dkt. No. 98 at 14. GVAC operates three K–8 tuition-free, public charter schools in Colorado that offer language immersion instruction in various languages. *See* FAC at ¶¶ 34, 145–49. Their learning model is specifically dependent on the use of instructors with native-language skills "who also bring their unique cultural perspectives and competencies from their home countries into the classroom." *See id.* at ¶ 149. Given this model, GVAC estimates that it recruits approximately two to five language teachers each year from around the world, regularly using the H-1B visa process to do so. *See id.* at ¶ 150. For the 2025 to 2026 school year, for example, GVAC hired ten teachers who required H-1B visa sponsorship. *Id.* However, because GVAC is tuition-free, it relies on funding from the State of Colorado, and could not afford to pay even a single $100,000 fee. *Id.* at ¶¶ 151–52. Contrary to Defendants' urging, the fact that GVAC may hire some American workers does not undercut their standing, because they cannot hire enough language teachers with the language and cultural competencies from within the United States to fill their needs.[11] *See id.*; *see also* Dkt. No. 75-6 ("Henderson Decl.").

The Court finds that PI Plaintiffs have standing to challenge the Proclamation and Agency Policies.[12]

**B. Consular Nonreviewability**

Defendants next argue that the Proclamation and resulting Agency Policies are non-justiciable under the doctrine of consular nonreviewability. *See* Dkt. No. 98 at 15–17. Under the doctrine, because the INA "does not authorize judicial review of a consular officer's denial of a visa . . . the federal courts cannot review those decisions." *Dep't of State v. Muñoz*, 602 U.S. 899,

[11] The District of Columbia's footnote in *Chamber of Commerce* about associational standing for cap-subject members is not to the contrary. *See* 815 F. Supp. 3d at 89, n.1. There, the court noted as an aside that only one of the Chamber's cap-subject members identified itself by name, and that member ultimately hired a "domestic," non-H-1B worker for a single open position. *Id.* In contrast, there is nothing in the record to suggest that GVAC has already filled its teacher positions with non-H-1B visa employees.

[12] In their motion to dismiss, Defendants urge that remaining Plaintiffs also lack standing because their injuries are only speculative. *See* Dkt. No. 104 at 3–8. But again, Defendants cite *Murthy* and suggest that Plaintiffs' injuries are dependent on a speculative causal chain. *Id.* The Court simply disagrees with this assessment, particularly at the motion to dismiss stage.

908 (2024).

Citing the Supreme Court, Defendants assert that "the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Id.* at 907 (quoting *Hawaii*, 585 U.S. at 702). Defendants assert that Congress has delegated its "sweeping" authority to the Executive Branch under the INA. *See* Dkt. No. 98 at 15–16 (citing 8 U.S.C. §§ 1182(f) and 1185(a)); *see also Fiallo v. Bell*, 430 U.S. 787, 796 (1977) (noting that "[t]he conditions of entry for every alien . . . have been recognized as matters solely for the responsibility of the Congress and wholly outside the power of this Court to control"). As the Supreme Court has noted, when "Congress [] delegate[s] to executive officials the discretionary authority to admit noncitizens . . . the action of an executive officer to admit or to exclude an alien is final and conclusive." *Muñoz*, 602 U.S. at 907–08. In short, Defendants characterize the Proclamation and Agency Policies as "admission decisions" that are nonreviewable. Dkt. No. 98 at 17.

However, Defendants' argument misses the mark. Plaintiffs are not challenging the manner in which Defendants exercised their discretionary authority to admit or deny noncitizens. Rather, Plaintiffs argue that Defendants *exceeded* any such delegated authority. None of Defendants' cited cases suggest that the consular nonreviewability doctrine applies to shield purported *ultra vires* conduct from judicial review. *Muñoz*, for example, involved a challenge to an individual visa denial. 602 U.S. at 902–18. The respondent—a U.S. citizen—brought a Due Process challenge to the consular officer's denial of her noncitizen husband's visa application. *Id.* at 902. The Court noted that consular nonreviewability barred it from considering any challenge by the noncitizen husband to the consular officer's decision. *See id.* at 908–09. Nevertheless, the Court considered the respondent's constitutional challenge under "a narrow exception" to the doctrine. *Id.* at 909–19 (holding that U.S. citizens do not have a fundamental liberty interest in the admission of a noncitizen spouse). Similarly, in *Knauff v. Shaughnessy*, the petitioner was challenging the Attorney General's order to exclude her without a hearing for security reasons. 338 U.S. 537, 539–41 (1950); *id.* at 543 ("[I]t is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government

to exclude a *given* alien."[13] (emphasis added)).

The Ninth Circuit, on the other hand, has rejected the argument that executive policies and practices, even in the immigration context, are completely unreviewable. *See Washington v. Trump*, 847 F.3d 1151, 1161–62 (9th Cir. 2017). In *Washington*, the plaintiffs challenged an executive order which "ban[ned] for 90 days the entry into the United States of individuals from seven countries." *Id.* at 1156. The government argued that the executive order was unreviewable, relying at least in part on the doctrine of consular nonreviewability. *Id.* at 1161–63 (citing *Kleindienst v. Mandel*, 408 U.S. 753 (1972)). In rejecting this argument, the court emphasized the critical distinction between "the President's *promulgation* of a sweeping immigration policy" and "an executive branch official's decision to issue or deny an individual visa." *Id.* (emphasis in original); *cf. Patel v. Reno*, 134 F.3d 929, 932 (9th Cir. 1997) (considering merits of petitioner's case where they were "challenging the consul's authority to suspend their visa applications, not challenging a decision within the discretion of the consul"). "[E]xercises of policymaking authority at the highest levels of the political branches are plainly not subject to [the doctrine of consular nonreviewability]." *Washington*, 847 F.3d at 1162. To the contrary, "it is beyond question that the federal judiciary retains the authority to adjudicate constitutional challenges to executive action." *Id.* at 1164; *see also id.* at 1163 ("This is no less true when the challenged immigration action implicates national security concerns.").

The Court therefore turns to the substance of Plaintiffs' claims and the motion for preliminary injunction.

### C. Preliminary Injunction Factors

#### i. Likelihood of Success on the Merits

The critical *Winter* factor, and the primary dispute among the parties, is Plaintiffs' likelihood of success on the merits of their claims. *See VidAngel*, 869 F.3d at 856. Plaintiffs

[13] In *Trump v. Hawaii*, the plaintiffs challenged Presidential Proclamation No. 9645, which placed entry restrictions on the nationals of several predominantly Muslim countries. 585 U.S. at 677. Although the government there had urged, as it does here, that the doctrine of consular nonreviewability prevented the Court from considering the case, the Court noted that the INA did not "expressly strip[] the Court of jurisdiction," and "assume[d] without deciding that plaintiffs' statutory claims [were] reviewable." *Id.* at 683–84.

challenge both the President's Proclamation and the Agency Policies as *ultra vires*, and further argue that the Agency Policies violate the APA.

As a threshold issue, and before turning to the substance of these claims, Defendants suggest that the Court lacks the authority to consider any *ultra vires* claim against the President. *See* Dkt. No. 98 at 17–20. Defendants broadly state that the Court lacks any power to enjoin the President. *Id.* at 17–18. And much like their argument about the application of the consular nonreviewability doctrine, Defendants urge that the INA gives the President broad authority, and that this authority is at its apex where, as here, he exercises his discretion in the immigration and national security context. *See id.* at 18–19. They further suggest that the INA "implicitly preclude[s] such review." *Id.* at 19–20.

Courts largely have bypassed such justiciability arguments in similar contexts. The Supreme Court's decision in *Trump v. Hawaii* highlights this approach. 585 U.S. at 683. There, the plaintiffs were also challenging a presidential proclamation that invoked the authority in §§ 1182(f) and 1185(a). *Id.* at 675–80. The Court "assume[d] without deciding that plaintiffs' statutory claims [were] reviewable." *Id.* at 683–84. Noting that "[t]he justiciability of plaintiffs' challenge under the INA presents a difficult question," the Court simply "assume[d] without deciding that plaintiffs' statutory claims are reviewable, notwithstanding consular nonreviewability or any other statutory nonreviewability issue."[14] *Id.* at 683. The District of Columbia in *Chamber of Commerce* also "side-stepp[ed]" such questions and "assume[d] that plaintiffs' claims challenging the Proclamation are justiciable." 815 F. Supp. 3d at 91. Here too, rather than wade into these complex questions in the first instance, the Court addresses Plaintiffs' claims against the Agency Policies first. As Defendants' own authorities indicate, although the Court may not have jurisdiction "to enjoin the President in the performance of his official duties,"

[14] The Court notes that although the Supreme Court reversed and remanded the Ninth Circuit's underlying opinion, the circuit court did directly address these justiciability questions. *See Hawaii v. Trump*, 878 F.3d 662, 678–80 (9th Cir. 2017), *rev'd and remanded*, 585 U.S. 667 (2018). There, the court noted that "[a]lthough the Executive has broad discretion over the admission and exclusion of aliens, that discretion is not boundless," and instead "extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations." *Id.* at 679 (quotation omitted) (cleaned up). "It is the duty of the courts, in cases properly before them, to say where those statutory and constitutional boundaries lie." *Id.* (quotation omitted).

*Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992), "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive," *id.* at 828 (Scalia, J., concurring).

**a. Claims against Agency Defendants**

Plaintiffs bring several claims against Agency Defendants under the APA. The APA requires courts to "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Defendants attempt to shield Agency Defendants from scrutiny, urging that the Agency Policies are not distinct from the Proclamation itself, and thus are unreviewable. *See* Dkt. No. 98 at 20–22, 39–40. Relatedly, they argue that there is no final agency action for purposes of APA review because the Agency Defendants were bound to follow the Proclamation. *Id.* at 22–25. The Court disagrees.

Despite Defendants' efforts to distinguish the case, the Court finds the Ninth Circuit's opinion in *Nebraska v. Su* directly on point. 121 F.4th 1 (9th Cir. 2024). In *Su*, the plaintiffs challenged President Biden's Executive Order 14026, which required federal contractors to pay employees a $15 minimum wage. *Id.* at 5–6. In response, and after notice and comment, the DOL issued a final rule implementing the executive order. *See id.* The plaintiffs sought to challenge both the executive order and the DOL's implementing rule. *Id.* at 6. The court reviewed both the executive order and the DOL's implementing rule, finding that they exceeded the statutory authority Congress provided under the Federal Property and Administrative Services Act ("FPASA"), and that the DOL, in issuing its implementing rule, had violated the APA.[15]

The DOL argued that the APA did not apply to the DOL's rule that implemented the executive order. *See id.* at 14. In rejecting this argument, the Ninth Circuit pointed out that "[n]o language in the APA prevents or excepts review of an agency action that implements a

[15] The Court notes that *Su* also suggests that at least in the Ninth Circuit, *ultra vires* challenges that a President exceeded his statutory authority are viable and such presidential action is reviewable, as the court explicitly found that President Biden had exceeded his statutory authority under the FPASA. *See* 121 F.4th at 7–13. In short, the executive order was not shielded from scrutiny simply because the President had issued it.

presidential action."[16] *Id.* at 15; *cf. City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997) (holding two executive orders were subject to judicial review under the APA). The *Su* court expressed incredulity at the agency's interpretation, concluding that it "would shockingly allow Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen." *Su*, 121 F.4th at 15; *see also id.* at 16 ("To hold as the Government urges would allow presidential administrations to issue agency regulations that evade APA-mandated accountability by simply issuing an executive order first."). The court was also unpersuaded that if such agency action was not exempted from APA review, "agencies would be put in the untenable position of having to follow mandatory executive orders and engage in APA-required deliberation about whether to choose a policy alternative unavailable under the executive order." *Id.* at 16 (quotation omitted). The court dismissed this concern on the ground that "[o]f course, policy justifications cannot supersede statutory text." *Id.* The court thus moved on to determine whether DOL acted arbitrarily and capriciously when it failed to consider alternatives to the $15 minimum wage mandate.[17] *Id.* at 17.

Defendants attempt to distinguish *Su* by arguing that unlike the executive order there, the Proclamation does not give the Agency Defendants any discretion to depart from it. *See* Dkt. No. 98 at 40. The executive order at issue in *Su* stated, *inter alia*, that "[t]he Secretary [of Labor] shall, consistent with applicable law, issue regulations . . . to implement the requirements of this order." *See* 86 Fed. Reg. 22,835, 22,836 (Section 4); *see also Su*, 121 F.4th at 17. But the Agency Defendants here have similarly broad discretion under the Proclamation. Section 2 of the Proclamation states that "[t]he Department of Homeland Security and the Department of State

[16] The Court recognizes that district courts in the District of Columbia have reached different conclusions, but this Court is bound by Ninth Circuit precedent. *Cf. Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 93, 98–105 (D.D.C. 2016); *Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001).

[17] Throughout their briefing and at the hearing, Defendants suggest that because the Proclamation pertains to matters of immigration and invokes national security concerns that it is sui generis. However, nothing in the Ninth Circuit's textual analysis in *Su* suggests that the subject matter of the presidential action matters when determining whether subsequent and implementing agency actions are subject to review under the APA. The APA provides no such limitation, and the Court finds no basis to impose one.

shall coordinate to take *all necessary and appropriate action* to implement this proclamation." *See* 90 Fed. Reg. at 46,029 (Section 2(c)) (emphasis added). The Proclamation also explicitly provides that the $100,000 payment "shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, *in the Secretary's discretion*, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States." *Id.* (Section 1(c)) (emphasis added). Defendants do not offer any reasoned distinction between the discretion provided to the DOL in implementing a $15 minimum wage in *Su* and the discretion provided here to the Agency Defendants, including the Secretary of Homeland Security, in implementing a supplemental payment of $100,000 for H-1B petitions.

At the hearing on the pending motions, Defendants also attempted to distinguish *Su* by arguing that it concerned an executive order rather than a proclamation. *See* Dkt. No. 115 at 45–64. Defendants urged that an executive order, as in *Su*, "is a directive to agencies, but doesn't, by itself, have the force of law." *See id.* at 47:19–25. Executive orders, counsel stated, "rely on agencies to [] implement them." *Id.* at 45:13–16. Defendants argued that the Proclamation here, in contrast, was issued consistent with the authority that Congress delegated to the President under § 1182(f), and had "the force of law" such that the agencies could not "diverge from what the President la[id] out in the proclamation." *Id.* at 45:21–46:2.

Defendants did not offer—and the Court has not found—any support for this distinction. *Su* itself stated that "[n]o language in the APA prevents or excepts review of an agency action that implements a presidential *action*." 121 F.4th at 15 (emphasis added). The Ninth Circuit's reasoning did not turn on the nature of the presidential action: the APA by its terms does not exclude actions implementing presidential proclamations from review any more than it does actions implementing executive orders.[18] Like the Proclamation, which invokes the President's

[18] Although the parties did not brief this specific issue, it is not clear that there is any meaningful distinction between executive orders and presidential proclamations for purposes of APA review. Secondary sources, for example, indicate that "the distinction [between executive orders and presidential proclamations] is not always maintained." *See* 3 Admin. L. & Prac. (3d ed.), *Executive Orders* § 7:31. "Executive orders are presidential directives issued to federal government agencies or officials" that "bind the agencies." *Id.* And "[m]ost executive orders are

statutory authority under § 1182(f), the first line of the executive order in *Su* stated that it invoked "the authority vested in me as President by the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act, 40 U.S.C. 101 *et seq.*" 86 Fed. Reg. 22,835. It is not clear why the INA broadly, or § 1182(f) more specifically, has more "force of law" than the Constitution or the FPASA. The Ninth Circuit has explained elsewhere that a presidential proclamation, also issued pursuant to §§ 1182(f) and 1185(a), did "not have the force of law," and had "little effect" without the agencies' implementing rule. *See East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 659 (9th Cir. 2021), *overruled on other grounds by Arizona All. for Retired Americans v. Mayes*, 186 F.4th 622 (9th Cir. 2026).

In *East Bay Sanctuary*, DOJ and DHS adopted an interim final rule, which "ma[de] migrants who enter the United States in violation of 'a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico' categorically ineligible for asylum." *Id.* at 658 (quoting 83 Fed. Reg. 55,934, 55,952). That same day, President Trump issued a presidential proclamation, invoking §§ 1182(f) and 1185(a), that said "[t]he entry of any alien into the United States across the international boundary between the United States and Mexico is hereby suspended and limited" for a period of 90 days. *See* Presidential Proclamation No. 9822, 83 Fed. Reg. 57,661, 57,663. However, the proclamation stated that this limitation would "not apply to any alien who enters the United States at a port of entry and properly presents for inspection, or to any lawful permanent resident of the United States." *Id.* Together, the rule and the proclamation "stripp[ed] asylum eligibility from every migrant who crosses into the United States between designated ports of entry." *East Bay Sanctuary*, 186 F.4th at 658. In discussing the import of the rule and the proclamation, the Ninth

issued pursuant to specific statutory delegation of authority . . . ." *Id.* Proclamations, on the other hand, "are generally hortatory or declaratory," and "Presidents tend to use proclamations in foreign affairs." *Id.* Under these definitions, the Proclamation at issue here operates like an executive order. The Court also notes that the President has used proclamations for domestic issues as well, such as lifting some prohibitions on commercial fishing operations and providing regulatory relief for coal-fired power plants. *See* Unleashing American Commercial Fishing in the Pacific, 90 Fed. Reg. 16,987 (April 17, 2025); Regulatory Relief for Certain Stationary Sources To Further Promote American Energy, 90 Fed. Reg. 34,583 (July 17, 2025). So the Court sees no reason to treat executive orders as differently than proclamations.

United States District Court
Northern District of California

Circuit explained:

> Individually, the Rule and Proclamation have little effect. The Proclamation *does not have the force of law*, and the Rule only effectuates proclamations. But together, the Rule and Proclamation make asylum entirely unavailable to migrants who enter the country between ports of entry.

*Id.* at 659 (emphasis added). The proclamation in *East Bay Sanctuary*, although similarly issued pursuant to §§ 1182(f) and 1185(a), still relied on the agencies to implement it. *See id.* at 669 ("[T]he Proclamation and Rule together create an 'operative rule of decision' for asylum eligibility that is reviewable by this court."). Here too, there is simply no basis for the Court to conclude that the Agency Policies are unreviewable under the APA on the ground that they implement the Proclamation.

Next, Defendants argue that Plaintiffs cannot challenge the Agency Policies because they do not constitute "final agency action." *See* Dkt. No. 98 at 20–25, 37–38; *see also* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). "[T]wo conditions must be satisfied for agency action to be 'final.'" *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

> First, the action must mark the "consummation" of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

*Id.* (cleaned up).

Although Defendants reference this two-step inquiry, they do not meaningfully grapple with it here. Instead, they repeatedly state that Plaintiffs are, in reality, challenging the Proclamation rather than any agency action or implementation. They urge that none of the Agency Policies impose the $100,000 fee at issue here. *See, e.g.*, Dkt. No. 98 at 22–25. Rather, Defendants assert that the Agency Policies "are merely explanatory, and are therefore not actions," and "at most, the memoranda merely direct the agency personnel to comply with the President's Proclamation . . . ." *See id.* at 23. As discussed above, however, binding Ninth Circuit precedent

precludes the conclusion that the agency's implementation of the Proclamation is shielded from APA review. In *Su*, the DOL's final rule explicitly sought to "establish[] standards and procedures for implementing and enforcing the minimum wage protections of the Executive order." *See* 86 Fed. Reg. at 67,126. It thus "imposed" the $15 hourly minimum wage on federal contractors in the same way that the Agency Policies here impose the $100,000 fee for H-1B visa petitions. To put a finer point on this, the DOL rule considered in *Su* explicitly stated "[t]here is no indication in the Executive order that the Department has authority to modify the amount or timing of the minimum wage requirement . . . ." *Id.* at 67,129. Even still, the court found that the rule was subject to review under the APA. *See Su*, 121 F.4th at 14–17; *accord Am. Fed'n of Gov't Emps. v. Trump*, 139 F.4th 1020, 1038–39 (9th Cir. 2025) (construing memorandum from Office of Management and Budget and Office of Personnel Management to be "final agency action" where it provided "instructions regarding the implementation of [Executive Order 14210]" regarding workforce reductions).

The Ninth Circuit's recent decision in *Pacito v. Trump* does not change this analysis. 169 F.4th 895 (2026). In *Pacito*, the Ninth Circuit reviewed preliminary injunctions prohibiting the enforcement of the President's executive order suspending the entry of certain refugees, as well as the agencies' actions defunding the program. *Id.* As relevant here, the Ninth Circuit considered whether the court could review the agencies' actions under the APA. *See id.* at 930–32. In beginning its discussion, the court emphasized that "[t]he Supreme Court has 'long applied a strong presumption favoring judicial review of administrative action.'" *Id.* at 930 (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)). Consistent with this Court's discussion above, the Ninth Circuit held that APA review did not apply to "the President's decision to suspend entry [of refugees]." *Id.* at 931. However, the court held that the APA challenge to the agencies' defunding decision "stands on different footing," and the effects of terminating funding "flowed from the termination letters issued by [the agencies]." *Id.* Nothing in *Pacito*, however, appears to implicitly or explicitly overturn or limit *Su*.

In light of this backdrop, the Court finds that the Agency Policies here readily satisfy the two-step inquiry in *Bennett v. Spear*. As the court in *Mullin* explained:

> First, Defendants' memoranda, FAQs, and other materials implementing the Proclamation have resulted in a policy imposing a $100,000 payment requirement on H-1B petitions. There is no indication that these actions are "of a merely tentative or interlocutory nature." Second, legal consequences flow out of Defendants' actions. Because of the Policy, employers seeking to hire workers through the H-1B program face a new payment obligation that did not exist before. These agency actions have altered the legal status quo for applicants to the H-1B program. Therefore, Defendants' issuance of the Policy constitutes final agency action.

*Mullin*, 833 F. Supp. 3d at 77 (quoting *Bennett*, 520 U.S. at 178). The Court thus turns to the merits of Plaintiffs' APA claims.

**1. Arbitrary and Capricious Claim**

Plaintiffs allege that the Agency Policies are arbitrary and capricious in violation of the APA. *See* FAC at ¶¶ 235–46; Dkt. No. 75 at 29–33. "To survive review under the arbitrary and capricious standard, an agency's action must have been the result of reasoned decisionmaking." *Pacito*, 169 F.4th at 937 (quotation omitted). Such decisionmaking requires an agency "to consider alternatives" and "give a reasoned explanation for its rejection of such alternatives." *Su*, 121 F.4th at 17 (quotation omitted).

Defendants' primary argument is that the Agency Policies are not subject to arbitrary and capricious review at all because the agencies were merely implementing a presidential directive (*i.e.*, the Proclamation). Dkt. No. 98 at 40–41. Defendants urge that considering alternatives would have required the agencies to "def[y] the H-1B Proclamation or [] consider[] choices they lacked authority to adopt . . . ." Dkt. No. 98 at 40. But as already explained above, the Ninth Circuit rejected this exact argument in *Su*. The court there directly found that "the executive order does not exempt [the agency] from basic APA requirements of reasoned decisionmaking." *Su*, 121 F.4th at 17. And despite the executive order unambiguously requiring a $15 an hour minimum wage, the Ninth Circuit in *Su* nevertheless held that the "DOL acted arbitrarily and capriciously when it overlooked alternatives to the $15 per hour minimum wage mandate," including "modifying the amount of the minimum wage rate, changing the effective date for the wage rate, or phasing in the wage rate over a number of years." *Id.* (cleaned up). Defendants

offer a halfhearted secondary response that "agencies 'are not compelled to explore every alternative device and thought conceivable by the mind of man.'" Dkt. No. 98 at 40 (quoting *DHS v. Regents of the Univ. of Cal*., 591 U.S. 1, 33 (2020)). But although the Supreme Court in *Regents* explained that the agency was not required to consider *all* policy alternatives, the agency "*was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33 (emphasis in original). There is no question here that Agency Defendants failed to consider *any* alternatives or the reliance interests of the regulated parties.[19] As such, Plaintiffs are likely to succeed on their claim that the Agency Policies are arbitrary and capricious.[20]

**2. Failure to Conduct Notice-and-Comment Rulemaking**

Plaintiffs also allege that the Agency Defendants violated (1) the APA by failing to engage in notice-and-comment rulemaking before implementing the Agency Policies; and relatedly, (2) the Regulatory Flexibility Act ("RFA") by failing to prepare an "initial regulatory flexibility analysis" describing the impact of the proposed rule on small businesses. *See* FAC at ¶¶ 248–50

[19] The Court finds it worth noting here that prior to the Proclamation and Agency Policies, Defendants had never increased H-1B fees without advance notice, and had never increased them by anywhere close to this magnitude. For example, USCIS increased the fees for H-1B filers by $1,125 in 2024, and by $10 in 2019. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 89 Fed. Reg. 6,194, 6,363 (Jan. 31, 2024); Registration Fee Requirement for Petitioners Seeking To File H-1B Petitions on Behalf of Cap Subject Aliens, 84 Fed. Reg. 60,307, 60,307 (Nov. 8, 2019).

[20] Defendants briefly cite the Supreme Court's emergency stay order in *Trump v. Orr*, suggesting it undercuts Plaintiffs' arbitrary and capricious argument. 146 S. Ct. 44, 46 (2025). There, the Court stayed a preliminary injunction enjoining the government from enforcing a policy requiring all new passports to display an individual's biological sex at birth. *Id.* In a single sentence, the Supreme Court stated that the plaintiffs were not "likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow." *Id.* The Court is mindful that although this was an emergency order, it remains binding precedent. *See Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring) ("[W]hen this Court issues a decision, it constitutes a precedent that commands respect in lower courts."). But the order offers little insight into the Court's reasoning. Without explanation, the Court cites 22 U.S.C. § 211a, which states that "[t]he Secretary of State may grant and issue passports . . . under such rules as the President shall designate and prescribe for and on behalf of the United States." *Id.* This statutory provision appears to suggest that the agencies have no discretion to deviate from the President's rule. Defendants do not point to a similar provision here, and as already discussed the Proclamation did grant the agencies considerable discretion. Without more, the Court does not read *Orr* as overruling *Su*, or as shielding from APA review all agency actions that follow presidential directives.

(citing 5 U.S.C. §§ 553(b)–(d), and 706(2)(D) and 5 U.S.C. §§ 601 *et seq.*). The Court finds that Plaintiffs have established that they are likely to succeed as to these claims as well.

Under the APA, when promulgating a "legislative rule," an agency must publish a proposed rule and give the public "an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ." 5 U.S.C. § 553(b)–(c). Only after considering relevant materials can the agency finalize the rule. *See* 5 U.S.C. § 553(c). By its terms, § 553 does not apply to "interpretative rules." *See* 5 U.S.C. § 553(b)(A). "[I]nterpretive rules merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule." *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003). "Legislative rules, on the other hand, create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress." *Id.* In other words, a legislative rule has the "force of law." *Id.* (quotation omitted). A rule may have the "force of law" "(1) when, in the absence of the rule, there would not be an adequate legislative basis for enforcement action; (2) when the agency has explicitly invoked its general legislative authority; or (3) when the rule effectively amends a prior legislative rule." *Id.*

Here, Defendants concede that Agency Defendants did not conduct any notice and comment rulemaking or prepare any analysis of the impact of the policies on small businesses. *See* Dkt. No. 98 at 37 (describing notice-and-comment rulemaking as "meaningless" in the face of the Proclamation). Instead, Defendants urge that the Agency Policies are not "legislative rules" because the Proclamation alone has the "force of law," and the policies merely interpreted it. *See* Dkt. No. 98 at 37–38. Without the Agency Policies, however, the $100,000 fee would not be enforceable. The policies provide the necessary contours and limitations for the imposition of the $100,000 fee.

For example, the Proclamation broadly states that "the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under [the H-1B visa program] is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000." *See* 90 Fed. Reg. at 46,028 (Section 1). The Proclamation indicates that it applies prospectively. *See id.* (Section 3). Still, the broad language of Section 1 suggests

that the fee is required not only for new petitions, but also that already-filed or even already-approved petitions must be "supplemented" by a $100,000 payment. The Agency Policies, however, determine who is actually subject to the fee requirement. The USCIS and State Department FAQs, for example, state that the payment would only be required for "new" petitions and would not be required for "H-1B visa renewals." *See* USCIS FAQ and State Dept. FAQ. The Agency Policies also specify how the fee shall be paid (through Pay.gov) and explain how, and under what circumstances, an exception may be sought. *See* USCIS H-1B Update. The Agency Defendants did not simply interpret the Proclamation, but set their own criteria for administering the fee and determining whether to grant exceptions from it. *See id.* (requiring "that a particular alien worker's presence in the United States as an H-1B worker is in the national interest, that no American worker is available to fill the role, that the alien worker does not pose a threat to the security or welfare of the United States, and that requiring the petitioning employer to make the payment on the alien's behalf would significantly undermine the interests of the United States").

The Agency Policies accordingly are most accurately characterized as legislative rules subject to notice-and-comment rulemaking. *Accord Mullin*, 833 F. Supp. 3d at 77 (concluding "it was the agency materials that created rights, assigned duties, and imposed obligations by effectuating the $100,000 payment requirement" (cleaned up)).

Even if the Court finds that the Agency Policies were legislative rules, Defendants argue that exceptions to notice-and-comment rulemaking apply. *See* Dkt. No. 98 at 38–39. Section 553 includes a "good cause" exception. *See* 5 U.S.C. § 553(b)(B). However, to invoke this exception, the agency must "incorporate[] the [good cause] finding and a brief statement of reasons therefor in the rules issued." *Id.* No such finding was made and no statement of reasons was issued. In any event, the good cause exception "is a high bar because it is essentially an emergency procedure." *East Bay Sanctuary*, 993 F.3d at 675 (quotation omitted). Accordingly, to invoke it, "[t]he government must make a sufficient showing that delay would do real harm to life, property, or public safety . . . or that some exigency interferes with its ability to carry out its mission." *Id.* (cleaned up).

Defendants have not met this high bar. They generically assert that it would be

"'impracticable' to announce rulemaking for a temporary one-year Proclamation and allow potential petitioners to quickly apply and avoid the Proclamation altogether." *See* Dkt. No. 98 at 38–39. However, the Proclamation now has been extended another year, undercutting Defendants' temporal argument. To the extent Defendants suggest that harm would result from the delay caused by rulemaking, they simply offer no support for this assertion. The Ninth Circuit rejected an argument in *East Bay Sanctuary* that good cause existed because "[t]he lag period before any regulation, statute, or proposed piece of legislation [would] allow[] parties to change their behavior in response." 993 F.3d at 676. The court reasoned that "[i]f we were to agree with the government's assertion that notice-and-comment procedures increase the potential harm the Rule is intended to regulate, these procedures would often cede to the good-cause exception." *Id.*

Similarly, for the "foreign affairs" exception to apply, *see* 5 U.S.C. § 553(b)(4)(B), "the public rulemaking provisions should provoke definitely undesirable international consequences." *East Bay Sanctuary*, 993 F.3d at 676 (quotation omitted). "Otherwise, the exception would become distended if applied to INS actions generally, even though immigration matters typically implicate foreign affairs." *Id.* (quotation omitted). The exception thus applies only "where the international consequences of the rule-making requirements are obvious or thoroughly explained." *Id.* Defendants have not made any showing of the international consequences flowing from the rulemaking requirements here. They assert that §§ 1182(f) and 1185(a) "inherently deal with foreign affairs functions . . . ." Dkt. No. 98 at 39. But this is clearly insufficient. The international consequences of requiring rulemaking here are no more obvious that they were in *East Bay Sanctuary*, which also involved the invocation of §§ 1182(f) and 1185(a).

Finally, the Court acknowledges that the D.C. district court's decision in *Chamber of Commerce* relied on the D.C. Circuit's harmless error doctrine to reject the plaintiffs' notice-and-comment claim because plaintiffs there had not met their burden to show that, had they been given notice and an opportunity to comment, they could have "mounted a credible challenge" to the agencies' memoranda. *See Chamber of Commerce*, 815 F. Supp. 3d at 111 (cleaned up). In the D.C. Circuit, "the harmless error rule requires the party asserting error to demonstrate prejudice from the error." *Id.* (quotation omitted).

But the Ninth Circuit, in contrast, has held that "[t]he public interest is served by compliance with the APA," and "it does not matter that notice and comment could have changed the substantive result; the public interest is served from the proper process itself." *East Bay Sanctuary*, 993 F.3d at 678 (quoting *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018)). Accordingly, the Ninth Circuit has stated that "[t]he court must exercise great caution in applying the harmless error rule in the administrative rulemaking context." *Azar*, 911 F.3d at 580 (quotation omitted). "The failure to provide notice and comment is harmless only where the agency's mistake clearly had no bearing on the procedure used or the substance of decision reached." *Id.* (cleaned up). The record before the Court does not support such a conclusion.

**ii. Likelihood of Irreparable Injury**

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22.

Defendants argue that the harm to Plaintiffs is purely economic and thus not irreparable because "the Court (in theory) could order the one-time payments returned." *See* Dkt. No. 98 at 41–42. But Defendants ignore Plaintiffs' compelling evidence that they cannot afford to pay the fee in the first place. BAE Industries, for example, could not afford the $100,000 payment for its valued Senior Quality Engineer. *See* Zylka Decl. at ¶ 11. Without this engineer, BAE Industries explained that it would "lose the years of knowledge, experience, and trust that this employee has developed." *Id.* at ¶¶ 12, 14–15. Nephrology Associates, likewise, has suffered a "reduced ability to provide medical services to the local population," as well as "disruption of business operations, and increased workload for existing physicians" because of its inability to pay the $100,000 fee. *See* Waters Decl. at ¶¶ 6–11, 20; *see also* Witte Decl. at ¶¶ 4–5 (describing need for additional teachers but all applicants will require H-1B visa sponsorship); Pattanaik Decl. at ¶¶ 14–15 (describing loss of clients and existential threat to business because of fee). The Court finds that Plaintiffs have shown a likelihood of irreparable harm absent the requested injunction.

**iii. Balance of the Equities and Public Interest**

As for the remaining factors, when the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge. *See*

*Drakes Bay*, 747 F.3d at 1092. According to Defendants, these factors tilt in their favor because the Proclamation is directed at resolving "[t]he large-scale replacement of American workers" which "has undermined both our economic and national security." Dkt. No. 98 at 53. They argue that granting the Plaintiffs relief would "deeply intrude[] into the core concerns of the executive branch." *Id.* at 44. At bottom, Defendants succinctly state their argument: "Every day an injunction is in place, the President loses valuable time to implement his policies." *Id.* Defendants' argument thus collapses into its prior assertion that the Court lacks authority to review the Agency Policies because the Proclamation has the "force of law" and the President is not subject to the APA. But the Court has already addressed these arguments above, and Defendants offer no concrete explanation of the equities or public interest here. On the other hand, and as noted previously, "[t]he public interest is served by compliance with the APA." *Azar*, 911 F.3d at 581. As the Ninth Circuit has explained, "[i]t does not matter that notice and comment could have changed the substantive result; the public interest is served from the proper process itself." *Id.* Particularly given the complex interests at play here, such process is especially critical under the circumstances.[21]

* * *

Accordingly, the Court concludes that the *Winter* factors favor a preliminary injunction. Where a court determines that an agency action is arbitrary and capricious or made "without observance of procedure required by law," the APA authorizes the court to "hold unlawful and set aside" that action. 5 U.S.C. § 706(2)(A), (D). In passing, Defendants suggest that the Court must limit any relief to the PI Plaintiffs. *See* Dkt. No. 98 at 44. But the Ninth Circuit has continued to

[21] To the extent Defendants suggest that in the immigration context agencies are freed from the procedural constraints of the APA, this exception does not appear in the APA itself and seems inconsistent with Ninth Circuit law. In *East Bay Sanctuary*, for example, the DOJ and DHS interim final rule and Presidential Proclamation No. 9822 involved asylum eligibility and entry across the United States-Mexico border. *See* 993 F.3d at 658–59; *see also id.* at 669 ("[T]he Proclamation and Rule together create an operative rule of decision for asylum eligibility that is reviewable by this court." (quotation omitted)). The court ultimately concluded that the "operative rule" was not in accordance with the law, was arbitrary and capricious, and failed to comply with notice-and-comment rulemaking requirements. *See id.* at 669–77. In so finding, however, the court never suggested that a possible cure for any APA violations was for the agencies to simply avoid rulemaking entirely.

United States District Court
Northern District of California

find that vacatur of agency actions found to violate the APA is appropriate and does not implicate the Supreme Court's concerns about "universal injunctions." *See Nat. Grocers v. Rollins*, 157 F.4th 1143, 1170, n.7 (9th Cir. 2025); *cf. Trump v. CASA, Inc.*, 606 U.S. 831 (2025) (staying preliminary injunctions "but only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue"). The Court thus **GRANTS IN PART** Plaintiffs' motion for a preliminary injunction, to the extent they seek vacatur of the Agency Policies. The Court otherwise **DENIES** the motion at this time.

## V. REQUEST FOR BOND AND STAY PENDING APPEAL

Defendants request that "to the extent the Court is inclined to issue a universal preliminary injunction, it should require bond." Dkt. No. 98 at 44–45. Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a . . . temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, district courts have considerable discretion in determining whether the posting of a bond is necessary:

> Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, if any. In particular, the district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.

*Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quotation omitted). Defendants make little effort to explain the likelihood of harm that would occur in light of an injunction. *See* Dkt. No. 98 at 44–45. They suggest that domestic workers will be "replace[d] by foreign labor" and that posting a bond will not impose a financial hardship given Plaintiffs' extensive assets. *Id.* But the Court is simply not persuaded that a bond is necessary where, as here, the Court found that Plaintiffs have shown a likelihood of success on the merits as to the claim that the Agency Defendants failed to comply with the APA's requirements. The Court exercises its discretion and waives any bond requirement under the circumstances.

Defendants also request that this Court should stay any injunction or vacatur pending appeal. Dkt. No. 98 at 45 (citing *Nken*, 556 U.S. at 435). This request is also denied. A stay is

United States District Court
Northern District of California

not appropriate where, as here, Plaintiffs have shown that they are likely to succeed on the merits of their APA claims. *Accord Mullin II*, 183 F.4th at 50–51.

## VI. CONCLUSION

The Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion for preliminary injunction as discussed above. Dkt. No. 75. The Agency Policies are **VACATED** and **REMANDED** to Agency Defendants. Agency Defendants, and all persons acting under their direction, are enjoined from enforcing or implementing the Agency Policies made pursuant to or in implementation of Proclamation No. 10973 and its extension in Proclamation No. 11069, until notice-and-comment rulemaking under the APA and regulatory flexibility analyses under the RFA have been conducted.

The Court **DENIES** the motion to dismiss. Dkt. No. 104. Defendants raise overlapping arguments in their opposition to the motion for preliminary injunction, but as the complexity of the issues discussed above suggests, this is not a case well-suited to a decision at the motion to dismiss stage. The Court further notes that the legal landscape has shifted considerably since Defendants first filed the motion to dismiss, and further briefing may be needed to squarely address any remaining issues.

The Court **DENIES** the related provisional motion to certify the class without prejudice. Dkt. No. 76. Even assuming the requirements of Rule 23(a) and Rule 23(b)(2) are met, it is not clear to the Court why class certification is necessary under the current circumstances. Certification is not required for the Court to enter the requested preliminary injunction, which it has done. Putative Class Members suggested that certification would "ensure[] that any declaratory and injunctive relief [would] apply consistently and fairly to all those affected . . . ." Dkt. No. 102 at 1. But Plaintiffs and any putative class members are now doubly protected: the *Mullin* court already vacated the Agency Policies such that the $100,000 fee is no longer in effect, and the First Circuit declined to stay the vacatur pending appeal. To the extent the Putative Class Plaintiffs believe class treatment is nonetheless still necessary, they may renew their motion for class certification and update their motion in light of current circumstances.

The Court further **SETS** a case management conference on October 27, 2026, at 2:00 p.m.

United States District Court
Northern District of California

The conference will be held by Public Zoom Webinar. All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg. All attorneys and pro se litigants appearing for the case management conference are required to join at least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio capabilities. The parties shall meet and confer and file a joint case management statement by October 20, 2026. The parties should be prepared to discuss a plan for expeditiously resolving this matter in light of the Court's order and the status of *Chamber of Commerce* and *Mullin*.

**IT IS SO ORDERED.**

Dated: 9/30/2026

Haywood S. Gill, Jr.
HAYWOOD S. GILLIAM, JR.
United States District Judge